UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| JOSEPH ABASCIANO, | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | C.A. No. |
| | : | JURY TRIAL DEMANDED |
| | : | |
| CITY OF BOSTON, by and Through | : | |
| Its Treasurer, Ashley Groffenberger; | : | |
| MICHELLE WU; MICHAEL A. COX; | : | |
| PHILLIP OWENS; and | : | |
| JOSEPH COPPINGER, | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT

Plaintiff Joseph Abasciano hereby commences this first amendment retaliation and discrimination action against his former employer the City of Boston and their agents for violations of 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mass. Gen. Laws c. 151B. Plaintiff alleges the following:

### The Parties

1.  Plaintiff JOSEPH ABASCIANO ("Abasciano") is an individual, male person of legal age, who, at all times relevant to this action, was a member of the Boston Police Department, an employee of the City of Boston, and a resident of the state of New Hampshire. Abasciano is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983; an "employee" within the meanings of 42 U.S.C. § 2000e(f); 42 U.S.C. § 12111(4); and Mass. Gen. Laws c. 151B § 1(6); a "qualified individual" within the meaning of 42 U.S.C. § 12111(8); and a "qualified handicapped person" within the meaning of Mass. Gen. Laws c. 151B § 1(16).

2.  Defendant CITY OF BOSTON is a municipal corporation organized under the laws of the Commonwealth of Massachusetts and is being sued by and through its Treasurer Ashley Groffenberger. At all times relevant to this matter, the City of Boston managed, maintained, operated, and controlled the Boston Police Department headquartered at 1 Schroeder Plaza, Boston, MA 02120 where it employed Abasciano. At all times relevant to this action, Defendant City of Boston was an "employer" within the meanings of 42 U.S.C. § 2000e(b); 42 U.S.C. § 12111(5); and Mass. Gen. Laws c. 151B § 1(5), and a "person acting under color of law" within the meaning of 42 U.S.C. § 1983.

3.    Defendant MICHELLE WU ("Wu") is an individual, female person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as its Mayor. At all times relevant to this action, Defendant Wu exercised control over the terms and conditions of Abasciano's employment and had the authority to terminate Abasciano's employment without the need for approval from the Boston City Council. At all times relevant to this action, Defendant Wu was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in her official capacity as Mayor of the City of Boston, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

4.    Defendant MICHAEL A. COX ("Cox") is an individual, male person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as Commissioner of the Boston Police Department.  At all times relevant to this action, Defendant Cox exercised control over the terms and conditions of Abasciano's employment and had the authority to terminate Abasciano's employment without the need for approval from the Boston City Council.  At all times relevant to this action, Defendant Cox was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in his official capacity as Commissioner of the Boston Police Department, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

5.    Defendant PHILLIP OWENS ("Owens") is an individual, male person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as Deputy Superintendent of the Boston Police Department.  At all times relevant to this action, Defendant Cox exercised control over the terms and conditions of Abasciano's employment and had the authority to recommend and institute disciplinary action against Abasciano.  At all times relevant to this action, Defendant Owens was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in his official capacity as Deputy Superintendent of the Boston Police Department, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

6.    Defendant JOSEPH COPPINGER ("Coppinger") is an individual, male person of legal age. Upon information and belief, Defendant Coppinger is a resident of the Commonwealth of Massachusetts.  At all relevant times to this matter, Defendant Coppinger was an employee of the City of Boston and a member of the Boston Police Department.  Defendant Coppinger is being sued personally and in his individual capacity.

## Jurisdiction and Venue

7.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 as Plaintiff and each Defendant are citizens of different states, and the amount in controversy exceeds $75,000.

8.      This Court has federal question jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983; 42 U.S.C. § 2000e et seq.; and 42 U.S.C. § 12101 et seq. pursuant to 28 U.S.C. § 1331.

9.      This Court's exercise of supplemental jurisdiction with respect to Plaintiff's state law claims is warranted because they are so related to Plaintiff's federal claims that they form part of the same case or controversy.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendants have offices, conduct business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred herein.

11.     Personal jurisdiction exists over Defendants in that they maintain sufficient minimal contacts in the Commonwealth of Massachusetts.  Specifically, Defendants engage in systematic and continuous activity in the Commonwealth of Massachusetts.  Moreover, a substantial portion of the actions complained of herein occurred in the Commonwealth of Massachusetts.

## Administrative Procedures

12.     On June 2, 2022, Abasciano filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (the "MCAD") for violations of Mass. Gen. Laws c. 151B (the "MCAD administrative charge"), which was simultaneously filed with the Equal Employment Opportunity Commission (the "EEOC") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. (the "EEOC administrative charge").

13.     On September 19, 2024, Abasciano withdrew the MCAD administrative charge and requested a Right to Sue Letter from the EEOC so he could file this action.

## Factual Allegations

### Abasciano's employment with the Boston Police Department

14.     On June 25, 2007, Abasciano began working as a police officer for the Boston Police Department (the "BPD").

15.     Abasciano graduated at the top of his class at the Boston Police Academy.

16.     During Abasciano's employment with the BPD, he received numerous citations and awards.

17.    For example, Abasciano and a team of officers he worked with at Orchard Park received an award for reducing crime in the area by 74%.

18.    During Abasciano's fourteen years on the BPD, he received no discipline prior to his termination on March 13, 2023.

**Abasciano takes FMLA family leave due to his wife's pregnancy**

19.    In or about September 2020, Abasciano took intermittent family leave under the Family and Medical Leave Act (the "FMLA") to care for his wife, who was pregnant with their third child.

20.    The BPD gave Abasciano a letter dated October 19, 2020 approving intermittent FMLA leave for the time period October 2, 2020 to November 30, 2020.

21.    On November 3, 2020, Abasciano's wife gave birth to their son.

22.    After Abasciano's son was born, he went out on a continuous FMLA leave ("FMLA leave").

23.    The BPD gave Abasciano a letter dated November 23, 2020 approving continuous FMLA leave from November 15, 2020 to January 23, 2021.

24.    When Abasciano was approved for FMLA Leave, the BPD provided him with FMLA paperwork.

25.    The FMLA paperwork did not include a restriction from traveling out of state while on FMLA leave.

26.    The BPD never informed Abasciano that he was prohibited from traveling out of state while on FMLA leave.

27.    The BPD's FMLA policy in place at the time did not prohibit an employee from traveling out of state while on FMLA leave.

**Abasciano travels to Washington, D.C. to attend a Trump rally on January 6, 2021**

28.    On January 5, 2021, Abasciano travelled to Washington, D.C. to attend a Donald Trump rally because of Constitutional issues surrounding the 2020 Presidential election.

29.    Abasciano's hope was not that Vice President Pence would overturn the Presidential election, but rather, that he would put a pause on counting the electors and send the electors back to four states to decide if their individual state's constitutions were followed.

30.    Abasciano's main concern was whether the Constitution was followed correctly.

31. Abasciano attended the rally with another BPD police officer named Jose Diaz ("Diaz") with whom he worked in District 2.

32. Abasciano and Diaz rented a car to travel from Boston to Washington, D.C. and stayed at the Foggy Bottom Marriott.

**The events of January 6, 2021 in Washington, D.C.**

33. On January 6, 2021, Abasciano and Diaz went to hear President Trump speak at the Ellipse, which is a park that abuts the White House.

34. Abasciano went through and passed a TSA-type checkpoint proving that he had no weapons in his possession.

35. Abasciano did not pass any barricades or overturned barricades.

36. President Trump spoke from 1:12 PM to 2:00 PM.

37. Abasciano was not wearing any clothing with BPD insignia on it because it would have been a violation of departmental rules to do so while attending a political rally.

38. Abasciano did not have any BPD equipment with him.

39. Abasciano did not identify himself to anyone that day as a member of the BPD.

40. From the time Abasciano and Diaz left the hotel, to the time they got to the Ellipse, to the time they got to the Capitol area, Abasciano witnessed no violence, no threats of violence, and no law enforcement presence.

41. Abasciano saw no one with a weapon that day.

42. The breach of the Capitol building happened on the opposite side of where Abasciano and Diaz were, and the side of the Capitol they were on was peaceful.

43. Abasciano did not personally witness anyone enter the Capitol building.

44. The only act of violence Abasciano witnessed was a person take some whacks at a window.

45. Abasciano did not take any photos of anyone conducting violent acts.

46. Abasciano did not take any photos of anyone damaging property.

47. Abasciano did not take any pictures of himself at the Capitol, but rather, he only took pictures of the crowd.

48. Abasciano did not enter the Capitol building.

49.     Abasciano did not go on the stairs of the Capitol.

50.     Abasciano did not go in any restricted areas of he Capitol.

51.     Abasciano did not damage any property.

52.     Abasciano did not commit any acts of violence.

53.     Abasciano and Diaz arrived at the Capitol at some time in between 3:15 PM and 3:40 PM.

54.     Abasciano and Diaz were on the road back to Boston by 5:22 PM.

55.     Abasciano and Diaz left the Capitol because they saw one incident where someone was taking whacks at a window, and there was a 6:00 PM curfew in place.

**Twitter[1]**

56.     Twitter is a social media platform with more than 600 million active users worldwide, including some 50.5 million active monthly users in the United States.  Twitter is primarily a platform for real-time updates, news, and brief posts (formerly known as "tweets").

57.     The Twitter platform focuses on short-form content limited to 280 or more characters for general users and is often used for quick, public conversations, debates, and breaking news. Twitter emphasizes public discourse and trending topics, allowing users to share thoughts with the broader world rather than just friends with a more immediate, conversational tone.

58.     Users can follow others without mutual friendship and engage in large-scale conversations around trending topics, but particularly relevant here is that a significant amount of speech posted on the platform is speech by, to, or about political topics such as elections for public office.  Twitter has become a hub for public dialogue, activism, and professional networking.

59.     A Twitter "user" is an individual who has created an account on the platform using an email, phone number, or Apple/Google account.  After signing up, users can choose a username (also called a "handle"), upload a profile photo, and write a bio.  A Twitter user's profile may contain information about the user including their name or it may be anonymous.  Users can follow other users to see their posts in their feed and customize their feed by selecting topics of interest.

60.     A tweet is a post on Twitter, originally limited to 140 characters but now extended to 280 or more for general users.  Premium users (subscribers) may have even more room to post. Users can also attach media like photos, GIFs, videos, or links.

---

[1] Twitter is now known as "X," however, for the purposes of this Verified Complaint, Abasciano will refer to this social media platform as "Twitter."

61.     Users can engage with tweets in several ways: liking (represented by a heart icon), retweeting, replying, or sharing (via direct messages or externally).

62.     Users can reply to tweets, creating conversations.  Replies appear under the original tweet and are visible to anyone who sees that tweet.

63.     Retweeting allows users to share someone else's tweet with their followers. Users can either "retweet" (share without adding anything) or "quote tweet" (share while adding your own comment or opinion).

64.     Users can use hashtags (words or phrases prefixed with the # symbol) to categorize tweets. Clicking on a hashtag lets you see other tweets using the same hashtag, making it easy to follow trends or topics.

65.     Users can control who sees their tweets.  An account can be public (anyone can see the tweets) or private (only approved followers can see the tweets).

**Abasciano's January 6, 2021 tweets**

66.     Abasciano has used the Twitter handle @mailboxjoe since 2014.

67.     On January 6, 2021, the settings on @mailboxjoe were public.

68.     In the profile of @mailboxjoe, Abasciano did not identify himself by name or his status as a Boston police officer.

69.     Abasciano maintained an anonymous Twitter account so he could express his First Amendment rights on political issues without fear of being retaliated against.

70.     Abasciano did not become aware until after January 6, 2021 that some members of the BPD knew that he was the one behind the @mailboxjoe twitter account.

71.     At 5:53 AM, Abasciano sent out the following tweet:

**"@GabrielSterling I can't wait to see you dragged away in handcuffs."**

72.     Abasciano sent this tweet from his hotel room.

73.     The person to whom Abasciano referred in this tweet was Gabriel Sterling ("Sterling"), the Secretary of State for Georgia.

74.     Abasciano sent this tweet because he believed that Sterling had violated the U.S. Constitution.

75.     Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

76.     Abasciano was trying to encourage elected officials to send the electors back to their respective states.

77.     At 6:44 AM, Abasciano sent out the following tweet:

> **"MAGA Millions of Patriots here in DC. Today is a day for choosing. Today there will be only two parties in America. Traitor and Patriots!" #January6 #MAGA #MarchForTrump**

78.     Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

79.     Abasciano borrowed the terms "traitor" and "patriot" from a letter President Ulysses S. Grant wrote to Grant's father at the beginning of the Civil War.

80.     In President Grant's letter to his father, he wrote in pertinent part:

> **Whatever may have been my political opinions before I have but one sentiment now.  That is we have a Government, and laws and a flag and they must all be sustained.  There are but two parties now, Traitors & Patriots and I want hereafter to be ranked with the latter, and I trust, the stronger party.**

81.     Abasciano downloaded a picture of the protesters and included it with his tweet.

82.     Abasciano directed the traitor and patriot comment to the elected officials that would be convening that day in the Joint House of Congress.

83.     Abasciano believed that the elected officials who wanted to delay the certification of the electoral votes were the "patriots" and those that were against it were the "traitors."

84.     At 8:14 AM, Abasciano sent out the following tweet:

> **"Hey @sentemajldr look out your window.  Millions of Patriots are on your doorstep and we are watching.  It is a time for choosing. Are you a traitor or are you a Patriot? #MarchForTrump #StopTheSteal #PatriotParty**

85.     Abasciano directed the tweet to Mitch McConnel, who was the Senate Majority Leader at the time.

86.     Abasciano sent the tweet because he wanted to have his grievances heard as an individual and to address the one who had the Constitutional authority to make those decisions.

87.     Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

88.     Abasciano was nowhere near the Capitol when he sent out this tweet.

89.     At 12:40 PM, Abasciano sent out the following tweet:

**"Everything that happens going forward @ VP is now on your conscience." #1776 Again #MarchForTrump #WeThePeople**

90.     Abasciano was still at the Ellipse when he sent out this tweet.

91.     Abasciano intended to express the opinion that he wanted Vice President Pence to delay the certification of the electoral votes.

92.     When Abasciano tweeted #1776, he intended to invoke the spirit of the Constitution and to send it to like-minded individuals.

93.     When Abasciano wrote #1776 again, he was not advocating for an overthrow of the U.S. government.

94.     Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

95.     Abasciano sent re-tweets at 12:41 PM and 12:42 PM.

96.     Abasciano was not active on Twitter for the next 3 hours and 12 minutes.

97.     During this approximate three-hour period, Abasciano did not check his Twitter feed.

98.     On January 6, 2021, at 3:54 PM, Abasciano sent out the following tweet:

**"I hope you never sleep well again @VP your Treasonous Act led to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @ LLinwood was right about you all along."**

99.     By sending this tweet, Abasciano was condemning law enforcement's shooting of a protester.

100.    A couple of people called Abasciano on his cell phone and informed him that a person at the rally had been shot, but he did not witness it.

101.    There were no signs of violence at the rally until that very end as he was leaving.

102.    On January 6, 2021, at 5:22 PM, Abasciano sent out the following tweet:

**"What I saw today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots v Law Enforcement trying to do their jobs in a no-win position. I fear this Treasonous election has killed the republic."**

103.   By using the term "patriots v. law enforcement," Abasciano meant that there were 100 million people on one side who hate the police and another 100 million that believe they get no justice.

104.   Abasciano was trying to encapsulate a sentiment and a feeling about all of the riots, protests and violence that happened in 2020.

105.   When Abasciano used the term "patriot," he was not referring to those who committed acts of violence at the Capitol.

106.   When Abasciano used the term "law enforcement," he was referring to law enforcement throughout the country.

107.   Abasciano sent this tweet when he was on the road and driving back home.

108.   Abasciano did not become aware that people entered the Capitol until after 6:00 PM when he and Diaz were on the road, and he saw it on Twitter.

109.   Eventually, Abasciano learned that there was a breach inside the Capitol, but he did not witness it, and there were no law enforcement establishing lines or perimeters.

110.   Abasciano only saw one police officer that day, and she was by herself with no tactical support.

111.   Abasciano did not witness a significant law enforcement presence that day.

112.   Abasciano saw a small number of agitators engage in a tug of war.

113.   Abasciano witnessed someone smash a window, but he does not know if that person got into the Capitol building.

114.   Abasciano witnessed people climbing the walls and police officers just standing there and not holding a line or doing crowd control.

115.   Abasciano was concerned people were going to fall and get injured.

116.   Abasciano could see that the crowd was starting to turn, so they started to leave the area.

117.   Abasciano did not engage any law enforcement.

118.   When Abasciano left the Capitol area, he witnessed people acting peacefully.

119.   Abasciano left the Capitol not realizing how much violence had occurred.

120.   Abasciano did not witness any ambulances or fire engines.

121.    Abasciano did not witness any police being carried on a stretcher.

122.    Abasciano did not witness anyone lying on the ground, being struck with rocks or a fire extinguisher or being stampeded.

123.    As Abasciano was walking to his car, he did not witness any sirens, lights or ambulances.

124.    In addition to the six tweets Abasciano sent out on January 6, 2021, he liked and retweeted several tweets denouncing the violence that happened at the Capitol.

**An anonymous person using the Twitter handle @B.Rosa617 complains to the BPD that Abasciano threatened the Vice President and Members of Congress.**

125.    On January 16, 2021, when then-Mayoral candidate Defendant Wu was asked by a news reporter whether she would fire any City of Boston employee who was at the Capitol on January 6, 2021, she stated: "Absolutely."

126.    Defendant Wu is a graduate of Harvard Law School.

127.    Defendant Wu did not clarify or condition her response that her decision to fire an employee would depend on whether the employee entered the Capitol.

128.    On January 19, 2021, an anonymous complaint was made to the BPD through Twitter against Abasciano via the twitter handle @B.Rosa617 (the "B. Rosa complaint").

129.    The B. Rosa tweet provided:

> **@bostonpolice- just a heads up.  A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress.  He and others, have now removed their social media.**

130.    On January 6, 2021, Abasciano deactivated his Twitter account because he was in fear of political retaliation and violence.

131.    Other than the B. Rosa complaint, there was only one other contact that came in through media relations about Abasciano's tweets, but it is unclear if it was a member of the general public or the media.

132.    Abasciano later learned that the person who submitted the B. Rosa complaint is Defendant Joseph Coppinger, who was also a Boston police officer at the time.

**The investigative process at the BPD for complaints against police officers**

133.    The Bureau of Professional Standards at the BPD encompasses the Internal Affairs Department ("IA"), the Anti-Corruption Department ("ACD"), Auditing Review, and Recruiting Investigations.

134.    ACD investigates corruption and criminal matters, while IA investigate rules and procedural violations.

135.    When a case transfers from ACD to IA, the hard file including the close-out report and recording of interviews is transferred and an "Orange Folder" is created.

136.    When a complaint comes in, the executive secretary or assistant meets with the Deputy Superintendent and a rules violation is assigned to the complaint.

137.    IA Pro is a software program or app that the IA uses to track activity in a case.

138.    Whenever a police officer takes custody of an IA file, the BPD protocol is to memorialize it in IA Pro.

139.    One of the purposes of using IA Pro is to track the chain of custody of an IA file.

140.    The internal affairs investigative process begins when the case is assigned to a Sergeant Detective, who collects relevant documentation; conducts interviews of the complainant and necessary witnesses; and drafts an internal affairs report with his/her findings.

141.    The case is then sent to a Lieutenant Detective, the Sergeant Detective's immediate superior.

142.    The Lieutenant Detective can find the allegations "sustained," "un-sustained," "unfounded" or "exonerated."

143.    "Sustained" means that there is proof beyond a preponderance of the evidence that the incident or the alleged violation did occur.

144.    "Un-sustained" means that the BPD was not able to prove or disprove that the actual allegation happened.

145.    "Unfounded" means that the incident did not occur.

146.    "Exonerated" means that the actions did occur, but that they were legal and proper.

147.    If the Lieutenant Detective feels that additional work is needed or wants clarification, he/she could request it, otherwise, he/she drafts a report and provides a recommendation and sends it to the Deputy Superintendent.

148.    If the Deputy Superintendent feels that additional work is needed or wants clarification, he/she could request it, otherwise, he/she either agrees with the report or disagrees by writing a "Non-concurrence letter."

149.    The Deputy Superintendent is not permitted to ask the Lieutenant Detective to change his/her report, but rather, they can only ask them to take another look at it

150.    The next step in the process is that the case is sent to the Superintendent of the Bureau of Professional Standards who follows the same procedure as the Deputy Superintendent.

151.    The next step in the process is that the case is sent to the BPD Legal Department who follows the same procedure at the Deputy Superintendent and Superintendent.

152.    If the BPD Legal Department determines there is a rules violation, then a separate meeting would be held to determine the discipline.

153.    The final step in the process is that the case goes to the BPD Commissioner who would make a determination of whether or not there is a rules violation.

154.    If the Commissioner does not agree with the determination, he/she can send it back to IA for further review.

155.    If the case is sent back down, the normal process is that the complaint is sent to the Deputy Superintendent, who then sends it back to the Sergeant Detective who did the investigation.

156.    It is still an open investigation until the Commissioner signs off on it.

157.    The rules require IA to complete an investigation within one year.

158.    If more time is needed, the BPD can request an extension of time from the Massachusetts POST Commission.[2]

---

[2] The Massachusetts Peace Officer Standards and Training (POST) Commission was established as part of the criminal justice reform legislation enacted in Chapter 253 of the Acts of 2020.  Its mission is to improve policing and enhance public confidence in law enforcement by implementing a fair process for mandatory certification, discipline, and training for all peace officers in the Commonwealth of Massachusetts.

**BPD's Anti-Corruption Department investigates the B. Rosa complaint against Abasciano.**

159.     On January 19, 2021, BPD opened an IA investigation of the B. Rosa complaint against Abasciano.

160.     In Abasciano's case, a civilian named Bridie Brienzi entered the complaint in IA Pro on January 19, 2021.

161.     As of January 19, 2021, Courtney Matthews was the Deputy Superintendent.

162.     The rules violation assigned to the B. Rosa complaint against Abasciano was a potential violation of Rule 102 § 4 – Neglect of Duty/Unreasonable Judgment.

163.     On February 9, 2021, Lieutenant Detective Daly of the ACD interviewed Abasciano.

164.     At this point, the BPD was investigating whether Abasciano had engaged in any criminal activity on January 6, 2021.

165.     The only tweet that ACD interviewers asked Abasciano about at his first interview was the tweet about Attorney Lin Wood.

166.     Abasciano did not intend to condone violence with his tweet about Lin Wood.

167.     Abasciano intended to express the opinion that Lin Wood was correct about not trusting Vice President Pence to do the right thing.

168.     Abasciano did not endorse any violent acts against Vice President Pence.

169.     Abasciano closed down his @mailboxjoe Twitter account on January 6, 2021 or January 7, 2021 and did not reopen it.

170.     Prior to the 2020 election, someone burned a thin blue line flag at Abasciano's home and spray-painted graffiti on Donald Trump signs he had on his lawn.

171.     On March 17, 2021, Lieutenant Detective Daly issued a close-out report providing that "Activity was determined not to exist."

172.     Lieutenant Detective Daly's close-out report concluded that neither Abasciano, nor Diaz were involved in the January 6, 2021 disturbances at the U.S. Capitol and that facial recognition and review of phone records showed no evidence of wrong-doing or inappropriate actions.

173.     On April 21, 2021, ACD interviewed Abasciano a second time – this time by Lieutenant Detective Michael Connolly and Sergeant Detective Leahy.

174.    At the second ACD interview, Abasciano was asked where he was when he sent the first tweet at 5:53 AM.

175.    Abasciano was just waking up at the hotel when he sent that tweet, but does not remember exactly where he was.

176.    The ACD interviewers did not ask Abasciano to explain his motive or intention behind this tweet.

177.    Abasciano was asked where he was when he sent the second tweet at 6:44 AM.

178.    Abasciano does not believe that he left the hotel when he sent this tweet.

179.    The ACD interviewers did not ask Abasciano to explain his motivation or intention behind this tweet.

180.    Abasciano was asked where he was when he sent the third tweet at 8:14 AM.

181.    Abasciano was on the far side of the White House when he sent this tweet.

182.    Abasciano was at the Ellipse when he sent the fourth tweet at 12:40 PM.

183.    On May 3, 2021, Lieutenant Detective Connolly issued a close-out report providing that "Activity was determined not to exist."

184.    Lieutenant Detective Connolly's close-out report concluded that there was no evidence that Abasciano or Diaz were involved in the January 6, 2021 disturbances at the U.S. Capitol.

185.    Abasciano and Diaz's personal phone numbers were given to the FBI, and the FBI did not locate any cell phone tower information that indicated that they were at the U.S. Capitol disturbances.

186.    Lieutenant Detective Connolly's close-out report concluded that Abasciano posted no inappropriate comments about the Vice President on his Twitter account.

187.    On May 3, 2021, ACD closed its investigation into the B. Rosa complaint against Abasciano.

188.    The only tweets that ACD interviewers asked Abasciano to explain were the last two tweets he sent.

189.    No one in ACD asked Abasciano to explain his intentions behind the other four tweets sent earlier in the day.

**Seargeant Detective Rafael Antunez of IA investigates the B. Rosa complaint against Abasciano.**

190.   On May 21, 2021, IA opened an investigation into Abasciano's conduct on January 6, 2021, and the case was assigned to Seargeant Detective Rafael Antunez ("Antunez").

191.   Antunez listened to the audio tapes of Abasciano's first and second ACD interviews and found his testimony to be truthful.

192.   Antunez listened to the audio tapes of Diaz's first and second ACD interviews and found his testimony to be truthful.

193.   On May 25, 2021, Antunez and Seargeant Detective Juana Hernandez conducted an audio-recorded interview of Abasciano.

194.   Interviewers asked Abasciano about his need for FMLA leave and whether he believed that there were restrictions that applied such on not leaving the state.

195.   Interviewers asked Abasciano about the circumstances surrounding the deactivation of his Twitter account.

196.   Interviewers never asked Abasciano about what messages he was intending to convey via the six tweets he sent on January 6, 2021.

197.   On June 23, 2021, Antunez wrote a report summarizing all of the different steps he took in the investigation and the evidence he collected.

198.   Antunez never found any evidence that Abasciano threatened Vice President Pence.

199.   Antunez never found any evidence that Abasciano threatened any members of Congress.

200.   Antunez noted that on January 6, 2021, the BPD did not have a social media policy in place to serve as a guidance for Boston police officers.

**Lieutenant Detective Thomas Lema issues a report finding that the allegations against Abasciano are un-sustained.**

201.   At the time of the Abasciano investigation, Lieutenant Detective Thomas Lema ("Lema") was Antunez's immediate supervisor.

202.   On June 29, 2021, Abasciano's file was forwarded to Lema for review.

203.   On November 16, 2021, Lema issued a report recommending as "Not Sustained" the allegations against Abasciano for violation of BPD Rule 102 § 4.

204.   Lema's report provided that the BPD "does not have a social media policy for employees, on duty or off-duty and as such these tweets did not violate any social media policy."

205.   In formulating his recommendation, Lema considered Abasciano's First Amendment rights under the U.S. Constitution, specifically, whether Abasciano's tweets violated the standard set forth by the U.S. Supreme Court in <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969).

206.   Lema's report concluded that Abasciano posted the tweets on January 6, 2021 as a private citizen.

207.   Lema's report concluded that:  "(Abasciano's) tweets which might be categorized as political rhetoric hyperbole could be considered offensive by some but these rules did not rise to the level of criminality nor call into question his ability or judgment to act as a police officer and would not be considered a violation of BPD rules and regulations."

208.   Lema's report concluded that Abasciano did not violate the BPD's FMLA policy, finding that there are "no distinctive FMLA guidelines or restrictions at the Federal and State levels of government that dictate what a person on paternity leave can and cannot do."

**Lema's Un-sustained finding is adopted by the Deputy Superintendent, the Superintendent, and the BPD Legal Department.**

209.   On November 16, 2021, the Abasciano file was sent to Deputy Superintendent Crispin ("Crispin") for his review.

210.   During Chrispin's two years working in IA, he has reviewed hundreds of reports and has written many non-concurrence letters.

211.   Crispin reviewed the Antunez report and the Lema report; he reviewed some of the tweets; and listened to some of the interviews.

212.   Crispin listened to Abasciano's IA interview and found his testimony to be truthful.

213.   Crispin reviewed the Antunez and Lema reports and found them to be thorough and complete.

214.   Crispin has a law degree.

215.   Crispin believed that none of Abasciano's tweets sent on January 6, 2021 violated any departmental rules.

216. Crispin believed that none of Abasciano's tweets sent on January 6, 2021 amounted to a threat or encouraged or condoned violence.

217. Crispin believed that Abasciano's tweets were protected under BPD Rule 102 § 30 ("Employees shall be permitted to . . . [e]xpress opinions as private individuals on political issues and candidates . . .").

218. Crispin does not believe that Abasciano referring to people as either "patriots" or "traitors" violates BPD rules because it did not necessarily speak to his ability to do his job.

219. Crispin believes whether Abasciano referring to people as either "patriots" or "traitors" violates BPD rules is a subjective opinion.

220. On November 16, 2021, Chrispin agreed with Lema's finding of un-sustained and memorialized his concurrence in IA Pro.

221. Crispin had previously sent an email on August 18, 2021 regarding outstanding IA investigations of promotional candidates for the position of Detective, and he listed Abasciano's case (2021-0021) as "completed."

222. Crispin believes there is no difference between Rule 102 § 3 conduct unbecoming and Rule 102 § 4 neglect of duty, unreasonable judgment other than section 3 applies to conduct off duty while section 4 applies to conduct occurring on duty.

223. On November 19, 2021, Superintendent Sharon Dottin ("Dottin") agreed with Lema's finding of un-sustained.

224. On December 8, 2021, the BPD Legal Department agreed with Lema's finding of un-sustained ("After review I agree with the finding of NOT-SUSTAINED").

**The BPD denies Abasciano efforts to seek a promotion to detective after he suffers work-related injuries to his right knee and left hip.**

225. In January 2021, Abasciano was assigned to the Medically Incapacitated Section (MIS) as a result of work-related injuries to his right knee and left hip.

226. Abasciano's knee injury was an exacerbation of a previous injury he suffered to the same knee in 2014.

227. After Abasciano suffered these injuries, he had some discussion with members of the BPD about retiring on an accidental disability pension, however, Abasciano was reluctant to do so.

228. Rather than retire on accidental disability, Abasciano wanted to pursue a promotion to Detective because it was a less-physically demanding position than Patrol Officer.

229. In September 2021, Abasciano learned there would be a training session in late October for Detective candidates, which was a mandatory step in the promotional process (the "Detectives training").

230. Abasciano had previously sat for a Detective promotional examination in 2018 and scored well above-average on the written and oral parts of the examination, however, he was not promoted.

231. Based on Abasciano's past performance on the Detective promotional examination, he was eligible for the October 2021 Detectives training.

232. On October 13, 2021, the BPD informed Abasciano and others potential candidates that they would not be permitted to attend the Detectives training unless they submitted proof they received the COVID vaccine or tested negative for COVID on a weekly basis.

233. On October 17, 2021, Abasciano emailed Chief of the Bureau of Administration and Techmology Lisa O'Brien ("O'Brien") for guidance because he was unvaccinated and also because he was unable to get tested due to a recent medical procedure.

234. Abasciano mentioned in the email to O'Brien that he was interested in seeking a religious exemption for the COVID vaccine.

235. On October 20, 2021, the BPD posted a list of police officers selected to attend Detectives training, and Abasciano's name was not included on the list.

236. After Abasciano learned that his name was omitted from the list, he emailed Deputy Chief Miller ("Miller") while also copying O'Brien and asked what he needed to do to be included on the Detectives training list, but neither responded to his email.

237. On October 22, 2021, Abasciano went to O'Brien's office in person to follow up on his email.

238. While searching for O'Brien, Abasciano spoke to Miller who asked him if he had mentioned in his email to O'Brien about not being vaccinated.

239. When Abasciano told Miller that he informed O'Brien he was unvaccinated, Miller stated: "I would be careful about who you email about that" or words to that effect.

240. While at the office, Abasciano provided a doctor's note to Claudelyn Valcin, M.D. ("Dr. Valcin") setting forth the accommodations of his disabilities he needed to take the Detectives training, which included lifting and movement restrictions.

241. Dr. Valcin also warned Abasciano to be careful about who he emailed about his vaccination status.

242. O'Brien rejected Abasciano's doctor's note claiming it was inadequate.

243. As a result, Abasciano was forced to obtain a second doctor's note.

244. On October 23, 2021, Abasciano sent an email to O'Brien, Miller, Dr. Valcin and other agents of the BPD inquiring whether he could attend the Detectives training.

245. Dr. Valcin informed Abasciano that she needed to speak with his doctors before the BPD would permit him to attend the Detectives training.

246. On October 26, 2021, O'Brien emailed Abasciano and informed him that Dr. Valcin could not get in touch with his doctors.

247. Despite receiving multiple notes from Abasciano's doctors, the BPD claimed they needed more information about his medical condition and the accommodations he needed.

248. Abasciano emailed the Boston Police Academy seeking a training calendar with a list of different activities so his doctors could review them and recommend the appropriate accommodations.

249. However, the BPD never provided Abasciano with a list of activities that candidates at the Detectives training were required to perform so his doctors could make the necessary recommended accommodations.

250. Eventually Abasciano's doctor reached out to a clerk at Occupational Health named "Gina" to inquire what information the BPD needed in the form of a doctor's note to clear Abasciano for training.

251. Upon information and belief, Gina stated to Abasciano's doctor: "It doesn't matter what you write. [Abasciano] is never going to be cleared for the training" or words to that effect.

252. On October 27, 2021, the BPD refused to allow Abasciano to attend the academic portion of the Detectives training due to "not being medically fit enough."

253. As a result, Abasciano did not attend the Detectives training and never received a promotion to detective.

**The BPD submits an involuntary application for accidental disability retirement on behalf of Abasciano.**

254. On June 30, 2022, BPD Commissioner Gregory Long ("Long") submitted to the Boston Retirement Board an involuntary application for accidental disability retirement benefits on behalf of Abasciano.

255. At the time, Abasciano did not want to retire and preferred to work as a Detective because it was a less-physically demanding position.

**After a year of inactivity, the new BPD Commissioner, Michael A. Cox, sends Abasciano's case to Deputy Superintendent Phillip Owens for a review.**

256. From December 9, 2021 to December 1, 2022, there was no activity in IA Pro for Abasciano's case.

257. IA's investigation into Abasciano's case was not completed with one year of the B. Rosa complaint.

258. Dottin did not request an extension of time from the Massachusetts POST Commission to complete the investigation in Abasciano's case.

259. The newly appointed Commissioner, Michael A. Cox ("Commissioner Cox") also did not request an extension of time from the Massachusetts POST Commission to complete the investigation of Abasciano's case.

260. In the Fall of 2022, Commissioner Cox asked Deputy Superintendent Phillip Owens ("Owens") to review approximately ten IA files that he had in his office telling him: "Take a look at this . . . tell me what you think."

261. After Owens reviewed the ten files, Commissioner Cox then gave him four more IA cases to review including Abasciano's.

262. At the time, Defendant Wu was the Mayor of Boston, having taken office on November 16, 2021.

263. Defendant Wu had previously stated to a news reporter that if she were elected mayor, she would fire any City of Boston employee who was at the Capitol on January 6, 2021.

264.  Owens took physical possession of the four files because he was being transferred to his own office in the IA Department.

265.  One of the IA cases Owens disagreed with involved a police officer named John Danilicki ("Danilicki") where there was a sustained finding for use of force.

266.  Owens did not write a non-concurrence letter in Danilicki's case because Lieutenant Detective Mike Connolly, who wrote the report finding the charges sustained, changed his report after speaking with Owens.

267.  Another IA case that Owens disagreed with involved police officer Brian Augustine ("Augustine").

268.  Owens did not write a non-concurrence letter in Augustine's case because Lt. Det. Timothy Gaughan, who wrote the report finding the charges sustained, changed his report after speaking with Owens.

269.  There was no entry in IA Pro that Owens took physical custody of Abasciano's IA file.

270.  At the time, Owens was aware that the Abasciano case was a high-profile case that was on the news and in the newspapers.

271.  Owens had seen articles in the newspaper and reporting on the news about Abasciano's case.

**Owens' writes a non-concurrence letter in Abasciano's case.**

272.  After reviewing all of the evidence collected by ACD, listening to both of Abasciano's ACD interviews and his IA interview, reviewing Antunez's report and Lema's report, Owens applied the evidence to different BPD rules – Rule 102 § 3 ("Conduct Unbecoming") and Rule 113 § 5 Canons of Ethics (Canon Eight) as opposed to Rule 102 § 4 ("Unreasonable Judgment").

273.  On December 2, 2022, Owens wrote a non-concurrence letter.

274.  Owens never memorialized his activity in IA Pro until he wrote the non-concurrence letter.

275.  Owens believed that Abasciano violated BPD rules because his inflammatory tweets made it appear that he supported the actions that were going on during the riot at the Capitol.

276.  Owens believed that Abasciano violated BPD rules because he used FMLA leave outside of its intended scope because he went to attend a rally in Washington, D.C., several hundred miles away from his home.

277.    Owens knew the FMLA paperwork that the BPD gave Abasciano did not have any specific restrictions on what he could and could not do.

278.    Owens never spoke with Antunez about the report he issued in Abasciano's case.

279.    Owens never spoke with Lema about the report he issued in Abasciano's case.

280.    Owens spoke with Crispin about Abasciano's case, but only regarding the FMLA issue.

281.    Owens spoke with Dottin about Abasciano's case, but only regarding the FMLA issue.

282.    Owens believed that Abasciano's tweets violated the public's trust in the BPD.

283.    Owens believed that Abasciano's tweets negatively impacted the BPD.

284.    Owens believed that Abasciano's comment made in a tweet "Today there will only two parties in America, traitors and patriots" questioned Abasciano's judgment, negatively affected the public trust and the confidence the public has in the BPD.

285.    Owens believed that the "patriot versus traitor" comment crossed the line from being protected under BPD Rule 102 § 30 and a violation of Rule 102 § 3 for conduct unbecoming.

286.    Owens believed that Abasciano was "pitting one side against another" with the "patriot versus traitor comment" and that it was calling into question the public's trust in the BPD.

287.    Owens believed that calling someone who is not patriot to this country, a "traitor," is definitely a problem and that it effects the ability and the efficiency of the BPD to deliver services.

288.    Owens interpreted Abasciano's use of "#1776 again" to mean he was advocating for a revolution.

289.    Owens interpreted Abasciano's use of the term "patriot" in the "patriot versus law enforcement" comment to mean the people who stormed the Capitol on January 6, 2021.

290.    Owens believed that Abasciano's use of the term "patriot" in the "patriot versus law enforcement" comment affected the ability to deliver efficient services to the men and women of the City of Boston; that it reflected poorly on the BPD; and that it violated BPD Rules 113 and 102 § 3.

291.    Owens interpreted Abasciano's deactivation of his Twitter account on January 6, 2021 or the following day to mean that he understood the ramifications of his tweets.

292. At the Boston Police Academy, police officer candidates are taught about the U.S. Constitution and the First Amendment.

293. However, Owens did not do a First Amendment analysis prior to issuing the non-concurrence letter.

294. Owens did nothing to learn about the First Amendment and whether Abasciano's tweets were protected speech prior to issuing the non-concurrence letter.

295. Owens did not contact any lawyers employed by the City of Boston to inquire about the First Amendment prior to issuing the non-concurrence letter.

296. Owens did not do anything independently to find out the identity of B. Rosa and how Abasciano's tweets made their way to the BPD prior to issuing the non-concurrence letter.

297. Owens believed that the protesters went to the Capitol on January 6, 2021 to oppose the election.

298. Owens did not consider whether Abasciano was engaging in political activity when he sent the tweets on January 6, 2021.

299. Owens did not believe that Rule 102 § 30 applied to or protected any of Abasciano's tweets.

300. When Owens wrote the non-concurrence letter, he did not know that Abasciano was quoting Ulysses S. Grant in using the "patriots versus traitor" quote.

301. Owens believed that police officers should not be dividing people into "patriots" and "traitors."

302. Owens did not believe that Abasciano would mistreat people of color because of the patriot versus traitor comment.

303. Owens had a problem with Abasciano referring to the 2020 election as a "treasonous election."

304. Owens did not believe Abasciano was using hyperbole to get his message across.

305. Owens was skeptical that Abasciano would be able to treat members of the public fairly.

306. Owens believed that members of the public would be fearful that Abasciano would treat them unfairly.

307.   Owens believed that services the BPD would not be able to provide because of Abasciano's tweets were the total operations plans such as community service to the public.

308.   Owens did not know which side of the Capitol Abasciano was on – the North or South side and that it did not make a difference to him.

309.   Owens believed the "Lin Wood" tweet violated BPD rules.

310.   Owens believed that any tweet critical of the government after the violence that occurred on January 6, 2021 would be a violation of departmental rules.

311.   Owens never contacted Abasciano and asked him to explain his intention behind the tweets.

312.   Owens believed that when Abasciano was in Washington, D.C. on January 6, 2021, he was not there as a private citizen, but rather, as a member of the BPD.

313.   On January 6, 2021, Abasciano did not post any pictures on social media of people storming the Capitol, breaking windows or committing violent acts and referring to them as "patriots."

314.   At the time, Owens wrote his non-concurrence letter, he was aware that Abasciano liked social media posts denouncing the violence at the Capitol on January 6, 2021.

315.   Owens believed that the #1776 again meant Abasciano was referring to Democrats as "tyrants" and that doing so constituted conduct unbecoming.

316.   Owens believed that Abasciano calling the new President a tyrant was conduct unbecoming.

**Dottin and the BPD Legal Department flip-flop on their prior un-stained findings.**

317.   After Dottin reviewed Owens' non-concurrence letter, she reversed her prior decision and found that the allegations against Abasciano were sustained under different a different BPD rule – conduct unbecoming.

318.   Dottin did not seek any legal advice before she made her sustained decision the second time around.

319.   Dottin made her decision to sustain the finding that Abasciano misused his FMLA leave based on Owens' recommendation after he attended a seminar on the FMLA.

320.   After the BPD Legal Department reviewed Owens' non-concurrence letter, it reversed its prior decision and found that the allegations against Abasciano were sustained under different rules.

321.  From the time the BPD Legal Department signed off on Abasciano's case on December 8, 2021 to the time the BPD Legal Department reversed its decision on December 2, 2022, no new or additional facts were uncovered in Abasciano's case.

322.  Dottin believes that Abasciano's tweets fell within a "gray area" and that whether his speech is protected "could go either way."

323.  Dottin never contacted Abasciano and asked him to explain the six tweets he sent on January 6, 2021.

### A Green Folder Meeting

324.  At a Green Folder meeting, the Deputy Superintendent, the Superintendent, the Commissioner's Chief of Staff, a representative from the Legal Department and a civilian meet to determine the appropriate punishment for a rules violation.

325.  At a Green Folder meeting, comparative evidence of the discipline other officers received for similar conduct is used as a gauge to determine the appropriate discipline.

326.  At a Green Folder meeting, the factors that are considered are:  comparator discipline as close to the offense that is being considered; the officer's disciplinary history; and the severity of the offense.

327.  Comparator discipline is used to ensure that a police officer is disciplined fairly.

### Abasciano's Green Folder Meeting

328.  At Abasciano's Green Folder meeting, it was disclosed that Abasciano had received no prior discipline.

329.  One comparator case that was used at Abasciano's Green Folder meeting involved police officer Michael Geary ("Geary") who was terminated for making the comment "Rats get bats" on the FBI Facebook page when the FBI sought help from the public identifying those who stormed the Capitol on January 6, 2021.

330.  However, Geary also had another IA case where he made insulting comments on social media about Breonna Taylor, a black woman who was shot and killed by the police.

331.  Another comparator case that was used at Abasciano's Green Folder meeting involved police officer Justin Barrett ("Barrett"), who was terminated for making racist comments about Harvard Professor Skip Gates.

332.  Barrett referred to Professor Gates as "a banana-eating, jungle monkey."

333. The Green Folder meeting ended with a recommendation to Commissioner Cox that Abasciano be terminated for misusing FMLA leave and for sending inappropriate tweets on January 6, 2021.

### The BPD terminates Abasciano

334. On January 30, 2023 and February 15, 2023, disciplinary hearings were held before Chief Administrative Hearings Officer Deputy Superintendent Richard Dahill ("Dahill").

335. The specifications (counts) that were heard at the disciplinary hearing were for: I - misuse of FMLA in violation of BPD Rule 102 § 3 (conduct unbecoming); II - tweets that support the riot at the Capitol and call into question his fitness to hold the role of police officer in violation of BPD Rule 102 § 3 (conduct unbecoming); and III -  tweets that support the riot at the Capitol and reflect unfavorably one the BPD in violation of BPD Rule 113 § 5, Canon of Ethics (Canon Eight).

336. On March 7, 2023, Dahill issued a decision finding that Specification I was not sustained, but that Specification II and III were sustained.

337. On March 13, 2023, the BPD fired Abasciano by a letter written by Commission Cox for violation of Rule 102 § 3 (Conduct Unbecoming) and Rule 113 § 5 (Canon of Ethics, Canon Eight) in connection with tweets he sent on January 6, 2021 through his Twitter account @mailboxjoe.

338. In the termination letter, Cox wrote:

> **"I find your social media posts describing individuals that stormed the Capital (sic) building as "patriots" calls into question your ability to police members of the community in an unbiased and objective manner."**

339. However, Commissioner Cox never contacted Abasciano and asked him to explain the six tweets he sent on January 6, 2021.

340. IA was unable to identify the person who made the B. Rosa complaint against Abasciano.

341. The BPD never sought an extension of time from the POST Commission to complete their IA investigation of Abasciano within the one year required under the law.

342. Prior to his termination, Abasciano had never received any discipline.

343. During Abasciano's employment with the BPD, no co-workers ever filed any complaints against him.

344.    There were no Boston police officers who complained about Abasciano's tweets.

345.    There were no Boston police officers who refused to work with Abasciano.

346.    There were no City of Boston employees who complained about Abasciano's tweets.

347.    There were no protests by members of the public because of Abasciano's tweets.

348.    At the time Abasciano sent the tweets on January 6, 2021, the BPD did not have a social medial policy in place.

349.    As of August 16, 2023, the BPD still did not have a social media policy in place.

350.    Defendants' actionable conduct complained of herein proximately caused Abasciano to suffer grave and substantial pecuniary damages, including lost wages, fringe benefits, vacation pay, as well as other pecuniary damages, now, and in the future.

351.    Defendants' actionable conduct complained of herein forced Abasciano to suffer substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a loss of income, fear regarding Abasciano ability to find new suitable employment, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

352.    The conduct of each Defendant warrants the imposition of statutory punitive or exemplary damages, because Defendants intentionally and maliciously and without justification or excuse subjected Abasciano to discriminatory terms and conditions of employment based on his disability and religion, and illegally retaliated against Abasciano for filing administrative charges in the MCAD and EEOC, thereby demonstrating each Defendants' reckless and callous indifference to Abasciano's right to work in an environment free from unlawful discrimination, and demonstrating each Defendants' malice or ill will.

353.    Defendants stand jointly and severally liable to Abasciano for his damages resulting from the Defendants' illegal and wrongful actions complained of herein.

## CLAIMS AGAINST DEFENDANT CITY OF BOSTON

### COUNT I
### FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
### PURSUANT TO A DISABILITY
### VIOLATION OF 42 U.S.C. § 12101 et seq.

354.   Plaintiff hereby incorporates by reference paragraphs 1-353 of this Verified Complaint as though fully set forth herein.

355.   In January 2021, Abasciano was assigned to the Medically Incapacitated Section (MIS) as a result of work-related injuries to his right knee and left hip.

356.   At all times relevant to this action, the physical impairments to Abasciano's right knee and left hip substantially limited one or more of his major life's activities including, but not limited to, the ability to walk, stand, lift, and bend.

357.   In September 2021, Abasciano learned there would be a training session in late October for Detective candidates, which was the mandatory first step in the promotional process (the "detectives training").

358.   On October 20, 2021, the BPD posted a list of police officers selected to attend the Detectives training, and Abasciano's name was not included on the list.

359.   Abasciano submitted two doctor's notes setting forth the accommodations he need to participate in the Detectives training, however, the BPD rejected both doctor's notes.

360.   Despite Abasciano's specific requests, the BPD never provided him with a list of activities that candidates at the Detectives training were required to perform so his doctors could make the necessary recommended accommodations.

361.   On October 27, 2021, the BPD refused to allow Abasciano to attend the academic portion of the Detectives training due to "not being medically fit enough."

362.   As a result, Abasciano did not attend the Detectives training and never received a promotion to Detective.

363.   By refusing to allow Plaintiff to attend the detectives training because of his disabilities and by failing to engage in the interactive process, Defendant violated 42 U.S.C. § 12101 et seq. and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

## COUNT II
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## PURSUANT TO A DISABILITY
## VIOLATION OF MASS. GEN. LAWS c. 151B

364.    Plaintiff hereby incorporates by reference paragraphs 1-363 of this Verified Complaint as though fully set forth herein.

365.    In January 2021, Abasciano was assigned to the Medically Incapacitated Section (MIS) as a result of work-related injuries to his right knee and left hip.

366.    At all times relevant to this action, the physical impairments to Abasciano's right knee and left hip substantially limited one or more of his major life's activities including, but not limited to, the ability to walk, stand, lift, and bend.

367.    In September 2021, Abasciano learned there would be a training session in late October for Detective candidates, which was the mandatory first step in the promotional process (the "detectives training").

368.    On October 20, 2021, the BPD posted a list of police officers selected to attend the Detectives training, and Abasciano's name was not included on the list.

369.    Abasciano submitted two doctor's notes setting forth the accommodations he need to participate in the Detectives training, however, the BPD rejected both doctor's notes.

370.    Despite Abasciano's specific requests, the BPD never provided him with a list of activities that candidates at the Detectives training were required to perform so his doctors could make the necessary recommended accommodations.

371.    On October 27, 2021, the BPD refused to allow Abasciano to attend the academic portion of the Detectives training due to "not being medically fit enough."

372.    As a result, Abasciano did not attend the Detectives training and never received a promotion to Detective.

373.    By refusing to allow Plaintiff to attend the detectives training because of his disabilities and by failing to engage in the interactive process, Defendant violated 42 U.S.C. § 12101 et seq. and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

## COUNT III
## RELIGIOUS DISCRIMINATION
## VIOLATION OF 42 U.S.C. § 2000e-2(a)

374.  Plaintiff hereby incorporates by reference paragraphs 1-373 of this Verified Complaint as though fully set forth herein.

375.  Abasciano did not take the COVID vaccine due to a sincerely held religious belief.

376.  Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief.

377.  After O'Brien learned that the reason Abasciano was unvaccinated was because of his sincerely held religious belief, she stopped responding to his emails.

378.  Shortly after Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief, his name did not appear on the detectives training list, and he was precluded from participating in the Detectives training.

379.  By refusing to allow Plaintiff to attend the detectives training because of his sincerely held religious belief, Defendant violated 42 U.S.C. § 2000e-2(a) and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

## COUNT IV
## RELIGIOUS DISCRIMINATION
## VIOLATION OF MASS. GEN. LAWS c. 151B

380.  Plaintiff hereby incorporates by reference paragraphs 1-379 of this Verified Complaint as though fully set forth herein.

381.  Abasciano did not take the COVID vaccine due to a sincerely held religious belief.

382.  Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief.

383.  After O'Brien learned that the reason Abasciano was unvaccinated was because of his sincerely held religious belief, she stopped responding to his emails.

384.  Shortly after Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief, his name did not appear on the detectives training list, and he was precluded from participating in the Detectives training.

385.   By refusing to allow Plaintiff to attend the detectives training because of his sincerely held religious belief, Defendant violated Mass. Gen. Laws c. 151B and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

## COUNT V
## RETALIATORY DISCHARGE
## VIOLATION OF 42 U.S.C. § 2000e-3(a)

386.   Plaintiff hereby incorporates by reference paragraphs 1-385 of this Verified Complaint as though fully set forth herein.

387.   On June 2, 2022, Abasciano filed the MCAD administrative charge.

388.   On August 8, 2022, Defendant filed a Position Statement with the MCAD.

389.   On November 23, 2022, Abasciano filed a rebuttal in which he alleged for the first time that in 2018, the BPD discriminated against him on the basis of his gender in relation to a Detectives promotional examination.

390.   A member of the BPD told Abasciano that the BPD purposely lowered his and another male police officer's examination scores so that female police officers with lesser experience could be promoted to Detective and, therefore, Abasciano reasonably and in good faith believed that the BPD had violated the law.

391.   Within a few months of the BPD receiving Abasciano's MCAD administrative charge and shortly after receiving his rebuttal alleging gender discrimination, Commissioner Cox sent Abasciano's IA file to Owens for a review after a year of inactivity.

392.   After Owens reviewed Abasciano's IA file, he wrote a non-concurrence letter on December 2, 2022 concluding that Abasciano violated BPD rules.

393.   After Owens wrote a non-concurrence letter, Dottin agreed with his conclusion and signed off on it on December 20, 2022, reversing her previous position that Abasciano violated no BPD rules.

394.   After Owens wrote a non-concurrence letter, the BPD Legal Department agreed with his conclusion and signed off on it on December 21, 2022, reversing its previous position that Abasciano violated no BPD rules.

395.   Shortly thereafter, a Green Folder meeting took place where the BPD Legal Department recommended Abasciano's termination, which was ultimately adopted by Commissioner Cox on March 13, 2023.

396.    Despite Abasciano's performance of his assigned duties in an exemplary and professional manner at all times during the course of his employment with Defendant, because he participated in protected conduct by filing an MCAD administrative charge and alleging gender discrimination in a rebuttal, Defendant unlawfully terminated Abasciano's valuable employment in violation of 42 U.S.C. § 2000e-3(a), and as a direct and proximate result of such illegal conduct, Abasciano has suffered grave and substantial damages, wherefore Defendants stands joint and severally liable to Abasciano for the damages more fully alleged in paragraphs 350-352 above.

## COUNT VI
## RETALIATORY DISCHARGE
## VIOLATION OF MASS. GEN. LAWS c. 151B

397.    Plaintiff hereby incorporates by reference paragraphs 1-398 of this Verified Complaint as though fully set forth herein.

398.    On June 2, 2022, Abasciano filed the MCAD administrative charge.

399.    On August 8, 2022, Defendant filed a Position Statement with the MCAD.

400.    On November 23, 2022, Abasciano filed a rebuttal in which he alleged for the first time that in 2018, the BPD discriminated against him on the basis of his gender in relation to a Detectives promotional examination.

401.    A member of the BPD told Abasciano that the BPD purposely lowered his and another male police officer's examination scores so that female police officers with lesser experience could be promoted to Detective and, therefore, Abasciano reasonably and in good faith believed that the BPD had violated the law.

402.    Within a few months of the BPD receiving Abasciano's MCAD administrative charge and shortly after receiving his rebuttal alleging gender discrimination, Commissioner Cox sent Abasciano's IA file to Owens for a review after a year of inactivity.

403.    After Owens reviewed Abasciano's IA file, he wrote a non-concurrence letter on December 2, 2022 concluding that Abasciano violated BPD rules.

404.    After Owens wrote a non-concurrence letter, Dottin agreed with his conclusion and signed off on it on December 20, 2022, reversing her previous position that Abasciano violated no BPD rules.

405.    After Owens wrote a non-concurrence letter, the BPD Legal Department agreed with his conclusion and signed off on it on December 21, 2022, reversing its previous position that Abasciano violated no BPD rules.

406.     Shortly thereafter, a Green Folder meeting took place where the BPD Legal Department recommended Abasciano's termination, which was ultimately adopted by Commissioner Cox on March 13, 2023.

407.     Despite Abasciano's performance of his assigned duties in an exemplary and professional manner at all times during the course of his employment with Defendant, because he participated in protected conduct by filing an MCAD administrative charge and alleging gender discrimination in a rebuttal, Defendant unlawfully terminated Abasciano's valuable employment in violation of 42 U.S.C. § 2000e-3(a), and as a direct and proximate result of such illegal conduct, Abasciano has suffered grave and substantial damages, wherefore Defendants stands joint and severally liable to Abasciano for the damages more fully alleged in paragraphs 350-352 above.

## COUNT VII
## FIRST AMENDMENT RETALIATION
## VIOLATION OF 42 U.S.C. § 1983

408.     Plaintiff hereby incorporates by reference paragraphs 1-407 of this Verified Complaint as though fully set forth herein.

409.     At all relevant times to this matter, Abasciano was employed by a public employer.

410.     On January 6, 2021, Abasciano sent out six tweets on Twitter concerning matters of a public concern — the 2020 Presidential election (the "January 6, 2021 tweets").

411.     Abasciano sent the January 6, 2021 tweets as a private person outside of the workplace.

412.     In Abasciano's Twitter profile, he did not identify himself as a police officer.

413.     In Abasciano's Twitter profile, he did not identify himself as a member of the BPD.

414.     In Abasciano's Twitter profile, he did not identify himself as an employee of the City of Boston.

415.     In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his workplace, supervisors or co-workers.

416.     In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his position as a police officer, the BPD or the City of Boston.

417.     By making the January 6, 2021 tweets, Abasciano was speaking as a citizen on matters of public concern.

418.     The January 6, 2021 tweets are political speech protected under the First Amendment to the United States Constitution.

419.     No BPD police officer ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

420.     No BPD police officer ever refused to work with Abasciano or requested that they not be assigned to work with him because of the January 6, 2021 tweets.

421.     No City of Boston employee ever complained to the BPD or to the City of Boston about the January 6, 2021 tweets.

422.     No member of the public ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

423.     There were no protests at the BPD or in the City of Boston about the January 6, 2021 tweets.

424.     On March 13, 2023, the City of Boston, terminated Abasciano via a termination letter issued by Cox.

425.     Abasciano's speech was a substantial or motivating factor in the City of Boston's decision to terminate him because Owens testified under oath that had Abasciano not sent the January 6, 2021 tweets, he would not have been terminated.

426.     Because there were no complaints by any police officers, City of Boston employees or members of the public about the January 6, 2021 tweets in which Abasciano commented upon matters of public concern, the efficiency of the public services the City of Boston performs through the BPD — preventing crime, protecting and serving the community, and upholding the laws of the city, state, and country — was not disrupted in any way.

427.     Accordingly, Abasciano's speech outweighed any interest that the City of Boston had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the City of Boston did not have an adequate justification for terminating Abasciano.

428.     Furthermore, any prediction The City of Boston made that the January 6, 2021 tweets would impair the operation of the BPD or damage the BPD's reputation and trust within the community was not reasonable.

429.     The BPD Commissioner is the executive head of the BPD and is responsible for the management, planning, direction, and control of the BPD.

430.     At all times relevant to this matter, the disciplinary process at the BPD is that police officers cannot be disciplined, including terminated, unless the BPD Commissioner ratifies it.

431.     As Deputy Superintendent, Owens was in a position to influence Cox, who had the final say in terminating Abasciano.

432.   Owens has testified under oath that the reason the City of Boston terminated Abasciano is because he divides people into "patriots" and "traitors" and, therefore, he is unfit to perform the duties of a police officer.

433.   However, this reason is not credible and, thus evidence of pretext for the true reason for Abasciano's termination, which is because he expressed controversial political opinions about the 2020 Presidential election via the January 6, 2021 tweets.

434.   When the City of Boston terminated Abasciano, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

435.   The March 13, 2023 termination letter issued by Cox provided that Abasciano was terminated because of his "social media posts."

436.   And because Abasciano's injury was caused by a person with final policymaking authority – Cox, who was the Commissioner of the BPD at the time – the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, the City of Boston is liable.

437.   Defendants conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff has been harmed thereby.

## COUNT VIII
## DEFAMATION

438.   Plaintiff hereby incorporates by reference paragraphs 1-437 of this Complaint as though fully set forth herein.

439.   On March 13, 2023, Cox issued a termination letter to Abasciano.

440.   In the termination letter, Cox wrote:  "I find your social media posts describing individuals that stormed the Capital building as 'patriots' calls into question your ability to police members of the community in an unbiased and objective manner."

441.   However, Abasciano never wrote in any of his tweets that the individuals who stormed the Capital were "patriots"  and, therefore, Defendant Cox's statement was made with knowledge that it was false.

442.   Defendant Cox made the defamatory comment with an improper motive.

443.   Defendant Cox made the defamatory comment with reckless disregard for its truth.

444.   Defendant Cox made the defamatory comment with malice.

445.   Defendant Cox's defamatory comment was published to others inside the BPD.

446. Defendant Cox's defamatory comment was eventually reported in the media.

447. Defendant Cox's statement that Abasciano described individuals that stormed the Capital building as "patriots" is incompatible with Abasciano's profession as a police officer and has caused severe damage to both his professional and personal reputations.

448. When Defendant Cox signed the March 13, 2023 termination letter, he was acting within the scope of his employment as Commissioner of the BPD and, therefore, Defendant City of Boston is vicariously liable for his actions.

WHEREFORE, Plaintiff has been harmed thereby.

### CLAIMS AGAINST DEFENDANTS MICHELLE WU, MICHAEL A. COX, AND PHILLIP OWENS

### COUNT IX
### VIOLATION OF 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION

449. Plaintiff hereby incorporates by reference paragraphs 1-448 of this Complaint as though fully set forth herein.

450. At all relevant times to this matter, Abasciano was employed by a public employer.

451. On January 6, 2021, Abasciano sent out six tweets on Twitter concerning matters of a public concern — the 2020 Presidential election (the "January 6, 2021 tweets").

452. Abasciano sent the January 6, 2021 tweets as a private person outside of the workplace.

453. In Abasciano's Twitter profile, he did not identify himself as a police officer.

454. In Abasciano's Twitter profile, he did not identify himself as a member of the BPD.

455. In Abasciano's Twitter profile, he did not identify himself as an employee of the City of Boston.

456. In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his workplace, supervisors or co-workers.

457. In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his position as a police officer, the BPD or the City of Boston.

458. By making the January 6, 2021 tweets, Abasciano was speaking as a citizen on matters of public concern.

459.    The January 6, 2021 tweets are political speech protected under the First Amendment to the United States Constitution.

460.    No BPD police officer ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

461.    No BPD police officer ever refused to work with Abasciano or requested that they not be assigned to work with him because of the January 6, 2021 tweets.

462.    No City of Boston employee ever complained to the BPD or to the City of Boston about the January 6, 2021 tweets.

463.    No member of the public ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

464.    There were no protests at the BPD or in the City of Boston about the January 6, 2021 tweets.

465.    On March 13, 2023, the City of Boston, terminated Abasciano via a termination letter issued by Defendant Cox.

466.    Abasciano's speech was a substantial or motivating factor in the City of Boston's decision to terminate him because Defendant Owens testified under oath that had Abasciano not sent the January 6, 2021 tweets, he would not have been terminated.

467.    Because there were no complaints by any police officers, City of Boston employees or members of the public about the January 6, 2021 tweets in which Abasciano commented upon matters of public concern, the efficiency of the public services the City of Boston performs through the BPD — preventing crime, protecting and serving the community, and upholding the laws of the city, state, and country — was not disrupted in any way.

468.    Accordingly, Abasciano's speech outweighed any interest that the City of Boston had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the City of Boston did not have an adequate justification for terminating Abasciano.

469.    Furthermore, any prediction The City of Boston made that the January 6, 2021 tweets would impair the operation of the BPD or damage the BPD's reputation and trust within the community was not reasonable.

470.    Defendant Owens has testified under oath that the reason the City of Boston terminated Abasciano is because he divides people into "patriots" and "traitors" and, therefore, he is unfit to perform the duties of a police officer.

471.    However, this reason is not credible and, thus evidence of pretext for the true reason for Abasciano's termination, which is because he expressed controversial political opinions about the 2020 Presidential election via the January 6, 2021 tweets.

472.   When the City of Boston terminated Abasciano, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

473.   The March 13, 2023 termination letter issued by Defendant Cox provided that Abasciano was terminated because of his "social media posts."

474.   On January 16, 2021, when then-Mayoral candidate Defendant Wu was asked by a news reporter whether she would fire any City of Boston employee who was at the Capitol on January 6, 2021, she stated: "Absolutely."

475.   Defendant Wu did not clarify or condition her response that her decision to fire an employee would depend on whether the employee entered the Capitol.

476.   Defendant Wu is a graduate of Harvard Law School and, therefore, it logically follows that she knew or should have known that the January 6, 2021 tweets were protected speech and that firing Abasciano would violate his First Amendment rights.

477.   Prior to terminating Abasciano on March 13, 2023, Defendants Cox and Owens were aware that the January 6, 2021 tweets constituted protected speech under the First Amendment to the United States Constitution because Lema's report included a First Amendment analysis, specifically, whether Abasciano's tweets violated the standard set forth by the U.S. Supreme Court in Brandenburg v. Ohio, 395 U.S. 444 (1969).

478.   Defendants Cox and Owens read Lema's report and, therefore, they knew or reasonably should have known that Abasciano as a citizen possessed constitutionally-protected rights to be free from retaliatory treatment by them and Defendant City of Boston even if Abasciano vigorously exercised his right to free speech.

479.   It was not objectively reasonable for Defendants to believe that they and Defendant City of Boston's unconstitutional, wrongful, tortious and negligent course of conduct concerning Abasciano was legally permissible in light of legal rules in existence at the time of the conduct.

480.   It was not objectively reasonable for Defendants to believe that their actions were permissible under law.

481.   Defendants are not entitled to immunity or qualified immunity regarding their unconstitutional, wrongful, tortious and negligent course of conduct concerning Abasciano complained of herein while acting under color of state law, because their conduct was clearly prohibited by federal law at the time, and it was clearly prohibited by reference to common standards of fairness, fair play and due process, and it was objectively and legally unreasonable in light of the legal rules clearly established at the time of the conduct.

482. Defendants stand personally liable to Abasciano pursuant to 42 U.S.C. § 1983 based upon their personal involvement and direct participation in the unconstitutional course of conduct concerning Abasciano complained of herein while acting under color of law and under pretense of law.

483. Defendants' conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

484. The public interest has been harmed by the Defendants' unlawful actions against Abasciano.

WHEREFORE, Plaintiff has been harmed thereby.

## CLAIMS AGAINST DEFENDANT JOSEPH COPPINGER

### COUNT X
### INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP

485. Plaintiff hereby incorporates by reference paragraphs 1-484 of this Complaint as though fully set forth herein.

486. In January 2021, Abasciano had a business relationship or contemplated contract of economic benefit with Defendant City of Boston.

487. Defendant Coppinger was aware of Abasciano's business relationship or contemplated contract of economic benefit with Defendant City of Boston as evidenced by the fact that in the B. Rosa Complaint he references Abasciano as one of the BPD's off duty officers ("A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress. . . ").

488. Defendant Coppinger interfered with Abasciano's business relationship or contemplated contract of economic benefit with Defendants City of Boston by intentionally misrepresenting to the BPD that Abasciano had threatened Vice President Pence and members of Congress and by only submitting three of Abasciano's six tweets so the BPD could not appreciate the proper context of his tweets.

489. Defendant Coppinger's interference with Abasciano's business relationship or contemplated contract of economic benefit with Defendant City of Boston was through improper motive or means because he disapproved of Abasciano's unpopular, political speech and, thus, wanted to see him punished by his employer.

490. As a direct and proximate result of Defendant Coppinger's conduct, Abasciano lost an advantageous business relationship with Defendant City of Boston when he was terminated form his position, thereby suffering severe economic losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JOSEPH ABASCIANO prays that this Honorable Court grant him the following relief:

1.      An order directing Defendant City of Boston to place Plaintiff in the position Plaintiff would have occupied but for Defendants' unlawful treatment of Plaintiff, and make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful treatment, including, but not limited to, lost wages, employment benefits, including an order requiring that Defendant reinstate Plaintiff to an appropriate position without further violation of his rights or retaliation;

2.      A finding that the Defendants stands joint and severally liable to make Plaintiff whole for all damages suffered as a result of the wrongful acts and omissions alleged in each Count herein, including inter alia damages for personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, extreme and severe emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a damage to his professional and personal reputations, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses;

3.      A finding that the Defendants stand joint and severally liable to Plaintiff for the imposition of statutory exemplary or punitive damages, because Defendants intentionally and maliciously and without justification or excuse illegally discriminated against Plaintiff on the basis of his religion and disability and retaliated against him for engaging in protected conduct, thereby demonstrating Defendants' reckless and callous indifference to Plaintiff's right to work in an environment free from unlawful discrimination, and demonstrating Defendants' malice or ill will;

4.      An order declaring that the acts and practices complained of herein are in violation of 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mass. Gen. Laws c. 151B.

5.      A permanent injunction against Defendants prohibiting future acts of discrimination against Plaintiff and similarly-situated employees;

6.      An order enjoining and permanently restraining Defendants from further violations of the 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mass. Gen. Laws c. 151B.

7.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

8.      A finding that the doctrine of qualified immunity is inapplicable to Defendants Wu, Cox, and Owens and that they are personally liable to Abasciano;

9. A finding that Defendants stand joint and severally liable to Plaintiff for an award of his reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-trial hearing to determine the amount of Plaintiff's reasonable attorneys' fees taxable to Defendants, along with a determination of Plaintiff's litigation costs and expenses taxable to Defendants;

10. An appropriate award of pre-judgment interest at the state rate of twelve percent (12%) per annum on all sums recovered; and

11. Such other and further relief as this Court deems just and proper.

### Demand for Jury Trial

Plaintiff claims trial by jury on all issues so triable.

### VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this **18**th day of October, 2024.

_____
JOSEPH ABASCIANO

Plaintiff
JOSEPH ABASCIANO
By His Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (MA BBO#: 657622)

LAW OFFICE OF MARK P. GAGLIARDI
56 Pine Street, Suite 200
Providence, RI 02903
(401) 277-2030 (office)
(401) 487-6666 (cell)
(401) 274-2780 (fax)
mark@markgagliardilaw.net

Date:  October 18, 2024