UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| JOSEPH ABASCIANO, | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | C.A. No. 1:24-cv-12654-ADB |
| | : | JURY TRIAL DEMANDED |
| | : | |
| CITY OF BOSTON, by and Through | : | |
| Its Treasurer, Ashley Groffenberger; | : | |
| MICHELLE WU; MICHAEL A. COX; | : | |
| PHILLIP OWENS; and | : | |
| JOSEPH COPPINGER, | : | |
| Defendants. | : | |

**AMENDED VERIFIED COMPLAINT**

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure and by the written consent of counsel of the opposing parties, Plaintiff Joseph Abasciano hereby amends the Verified Complaint filed on October 18, 2024 (ECF Doc. No. 1) for first amendment retaliation and discrimination against his former employer the City of Boston and their agents for violations of 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mass. Gen. Laws c. 151B. Plaintiff alleges the following:

**The Parties**

1. Plaintiff JOSEPH ABASCIANO ("Abasciano") is an individual, male person of legal age, who, at all times relevant to this action, was a member of the Boston Police Department, an employee of the City of Boston, and a resident of the state of New Hampshire. Abasciano is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983; an "employee" within the meanings of 42 U.S.C. § 2000e(f); 42 U.S.C. § 12111(4); and Mass. Gen. Laws c. 151B § 1(6); a "qualified individual" within the meaning of 42 U.S.C. § 12111(8); and a "qualified handicapped person" within the meaning of Mass. Gen. Laws c. 151B § 1(16).

2. Defendant CITY OF BOSTON is a municipal corporation organized under the laws of the Commonwealth of Massachusetts and is being sued by and through its Treasurer Ashley Groffenberger. At all times relevant to this matter, the City of Boston managed, maintained, operated, and controlled the Boston Police Department headquartered at 1 Schroeder Plaza, Boston, MA 02120 where it employed Abasciano. At all times relevant to this action, Defendant City of Boston was an "employer" within the meanings of 42 U.S.C. § 2000e(b); 42 U.S.C. § 12111(5); and Mass. Gen. Laws c. 151B § 1(5), and a "person acting under color of law" within the meaning of 42 U.S.C. § 1983.

3.      Defendant MICHELLE WU ("Wu") is an individual, female person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as its Mayor. At all times relevant to this action, Defendant Wu exercised control over the terms and conditions of Abasciano's employment and had the authority to terminate Abasciano's employment without the need for approval from the Boston City Council. At all times relevant to this action, Defendant Wu was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in her official capacity as Mayor of the City of Boston, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

4.      Defendant MICHAEL A. COX ("Cox") is an individual, male person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as Commissioner of the Boston Police Department.  At all times relevant to this action, Defendant Cox exercised control over the terms and conditions of Abasciano's employment and had the authority to terminate Abasciano's employment without the need for approval from the Boston City Council.  At all times relevant to this action, Defendant Cox was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in his official capacity as Commissioner of the Boston Police Department, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

5.      Defendant PHILLIP OWENS ("Owens") is an individual, male person of legal age, who, at all times relevant to this action, was an employee of the City of Boston and served as Deputy Superintendent of the Boston Police Department.  At all times relevant to this action, Defendant Cox exercised control over the terms and conditions of Abasciano's employment and had the authority to recommend and institute disciplinary action against Abasciano.  At all times relevant to this action, Defendant Owens was a "person acting under color of law" within the meaning of 42 U.S.C. § 1983 and is named as a defendant in this action, individually, and in his official capacity as Deputy Superintendent of the Boston Police Department, who actively participated in, and stands responsible for the unconstitutional, wrongful, tortious and negligent acts, errors and omissions complained of herein.

6.      Defendant JOSEPH COPPINGER ("Coppinger") is an individual, male person of legal age. Upon information and belief, Defendant Coppinger is a resident of the Commonwealth of Massachusetts.  At all relevant times to this matter, Defendant Coppinger was an employee of the City of Boston and a member of the Boston Police Department.  Defendant Coppinger is being sued personally and in his individual capacity.

**Jurisdiction and Venue**

7.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 as Plaintiff and each Defendant are citizens of different states, and the amount in controversy exceeds $75,000.

8.      This Court has federal question jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983; 42 U.S.C. § 2000e et seq.; and 42 U.S.C. § 12101 et seq. pursuant to 28 U.S.C. § 1331.

9.      This Court's exercise of supplemental jurisdiction with respect to Plaintiff's state law claims is warranted because they are so related to Plaintiff's federal claims that they form part of the same case or controversy.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendants have offices, conduct business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred herein.

11.     Personal jurisdiction exists over Defendants in that they maintain sufficient minimal contacts in the Commonwealth of Massachusetts. Specifically, Defendants engage in systematic and continuous activity in the Commonwealth of Massachusetts. Moreover, a substantial portion of the actions complained of herein occurred in the Commonwealth of Massachusetts.

**Administrative Procedures**

12.     On June 2, 2022, Abasciano filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (the "MCAD") for violations of Mass. Gen. Laws c. 151B (the "MCAD administrative charge"), which was simultaneously filed with the Equal Employment Opportunity Commission (the "EEOC") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. (the "EEOC administrative charge").

13.     On September 19, 2024, Abasciano withdrew the MCAD administrative charge and requested a "Right to Sue Letter" from the EEOC so he could file this action.

14.     On October 31, 2024, the EEOC issued a Right to Sue Letter, a copy of which is attached hereto as Exhibit "A."

15.     Abasciano has performed all conditions precedent to filing his Chapter 151B and Title VII claims.

### Factual Allegations

### Abasciano's employment with the Boston Police Department

16.     On June 25, 2007, Abasciano began working as a police officer for the Boston Police Department (the "BPD").

17.     Abasciano graduated at the top of his class at the Boston Police Academy.

18.     During Abasciano's employment with the BPD, he received numerous citations and awards.

19.     For example, Abasciano and a team of officers he worked with at Orchard Park received an award for reducing crime in the area by 74%.

20.     During Abasciano's fourteen years on the BPD, he received no discipline prior to his termination on March 13, 2023.

### Abasciano takes FMLA family leave due to his wife's pregnancy

21.     In or about September 2020, Abasciano took intermittent family leave under the Family and Medical Leave Act (the "FMLA") to care for his wife, who was pregnant with their third child.

22.     The BPD gave Abasciano a letter dated October 19, 2020 approving intermittent FMLA leave for the time period October 2, 2020 to November 30, 2020.

23.     On November 3, 2020, Abasciano's wife gave birth to their son.

24.     After Abasciano's son was born, he went out on a continuous FMLA leave ("FMLA leave").

25.     The BPD gave Abasciano a letter dated November 23, 2020 approving continuous FMLA leave from November 15, 2020 to January 23, 2021.

26.     When Abasciano was approved for FMLA Leave, the BPD provided him with FMLA paperwork.

27.     The FMLA paperwork did not include a restriction from traveling out of state while on FMLA leave.

28.     The BPD never informed Abasciano that he was prohibited from traveling out of state while on FMLA leave.

29.     The BPD's FMLA policy in place at the time did not prohibit an employee from traveling out of state while on FMLA leave.

**Abasciano travels to Washington, D.C. to attend a Trump rally on January 6, 2021**

30.      On January 5, 2021, Abasciano travelled to Washington, D.C. to attend a Donald Trump rally because of Constitutional issues surrounding the 2020 Presidential election.

31.      Abasciano's hope was not that Vice President Pence would overturn the Presidential election, but rather, that he would put a pause on counting the electors and send the electors back to four states to decide if their individual state's constitutions were followed.

32.      Abasciano's main concern was whether the Constitution was followed correctly.

33.      Abasciano attended the rally with another BPD police officer named Jose Diaz ("Diaz") with whom he worked in District 2.

34.      Abasciano and Diaz rented a car to travel from Boston to Washington, D.C. and stayed at the Foggy Bottom Marriott.

**The events of January 6, 2021 in Washington, D.C.**

35.      On January 6, 2021, Abasciano and Diaz went to hear President Trump speak at the Ellipse, which is a park that abuts the White House.

36.      Abasciano went through and passed a TSA-type checkpoint proving that he had no weapons in his possession.

37.      Abasciano did not pass any barricades or overturned barricades.

38.      President Trump spoke from 1:12 PM to 2:00 PM.

39.      Abasciano was not wearing any clothing with BPD insignia on it because it would have been a violation of departmental rules to do so while attending a political rally.

40.      Abasciano did not have any BPD equipment with him.

41.      Abasciano did not identify himself to anyone that day as a member of the BPD.

42.      From the time Abasciano and Diaz left the hotel, to the time they got to the Ellipse, to the time they got to the Capitol area, Abasciano witnessed no violence, no threats of violence, and no law enforcement presence.

43.      Abasciano saw no one with a weapon that day.

44.      The breach of the Capitol building happened on the opposite side of where Abasciano and Diaz were, and the side of the Capitol they were on was peaceful.

45.      Abasciano did not personally witness anyone enter the Capitol building.

46.   The only act of violence Abasciano witnessed was a person take some whacks at a window.

47.   Abasciano did not take any photos of anyone conducting violent acts.

48.   Abasciano did not take any photos of anyone damaging property.

49.   Abasciano did not take any pictures of himself at the Capitol, but rather, he only took pictures of the crowd.

50.   Abasciano did not enter the Capitol building.

51.   Abasciano did not go on the stairs of the Capitol.

52.   Abasciano did not go in any restricted areas of he Capitol.

53.   Abasciano did not damage any property.

54.   Abasciano did not commit any acts of violence.

55.   Abasciano and Diaz arrived at the Capitol at some time in between 3:15 PM and 3:40 PM.

56.   Abasciano and Diaz were on the road back to Boston by 5:22 PM.

57.   Abasciano and Diaz left the Capitol because they saw one incident where someone was taking whacks at a window, and there was a 6:00 PM curfew in place.

**Twitter**[1]

58.   Twitter is a social media platform with more than 600 million active users worldwide, including some 50.5 million active monthly users in the United States.  Twitter is primarily a platform for real-time updates, news, and brief posts (formerly known as "tweets").

59.   The Twitter platform focuses on short-form content limited to 280 or more characters for general users and is often used for quick, public conversations, debates, and breaking news. Twitter emphasizes public discourse and trending topics, allowing users to share thoughts with the broader world rather than just friends with a more immediate, conversational tone.

60.   Users can follow others without mutual friendship and engage in large-scale conversations around trending topics, but particularly relevant here is that a significant amount of speech posted on the platform is speech by, to, or about political topics such as elections for public office.  Twitter has become a hub for public dialogue, activism, and professional networking.

---

[1] Twitter is now known as "X," however, for the purposes of this Verified Complaint, Abasciano will refer to this social media platform as "Twitter."

61.     A Twitter "user" is an individual who has created an account on the platform using an email, phone number, or Apple/Google account.  After signing up, users can choose a username (also called a "handle"), upload a profile photo, and write a bio.  A Twitter user's profile may contain information about the user including their name or it may be anonymous.  Users can follow other users to see their posts in their feed and customize their feed by selecting topics of interest.

62.     A tweet is a post on Twitter, originally limited to 140 characters but now extended to 280 or more for general users.  Premium users (subscribers) may have even more room to post.  Users can also attach media like photos, GIFs, videos, or links.

63.     Users can engage with tweets in several ways: liking (represented by a heart icon), retweeting, replying, or sharing (via direct messages or externally).

64.     Users can reply to tweets, creating conversations.  Replies appear under the original tweet and are visible to anyone who sees that tweet.

65.     Retweeting allows users to share someone else's tweet with their followers. Users can either "retweet" (share without adding anything) or "quote tweet" (share while adding your own comment or opinion).

66.     Users can use hashtags (words or phrases prefixed with the # symbol) to categorize tweets.  Clicking on a hashtag lets you see other tweets using the same hashtag, making it easy to follow trends or topics.

67.     Users can control who sees their tweets.  An account can be public (anyone can see the tweets) or private (only approved followers can see the tweets).

**Abasciano's January 6, 2021 tweets**

68.     Abasciano has used the Twitter handle @mailboxjoe since 2014.

69.     On January 6, 2021, the settings on @mailboxjoe were public.

70.     In the profile of @mailboxjoe, Abasciano did not identify himself by name or his status as a Boston police officer.

71.     Abasciano maintained an anonymous Twitter account so he could express his First Amendment rights on political issues without fear of being retaliated against.

72.     Abasciano did not become aware until after January 6, 2021 that some members of the BPD knew that he was the one behind the @mailboxjoe twitter account.

73.     At 5:53 AM, Abasciano sent out the following tweet:

**"@GabrielSterling I can't wait to see you dragged away in handcuffs."**

74.     Abasciano sent this tweet from his hotel room.

75.     The person to whom Abasciano referred in this tweet was Gabriel Sterling ("Sterling"), the Secretary of State for Georgia.

76.     Abasciano sent this tweet because he believed that Sterling had violated the U.S. Constitution.

77.     Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

78.     Abasciano was trying to encourage elected officials to send the electors back to their respective states.

79.     At 6:44 AM, Abasciano sent out the following tweet:

>   **"MAGA Millions of Patriots here in DC. Today is a day for choosing. Today there will be only two parties in America. Traitor and Patriots!" #January6 #MAGA #MarchForTrump**

80.     Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

81.     Abasciano borrowed the terms "traitor" and "patriot" from a letter President Ulysses S. Grant wrote to Grant's father at the beginning of the Civil War.

82.     In President Grant's letter to his father, he wrote in pertinent part:

>   **Whatever may have been my political opinions before I have but one sentiment now.  That is we have a Government, and laws and a flag and they must all be sustained.  There are but two parties now, Traitors & Patriots and I want hereafter to be ranked with the latter, and I trust, the stronger party.**

83.     Abasciano downloaded a picture of the protesters and included it with his tweet.

84.     Abasciano directed the traitor and patriot comment to the elected officials that would be convening that day in the Joint House of Congress.

85.     Abasciano believed that the elected officials who wanted to delay the certification of the electoral votes were the "patriots" and those that were against it were the "traitors."

86.     At 8:14 AM, Abasciano sent out the following tweet:

>   **"Hey @sentemajldr look out your window.  Millions of Patriots are on your doorstep and we are watching. It is a time for choosing. Are you a traitor or are you a Patriot? #MarchForTrump #StopTheSteal #PatriotParty**

87.   Abasciano directed the tweet to Mitch McConnel, who was the Senate Majority Leader at the time.

88.   Abasciano sent the tweet because he wanted to have his grievances heard as an individual and to address the one who had the Constitutional authority to make those decisions.

89.   Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

90.   Abasciano was nowhere near the Capitol when he sent out this tweet.

91.   At 12:40 PM, Abasciano sent out the following tweet:

> **"Everything that happens going forward @ VP is now on your conscience." #1776 Again #MarchForTrump #WeThePeople**

92.   Abasciano was still at the Ellipse when he sent out this tweet.

93.   Abasciano intended to express the opinion that he wanted Vice President Pence to delay the certification of the electoral votes.

94.   When Abasciano tweeted #1776, he intended to invoke the spirit of the Constitution and to send it to like-minded individuals.

95.   When Abasciano wrote #1776 again, he was not advocating for an overthrow of the U.S. government.

96.   Abasciano was not aware of any violence at the Capitol at the time he sent out this tweet.

97.   Abasciano sent re-tweets at 12:41 PM and 12:42 PM.

98.   Abasciano was not active on Twitter for the next 3 hours and 12 minutes.

99.   During this approximate three-hour period, Abasciano did not check his Twitter feed.

100.  On January 6, 2021, at 3:54 PM, Abasciano sent out the following tweet:

> **"I hope you never sleep well again @VP your Treasonous Act led to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @ LLinwood was right about you all along."**

101.  By sending this tweet, Abasciano was condemning law enforcement's shooting of a protester.

102.  A couple of people called Abasciano on his cell phone and informed him that a person at the rally had been shot, but he did not witness it.

103.    There were no signs of violence at the rally until that very end as he was leaving.

104.    On January 6, 2021, at 5:22 PM, Abasciano sent out the following tweet:

> **"What I saw today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots v Law Enforcement trying to do their jobs in a no-win position. I fear this Treasonous election has killed the republic."**

105.    By using the term "patriots v. law enforcement," Abasciano meant that there were 100 million people on one side who hate the police and another 100 million that believe they get no justice.

106.    Abasciano was trying to encapsulate a sentiment and a feeling about all of the riots, protests and violence that happened in 2020.

107.    When Abasciano used the term "patriot," he was not referring to those who committed acts of violence at the Capitol.

108.    When Abasciano used the term "law enforcement," he was referring to law enforcement throughout the country.

109.    Abasciano sent this tweet when he was on the road and driving back home.

110.    Abasciano did not become aware that people entered the Capitol until after 6:00 PM when he and Diaz were on the road, and he saw it on Twitter.

111.    Eventually, Abasciano learned that there was a breach inside the Capitol, but he did not witness it, and there were no law enforcement establishing lines or perimeters.

112.    Abasciano only saw one police officer that day, and she was by herself with no tactical support.

113.    Abasciano did not witness a significant law enforcement presence that day.

114.    Abasciano saw a small number of agitators engage in a tug of war.

115.    Abasciano witnessed someone smash a window, but he does not know if that person got into the Capitol building.

116.    Abasciano witnessed people climbing the walls and police officers just standing there and not holding a line or doing crowd control.

117.    Abasciano was concerned people were going to fall and get injured.

118.    Abasciano could see that the crowd was starting to turn, so they started to leave the area.

119. Abasciano did not engage any law enforcement.

120. When Abasciano left the Capitol area, he witnessed people acting peacefully.

121. Abasciano left the Capitol not realizing how much violence had occurred.

122. Abasciano did not witness any ambulances or fire engines.

123. Abasciano did not witness any police being carried on a stretcher.

124. Abasciano did not witness anyone lying on the ground, being struck with rocks or a fire extinguisher or being stampeded.

125. As Abasciano was walking to his car, he did not witness any sirens, lights or ambulances.

126. In addition to the six tweets Abasciano sent out on January 6, 2021, he liked and retweeted several tweets denouncing the violence that happened at the Capitol.

**An anonymous person using the Twitter handle @B.Rosa617 complains to the BPD that Abasciano threatened the Vice President and Members of Congress.**

127. On January 16, 2021, when then-Mayoral candidate Defendant Wu was asked by a news reporter whether she would fire any City of Boston employee who was at the Capitol on January 6, 2021, she stated: "Absolutely."

128. Defendant Wu is a graduate of Harvard Law School.

129. Defendant Wu did not clarify or condition her response that her decision to fire an employee would depend on whether the employee entered the Capitol.

130. On January 19, 2021, an anonymous complaint was made to the BPD through Twitter against Abasciano via the twitter handle @B.Rosa617 (the "B. Rosa complaint").

131. The B. Rosa tweet provided:

> **@bostonpolice- just a heads up.  A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress.  He and others, have now removed their social media.**

132. On January 6, 2021, Abasciano deactivated his Twitter account because he was in fear of political retaliation and violence.

133.    Other than the B. Rosa complaint, there was only one other contact that came in through media relations about Abasciano's tweets, but it is unclear if it was a member of the general public or the media.

134.    Abasciano later learned that the person who submitted the B. Rosa complaint is Defendant Joseph Coppinger, who was also a Boston police officer at the time.

### The investigative process at the BPD for complaints against police officers

135.    The Bureau of Professional Standards at the BPD encompasses the Internal Affairs Department ("IA"), the Anti-Corruption Department ("ACD"), Auditing Review, and Recruiting Investigations.

136.    ACD investigates corruption and criminal matters, while IA investigate rules and procedural violations.

137.    When a case transfers from ACD to IA, the hard file including the close-out report and recording of interviews is transferred and an "Orange Folder" is created.

138.    When a complaint comes in, the executive secretary or assistant meets with the Deputy Superintendent and a rules violation is assigned to the complaint.

139.    IA Pro is a software program or app that the IA uses to track activity in a case.

140.    Whenever a police officer takes custody of an IA file, the BPD protocol is to memorialize it in IA Pro.

141.    One of the purposes of using IA Pro is to track the chain of custody of an IA file.

142.    The internal affairs investigative process begins when the case is assigned to a Sergeant Detective, who collects relevant documentation; conducts interviews of the complainant and necessary witnesses; and drafts an internal affairs report with his/her findings.

143.    The case is then sent to a Lieutenant Detective, the Sergeant Detective's immediate superior.

144.    The Lieutenant Detective can find the allegations "sustained," "un-sustained," "unfounded" or "exonerated."

145.    "Sustained" means that there is proof beyond a preponderance of the evidence that the incident or the alleged violation did occur.

146.    "Un-sustained" means that the BPD was not able to prove or disprove that the actual allegation happened.

147.    "Unfounded" means that the incident did not occur.

148.    "Exonerated" means that the actions did occur, but that they were legal and proper.

149.    If the Lieutenant Detective feels that additional work is needed or wants clarification, he/she could request it, otherwise, he/she drafts a report and provides a recommendation and sends it to the Deputy Superintendent.

150.    If the Deputy Superintendent feels that additional work is needed or wants clarification, he/she could request it, otherwise, he/she either agrees with the report or disagrees by writing a "Non-concurrence letter."

151.    The Deputy Superintendent is not permitted to ask the Lieutenant Detective to change his/her report, but rather, they can only ask them to take another look at it

152.    The next step in the process is that the case is sent to the Superintendent of the Bureau of Professional Standards who follows the same procedure as the Deputy Superintendent.

153.    The next step in the process is that the case is sent to the BPD Legal Department who follows the same procedure at the Deputy Superintendent and Superintendent.

154.    If the BPD Legal Department determines there is a rules violation, then a separate meeting would be held to determine the discipline.

155.    The final step in the process is that the case goes to the BPD Commissioner who would make a determination of whether or not there is a rules violation.

156.    If the Commissioner does not agree with the determination, he/she can send it back to IA for further review.

157.    If the case is sent back down, the normal process is that the complaint is sent to the Deputy Superintendent, who then sends it back to the Sergeant Detective who did the investigation.

158.    It is still an open investigation until the Commissioner signs off on it.

159.    The rules require IA to complete an investigation within one year.

160.    If more time is needed, the BPD can request an extension of time from the Massachusetts POST Commission.[2]

---

[2] The Massachusetts Peace Officer Standards and Training (POST) Commission was established as part of the criminal justice reform legislation enacted in Chapter 253 of the Acts of 2020. Its mission is to improve policing and enhance public confidence in law enforcement by implementing a fair process for mandatory certification, discipline, and training for all peace officers in the Commonwealth of Massachusetts.

### BPD's Anti-Corruption Department investigates the B. Rosa complaint against Abasciano.

161.    On January 19, 2021, BPD opened an IA investigation of the B. Rosa complaint against Abasciano.

162.    In Abasciano's case, a civilian named Bridie Brienzi entered the complaint in IA Pro on January 19, 2021.

163.    As of January 19, 2021, Courtney Matthews was the Deputy Superintendent.

164.    The rules violation assigned to the B. Rosa complaint against Abasciano was a potential violation of Rule 102 § 4 – Neglect of Duty/Unreasonable Judgment.

165.    On February 9, 2021, Lieutenant Detective Daly of the ACD interviewed Abasciano.

166.    At this point, the BPD was investigating whether Abasciano had engaged in any criminal activity on January 6, 2021.

167.    The only tweet that ACD interviewers asked Abasciano about at his first interview was the tweet about Attorney Lin Wood.

168.    Abasciano did not intend to condone violence with his tweet about Lin Wood.

169.    Abasciano intended to express the opinion that Lin Wood was correct about not trusting Vice President Pence to do the right thing.

170.    Abasciano did not endorse any violent acts against Vice President Pence.

171.    Abasciano closed down his @mailboxjoe Twitter account on January 6, 2021 or January 7, 2021 and did not reopen it.

172.    Prior to the 2020 election, someone burned a thin blue line flag at Abasciano's home and spray-painted graffiti on Donald Trump signs he had on his lawn.

173.    On March 17, 2021, Lieutenant Detective Daly issued a close-out report providing that "Activity was determined not to exist."

174.    Lieutenant Detective Daly's close-out report concluded that neither Abasciano, nor Diaz were involved in the January 6, 2021 disturbances at the U.S. Capitol and that facial recognition and review of phone records showed no evidence of wrong-doing or inappropriate actions.

175.    On April 21, 2021, ACD interviewed Abasciano a second time – this time by Lieutenant Detective Michael Connolly and Sergeant Detective Leahy.

176.    At the second ACD interview, Abasciano was asked where he was when he sent the first tweet at 5:53 AM.

177.    Abasciano was just waking up at the hotel when he sent that tweet, but does not remember exactly where he was.

178.    The ACD interviewers did not ask Abasciano to explain his motive or intention behind this tweet.

179.    Abasciano was asked where he was when he sent the second tweet at 6:44 AM.

180.    Abasciano does not believe that he left the hotel when he sent this tweet.

181.    The ACD interviewers did not ask Abasciano to explain his motivation or intention behind this tweet.

182.    Abasciano was asked where he was when he sent the third tweet at 8:14 AM.

183.    Abasciano was on the far side of the White House when he sent this tweet.

184.    Abasciano was at the Ellipse when he sent the fourth tweet at 12:40 PM.

185.    On May 3, 2021, Lieutenant Detective Connolly issued a close-out report providing that "Activity was determined not to exist."

186.    Lieutenant Detective Connolly's close-out report concluded that there was no evidence that Abasciano or Diaz were involved in the January 6, 2021 disturbances at the U.S. Capitol.

187.    Abasciano and Diaz's personal phone numbers were given to the FBI, and the FBI did not locate any cell phone tower information that indicated that they were at the U.S. Capitol disturbances.

188.    Lieutenant Detective Connolly's close-out report concluded that Abasciano posted no inappropriate comments about the Vice President on his Twitter account.

189.    On May 3, 2021, ACD closed its investigation into the B. Rosa complaint against Abasciano.

190.    The only tweets that ACD interviewers asked Abasciano to explain were the last two tweets he sent.

191.    No one in ACD asked Abasciano to explain his intentions behind the other four tweets sent earlier in the day.

**Seargeant Detective Rafael Antunez of IA investigates the B. Rosa complaint against Abasciano.**

192.   On May 21, 2021, IA opened an investigation into Abasciano's conduct on January 6, 2021, and the case was assigned to Seargeant Detective Rafael Antunez ("Antunez").

193.   Antunez listened to the audio tapes of Abasciano's first and second ACD interviews and found his testimony to be truthful.

194.   Antunez listened to the audio tapes of Diaz's first and second ACD interviews and found his testimony to be truthful.

195.   On May 25, 2021, Antunez and Seargeant Detective Juana Hernandez conducted an audio-recorded interview of Abasciano.

196.   Interviewers asked Abasciano about his need for FMLA leave and whether he believed that there were restrictions that applied such on not leaving the state.

197.   Interviewers asked Abasciano about the circumstances surrounding the deactivation of his Twitter account.

198.   Interviewers never asked Abasciano about what messages he was intending to convey via the six tweets he sent on January 6, 2021.

199.   On June 23, 2021, Antunez wrote a report summarizing all of the different steps he took in the investigation and the evidence he collected.

200.   Antunez never found any evidence that Abasciano threatened Vice President Pence.

201.   Antunez never found any evidence that Abasciano threatened any members of Congress.

202.   Antunez noted that on January 6, 2021, the BPD did not have a social media policy in place to serve as a guidance for Boston police officers.

**Lieutenant Detective Thomas Lema issues a report finding that the allegations against Abasciano are un-sustained.**

203.   At the time of the Abasciano investigation, Lieutenant Detective Thomas Lema ("Lema") was Antunez's immediate supervisor.

204.   On June 29, 2021, Abasciano's file was forwarded to Lema for review.

205.     On November 16, 2021, Lema issued a report recommending as "Not Sustained" the allegations against Abasciano for violation of BPD Rule 102 § 4.

206.     Lema's report provided that the BPD "does not have a social media policy for employees, on duty or off-duty and as such these tweets did not violate any social media policy."

207.     In formulating his recommendation, Lema considered Abasciano's First Amendment rights under the U.S. Constitution, specifically, whether Abasciano's tweets violated the standard set forth by the U.S. Supreme Court in Brandenburg v. Ohio, 395 U.S. 444 (1969).

208.     Lema's report concluded that Abasciano posted the tweets on January 6, 2021 as a private citizen.

209.     Lema's report concluded that:  "(Abasciano's) tweets which might be categorized as political rhetoric hyperbole could be considered offensive by some but these rules did not rise to the level of criminality nor call into question his ability or judgment to act as a police officer and would not be considered a violation of BPD rules and regulations."

210.     Lema's report concluded that Abasciano did not violate the BPD's FMLA policy, finding that there are "no distinctive FMLA guidelines or restrictions at the Federal and State levels of government that dictate what a person on paternity leave can and cannot do."

**Lema's Un-sustained finding is adopted by the Deputy Superintendent, the Superintendent, and the BPD Legal Department.**

211.     On November 16, 2021, the Abasciano file was sent to Deputy Superintendent Crispin ("Crispin") for his review.

212.     During Chrispin's two years working in IA, he has reviewed hundreds of reports and has written many non-concurrence letters.

213.     Crispin reviewed the Antunez report and the Lema report; he reviewed some of the tweets; and listened to some of the interviews.

214.     Crispin listened to Abasciano's IA interview and found his testimony to be truthful.

215.     Crispin reviewed the Antunez and Lema reports and found them to be thorough and complete.

216.     Crispin has a law degree.

217.     Crispin believed that none of Abasciano's tweets sent on January 6, 2021 violated any departmental rules.

218. Crispin believed that none of Abasciano's tweets sent on January 6, 2021 amounted to a threat or encouraged or condoned violence.

219. Crispin believed that Abasciano's tweets were protected under BPD Rule 102 § 30 ("Employees shall be permitted to . . . [e]xpress opinions as private individuals on political issues and candidates . . .").

220. Crispin does not believe that Abasciano referring to people as either "patriots" or "traitors" violates BPD rules because it did not necessarily speak to his ability to do his job.

221. Crispin believes whether Abasciano referring to people as either "patriots" or "traitors" violates BPD rules is a subjective opinion.

222. On November 16, 2021, Chrispin agreed with Lema's finding of un-sustained and memorialized his concurrence in IA Pro.

223. Crispin had previously sent an email on August 18, 2021 regarding outstanding IA investigations of promotional candidates for the position of Detective, and he listed Abasciano's case (2021-0021) as "completed."

224. Crispin believes there is no difference between Rule 102 § 3 conduct unbecoming and Rule 102 § 4 neglect of duty, unreasonable judgment other than section 3 applies to conduct off duty while section 4 applies to conduct occurring on duty.

225. On November 19, 2021, Superintendent Sharon Dottin ("Dottin") agreed with Lema's finding of un-sustained.

226. On December 8, 2021, the BPD Legal Department agreed with Lema's finding of un-sustained ("After review I agree with the finding of NOT-SUSTAINED").

**The BPD denies Abasciano efforts to seek a promotion to detective after he suffers work-related injuries to his right knee and left hip.**

227. In January 2021, Abasciano was assigned to the Medically Incapacitated Section (MIS) as a result of work-related injuries to his right knee and left hip.

228. Abasciano's knee injury was an exacerbation of a previous injury he suffered to the same knee in 2014.

229. After Abasciano suffered these injuries, he had some discussion with members of the BPD about retiring on an accidental disability pension, however, Abasciano was reluctant to do so.

230.    Rather than retire on accidental disability, Abasciano wanted to pursue a promotion to Detective because it was a less-physically demanding position than Patrol Officer.

231.    In September 2021, Abasciano learned there would be a training session in late October for Detective candidates, which was a mandatory step in the promotional process (the "Detectives training").

232.    Abasciano had previously sat for a Detective promotional examination in 2018 and scored well above-average on the written and oral parts of the examination, however, he was not promoted.

233.    Based on Abasciano's past performance on the Detective promotional examination, he was eligible for the October 2021 Detectives training.

234.    On October 13, 2021, the BPD informed Abasciano and others potential candidates that they would not be permitted to attend the Detectives training unless they submitted proof they received the COVID vaccine or tested negative for COVID on a weekly basis.

235.    On October 17, 2021, Abasciano emailed Chief of the Bureau of Administration and Technology Lisa O'Brien ("O'Brien") for guidance because he was unvaccinated and also because he was unable to get tested due to a recent medical procedure.

236.    Abasciano mentioned in the email to O'Brien that he was interested in seeking a religious exemption for the COVID vaccine.

237.    On October 20, 2021, the BPD posted a list of police officers selected to attend Detectives training, and Abasciano's name was not included on the list.

238.    After Abasciano learned that his name was omitted from the list, he emailed Deputy Chief Miller ("Miller") while also copying O'Brien and asked what he needed to do to be included on the Detectives training list, but neither responded to his email.

239.    On October 22, 2021, Abasciano went to O'Brien's office in person to follow up on his email.

240.    While searching for O'Brien, Abasciano spoke to Miller who asked him if he had mentioned in his email to O'Brien about not being vaccinated.

241.    When Abasciano told Miller that he informed O'Brien he was unvaccinated, Miller stated: "I would be careful about who you email about that" or words to that effect.

242.    While at the office, Abasciano provided a doctor's note to Claudelyn Valcin, M.D. ("Dr. Valcin") setting forth the accommodations of his disabilities he needed to take the Detectives training, which included lifting and movement restrictions.

243.    Dr. Valcin also warned Abasciano to be careful about who he emailed about his vaccination status.

244.    O'Brien rejected Abasciano's doctor's note claiming it was inadequate.

245.    As a result, Abasciano was forced to obtain a second doctor's note.

246.    On October 23, 2021, Abasciano sent an email to O'Brien, Miller, Dr. Valcin and other agents of the BPD inquiring whether he could attend the Detectives training.

247.    Dr. Valcin informed Abasciano that she needed to speak with his doctors before the BPD would permit him to attend the Detectives training.

248.    On October 26, 2021, O'Brien emailed Abasciano and informed him that Dr. Valcin could not get in touch with his doctors.

249.    Despite receiving multiple notes from Abasciano's doctors, the BPD claimed they needed more information about his medical condition and the accommodations he needed.

250.    Abasciano emailed the Boston Police Academy seeking a training calendar with a list of different activities so his doctors could review them and recommend the appropriate accommodations.

251.    However, the BPD never provided Abasciano with a list of activities that candidates at the Detectives training were required to perform so his doctors could make the necessary recommended accommodations.

252.    Eventually Abasciano's doctor reached out to a clerk at Occupational Health named "Gina" to inquire what information the BPD needed in the form of a doctor's note to clear Abasciano for training.

253.    Upon information and belief, Gina stated to Abasciano's doctor: "It doesn't matter what you write. [Abasciano] is never going to be cleared for the training" or words to that effect.

254.    On October 27, 2021, the BPD refused to allow Abasciano to attend the academic portion of the Detectives training due to "not being medically fit enough."

255.    As a result, Abasciano did not attend the Detectives training and never received a promotion to detective.

**The BPD submits an involuntary application for accidental disability retirement on behalf of Abasciano.**

256.    On June 30, 2022, BPD Commissioner Gregory Long ("Long") submitted to the Boston Retirement Board an involuntary application for accidental disability retirement benefits on behalf of Abasciano.

257.    At the time, Abasciano did not want to retire and preferred to work as a Detective because it was a less-physically demanding position.

**After a year of inactivity, the new BPD Commissioner, Michael A. Cox, sends Abasciano's case to Deputy Superintendent Phillip Owens for a review.**

258.    From December 9, 2021 to December 1, 2022, there was no activity in IA Pro for Abasciano's case.

259.    IA's investigation into Abasciano's case was not completed with one year of the B. Rosa complaint.

260.    Dottin did not request an extension of time from the Massachusetts POST Commission to complete the investigation in Abasciano's case.

261.    The newly appointed Commissioner, Michael A. Cox ("Commissioner Cox") also did not request an extension of time from the Massachusetts POST Commission to complete the investigation of Abasciano's case.

262.    In the Fall of 2022, Commissioner Cox asked Deputy Superintendent Phillip Owens ("Owens") to review approximately ten IA files that he had in his office telling him: "Take a look at this . . . tell me what you think."

263.    After Owens reviewed the ten files, Commissioner Cox then gave him four more IA cases to review including Abasciano's.

264.    At the time, Defendant Wu was the Mayor of Boston, having taken office on November 16, 2021.

265.    Defendant Wu had previously stated to a news reporter that if she were elected mayor, she would fire any City of Boston employee who was at the Capitol on January 6, 2021.

266.    Owens took physical possession of the four files because he was being transferred to his own office in the IA Department.

267.    One of the IA cases Owens disagreed with involved a police officer named John Danilicki ("Danilicki") where there was a sustained finding for use of force.

268.    Owens did not write a non-concurrence letter in Danilicki's case because Lieutenant Detective Mike Connolly, who wrote the report finding the charges sustained, changed his report after speaking with Owens.

269.    Another IA case that Owens disagreed with involved police officer Brian Augustine ("Augustine").

270.    Owens did not write a non-concurrence letter in Augustine's case because Lt. Det. Timothy Gaughan, who wrote the report finding the charges sustained, changed his report after speaking with Owens.

271.    There was no entry in IA Pro that Owens took physical custody of Abasciano's IA file.

272.    At the time, Owens was aware that the Abasciano case was a high-profile case that was on the news and in the newspapers.

273.    Owens had seen articles in the newspaper and reporting on the news about Abasciano's case.

**Owens' writes a non-concurrence letter in Abasciano's case.**

274.    After reviewing all of the evidence collected by ACD, listening to both of Abasciano's ACD interviews and his IA interview, reviewing Antunez's report and Lema's report, Owens applied the evidence to different BPD rules – Rule 102 § 3 ("Conduct Unbecoming") and Rule 113 § 5 Canons of Ethics (Canon Eight) as opposed to Rule 102 § 4 ("Unreasonable Judgment").

275.    On December 2, 2022, Owens wrote a non-concurrence letter.

276.    Owens never memorialized his activity in IA Pro until he wrote the non-concurrence letter.

277.    Owens believed that Abasciano violated BPD rules because his inflammatory tweets made it appear that he supported the actions that were going on during the riot at the Capitol.

278.    Owens believed that Abasciano violated BPD rules because he used FMLA leave outside of its intended scope because he went to attend a rally in Washington, D.C., several hundred miles away from his home.

279.    Owens knew the FMLA paperwork that the BPD gave Abasciano did not have any specific restrictions on what he could and could not do.

280.    Owens never spoke with Antunez about the report he issued in Abasciano's case.

281.    Owens never spoke with Lema about the report he issued in Abasciano's case.

282.    Owens spoke with Crispin about Abasciano's case, but only regarding the FMLA issue.

283.    Owens spoke with Dottin about Abasciano's case, but only regarding the FMLA issue.

284.    Owens believed that Abasciano's tweets violated the public's trust in the BPD.

285.    Owens believed that Abasciano's tweets negatively impacted the BPD.

286.    Owens believed that Abasciano's comment made in a tweet "Today there will only two parties in America, traitors and patriots" questioned Abasciano's judgment, negatively affected the public trust and the confidence the public has in the BPD.

287.    Owens believed that the "patriot versus traitor" comment crossed the line from being protected under BPD Rule 102 § 30 and a violation of Rule 102 § 3 for conduct unbecoming.

288.    Owens believed that Abasciano was "pitting one side against another" with the "patriot versus traitor comment" and that it was calling into question the public's trust in the BPD.

289.    Owens believed that calling someone who is not patriot to this country, a "traitor," is definitely a problem and that it effects the ability and the efficiency of the BPD to deliver services.

290.    Owens interpreted Abasciano's use of "#1776 again" to mean he was advocating for a revolution.

291.    Owens interpreted Abasciano's use of the term "patriot" in the "patriot versus law enforcement" comment to mean the people who stormed the Capitol on January 6, 2021.

292.    Owens believed that Abasciano's use of the term "patriot" in the "patriot versus law enforcement" comment affected the ability to deliver efficient services to the men and women of the City of Boston; that it reflected poorly on the BPD; and that it violated BPD Rules 113 and 102 § 3.

293.    Owens interpreted Abasciano's deactivation of his Twitter account on January 6, 2021 or the following day to mean that he understood the ramifications of his tweets.

294.    At the Boston Police Academy, police officer candidates are taught about the U.S. Constitution and the First Amendment.

295.    However, Owens did not do a First Amendment analysis prior to issuing the non-concurrence letter.

296.    Owens did nothing to learn about the First Amendment and whether Abasciano's tweets were protected speech prior to issuing the non-concurrence letter.

297.    Owens did not contact any lawyers employed by the City of Boston to inquire about the First Amendment prior to issuing the non-concurrence letter.

298.    Owens did not do anything independently to find out the identity of B. Rosa and how Abasciano's tweets made their way to the BPD prior to issuing the non-concurrence letter.

299.    Owens believed that the protesters went to the Capitol on January 6, 2021 to oppose the election.

300.    Owens did not consider whether Abasciano was engaging in political activity when he sent the tweets on January 6, 2021.

301.    Owens did not believe that Rule 102 § 30 applied to or protected any of Abasciano's tweets.

302.    When Owens wrote the non-concurrence letter, he did not know that Abasciano was quoting Ulysses S. Grant in using the "patriots versus traitor" quote.

303.    Owens believed that police officers should not be dividing people into "patriots" and "traitors."

304.    Owens did not believe that Abasciano would mistreat people of color because of the patriot versus traitor comment.

305.    Owens had a problem with Abasciano referring to the 2020 election as a "treasonous election."

306.    Owens did not believe Abasciano was using hyperbole to get his message across.

307.    Owens was skeptical that Abasciano would be able to treat members of the public fairly.

308.    Owens believed that members of the public would be fearful that Abasciano would treat them unfairly.

309.    Owens believed that services the BPD would not be able to provide because of Abasciano's tweets were the total operations plans such as community service to the public.

310.    Owens did not know which side of the Capitol Abasciano was on – the North or South side and that it did not make a difference to him.

311.    Owens believed the "Lin Wood" tweet violated BPD rules.

312.    Owens believed that any tweet critical of the government after the violence that occurred on January 6, 2021 would be a violation of departmental rules.

313.    Owens never contacted Abasciano and asked him to explain his intention behind the tweets.

314.    Owens believed that when Abasciano was in Washington, D.C. on January 6, 2021, he was not there as a private citizen, but rather, as a member of the BPD.

315.    On January 6, 2021, Abasciano did not post any pictures on social media of people storming the Capitol, breaking windows or committing violent acts and referring to them as "patriots."

316.    At the time, Owens wrote his non-concurrence letter, he was aware that Abasciano liked social media posts denouncing the violence at the Capitol on January 6, 2021.

317.    Owens believed that the #1776 again meant Abasciano was referring to Democrats as "tyrants" and that doing so constituted conduct unbecoming.

318.    Owens believed that Abasciano calling the new President a tyrant was conduct unbecoming.

**Dottin and the BPD Legal Department flip-flop on their prior un-stained findings.**

319.    After Dottin reviewed Owens' non-concurrence letter, she reversed her prior decision and found that the allegations against Abasciano were sustained under different a different BPD rule – conduct unbecoming.

320.    Dottin did not seek any legal advice before she made her sustained decision the second time around.

321.    Dottin made her decision to sustain the finding that Abasciano misused his FMLA leave based on Owens' recommendation after he attended a seminar on the FMLA.

322.    After the BPD Legal Department reviewed Owens' non-concurrence letter, it reversed its prior decision and found that the allegations against Abasciano were sustained under different rules.

323.    From the time the BPD Legal Department signed off on Abasciano's case on December 8, 2021 to the time the BPD Legal Department reversed its decision on December 2, 2022, no new or additional facts were uncovered in Abasciano's case.

324.    Dottin believes that Abasciano's tweets fell within a "gray area" and that whether his speech is protected "could go either way."

325.    Dottin never contacted Abasciano and asked him to explain the six tweets he sent on January 6, 2021.

### A Green Folder Meeting

326.    At a Green Folder meeting, the Deputy Superintendent, the Superintendent, the Commissioner's Chief of Staff, a representative from the Legal Department and a civilian meet to determine the appropriate punishment for a rules violation.

327.    At a Green Folder meeting, comparative evidence of the discipline other officers received for similar conduct is used as a gauge to determine the appropriate discipline.

328.    At a Green Folder meeting, the factors that are considered are:  comparator discipline as close to the offense that is being considered; the officer's disciplinary history; and the severity of the offense.

329.    Comparator discipline is used to ensure that a police officer is disciplined fairly.

### Abasciano's Green Folder Meeting

330.    At Abasciano's Green Folder meeting, it was disclosed that Abasciano had received no prior discipline.

331.    One comparator case that was used at Abasciano's Green Folder meeting involved police officer Michael Geary ("Geary") who was terminated for making the comment "Rats get bats" on the FBI Facebook page when the FBI sought help from the public identifying those who stormed the Capitol on January 6, 2021.

332.    However, Geary also had another IA case where he made insulting comments on social media about Breonna Taylor, a black woman who was shot and killed by the police.

333.    Another comparator case that was used at Abasciano's Green Folder meeting involved police officer Justin Barrett ("Barrett"), who was terminated for making racist comments about Harvard Professor Skip Gates.

334.    Barrett referred to Professor Gates as "a banana-eating, jungle monkey."

335.    The Green Folder meeting ended with a recommendation to Commissioner Cox that Abasciano be terminated for misusing FMLA leave and for sending inappropriate tweets on January 6, 2021.

### The BPD terminates Abasciano

336.    On January 30, 2023 and February 15, 2023, disciplinary hearings were held before Chief Administrative Hearings Officer Deputy Superintendent Richard Dahill ("Dahill").

337.    The specifications (counts) that were heard at the disciplinary hearing were for: I - misuse of FMLA in violation of BPD Rule 102 § 3 (conduct unbecoming); II - tweets that support the riot at the Capitol and call into question his fitness to hold the role of police officer in violation of BPD Rule 102 § 3 (conduct unbecoming); and III - tweets that support the riot at the Capitol and reflect unfavorably one the BPD in violation of BPD Rule 113 § 5, Canon of Ethics (Canon Eight).

338.    On March 7, 2023, Dahill issued a decision finding that Specification I was not sustained, but that Specification II and III were sustained.

339.    On March 13, 2023, the BPD fired Abasciano by a letter written by Commission Cox for violation of Rule 102 § 3 (Conduct Unbecoming) and Rule 113 § 5 (Canon of Ethics, Canon Eight) in connection with tweets he sent on January 6, 2021 through his Twitter account @mailboxjoe.

340.    In the termination letter, Cox wrote:

> **"I find your social media posts describing individuals that stormed the Capital (sic) building as "patriots" calls into question your ability to police members of the community in an unbiased and objective manner."**

341.    However, Commissioner Cox never contacted Abasciano and asked him to explain the six tweets he sent on January 6, 2021.

342.    IA was unable to identify the person who made the B. Rosa complaint against Abasciano.

343.    The BPD never sought an extension of time from the POST Commission to complete their IA investigation of Abasciano within the one year required under the law.

344.    Prior to his termination, Abasciano had never received any discipline.

345.    During Abasciano's employment with the BPD, no co-workers ever filed any complaints against him.

346.   There were no Boston police officers who complained about Abasciano's tweets.

347.   There were no Boston police officers who refused to work with Abasciano.

348.   There were no City of Boston employees who complained about Abasciano's tweets.

349.   There were no protests by members of the public because of Abasciano's tweets.

350.   At the time Abasciano sent the tweets on January 6, 2021, the BPD did not have a social medial policy in place.

351.   As of August 16, 2023, the BPD still did not have a social media policy in place.

352.   On March 23, 2023, Abasciano appealed his termination to the Massachusetts Civil Service Commission (the "CSC").

353.   Five evidentiary hearings were held before the CSC on August 16, 2023, August 23, 2023, October 11, 2023, October 18, 2023 and December 7, 2023.

354.   On April 1, 2024, Abasciano and the BPD each filed post-hearing briefs with the CSC.

355.   In Abasciano's post-hearing brief, he argued that the tweets that resulted in his termination were protected speech under the First Amendment and, therefore, the BPD did not have "just cause" to terminate him.

356.   In the BPD's post-hearing brief, it argued that Abasciano's tweets that resulted in his termination were not protected speech under the First Amendment and, therefore, the BPD had "just cause" to terminate him.

357.   On December 19, 2024, the CSC issued a decision vacating Abasciano's termination, a copy of which is attached hereto as Exhibit "B" (the "CSC Decision").

358.   The CSC Decision provided, in pertinent part:

> . . the BPD did not have just cause to discharge [Abasciano] for engaging in protected speech"

(Id. at 3).

> . . . (1) [Abasciano's] tweets are private political speech on matters of public concern that fit within the scope of BPD Rule 102, Section 30 and (2) the BPD has not established an adequate justification to restrict that speech in the interest of protecting the BPD's mission or operations. Therefore, the tweets cannot be sanctioned as "conduct unbecoming" under BPD Rule 102, Section 3 or as a violation of the BPD's Canon of Ethics under Rule 113, Canon 8.

(Id. at 35).

359.    The BPD never appealed the CSC Decision to the Massachusetts Superior Court and, therefore, the CSC Decision and order are final.

360.    Defendants' actionable conduct complained of herein proximately caused Abasciano to suffer grave and substantial pecuniary damages, including lost wages, fringe benefits, vacation pay, as well as other pecuniary damages, now, and in the future.

361.    Defendants' actionable conduct complained of herein forced Abasciano to suffer substantial compensatory damages, including personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a loss of income, fear regarding Abasciano ability to find new suitable employment, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses.

362.    The conduct of each Defendant warrants the imposition of statutory punitive or exemplary damages, because Defendants intentionally and maliciously and without justification or excuse subjected Abasciano to discriminatory terms and conditions of employment based on his disability and religion, and illegally retaliated against Abasciano for filing administrative charges in the MCAD and EEOC, thereby demonstrating each Defendants' reckless and callous indifference to Abasciano's right to work in an environment free from unlawful discrimination, and demonstrating each Defendants' malice or ill will.

363.    Defendants stand jointly and severally liable to Abasciano for his damages resulting from the Defendants' illegal and wrongful actions complained of herein.

## CLAIMS AGAINST DEFENDANT CITY OF BOSTON

### COUNT I
### FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
### PURSUANT TO A DISABILITY
### VIOLATION OF 42 U.S.C. § 12101 et seq.

364.    Plaintiff hereby incorporates by reference paragraphs 1-363 of this Verified Complaint as though fully set forth herein.

365.    In January 2021, Abasciano was assigned to the Medically Incapacitated Section (MIS) as a result of work-related injuries to his right knee and left hip.

366.    At all times relevant to this action, the physical impairments to Abasciano's right knee and left hip substantially limited one or more of his major life's activities including, but not limited to, the ability to walk, stand, lift, and bend.

367.    In September 2021, Abasciano learned there would be a training session in late October for Detective candidates, which was the mandatory first step in the promotional process (the "detectives training").

368.    On October 20, 2021, the BPD posted a list of police officers selected to attend the Detectives training, and Abasciano's name was not included on the list.

369.    Abasciano submitted two doctor's notes setting forth the accommodations he need to participate in the Detectives training, however, the BPD rejected both doctor's notes.

370.    Despite Abasciano's specific requests, the BPD never provided him with a list of activities that candidates at the Detectives training were required to perform so his doctors could make the necessary recommended accommodations.

371.    On October 27, 2021, the BPD refused to allow Abasciano to attend the academic portion of the Detectives training due to "not being medically fit enough."

372.    As a result, Abasciano did not attend the Detectives training and never received a promotion to Detective.

373.    By refusing to allow Plaintiff to attend the detectives training because of his disabilities and by failing to engage in the interactive process, Defendant violated 42 U.S.C. § 12101 et seq. and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

WHEREFORE, Plaintiff prays for the relief hereinafter set forth.

## COUNT II
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## PURSUANT TO A DISABILITY
## VIOLATION OF MASS. GEN. LAWS c. 151B

374.    Plaintiff hereby incorporates by reference paragraphs 1-373 of this Verified Complaint as though fully set forth herein.

375.    In January 2021, Abasciano was assigned to the Medically Incapacitated Section (MIS) as a result of work-related injuries to his right knee and left hip.

376.    At all times relevant to this action, the physical impairments to Abasciano's right knee and left hip substantially limited one or more of his major life's activities including, but not limited to, the ability to walk, stand, lift, and bend.

377.    In September 2021, Abasciano learned there would be a training session in late October for Detective candidates, which was the mandatory first step in the promotional process (the "detectives training").

378.    On October 20, 2021, the BPD posted a list of police officers selected to attend the Detectives training, and Abasciano's name was not included on the list.

379.    Abasciano submitted two doctor's notes setting forth the accommodations he need to participate in the Detectives training, however, the BPD rejected both doctor's notes.

380.    Despite Abasciano's specific requests, the BPD never provided him with a list of activities that candidates at the Detectives training were required to perform so his doctors could make the necessary recommended accommodations.

381.    On October 27, 2021, the BPD refused to allow Abasciano to attend the academic portion of the Detectives training due to "not being medically fit enough."

382.    As a result, Abasciano did not attend the Detectives training and never received a promotion to Detective.

383.    By refusing to allow Plaintiff to attend the detectives training because of his disabilities and by failing to engage in the interactive process, Defendant violated 42 U.S.C. § 12101 et seq. and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

## COUNT III
## RELIGIOUS DISCRIMINATION
## VIOLATION OF 42 U.S.C. § 2000e-2(a)

384.    Plaintiff hereby incorporates by reference paragraphs 1-383 of this Verified Complaint as though fully set forth herein.

385.    Abasciano did not take the COVID vaccine due to a sincerely held religious belief.

386.    Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief.

387.    After O'Brien learned that the reason Abasciano was unvaccinated was because of his sincerely held religious belief, she stopped responding to his emails.

388.    Shortly after Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief, his name did not appear on the detectives training list, and he was precluded from participating in the Detectives training.

389.    By refusing to allow Plaintiff to attend the detectives training because of his sincerely held religious belief, Defendant violated 42 U.S.C. § 2000e-2(a) and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

## COUNT IV
## RELIGIOUS DISCRIMINATION
## VIOLATION OF MASS. GEN. LAWS c. 151B

390.    Plaintiff hereby incorporates by reference paragraphs 1-389 of this Verified Complaint as though fully set forth herein.

391.    Abasciano did not take the COVID vaccine due to a sincerely held religious belief.

392.    Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief.

393.    After O'Brien learned that the reason Abasciano was unvaccinated was because of his sincerely held religious belief, she stopped responding to his emails.

394.    Shortly after Abasciano communicated to O'Brien that the reason he did not take the COVID vaccine was due to a sincerely held religious belief, his name did not appear on the detectives training list, and he was precluded from participating in the Detectives training.

395.    By refusing to allow Plaintiff to attend the detectives training because of his sincerely held religious belief, Defendant violated Mass. Gen. Laws c. 151B and as a direct and proximate result of such illegal conduct, Plaintiff has suffered grave and substantial damages, wherefore Defendant stands liable to Plaintiff for the damages more fully alleged in paragraphs 350-352 above.

## COUNT V
## RETALIATORY DISCHARGE
## VIOLATION OF 42 U.S.C. § 2000e-3(a)

396.    Plaintiff hereby incorporates by reference paragraphs 1-395 of this Verified Complaint as though fully set forth herein.

397.    On June 2, 2022, Abasciano filed the MCAD administrative charge.

398.    On August 8, 2022, Defendant filed a Position Statement with the MCAD.

399.    On November 23, 2022, Abasciano filed a rebuttal in which he alleged for the first time that in 2018, the BPD discriminated against him on the basis of his gender in relation to a Detectives promotional examination.

400.    A member of the BPD told Abasciano that the BPD purposely lowered his and another male police officer's examination scores so that female police officers with lesser experience could be promoted to Detective and, therefore, Abasciano reasonably and in good faith believed that the BPD had violated the law.

401.    Within a few months of the BPD receiving Abasciano's MCAD administrative charge and shortly after receiving his rebuttal alleging gender discrimination, Commissioner Cox sent Abasciano's IA file to Owens for a review after a year of inactivity.

402.    After Owens reviewed Abasciano's IA file, he wrote a non-concurrence letter on December 2, 2022 concluding that Abasciano violated BPD rules.

403.    After Owens wrote a non-concurrence letter, Dottin agreed with his conclusion and signed off on it on December 20, 2022, reversing her previous position that Abasciano violated no BPD rules.

404.    After Owens wrote a non-concurrence letter, the BPD Legal Department agreed with his conclusion and signed off on it on December 21, 2022, reversing its previous position that Abasciano violated no BPD rules.

405.    Shortly thereafter, a Green Folder meeting took place where the BPD Legal Department recommended Abasciano's termination, which was ultimately adopted by Commissioner Cox on March 13, 2023.

406.    Despite Abasciano's performance of his assigned duties in an exemplary and professional manner at all times during the course of his employment with Defendant, because he participated in protected conduct by filing an MCAD administrative charge and alleging gender discrimination in a rebuttal, Defendant unlawfully terminated Abasciano's valuable employment in violation of 42 U.S.C. § 2000e-3(a), and as a direct and proximate result of such illegal conduct, Abasciano has suffered grave and substantial damages, wherefore Defendants stands joint and severally liable to Abasciano for the damages more fully alleged in paragraphs 350-352 above.

## COUNT VI
## RETALIATORY DISCHARGE
## VIOLATION OF MASS. GEN. LAWS c. 151B

407.    Plaintiff hereby incorporates by reference paragraphs 1-406 of this Verified Complaint as though fully set forth herein.

408.    On June 2, 2022, Abasciano filed the MCAD administrative charge.

409.    On August 8, 2022, Defendant filed a Position Statement with the MCAD.

410.    On November 23, 2022, Abasciano filed a rebuttal in which he alleged for the first time that in 2018, the BPD discriminated against him on the basis of his gender in relation to a Detectives promotional examination.

411.    A member of the BPD told Abasciano that the BPD purposely lowered his and another male police officer's examination scores so that female police officers with lesser experience could be promoted to Detective and, therefore, Abasciano reasonably and in good faith believed that the BPD had violated the law.

412.    Within a few months of the BPD receiving Abasciano's MCAD administrative charge and shortly after receiving his rebuttal alleging gender discrimination, Commissioner Cox sent Abasciano's IA file to Owens for a review after a year of inactivity.

413.    After Owens reviewed Abasciano's IA file, he wrote a non-concurrence letter on December 2, 2022 concluding that Abasciano violated BPD rules.

414.    After Owens wrote a non-concurrence letter, Dottin agreed with his conclusion and signed off on it on December 20, 2022, reversing her previous position that Abasciano violated no BPD rules.

415.    After Owens wrote a non-concurrence letter, the BPD Legal Department agreed with his conclusion and signed off on it on December 21, 2022, reversing its previous position that Abasciano violated no BPD rules.

416.    Shortly thereafter, a Green Folder meeting took place where the BPD Legal Department recommended Abasciano's termination, which was ultimately adopted by Commissioner Cox on March 13, 2023.

417.    Despite Abasciano's performance of his assigned duties in an exemplary and professional manner at all times during the course of his employment with Defendant, because he participated in protected conduct by filing an MCAD administrative charge and alleging gender discrimination in a rebuttal, Defendant unlawfully terminated Abasciano's valuable employment in violation of 42 U.S.C. § 2000e-3(a), and as a direct and proximate result of such illegal conduct, Abasciano has suffered grave and substantial damages, wherefore Defendants stands joint and severally liable to Abasciano for the damages more fully alleged in paragraphs 350-352 above.

## COUNT VII
## FIRST AMENDMENT RETALIATION
## VIOLATION OF 42 U.S.C. § 1983

418.    Plaintiff hereby incorporates by reference paragraphs 1-417 of this Verified Complaint as though fully set forth herein.

419.    At all relevant times to this matter, Abasciano was employed by a public employer.

420.    On January 6, 2021, Abasciano sent out six tweets on Twitter concerning matters of a public concern — the 2020 Presidential election (the "January 6, 2021 tweets").

421.    Abasciano sent the January 6, 2021 tweets as a private person outside of the workplace.

422.    In Abasciano's Twitter profile, he did not identify himself as a police officer.

423.    In Abasciano's Twitter profile, he did not identify himself as a member of the BPD.

424.    In Abasciano's Twitter profile, he did not identify himself as an employee of the City of Boston.

425.    In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his workplace, supervisors or co-workers.

426.    In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his position as a police officer, the BPD or the City of Boston.

427.    By making the January 6, 2021 tweets, Abasciano was speaking as a citizen on matters of public concern.

428.    The January 6, 2021 tweets are political speech protected under the First Amendment to the United States Constitution.

429.    No BPD police officer ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

430.    No BPD police officer ever refused to work with Abasciano or requested that they not be assigned to work with him because of the January 6, 2021 tweets.

431.    No City of Boston employee ever complained to the BPD or to the City of Boston about the January 6, 2021 tweets.

432.    No member of the public ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

433.    There were no protests at the BPD or in the City of Boston about the January 6, 2021 tweets.

434.    On March 13, 2023, the City of Boston, terminated Abasciano via a termination letter issued by Cox.

435.    Abasciano's speech was a substantial or motivating factor in the City of Boston's decision to terminate him because Owens testified under oath that had Abasciano not sent the January 6, 2021 tweets, he would not have been terminated.

436.    Because there were no complaints by any police officers, City of Boston employees or members of the public about the January 6, 2021 tweets in which Abasciano commented upon matters of public concern, the efficiency of the public services the City of Boston performs through the BPD — preventing crime, protecting and serving the community, and upholding the laws of the city, state, and country — was not disrupted in any way.

437.    Accordingly, Abasciano's speech outweighed any interest that the City of Boston had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the City of Boston did not have an adequate justification for terminating Abasciano.

438.    Furthermore, any prediction The City of Boston made that the January 6, 2021 tweets would impair the operation of the BPD or damage the BPD's reputation and trust within the community was not reasonable.

439.    The BPD Commissioner is the executive head of the BPD and is responsible for the management, planning, direction, and control of the BPD.

440.    At all times relevant to this matter, the disciplinary process at the BPD is that police officers cannot be disciplined, including terminated, unless the BPD Commissioner ratifies it.

441.    As Deputy Superintendent, Owens was in a position to influence Cox, who had the final say in terminating Abasciano.

442.    Owens has testified under oath that the reason the City of Boston terminated Abasciano is because he divides people into "patriots" and "traitors" and, therefore, he is unfit to perform the duties of a police officer.

443.    However, this reason is not credible and, thus evidence of pretext for the true reason for Abasciano's termination, which is because he expressed controversial political opinions about the 2020 Presidential election via the January 6, 2021 tweets.

444.    When the City of Boston terminated Abasciano, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

445.    The March 13, 2023 termination letter issued by Cox provided that Abasciano was terminated because of his "social media posts."

446.    And because Abasciano's injury was caused by a person with final policymaking authority – Cox, who was the Commissioner of the BPD at the time – the unconstitutional conduct occurred pursuant to an official policy or custom and, therefore, the City of Boston is liable.

447.    Defendants conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff has been harmed thereby.

## COUNT VIII
## DEFAMATION

448.    Plaintiff hereby incorporates by reference paragraphs 1-447 of this Complaint as though fully set forth herein.

449.    On March 13, 2023, Cox issued a termination letter to Abasciano.

450.    In the termination letter, Cox wrote: "I find your social media posts describing individuals that stormed the Capital building as 'patriots' calls into question your ability to police members of the community in an unbiased and objective manner."

451.    However, Abasciano never wrote in any of his tweets that the individuals who stormed the Capital were "patriots" and, therefore, Defendant Cox's statement was made with knowledge that it was false.

452.    Defendant Cox made the defamatory comment with an improper motive.

453.    Defendant Cox made the defamatory comment with reckless disregard for its truth.

454.    Defendant Cox made the defamatory comment with malice.

455.    Defendant Cox's defamatory comment was published to others inside the BPD.

456.    Defendant Cox's defamatory comment was eventually reported in the media.

457.    Defendant Cox's statement that Abasciano described individuals that stormed the Capital building as "patriots" is incompatible with Abasciano's profession as a police officer and has caused severe damage to both his professional and personal reputations.

458.    When Defendant Cox signed the March 13, 2023 termination letter, he was acting within the scope of his employment as Commissioner of the BPD and, therefore, Defendant City of Boston is vicariously liable for his actions.

WHEREFORE, Plaintiff has been harmed thereby.

## CLAIMS AGAINST DEFENDANTS MICHELLE WU, MICHAEL A. COX, AND PHILLIP OWENS

### COUNT IX
### VIOLATION OF 42 U.S.C. § 1983
### FIRST AMENDMENT RETALIATION

459.    Plaintiff hereby incorporates by reference paragraphs 1-458 of this Complaint as though fully set forth herein.

460.    At all relevant times to this matter, Abasciano was employed by a public employer.

461.    On January 6, 2021, Abasciano sent out six tweets on Twitter concerning matters of a public concern — the 2020 Presidential election (the "January 6, 2021 tweets").

462.    Abasciano sent the January 6, 2021 tweets as a private person outside of the workplace.

463.    In Abasciano's Twitter profile, he did not identify himself as a police officer.

464.    In Abasciano's Twitter profile, he did not identify himself as a member of the BPD.

465.    In Abasciano's Twitter profile, he did not identify himself as an employee of the City of Boston.

466.    In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his workplace, supervisors or co-workers.

467.    In the January 6, 2021 tweets, Abasciano did not reference any matters pertaining to his position as a police officer, the BPD or the City of Boston.

468.    By making the January 6, 2021 tweets, Abasciano was speaking as a citizen on matters of public concern.

469.    The January 6, 2021 tweets are political speech protected under the First Amendment to the United States Constitution.

470.    No BPD police officer ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

471.    No BPD police officer ever refused to work with Abasciano or requested that they not be assigned to work with him because of the January 6, 2021 tweets.

472.    No City of Boston employee ever complained to the BPD or to the City of Boston about the January 6, 2021 tweets.

473. No member of the public ever complained to the BPD or the City of Boston about the January 6, 2021 tweets.

474. There were no protests at the BPD or in the City of Boston about the January 6, 2021 tweets.

475. On March 13, 2023, the City of Boston, terminated Abasciano via a termination letter issued by Defendant Cox.

476. Abasciano's speech was a substantial or motivating factor in the City of Boston's decision to terminate him because Defendant Owens testified under oath that had Abasciano not sent the January 6, 2021 tweets, he would not have been terminated.

477. Because there were no complaints by any police officers, City of Boston employees or members of the public about the January 6, 2021 tweets in which Abasciano commented upon matters of public concern, the efficiency of the public services the City of Boston performs through the BPD — preventing crime, protecting and serving the community, and upholding the laws of the city, state, and country — was not disrupted in any way.

478. Accordingly, Abasciano's speech outweighed any interest that the City of Boston had in preventing unnecessary disruptions and inefficiencies in the workplace and, therefore, the City of Boston did not have an adequate justification for terminating Abasciano.

479. Furthermore, any prediction The City of Boston made that the January 6, 2021 tweets would impair the operation of the BPD or damage the BPD's reputation and trust within the community was not reasonable.

480. Defendant Owens has testified under oath that the reason the City of Boston terminated Abasciano is because he divides people into "patriots" and "traitors" and, therefore, he is unfit to perform the duties of a police officer.

481. However, this reason is not credible and, thus evidence of pretext for the true reason for Abasciano's termination, which is because he expressed controversial political opinions about the 2020 Presidential election via the January 6, 2021 tweets.

482. When the City of Boston terminated Abasciano, it was acting under the color of law within the meaning of 42 U.S.C. § 1983.

483. The March 13, 2023 termination letter issued by Defendant Cox provided that Abasciano was terminated because of his "social media posts."

484. On January 16, 2021, when then-Mayoral candidate Defendant Wu was asked by a news reporter whether she would fire any City of Boston employee who was at the Capitol on January 6, 2021, she stated: "Absolutely."

485.    Defendant Wu did not clarify or condition her response that her decision to fire an employee would depend on whether the employee entered the Capitol.

486.    Defendant Wu is a graduate of Harvard Law School and, therefore, it logically follows that she knew or should have known that the January 6, 2021 tweets were protected speech and that firing Abasciano would violate his First Amendment rights.

487.    Prior to terminating Abasciano on March 13, 2023, Defendants Cox and Owens were aware that the January 6, 2021 tweets constituted protected speech under the First Amendment to the United States Constitution because Lema's report included a First Amendment analysis, specifically, whether Abasciano's tweets violated the standard set forth by the U.S. Supreme Court in Brandenburg v. Ohio, 395 U.S. 444 (1969).

488.    Defendants Cox and Owens read Lema's report and, therefore, they knew or reasonably should have known that Abasciano as a citizen possessed constitutionally-protected rights to be free from retaliatory treatment by them and Defendant City of Boston even if Abasciano vigorously exercised his right to free speech.

489.    It was not objectively reasonable for Defendants to believe that they and Defendant City of Boston's unconstitutional, wrongful, tortious and negligent course of conduct concerning Abasciano was legally permissible in light of legal rules in existence at the time of the conduct.

490.    It was not objectively reasonable for Defendants to believe that their actions were permissible under law.

491.    Defendants are not entitled to immunity or qualified immunity regarding their unconstitutional, wrongful, tortious and negligent course of conduct concerning Abasciano complained of herein while acting under color of state law, because their conduct was clearly prohibited by federal law at the time, and it was clearly prohibited by reference to common standards of fairness, fair play and due process, and it was objectively and legally unreasonable in light of the legal rules clearly established at the time of the conduct.

492.    Defendants stand personally liable to Abasciano pursuant to 42 U.S.C. § 1983 based upon their personal involvement and direct participation in the unconstitutional course of conduct concerning Abasciano complained of herein while acting under color of law and under pretense of law.

493.    Defendants' conduct as described herein constitutes a violation of 42 U.S.C. § 1983.

494.    The public interest has been harmed by the Defendants' unlawful actions against Abasciano.

WHEREFORE, Plaintiff has been harmed thereby.

### CLAIMS AGAINST DEFENDANT JOSEPH COPPINGER

### COUNT X
### INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP

495.    Plaintiff hereby incorporates by reference paragraphs 1-494 of this Complaint as though fully set forth herein.

496.    In January 2021, Abasciano had a business relationship or contemplated contract of economic benefit with Defendant City of Boston.

497.    Defendant Coppinger was aware of Abasciano's business relationship or contemplated contract of economic benefit with Defendant City of Boston as evidenced by the fact that in the B. Rosa Complaint he references Abasciano as one of the BPD's off duty officers ("A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress. . . ").

498.    Defendant Coppinger interfered with Abasciano's business relationship or contemplated contract of economic benefit with Defendants City of Boston by intentionally misrepresenting to the BPD that Abasciano  had threatened Vice President Pence and members of Congress and by only submitting three of Abasciano's six tweets so the BPD could not appreciate the proper context of his tweets.

499.    Defendant Coppinger's interference with Abasciano's business relationship or contemplated contract of economic benefit with Defendant City of Boston was through improper motive or means because he disapproved of Abasciano's unpopular, political speech and, thus, wanted to see him punished by his employer.

500.    As a direct and proximate result of Defendant Coppinger's conduct, Abasciano lost an advantageous business relationship with Defendant City of Boston when he was terminated form his position, thereby suffering severe economic losses.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff JOSEPH ABASCIANO prays that this Honorable Court grant him the following relief:

1.    An order directing Defendant City of Boston to place Plaintiff in the position Plaintiff would have occupied but for Defendants' unlawful treatment of Plaintiff, and make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful treatment, including, but not limited to, lost wages, employment benefits, including an order requiring that Defendant reinstate Plaintiff to an appropriate position without further violation of his rights or retaliation;

2.    A finding that the Defendants stands joint and severally liable to make Plaintiff whole for all damages suffered as a result of the wrongful acts and omissions alleged in each Count herein, including inter alia damages for personal emotional pain, personal suffering, personal inconvenience and discomfort, mental anguish, extreme and severe emotional distress, loss of enjoyment of life, humiliation, embarrassment, fear and discomfort triggered by suffering a damage to his professional and personal reputations, anguish, frustration, and other severe non-pecuniary losses, now, and in the future, as well as future pecuniary losses

3.    A finding that the Defendants stand joint and severally liable to Plaintiff for the imposition of statutory exemplary or punitive damages, because Defendants intentionally and maliciously and without justification or excuse illegally discriminated against Plaintiff on the basis of his religion and disability and retaliated against him for engaging in protected conduct, thereby demonstrating Defendants' reckless and callous indifference to Plaintiff's right to work in an environment free from unlawful discrimination, and demonstrating Defendants' malice or ill will;

4.    An order declaring that the acts and practices complained of herein are in violation of 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mass. Gen. Laws c. 151B.

5.    A permanent injunction against Defendants prohibiting future acts of discrimination against Plaintiff and similarly-situated employees;

6.    An order enjoining and permanently restraining Defendants from further violations of the 42 U.S.C. § 1983; Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mass. Gen. Laws c. 151B.

7.    An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

8.    A finding that the doctrine of qualified immunity is inapplicable to Defendants Wu, Cox, and Owens and that they are personally liable to Abasciano;

9.   A finding that Defendants stand joint and severally liable to Plaintiff for an award of his reasonable attorneys' fees, litigation costs and other costs of this action, together with a post-trial hearing to determine the amount of Plaintiff's reasonable attorneys' fees taxable to Defendants, along with a determination of Plaintiff's litigation costs and expenses taxable to Defendants;

10.  An appropriate award of pre-judgment interest at the state rate of twelve percent (12%) per annum on all sums recovered; and

11.  Such other and further relief as this Court deems just and proper.

## Demand for Jury Trial

Plaintiff claims trial by jury on all issues so triable.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 19th day of February, 2025.

_____

JOSEPH ABASCIANO

Plaintiff
JOSEPH ABASCIANO
By His Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (MA BBO#: 657622)

LAW OFFICE OF MARK P. GAGLIARDI
56 Pine Street, Suite 200
Providence, RI 02903
(401) 277-2030 (office)
(401) 487-6666 (cell)
(401) 274-2780 (fax)
mark@markgagliardilaw.net

Date: February 19, 2025

## CERTIFICATION OF SERVICE

I hereby certify that on this 19th day of February 2025, I filed electronically this document with the ECF system of the United States District Court for the District of Massachusetts and, therefore, all counsel-of-record have received notice electronically.

/s/Mark P. Gagliardi
Mark P. Gagliardi
Page 43 of 43

# EXHIBIT A



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website:  www.eeoc.gov

## <u>DISMISSAL AND NOTICE OF RIGHTS</u>

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 10/31/2024

**To:** Joseph Abasciano

Abascianoj@gmail.com

Charge No: 16C-2022-01607

EEOC Representative and email:    MARIANNE MONTLER
Supervisory Investigator
marianne.montler@eeoc.gov

---

## DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge. The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Yaw Gyebi, Jr.
10/31/2024

Yaw Gyebi, Jr.
District Director

**Cc:**

BOSTON POLICE DEPARTMENT

James.megee@pd.boston.gov

One Schroeder Plaza

Boston MA 2120


Please retain this notice for your records.

## INFORMATION RELATED TO FILING SUIT

## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:

https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request

for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 16C-2022-01607to the District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 16C-2022-01607to the District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at:

http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

✓ **Only one** major life activity need be substantially limited.

✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

"Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT B

## COMMONWEALTH OF MASSACHUSETTS

**CIVIL SERVICE COMMISSION**
100 Cambridge Street, Suite 200
Boston, MA 02114
(617) 979-1900

**JOSEPH ABASCIANO,**
            *Appellant*

    *v.*

**BOSTON POLICE DEPARTMENT**,
            *Respondent*

**Docket Number:**                    **D1-23-033**


Appearance for Appellant:            Mark P. Gagliardi, Esq.
                                     Law Office of Mark P. Gagliardi
                                     56 Pine Street – Suite 200
                                     Providence, RI 02903


Appearance for Respondent:           Joseph A. McClellan, Esq.
                                     Assistant Corporation Counsel
                                     Office of the Legal Advisor
                                     Boston Police Department
                                     One Schroeder Plaza
                                     Boston, MA 02120

Commissioners:                       Paul M. Stein

### SUMMARY OF DECISION

The substantive issue presented in this appeal is whether certain tweets sent by the Appellant on January 6, 2021, while attending the so-called "Stop the Steal" rally in Washington, D.C., constituted substantial misconduct that warranted his termination as a Police Officer in the Boston Police Department (BPD).[1] It was undisputed that, when the tweets were sent, the Appellant was off duty, they were sent from a private Twitter account and they did not identify the Appellant or his employment with the BPD. It was also undisputed that the Appellant did not participate in any way in the violent insurrection that day at the Capitol following the rally.

---

[1] After the record closed and the appeal was under advisement, the BPD filed a Motion to Dismiss the appeal for lack of jurisdiction on the grounds that an application for the Appellant's involuntary disability retirement had been filed by the BPD in June 2022 and was approved in January 2024, effective retroactive to the date of the Appellant's termination in March 2023. The BPD argued, therefore, that, as a retiree, the Appellant was no longer an aggrieved person over whom the Commission could order reinstatement or grant relief. The Appellant opposed the motion. For the reasons explained in this Decision, the Motion to Dismiss is denied.

The BPD conducted two thorough internal investigations – one by the Anti-Corruption Division (ACD) completed in May 2021 and another by the Internal Affairs Division (IAD) completed in November 2021. The ACD investigation confirmed that the Appellant had *not* personally participated in the violent insurrection or committed any criminal acts. As to the Appellant's tweets, the IAD investigation concluded that they were *not* intended to incite or condone violence and they did *not* impact the Appellant's ability to do his job. Overall, these investigations concluded that the Appellant had *not* engaged in any misconduct that violated the BPD's Rules and Procedures.

More than a year later, in December 2022, newly appointed BPD leadership reopened the Appellant's IAD file and, this time, reached a starkly different conclusion that charged the Appellant with "conduct unbecoming" for sending the January 6, 2021 tweets and recommended that the Appellant be terminated, which recommendation the new Police Commissioner adopted.

After a five-day de novo hearing, the Commission concluded that the two 2021 investigations were more objective, timely and thorough; were supported by a preponderance of the evidence; and deserve more weight than the less thorough December 2022 "paper review" which relied on erroneous facts and conclusions that were not substantiated by credible evidence. In short, the Commission allowed the Appellant's appeal because the preponderance of the evidence confirmed the BPD's 2021 initial findings and conclusions that the Appellant did *not* engage in misconduct on January 6, 2021, that there was *not* just cause to justify any discipline against him solely for the handful of tweets he sent from an anonymous account that day, and that the BPD had not shown, beyond speculation, that his tweets negatively impacted the BPD's operations or public mission.

This decision does not overlook the fact that most citizens, including members of this Commission, rightly reject the Appellant's misinformed opinions contained in his tweets about the 2020 election and its aftermath. The limited issues before the Commission, however, were: (1) whether the Appellant's disability retirement application filed by the BPD in June 2022 and approved retroactively to his termination date divested the Commission of jurisdiction to adjudicate the just cause for the BPD's termination decision, which the Commission decided it did not; and (2) whether, on the facts and the law, the Appellant's tweets were constitutionally protected speech, as he claimed, or whether, when made, or after they became public, the tweets rose to the level of sanctionable misconduct that justified his termination as the BPD claimed. The Commission's decision finds the Appellant's tweets to be protected speech and are not just cause for his termination. The decision is not to be construed as endorsing the substance of those misinformed opinions nor as condoning the underlying, unconscionable criminal acts committed by those who stormed the Capitol that day.

## DECISION

On March 23, 2023, the Appellant, Joseph Abasciano, appealed to the Civil Service Commission

(Commission), pursuant to G.L. c. 31, § 43, contesting his discharge as BPD Police Officer.[2] The

Commission held a remote pre-hearing on May 23, 2023 and held five days of evidentiary hearing

---

[2] The Standard Adjudicatory Rules of Practice and Procedure, 801 CMR 1.01 (formal rules), apply to adjudications before the Commission with G.L. c. 31, or any Commission rules, taking precedence.

at the Commission's Boston Offices on August 16, 2023, August 23, 2023, October 11, 2023, October 18, 2023 and December 7, 2023. The full hearings were digitally recorded and the parties received links to the recording. The recordings were transcribed into a written record which has been provided to the Commission, and the parties stipulated that the written transcripts became the official record of the hearings.[3] The parties submitted proposed decisions on April 1, 2024.

After the record closed and was under review, the Commission learned that the Appellant had been placed on injured duty leave for over two years prior to his termination and that, in June 2022, the BPD had filed an application for involuntary retirement of the Appellant, which was approved in January 2024, effective retroactively to the date of the Appellant's termination on March 13, 2023. By procedural orders, the Commission directed the parties to address whether the Appellant's retirement raised any questions about the Commission's jurisdiction over this appeal. As a result, the BPD filed a Motion to Dismiss the appeal for lack of jurisdiction, which the Appellant opposed.

For the reasons stated below, the BPD Motion to Dismiss is denied and the Appellant's appeal is allowed, as the BPD did not have just cause to discharge him for engaging in protected speech. The scope of the relief, if any, financial or otherwise, to which the Appellant may be entitled by virtue of the allowance of this appeal is a matter that must be left for agreement of the parties or adjudication in another forum with authority to interpret and enforce the applicable provisions of the relevant retirement, collective bargaining and other non-civil service laws involved.

**FINDINGS OF FACT**

The Commission received 86 exhibits into evidence (*App.Exhs.1 through 51; Resp.Exhs.1 through 35)*. Based on the documents submitted and the testimony of the following witnesses:

---

[3] If there is a judicial appeal of this decision, the plaintiff in the judicial appeal would be obligated to use the official written transcripts to the extent that the plaintiff challenges the decision as unsupported by substantial evidence, arbitrary and capricious, or an abuse of discretion.

*Called by the BPD:*
- BPD Superintendent Sharon Dottin
- BPD Deputy Superintendent Philip Owens
- BPD Sergeant Detective Rafael Antunez

*Called by the Appellant:*
- Joseph Abasciano, Appellant
- BPD Deputy Superintendent Eddy Chrispin
- BPD Captain Sean Martin

and taking administrative notice of all matters filed in the case and pertinent statutes, regulations, case law and policies, and reasonable inferences therefrom, a preponderance of the evidence establishes the following findings of fact:

**<u>Background</u>**

1.  The Appellant, Joseph Abasciano received his bachelor's degree in 2001. After serving honorably for four years on active duty with the U.S. Marine Corps, including a deployment to Iraq, he was employed briefly as a Correction Officer with a County Sheriff's Department prior to commencing his employment as a BPD police officer in June 2007. (*App.Exh.1 & 45; Resp.Exh.30, Vol.II [Appellant];Tr.V:8-18 [Appellant]*)

2.  Throughout his career, the Appellant received approximately three dozen official commendations for his performance and had no prior discipline. (*Resp.Exhs.34 & 49; App.Exhs.1, 2 through 5 &45; Tr.V:28-39 [Appellant]*)

3.  The Appellant's first assignment was District 11, an area in Dorchester, where he worked for about five years, interrupted by a second deployment to Iraq as a reservist. During this time, then Sergeant (now Captain) Sean Martin became his supervisor and mentor. (*Resp.Exh.30,Vol.II [Appellant];Tr.V:19 [Appellant]; Tr.IV:62-63 [Martin]*)

4.  When Sgt. Martin transferred to District 2, the Appellant chose to transfer with him to serve as a member of a community policing team under Sgt. Martin's command.  District 2 covers the

4

Orchard Park/Madison Park area of Boston. District 2 was a "high call volume" district where community police teams were assigned to focus on the "hotspots" with significant levels of criminal activity. (*Resp.Exh.30,Vol.II[Appellant]; Tr.V:19-23,30 [Appellant]; Tr.IV:64-66, 69 [Martin]*)

5.   Sgt. Martin described the Appellant as a "high performer" at District 2 and District 11.  Sgt. Martin observed the Appellant deal with police colleagues and community members on a daily basis. He never knew the Appellant to treat them with disrespect. Sgt. Martin "never observed any issue of anything impacting the Appellant's ability to do the job." (*Tr.IV:67-68, 71, 81 [Martin]*)

6.   During his career, the Appellant was injured on duty on five occasions and, eventually, he transferred in or about September 2018 from District 2 to District 14, a less strenuous assignment:

- In October 2010, he suffered knee strain and minor abrasions while arresting a suspect.

- In December 2013, he suffered another knee strain while in pursuit of a suspect that led to surgery in May 2014 and rehabilitation prior to his return to work in August 2014.

- In November 2014, he tore his ACL in pursuit of a thief which required another surgery. He returned to duty in December 2016.

- In July 2018, the Appellant was subduing an armed suspect when he injured his hand, shoulder and knee. He was treated at the hospital and returned to duty.

- In July 2020, the Appellant was violently pushed by a prisoner, exacerbating prior injuries to his leg. He did not ever return to duty.[4]

(*Resp.Exh.30,Vol.II [Appellant];Tr.V:23, 26, 40-41 [Appellant]; Tr.IV:72-23 [Martin]; Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

---

[4] A request by the Appellant to return to limited duty in September 2021 was denied by the BPD because the Appellant's physical restrictions as determined by the BPD were inconsistent with his attempt to return to duty. (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

7.  After his July 2020 injury, the Appellant began using his sick leave until September 2020, when the Appellant began a prior-approved intermittent leave under the federal Family Medical Leave Act (FMLA) to care for a family member. In November, the Appellant's FMLA leave was converted to approved continuous leave for two months beginning November 15, 2020 through January 23, 2021. (*Resp.Exh.22; Tr.V:41-43 [Appellant]*)

8.  The Appellant transitioned to injured leave status pursuant to G.L. c. 41, §111F on or about January 12, 2021, due to an increase in his symptoms of pain and immobility issues that, ultimately, resulted in additional surgery in January 2022. (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

9.  The documentation that the Appellant received from the BPD approving his FMLA leave contained no guidelines or restrictions on his ability to travel for personal reasons while on FMLA leave. (*Resp.Exh.22 & 25; Tr.II:84-85 [Owens];Tr.IV:34 [Chrispin];Tr.V:43 [Appellant]*)

**BPD Rules and Procedures**

10. The BPD has promulgated a set of Rules and Procedures governing the BPD's operations and conduct of its members. Among the rules relevant to the present appeal is Rule 102 of the BPD's Rules and Procedures entitled "The Conduct and General Rights and Responsibilities of Department Personnel", which provides, in relevant part:

> **Sec.2. GENERAL CONSIDERATIONS.** Police officers are more visible to the community than most other persons in government or public service. Public scrutiny and sometimes public criticism is directed not only at police performance but also at the behavior of those who deliver police services. *The establishment of proper standards for police behavior must take into account not only the expectations of the citizen but also the importance of respecting the individual rights of police employees. The Boston Police Department recognizes that its employees have certain basic personal rights and restricts those rights only where necessary to ensure the integrity of the Department and the highest quality of police service are maintained.*
>                                         . . .
> **Sec.3. CONDUCT.** *Employees shall conduct themselves at all times both on and off duty in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which tends to indicate that the employee is unable or unfit to*

*continue as a member of the Department, or tends to impair the operation of the Department or its employees.*

. . .

**Sec.4 NEGLECT OF DUTY:** *This includes any conduct or omission* which is not in accordance with established and ordinary duties or procedures as to such employees or *which constitutes use of unreasonable judgment in the exercise of any discretion granted to an employee.*

. . .

**Sec.19. STATEMENT OF OPINIONS.** *Employees shall not publicly criticize or ridicule the Department, its policies, or other employees by speech, writing or expression in any other manner when such speech, writing or other expression is defamatory, unlawful, interferes with the maintenance of discipline, or is made with reckless disregard of its truth or falsity.*

. . .

**Sec.30 POLITICAL ACTIVITY.** *Employees shall be permitted to*: Register and vote in any election. *Express opinions as private individuals on political issues and candidates*, subject to the provisions of Section 19 of this Rule. *Attend political conventions, rallies and similar political gatherings as private individuals*. Become candidates for election to an office of any town or city, other than the City of Boston, in any county other than Suffolk County, or other . . . office[s] which are not prohibited by Section 31 of the Rule. Hold membership in a political party and participate in its functions to the extent consistent with law and with these rules. Participate fully in public affairs to the extent that such endeavors do not impair the natural and efficient performance of official duties or create real or apparent conflicts of interest.

. . .

**Sec.31. EMPLOYEES NOT ON LEAVE OF ABSENCE PURSUANT TO SECTION 32 [TO BECOME A CANDIDATE FOR PUBLIC OFFICE] ARE PROHIBITED FROM:**

- Using their official capacity to interfere with or affect any election.

. . .

- Soliciting votes in support of or in opposition to any candidate in any way which would identify an employee as a member of the Boston Police Department.

. . .

- Engaging in any political activities prohibited by federal law, state statute or municipal ordinance.

. . .

[Miscellaneous prohibitions restricting the soliciting or making of political contributions or using public resources for political campaign activities are omitted here]

(*App.Exh.8*) (*emphasis added*)

11. Also relevant here is Rule 113 of the BPD's Rules and Procedures, entitled "Public Integrity

Policy", which provides, in relevant part:

**Sec.1. PURPOSE**. The purpose of this policy is to set forth the standards of ethics which will guide both the Boston Police Department, as an organization, and its officers and employees in the conduct of their private and professional affairs.

. . .

**Sec.3. POLICY**. It is the policy of the Boston Police Department that every action of the Department as an organization and those of the individuals who act on its behalf, will reflect the highest standards of honesty and integrity. *In all of our dealings whether with the public, other elements of the criminal justice system, or with each other, we will act in accordance with the ethical standards that are set forth below*. Additionally, it is the responsibility of each and every member of the Boston Police Department to adhere to those standards and to

take all necessary and prudent actions to expose those who knowingly violate the public trust. It is the responsibility of the Department to prevent, Detect and correct instances of misconduct, administrative or criminal, within the organization.

. . .

**Sec.5. CANONS OF ETHICS.** General Statement – In furtherance of this policy, the following Canons of Ethics are adopted. . . _[V]iolations of these canons severely undermine the ability of the Department to gain the confidence of both its employees and the public, and also negatively affect the ability to fulfill its essential mission. They are not meant to replace or supersede existing laws, special orders, or rules and regulations_, but to supplement them; they also serve as a reminder of the public trust that has been conferred upon the Boston Police Department by the citizens of Boston, and the need for constant vigilance to support that trust.

, , ,

**Canon Eight:** _Employees shall conduct their private affairs so as not to reflect unfavorably on the Boston Police Department, or in such manner as to affect their ability to perform their duties honestly, fairly and without impairment_.

(*App.Exh.10*) (_emphasis added_)

12. The BPD's Rules and Procedures do not include a social media policy or specific rules governing personal social media use. (*Tr.I:77 [Antunez];TrV:63-65 [Appellant]*)

## The Appellant's Trip to Washington DC on January 6, 2021

13. The Appellant has been politically and civically active for many years. He served on the Massachusetts Republican State Committee and, more recently, on the New Hampshire Republican State Committee. (*Resp.Exh.30,Vol.II[Appellant]; Tr.V:38-39 [Appellant]; Tr.IV:54-55 [Chrispin]*)

14. The Appellant maintained a social media account on Twitter (now known as X). He did not use his name in connection with the account, nor did he identify himself as a BPD Police Officer. He used the anonymous handle "@mailboxjoe".  His user profile listed his location as "Boston" and described himself as: "A beer-drinking, Marine Vet, constitutional conservative who believes in Peace Through Strength." (*Resp.Exh.18:Resp.Exh.30,Vol.II [Appellant]; Tr.V:147 [Appellant]*)

15. In the months preceding January 6, 2021, the Appellant posted over 2500 tweets (including retweets and replies) through his "@mailboxjoe" Twitter account. The Appellant's Twitter activity throughout this time frame dealt almost entirely with politics and, specifically, with the results of the

2020 national election and its aftermath. (*Resp.Exh.29*)[5]

16. On January 5, 2020, the Appellant travelled to Washington, D.C. with a fellow officer to attend the so-called "Stop The Steal" rally scheduled for the next day at which President Donald Trump was expected. (*Resp.Exhs.18 through 21; Tr.V:43-45, 49-51 [Appellant]*)

17. At 5:27 p.m. on January 5, 2023, the Appellant sent a reply tweet to @realDonaldTrump @senatmajlder @johnCornyn @senJohn Thune, concerning the size of the rally: "Thousands? With Respect Mr. President I am here and it is going to be Millions by tomorrow." (*Resp.Exhs.12 &29*)

18. In the early morning of January 6, 2021, the Appellant received a tweet from an unknown source stating, among other things, that Gabriel Sterling, the "Georgia 'Republican' Secretary of State" had "[c]aved to Stacy Abrams and eliminated meaningful signature match" and "[t]aped and leaked a phone call with [President Trump]". The Appellant thought such reports showed that Sterling broke the law and violated his oath of office. (*Resp.Exhs.5,12&.29; Tr.V:67-68 [Appellant]*)

19. At 5:53 a.m. on January 6, 2021, the Appellant replied to a tweet from @GabrielSterling, in which Secretary Sterling offered an explanation for his actions, writing: "I can't wait to see you dragged away in handcuffs." The Appellant said this tweet used the "hyperbole of the day" to deplore Mr. Sterling's attempt to defend his actions. (*Resp.Exhs.5, 12 & 29 Tr.V:67-68 [Appellant]*)

---

[5] During the investigation which gave rise to this appeal, the BPD Regional Intelligence Center (BRIC) downloaded a large volume of data from the Appellant's archived Twitter account. These data were reported on a 24-hour clock and the parties stipulated that subtracting eight hours from the times on the document converted the time on the tweets to Eastern Standard Time (EST).

I reviewed the complete record of the retrieved Twitter data which consists primarily of retweets and replies to tweets that endorsed the idea that the 2020 presidential election was stolen through fraud by election officials and foreign interference and demanded that Donald Trump remain in office for a second term. The retrieved information is displayed in a summary, tabular form and does not identity the recipients of retweets or the content of the tweets the Appellant received to which he did not reply, nor does it show the identity of the Appellant's approximately 100 or more Twitter "followers". (*Resp.Exhs.25, 29 & 35; Tr.V:148-150[Appellant]*)

20. At 6:44 a.m., the Appellant tweeted:

> MAGA Millions Patriots here in DC. Today is a day for choosing. Today there will be only two parties in America. Traitors and Patriots!" The Appellant added the hashtags #January6, #MAGA and #MarchForTrump"

The Appellant attached an image showing a crowd of people with the Washington Monument in the background. (*Resp.Exh.6, 12 & 29:Tr.V:72-73* )[6]

21. Sometime before 9:00 a.m., the Appellant and the fellow off-duty BPD officer checked out of the hotel where they stayed for the night and walked to the rally site at the Ellipse in front of the White House, passing through a metal detector to be admitted into the rally area. They wore civilian clothes and carried no BPD equipment or indicia identifying them as BPD police officers. They arrived early and got close to the stage. (*Resp.Exh.18 through 21 & 30; Tr.V:51-53 [Appellant]*)

22. At 8:14 a.m., the Appellant tweeted:

> Hey @senmajlder look out your window. Millions of Patriots are at your doorstep and we are watching. It is time for choosing. Are you a traitor or are you a Patriot #MarchforTrump, #StopTheSteal and #PatriotParty.

(*Resp.Exhs.7, 12 & 29*)

23. At 9:49 a.m., the Appellant tweeted to Vice President Pence's Twitter account:

> @VP I have friends and family who do not believe you have the courage to fulfill your oath and send the illegitimate electors back to the states. Mr. VP I have faith in God you will do your duty! Stand up for America!

(*Resp.Exh.29*)

24. At 10:03 a.m., the Appellant tweeted:

> "Send it back @VP".

(*Resp.Exh.29*)

---

[6] According to the Appellant, the reference to "two parties . . .traitors and patriots" was what might be called a "meme" contrived by supporters of former President Trump to glorify their self-serving position that those who wanted to keep Trump in office were "patriots" and to denigrate those who accepted Joe Biden as the legitimately elected successor as "traitors."  The language appears frequently in the thread of prior tweets about the 2020 election received by the Appellant. (*App.Exhs.13, 29 & 50; meme Tr.V:70-72 [Appellant]*)

25. At 12:40 p.m., while still at the rally, the Appellant tweeted:

> Everything that happens going forward @VP is now on your conscience" with the hashtags #1776Again, #MarchForTrump and #WeThePeople.

(*Resp.Exhs.8, 12 & 29; Tr.V:78-79 [Appellant]*)

26. The Appellant and the fellow officer stayed at the rally listening to the speeches. When President Trump finished speaking, at approximately 1:15 p.m., they left the rally and began slowly walking to the Capitol. Since they had been close to the stage, it took them over an hour to reach a grassy area near some rotaries on the <u>west</u> side of the Capitol, arriving there about 3:00 pm or 3:30 p.m. (*Resp.Exhs.18 through 21; App.Exh.51; Tr.V:78, 125 [Appellant]*)

27. By the time of their arrival, a mob had broken into the Capitol through the <u>east</u> side of the building and had made its way to the doors on the west side. The House and Senate had gone into recess and the building was in lockdown. (*Resp.Exh.17*)

28. At 3:54 p.m.[7], the Appellant tweeted:

> I hope you never sleep well again @VP your Treasonous Act lead [sic] to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @LLinWood was right about you all along.

(*Resp.Exhs.10, 12 & 29*) [8]

29. The Appellant and the fellow officer stayed at the west side of the Capitol for an hour or less, "a great distance" from the building. They crossed no barricades or lines that would have given them notice that they had gone anywhere they weren't allowed to be. They described the crowd near them as "rowdy but controlled" with some people gathered in "prayer groups". They saw people closer to the Capitol climbing walls on the west side and others in a "tug of war" with what they assumed

---

[7] I have used the 8-hour adjusted time shown on the BRIC-retrieved Twitter data. (*Resp.Exh.29*)

[8] This tweet refers to Ashli Babitt who was shot by a Capitol Police officer shortly after 3:00 pm. The Appellant heard about the shooting through messages received on his cell phone. (*Resp.Exhs.17 & 18; Tr.V:153-154 [Appellant]*)

were law enforcement and, at one point saw a person "taking a whack" at a window, all of which "was not what we were there for" and they decided to leave. They walked back to their car (over an hour's walk) and drove home to Boston, leaving Washington ahead of a 6:00 pm curfew. (*Resp.Exhs.18 through 21; Resp.Exh.30, Vol.I [Antunez & Owens]; Tr.I:48-49 [Antunez]; Tr.V:60-62, 88, 126-132, 142-143 [Appellant]*) [9]

30. As the Appellant and the fellow officer drove back to Boston, they learned additional details about the invasion that had taken place on the east side of the Capitol and the scope of the violence that had occurred inside the building. The Appellant received a number of tweets, including some critical of the violence that had occurred, which he "liked" and retweeted them. (*Resp.Exh.29; App.Exh.15; Tr.V:87-90,138-140,150,167-172, 179-182 [Appellant]*).

31. At 5:22 p.m., while on the road home, the Appellant tweeted:

> What I saw in [sic] today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots and Law Enforcement trying to do their jobs in a no win [sic] position. I fear this Treasonous election has killed the republic.

(*Resp.Exh.9, 12 & 29:Tr.V:62, 87 [Appellant]*)

32. During the evening of January 6, 2021 or on the following day, the Appellant was "doxxed" (identified as a BPD police officer using the @mailboxjoe Twitter account) by another BPD police officer (whom the Appellant said was a "high ranking" police union official who was not on good terms with the Appellant), using a (now defunct) fictitious Twitter handle. (*Resp.Exhs.1 & 2,18 through 21 & 29; Resp.Exh.30,Vol.II [Appellant]; Tr.V:97-98, 111-117, 174-178 [Appellant]*)

---

[9] At the Commission hearing, the Appellant had some doubt about what he saw personally and what he assumed he saw but later learned from news coverage and social media. I do not find that the Appellant's accounts of his actions on January 6, 2021 have changed much, but, to the extent there are discrepancies, which I attribute mainly to fading memory, my findings give greater weight to the more contemporaneous recollections provided during the 2021 BPD investigatory interviews. [*Resp.Exhs.18 through 21*]. (*Tr.V:64, 122-131 [Appellant];Tr.I:120-122 [Dottin]*)

33. The suspected officer was one of maybe two BPD officers whom the Appellant believed knew about the Appellant's nickname "Mailbox Joe" that had been given to him by his neighbors. The Appellant was not initially "one hundred percent" certain and declined to name the officer during the BPD investigation, when he had union representation. By the time of the Commission hearing, the Appellant testified that this BPD officer had admitted to the Appellant to being the person who identified the Appellant as the owner of the Twitter account with the handle @mailboxjoe. (*Resp.Exhs.18 through 21, Resp.Exh.30,Vol.II [Appellant]; Tr.V:111-114, 145-148 [Appellant]*)

34. After learning that he had been identified as the owner of his anonymous Twitter account, the Appellant closed down the account. (*Resp.Exhs.1 & 2,18 through 21 & 29; Resp.Exh.30,Vol.II [Appellant]; Tr.V:97-98, 111-117, 174-178 [Appellant]*)

35. The Appellant had been targeted with harassment and vandalism at his home in the past, due to his support of President Trump during the 2020 election. For that reason, he had previously shut down his Facebook account which identified him personally.  He kept his Twitter account because he believed, until his exposure January 6, 2021, that his tweets about political matters were anonymous and would not be traced back to him or his family. (*Resp.Exhs.18 through 21.Resp.Exh.30,Vol.II [Appellant]; Tr.V:98 [Appellant]*)

**The BPD's Bureau of Professional Standards First Investigation**

36. At some point after the Appellant shut down his @mailboxjoe account, the BPD received ag tweet from the police officer later confirmed to be the BPD officer described above:

> @bostonpolice – just a heads up. A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress. He and others have now removed their social media.

Attached to the tweet were screenshots of three of the January 6, 2021 tweets sent by the Appellant described above in Finding Nos. 20, 22 and 28. (*Resp.Exhs.1 & 4*)

13

37. On January 14, 2021, the Boston Globe reported, in part:

> The Boston Police Department said it is investigating whether one of its officers took part last week in a rally and ensuing siege on the US Capitol, and the agency is examining social media posts in which the alleged officer threatened Vice President Mike Pence. . . . Boston police and the Globe know the suspected identity of the officer, but the Globe is not naming him because it cannot confirm the authenticity of the posts. . . . Another Twitter user had taken screenshots of @mailboxjoe's post, then shared them with the Boston Police Department's social medical account and identified @mailboxjoe as a veteran officer. It does not appear that the department acted on that message prior to Globe inquiries.

At least one television station also broadcast a similar report. *Resp.Exhs.4, 13 & 14;Resp.Exh.30, Vol.I [Antunez & Owens]*)

38. On about January 16, 2021, the BPD's Anti-Corruption Division (ACD) in the Bureau of Professional Standards began an investigation into the alleged involvement of the Appellant and the fellow officer in the violence at the Capitol on January 6, 2021. The ACD's investigation focused on whether the Appellant had engaged in any criminal misconduct on January 6, 2021. (*Resp.Exhs.23 &24; Resp.Exh.30, Vol.I [Antunez]; Tr.I:40-42 [Antunez];Tr.II:22-23 [Owens]*)

39. On January 19, 2021, the Internal Affairs Division (IAD) of the Bureau of Professional Standards also opened an investigation into whether the Appellant's actions on January 6, 2021 had violated any BPD Rules and Procedures.  The IAD rules investigation was put on hold pending completion of the ACD's investigation into the Appellant's possible violation of the criminal law. (*App.Exh.46; Resp.Exh.30, Vol,I[Antunez];Tr.I:41-42,70[Antunez];Tr.IV:7 [Chrispin]*)

40. During the ACD investigation, the Appellant was interviewed on February 9, 2021 and April 21, 2021. The Appellant's fellow officer was interviewed on February 18, 2021.  At his first interview, the Appellant confirmed that the Twitter handle @mailboxjoe was his. He acknowledged that he had closed the account after being "doxxed", i.e. identified as the owner of the Twitter account @mailboxjoe.  He had a strong suspicion about who had publicly identified him but declined to name him because the Appellant was not absolutely certain. (*Resp.Exhs.18 through 20*)

14

41. Both the @mailboxjoe account and the other officer's Twitter account had been deactivated by the time of the ACD investigation. But for the Appellant's confirmation, the BPD would not have been able to connect him with the Twitter handle @mailboxjoe. It could not determine the identity of the person who had tied the Appellant to his Twitter account. (*Resp.Exhs.2 & 3;Tr.I:94-95 [Antunez] Tr.I:180-182 [Dottin]; Tr.II:1313-134 [Owens]*)

42. In addition to the interviews, the ACD reviewed the tweets that allegedly involved threats to the Vice President and others along with the data from the Appellant's account retrieved by the Boston Regional Intelligence Center (BRIC), as well as face recognition data and cell phone data obtained through the FBI, which confirmed that, as the Appellant asserted, neither the Appellant nor the fellow officer had been part of the mob that had stormed the Capitol. (*Resp.Exhs.23 & 24*)

43. Ultimately, the ACD investigation concluded that the Appellant's tweets and conduct on January 6, 2021 violated no criminal law. The ACD investigation was closed on May 3, 2021 with the conclusion: "Activity was determined not to exist." (*Resp.Exhs.23 & 24; Tr.I:43-44 [Antunez]; Tr.II:27 [Owens];Tr.IV:89-91 [Martin]*)

44. On May 19, 2021, the IAD revived its investigation. IAD Sergeant Detective Antunez was assigned to investigate whether the Appellant's actions on January 6, 2021 violated any BPD Rules and Procedures, with the focus on Rule 102, Section 4, Neglect of Duty/Unreasonable Judgement. (*App.Exh.46*; *Resp.Exhs.22 & 25; Resp.Exh.30,Vol.I [Antunez];Tr.I:45,50-53 65-67, 73 [Antunez]; Tr.II;26-28 [Owens];Tr.IV:9-12 [Chrispin]*)[10]

---

[10] Deputy Superintendent Eddy Chrispin served as the commander in charge of the IAD from January 21, 2021 until October 2022.  As the head of the IAD, Superintendent Chrispin would be responsible to review the allegations of a complaint against a BPD officer and identify at least one rule violation for purposes of "recording it and tracking it" on the BPD's software program (IAPro). Investigators were expected to "take into account all of the Boston Police Department Rules and Regulations" that would come into play as the facts of the investigation were developed. (*Tr.IV:4-5: 9-14 [Chrispin]*)

45. Sergeant Detective Antunez received the complete ACD file.  He listened to audio recordings of all of the ACD interviews of the Appellant and his fellow officer. He reviewed the tweets made by the Appellant as well as the history of his Twitter account obtained by the BIRC that had been obtained during the ACD investigation. He conducted his own audio/video interview of the Appellant on May 25, 2021 in which he covers the issues involving the Appellant's alleged misuse of FMLA leave as well as his behavior on January 6, 2020.  He reviewed the Appellant's time and attendance records for January 5, 2021 and January 6, 2021. He confirmed the Appellant's description of the prior vandalism of his home by obtaining copies of the BPD incident reports for three days in August and September 2020. He prepared a 42-page investigative report which he submitted through Lieutenant Detective Thomas Lima, to his immediate superior, Eddy Chrispin, then the Deputy Superintendent in charge of the IAD. (*App.Exh.46; Resp.Exhs.25 & 35: Tr.I:46-51 [Appellant]*)

46. On June 29, 2021, Lieutenant Detective Lima prepared a cover report which contained an abridged summary of the facts drawn from Sergeant Detective Antunez and a conclusion that the Appellant had not violated any BPD rules. Pursuant to standard procedure, Lieutenant Detective Lima's report was forwarded and approved by Deputy Superintendent Chrispin, then forwarded to BPS Superintendent Sharon Dottin, who noted and approved the report and forwarded it along for review by the BPD Legal Advisor. (*Resp.Exhs.35&.46  Tr.I:51-52[Antunez];Tr.I:100-127[Dottin];Tr.IV;16-32 [Chrispin]*)

47. The BPD Office of the Legal Advisor "tasked back" the investigation to IAD and, after further review, eventually approved it. On or about November 16, 2021, the final report was approved by IAD Deputy Superintendent Chrispin and the Bureau of Professional Standards Superintendent Sharon Dottin.  (*App.Exhs.26, 35 & 46;Tr.I:125-127 [Dottin]*)

48. The IAD November 16, 2021 investigation report made the following Findings/Recommendations concerning the Appellant:

Relative to Police Officer Joseph Abasciano being present at the President's speech and the march to the Capital [sic] building, Officer Abasciano stated that he was in the vicinity of the Capitol Grounds for 25 to 40 minutes. . . .Officer Abasciano stated that when he saw a window being broken to the Capital [sic] building, he decided that it was time to leave the area and return to his rental vehicle. *There was no evidence that either of the officers had been on the Capitol grounds during the violence or had participated in any violent acts or any threatening disorderly behavior.*

Relative to the tweets and social media posts, Police Officer Joseph Abasciano had written many tweets that might be considered to be rhetorical hyperbole. *The Internal Affairs Division investigation revealed no evidence that PO Abasciano posted inappropriate comments that were threatening on his Twitter account* . . . . The Boston Police Department has no social media policy.

Relative to the FMLA requirements, there are no distinctive FMLA guidelines or restrictions at the Federal and State levels of government that dictate what a person on paternity leave can and cannot do. . . .

Boston Police Department Rule 102, Section 4, states the following: Sec 4: NEGLECT OF DUTY: This includes any conduct or omission which is not in accordance with established and ordinary duties or procedures as to such employees or which constitutes use of unreasonable judgment in the exercising of any discretion granted to an employee.

The following are the quotes . . . as they may relate to threats against the Vice President of the United States and, as a Boston Police Officer, unreasonable judgment as an employee of the Boston Police Department.

[Quoting the tweets on 1/5/21 @ 5:27 am; 1/6/21 @ 5:53 am, @6:44 am, @8:14 am, 12:40 pm, @3:54 pm and @5:22 am]

[T]he Constitution of the United States the First Amendment . . . protects citizens against government limits on their freedom of expression, but it does not prevent a private employer from setting its own rules. . . . The Supreme Court has recognized . . . the 'Brandeburg Test' which requires that in order to punish the speaker, the speech is 1–directed to inciting or producing imminent lawless action, and 2–likely to incite or produce such action. . . . [The BPD] does not have a social media policy for employees, on-duty or off-duty, and as such these tweets did not violate any social media policy."

. . .

*Police Officer Joseph Abasciano posted the tweets above as a private citizen. These tweets which might be categorized as political rhetoric hyperbole [and] could be considered offensive by some but . . . did not rise to the level of criminality nor call into question his ability or judgement to act as a police officer and would not be considered a violation of BPD rules and regulations*.

17

After careful review and due consideration of all the facts and evidence, I am unable to prove or disprove that the violation of BPD Rule 102 – Section 4 - Neglect of Duty/Unreasonable Judgment occurred. While out on . . . leave as an employee of the Boston Police Department, Officer Abasciano, within an approximately 24-hur period, drove down to Washington, D.C., participated in a rally for the President, marched to the perimeter of the Capital [sic] and drove back to Massachusetts. His tweets, prior to the events of the day, were not deemed inappropriate. *I [Detective Lieutenant Lima] after a thorough review of the evidence relative to Officer Abasciano's Twitter account and his personal tweets, did not find any evidence in which Officer Abasciano was in violation of any BPD rules*. Therefore, I respectfully recommend that this allegation be classified as Not Sustained."

(*Resp.Exhs.26 & 35*) (*Emphasis added*)

49. On December 8, 2021, the BPD Legal Advisor reported: "After review, I agree with the finding of NON-SUSTAINED" as to all allegations against the Appellant. Pursuant to standard procedure, the Legal Advisor then forwarded the file to Superintendent-in-Chief Gregory Long, the Acting Police Commissioner who then had the final word on all IAD complaints. (*Tr.I:114-115 [Dottin];Tr.II;40-41 [Owens]; Tr.IV:24-26 [Chrispin]*)

50. Acting Commissioner Long was appointed Acting Police Commissioner on February 3, 2021 by former Mayor Michael Walsh and served until Michael Cox, the current Police Commissioner, was sworn in by his successor, Mayor Michelle Wu, on August 22, 2022. Acting Police Commissioner Long took no action on the recommended finding in the Appellant's IAD investigation during his tenure. (*Resp.Exh.46;Tr.II:40-41,130 [Owens];Tr.IV:26-27 [Chrispin]; Administrative Notice* [*police.boston.gov*]) [11]

**The Involuntary Retirement Application**

48. The BPD raised the idea of a disability retirement with the Appellant as early as 2014, based on

---

[11] Police Commissioner William Gross retired unexpectedly in late January 2021. His replacement, Dennis White, was placed on administrative leave after three days in office (and ultimately terminated in June 2021). Michelle Wu became Mayor of Boston on November 16, 2021 replacing Kim Janey, the Acting Mayor when Mayor Walsh resigned after he was nominated as the Biden Administration's Secretary of Labor. (*Administrative Notice* [*BPD History; Michell Wu Wikipedia*])

the opinions of the BPD's medical professionals, but the Appellant preferred to pursue a course of treatment recommended by his own doctors. (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

51. In January 2022, the Appellant underwent another hip surgery, with little improvement. The doctors suspected increased loading on the right knee due to the hip surgery. MRIs performed in May and June 2022 confirmed that the Appellant had suffered a "partial tear of the anterior fibers in the ACL" and "1) acquired musculoskeletal deformity, 2) chondromalacia of right patella, and 3) sprain on anterior cruciate ligament of knee". (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

52. On June 30, 2022, Acting Commissioner Long signed an Involuntary Retirement Application in which he stated that the Appellant "has not been able to do the full and essential duties of a police officer since 01/11/2021. It appears he will not be able to perform these duties in the near future." (*Exhibit B, Appellant's Supplemental Post-Hearing Memorandum; Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

## The BPD's 2022 Investigation Review

53. In or about September 2022, approximately a month after becoming Police Commissioner, Michael Cox elevated then Sergeant Detective Philip Owens to the (non-civil service) position of Deputy Superintendent, transferred him from District A7 (East Boston) to work in the Commissioner's office for about a month, and then assigned him to replace Deputy Superintendent Chrispin as the head of the IAD. (*Tr.II:10-11[Owens], Tr.III:55-56 [Owens]*)[12]

---

[12] Commissioner Cox (then Deputy Superintendent Cox) had supervised Sergeant Detective Owens when they both worked in the IAD. (*Tr.II:11[Owens]*)

54. One of the initial assignments that Deputy Superintendent Owens received was to "take a look" at several IAD files pending review and needing a decision by the Police Commissioner. The largest of these was the Appellant's file, which Deputy Superintendent Owens knew was "a high-profile case" he had read about in the newspapers. (*Tr.II:42-45,68-69,72[Owens];Tr.III;65[Owens]*)

55. The Appellant's IAD file was the last file that Deputy Superintendent Owens reviewed. His review consisted mainly of reading the ACD and IAD investigative files that had been completed in May 2021 and November 2021 with a recommendation that no misconduct had occurred to warrant discipline of the Appellant. (*App.Exhs.12, 24 & 47; Tr.II:46-71, 70 [Owens]; Tr.III:82-84,139,147 [Owens]; Tr.V:97 [Appellant]*)

56. Ater attending a training session regarding the FMLA and conducting his own research, Deputy Superintendent Owens reached out to several sources for information specifically about the Appellant's FMLA. He recalled having no substantive follow-up communications with the Appellant or with either Lieutenant Detective Lima or Sergeant Detective Antunez. He did speak with Superintendent Dottin and Deputy Superintendent Chrispin, but only about the FMLA issue. (*App.Exhs.12,24& 47;Tr.II:46-71,70[Owens];Tr.III:82-84,139, 147 [Owens]; Tr.V:97 [Appellant]*)

57. On December 20, 2022, Deputy Superintendent Owens forwarded an IAD Recommendation to Police Commissioner Cox, accompanied by a "Non-Concurrence" letter that he had prepared, in which he explained why he was "inclined to disagree" with the recommended findings of non-sustained as stated in the November 2021 IAD report. Specifically, he found, instead, that:

- The Appellant had "purposefully misused his granted FMLA outside of its intended scope" by attending a rally on January 6, 2021 that "turned into a violent insurrection";

- "[T]he argument that that Officer Abasciano partook of the events of January 6, 2016 as a private citizen [and not as a BPD officer] was "inaccurate";

- The Appellant made "incendiary tweets that condone violent insurrection"; and

- The Appellant showed "consciousness of guilt" by shutting down his Twitter account after he was outed as a BPD police officer because he "understood that being identified as a Boston Police Officer . . . present at the January 6th 2021 violent insurrection, who also tweeted incendiary tweets that condone the violent insurrection[,] would be viewed unfavorably by the Boston Police Department and the citizens of the City of Boston."

(*Resp.Exhs.28 & 35*)

58. Deputy Superintendent Owens recommended that Appellant's misuse of FMLA leave and "inflammatory tweets", as he described them, were enough to prove by a preponderance of evidence that charges be "Sustained" against the Appellant for violation of BPD Rule 102, Section 3 (Conduct Unbecoming of a Police Officer) and BPD Rule 113, Section 5, Canon Eight (Public Integrity Policy).(*Resp.Exhs.28,35&46;Tr.II;77-89.100-111[Owens];Tr.III;149-150,162, 175-178 [Owens]*)

59. Superintendent Dottin and the Office of the Legal Advisor both reversed their prior opinions that charges against the Appellant were "Not Sustained" and approved Deputy Superintendent Owens's "Non-Concurrence" letter that recommended findings of "Sustained" violations of Rules 102 and 113. (*Resp.Exh.46;Tr.I:115-117,142-143[Dottin];Tr.II:113-114[Owens]*)

60. At the Commission hearing, Superintendent Dottin offers several reasons to distinguish her approval to sustain the charges recommended by Deputy Superintendent Owens in his December 2022 non-concurrence letter from her August 2021 concurrence with Detective Lieutenant Lima's recommendation that the charges against the Appellant were "not sustained". She asserted that the 2021 charges and the 2022 charges cited different BPD rules – the original IAD report had focused on violation of the rule prohibiting "neglect of duty" and "unreasonable judgment" versus "conduct unbecoming" and violation of the Canons of Ethics cited in the 2022 report (which could apply to

both on-duty and off-duty behavior). She agreed that the "tweets" alone were a "grey area" and could be considered protected political speech but, taking the "totality of the day" into account, she said she agreed with Deputy Superintendent's Owens's conclusion that the Appellant's attendance at the January 6, 2021 rally went "beyond the intended scope" of his approved FMLA leave and that he had sent "incendiary tweets condoning the violent insurrection." She said that "[o]nce Deputy Owens had put it all together, it just kind of came together, and it kind of clicked for me" that the Appellant's trustworthiness as a BPD police officer (both within the BPD and with the public) had been compromised by the "totality" of his actions which amounted to conduct unbecoming in violation of Rule 102, Section 3 and a breach of the public trust that reflect unfavorable on the BPD in violation of the Public Integrity Policy. (*Tr.I:142-161 [Dottin]*)

61.  After the charges against the Appellant were approved, the Bureau of Professional Standards audit review unit researched the records and prepared a comparator memo containing a synopsis of what purported to be comparable examples of "Discipline Administered in Similar Cases"; here, two prior cases involving violations of Rule 102 - Conduct Unbecoming and Canon 8 of Rule 113 - Public Integrity Policy. (*Resp.Exhs.34 & 46; Tr.I:167-170 [Dottin];Tr.II:115-116 [Owens]*)

62. In the Appellant's case, the comparator memo used to measure the level of discipline to be imposed on the Appellant included two examples of allegedly similar misconduct in which termination was imposed or pending Police Commissioner approval:

- BPD Police Officer MG – termination recommendation pending for posting the comment "Rats Get Bats" on the FBI's website to mock the request of the FBI's outreach to the public seeking to identify individuals who took part in the insurrection on January 6, 2021. This was not the officer's only comment that suggested he condoned violence. After the killing of Breonna Taylor in a botched police raid in Louisville, the officer purportedly

22

downplayed the shooting by posting something to the effect: "This is what happens when you hang out with drug dealers." (*Resp.Exh.34;Tr.III:157[Owens];Tr.II:120[Owens]; Tr.IV:57-59, 110,134-135 [Chrispin]*)[13]

- BPD Police Officer JB – Officer terminated after referring to a black university professor he had arrested using a repugnant racial stereotype. The case received national notoriety and led to President Obama inviting the officer and the professor to the White House for a "beer summit." (*Resp.Exh.34;Tr.III:157-159[Owens];Tr.IV:110-118 [Chrispin]*)

63. Superintendent Dottin, Deputy Superintendent Owens and a representative of the Office of Legal Advisor reviewed the comparator memo, together with the Appellant's prior disciplinary record (none) and the severity of the offense, at a "Green Folder" meeting at which they determined that termination from employment was the appropriate discipline. Their recommendation was then communicated to Police Commissioner Cox, who approved the recommendation to proceed with the Appellant's termination. (*Resp.Exh.46; Tr.I:167 [Dottin]; Tr.II:115-119,121-123 [Owens]*)

64. On January 30, 2023 and February 15, 2023, a hearing was convened before BPD Chief Administrative Hearings Officer Deputy Superintendent Richard Dahill on three alleged charges:

- **Misuse of FMLA leave** instead of taking "another type of day off" to attend the January 6, 2021 rally. **Specification I - Violation of BPD Rule 103, §3, Conduct Unbecoming.**

- **Posting six named tweets** on January 6, 2021 that were visible to the public and "support the capital [sic] riots and insurrection of the United States", "support the arrest of elected officials" and "divides individuals into 'traitors' and 'patriots' ", reflect unfavorably on the BPD and call into question the Appellant's fitness to serve as a BPD police officer and the Appellant's ability to perform his duties fairly, and without bias. **Specification II - Violation of BPD Rule 103, §3, Conduct Unbecoming; Specification III - Violation of BPD Rule 113, §5, Canon 8**

The BPD was represented by counsel, introduced 35 exhibits and called Deputy Superintendent Owens and Sergeant Detective Antunez. The Appellant was represented by counsel, introduced 18

---

[13] The evidence did not disclose whether Officer MG's post disclosed his affiliation with the BPD or whether he was identified as such by the BPD through other means.

exhibits, called Superintendent Dottin, Deputy Superintendent Chrispin and testified on his own behalf. (*Resp.Exhs.30, 32, 33 & 46*)

65. On March 7, 2023, Deputy Superintendent Dahill issued his report. He rejected the BPD's argument that the Appellant misused his FMLA leave and concluded that Specification I was NOT SUSTAINED.  He did find that the Appellant's twitter posts "indicate that the Appellant is unable to impartially and without bias perform his duties" as a sworn BPD police officer, "indicates a rigid viewpoint that does not recognize the duty to protect the rights of all individuals", showed "lack of a commitment to preserving life and property", "impaired the working relationships among members of the Department, damaged the Department's reputation, interfered with the Department operations as evidenced by the numerous media reports concerning Officer Abasciano's conduct", and "negatively impacted the Department's relationship with the community and damaged the Department's reputation."  Deputy Superintendent Dahill considered, but rejected, the Appellant's arguments that his tweets were expressing his First Amendment rights as a private citizen and that he was being singled out and treated more harshly than other officers because his opinions were unpopular within the BPD.  Deputy Superintendent Dahill concluded that the BPD had proved the charge of violation of Rule 102, §3 and Rule 113, §5, Canon 8. (*Resp.Exh.32*)

66. By letter dated March 13, 2023, Police Commissioner Cox, without further inquiry of the Appellant or any other BPD member, found that "your social media posts describing individuals that stormed the Capital [sic] building as 'patriots' calls into question your ability to police members of the community in an unbiased and objective manner.  I also find that this conduct impairs the operation of the Department and its employees by damaging the Department's reputation and trust within the community . . . and your conduct is detrimental to the mission of the Boston Polce Department."  Police Commissioner Cox concluded that the evidence at the hearing before Deputy

24

Superintendent Dahill established just cause to sustain Specifications II (Conduct Unbecoming) and Specification III (Canon of Ethics, Canon Eight) and informed the Appellant that his employment with the BPD was terminated "effective immediately." (*Resp.Exhs.33 & 46*)

67. The BPD hand-delivered a copy of the termination notice to the Appellant at his residence in New Hampshire, which is approximately a two-hour drive from the BPD headquarters, sometime in the late afternoon of March 13, 2024. (*Appellant's Opposition to BPD's Motion to Dismiss; E-mail from BPD counsel to Commission dated 10/16/2024*)

68. Upon receipt of notice of termination, the Appellant initiated steps to "buy back" his military service to give him 20 years of service, enough to file for a superannuation retirement. After doing so, he began to receive superannuation retirement benefits in or about May or June 2024, retroactive to March 13, 2023. (*Exhibit A & C, Appellant's Supplemental Post-Hearing Memorandum*)

69. By letter dated January 26, 2024, the Boston Retirement System informed the Appellant:

> This is to notify you that the Boston Retirement Board in conjunction with the Public Employee Retirement Administration Commission has approved your application for an <u>Accidental Disability Retirement</u> to take effect as of the close of business on <u>03/13/2023,</u> in accordance with Massachusetts General Laws, C[hapter] 32, §7.

(*Resp.Exh.22; Resp.Exh.30,Vol.II [Appellant]; Email from Appellant's Counsel 5/28/24; Exhibit C, Appellant's Opposition to BPD's Motion to Dismiss*)

**<u>Evidence at Commission Hearing of BPD's Disparate Treatment of Protected Speech</u>**

70. The Appellant called two witnesses with direct personal knowledge of the Appellant's work ethic and on-the-job performance: (a) Capt. Martin supervised the Appellant's work at District 2 and District 11 for about five years, as described earlier; (b) Deputy Superintendent Chrispin was a Board Member and past President of the Massachusetts Association of Minority Law Enforcement Officers (MAMLEO) and knew the Appellant from his participation at a number of MAMLEO board meetings. (*Tr.IV:54 [Chrispin]; Tr.IV:62-64 [Martin]*)

25

71. Capt. Martin knew the Appellant's political views were "very conservative", but he never observed the Appellant expressing them to members of the public in his capacity as a police officer. He never knew the Appellant to treat any members of the public in an unfair or disrespectful manner or treat any police officer or member of the community in a biased way. He did not ever observe the Appellant treat anyone differently or disrespectfully or unfairly because they had different political views. As his supervisor, he never saw that the Appellant's political views prevented him from performing any of his duties as a BPD police officer. (*Tr.IV:65-70 [Martin]*)

72. During the Commission hearing, I asked Capt. Martin to review the Appellant's tweets sent on January 6, 2021 and asked whether they impacted his opinion about the Appellant's ability to perform his job as a police officer. Capt. Martin responded:

> "Basically, these tweets . . . are extremely, extremely passionate about politics. He is very emotional, but looking at these, I don't see how, given my history, my experience, and the time I supervised and worked with Joe, I don't see how this – I have never seen this impact his ability to do his job or how he treated anybody."

(*Tr.IV:85-86 [Martin]*)

73. Deputy Superintendent Chrispin did not see the Appellant's tweets calling people patriots and traitors as a work-related problem, because "I don't think that necessarily speaks to his ability to do his job. I think a lot of these things are based on opinion, and they are somewhat subjective . . . because obviously Deputy Superintendent Owens disagrees with me. . . . I just didn't think it rose to that level." He agreed that it was a "tough case" but "we have to strike a balance in terms of what amounts to a threat, what amounts to conduct unbecoming, and what are First Amendment rights" to express thoughts or ideas. He did not read the Appellant to be "encouraging inducing violence, encouraging violence or condoning violence", which he believed was the threshold that needed to be crossed in order to rise to the level of a violation of BPD rules. (*Tr.IV:50-56, 101-102 [Chrispin]*)

26

74. Save for the anonymous message from the person whom the Appellant identified as harboring personal animus against him, no BPD police officers or City of Boston employee complained about the Appellant's tweets or refused to work with him. The BPD received no confirmed complaints or protests about the Appellant from members of the public, even after media reports had disclosed his identity. (*Tr.IV:102-104 [Chrispin]; Tr.V:111-114, 145-148 [Appellant]*)

75. Deputy Superintendent Chrispin considered the rules governing "conduct unbecoming" and "unreasonable judgement" to encompass a broad array of comparable conduct and a violation of either of those rules was not necessarily reason for termination. (*Tr. IV:100-101, 141-142 [Chrispin]*)

76. The Appellant introduced several examples of other alleged conduct unbecoming by BPD officers that resulted in lesser discipline or no discipline, including:

- A BPD officer who received a three-day suspension for leaking sensitive information about a homicide investigation; and

- A BPD officer who received a 60-day or 90-day suspension after being caught stealing.

When asked about the latter discipline, Superintendent Dottin agreed that it was "fair" to say that, at the BPD, "committing a crime of stealing on camera . . . gets you a brief suspension, but speech that you categorize as political gets you terminated." (*Tr.I:163-165 [Dottin]*)[14]

77. BPD officers receive training on the freedom of speech provided to citizens under the First Amendment to the U.S. Constitution and the Massachusetts Declaration of Rights, but that training does not encompass standards governing protected speech by BPD officers speaking as private citizens on matters of public concern, and BPD officers do not appear familiar with those specific standards. (*Tr.I:150-157[Dottin]; Tr.II:126 [Owens]*)

---

[14] The Appellant also introduced summaries of incidents involving alleged serious misconduct by BPD officers, some of which received public attention, including some that were the subject of a public protest, but which did not always result in termination. Given the limited details provided about these other examples, I do not give them much weight. (*See Appellant's Exhs.30-44 & 49*)

## APPLICABLE CIVIL SERVICE LAW

A tenured civil service employee may be disciplined for "just cause" after due notice and hearing upon written decision "which shall state fully and specifically the reasons therefore." G.L. c. 31, § 41. An employee aggrieved by the decision may appeal to the Commission. G.L. c. 31, § 43. Under section 43, the appointing authority carries the burden to prove "just cause" for the action taken by a "preponderance of the evidence." Id. See, e.g., Falmouth v. Civ. Serv. Comm'n, 447 Mass. 814, 823 (2006); Police Dep't of Boston v. Collins, 48 Mass. App. Ct. 411, *rev. den*., 726 N.E.2d 417 (2000).

In performing its review, the Commission hears evidence and finds facts anew. Examining an earlier but substantially similar version of the same statute, the Appeals Court wrote:  " 'We interpret this as providing for a hearing de novo upon all material evidence and a decision by the commission upon that evidence and not merely for a review of the previous hearing held before the appointing officer. There is no limitation of the evidence to that which was before the appointing officer.' " Leominster v. Stratton, 58 Mass. App. Ct. 726, 727-28 (2003).

The Commission determines just cause for discipline by inquiring "whether the employee has been guilty of substantial misconduct which adversely affects the public interest by impairing the efficiency of public service." School Comm. v. Civ. Serv. Comm'n, 43 Mass. App. Ct. 486, 488, *rev. den*., 426 Mass. 1104 (1997). See also Doherty v. Civil Serv. Comm'n, 486 Mass. 487, 493 (2020). It is also a basic tenet of merit principles, which are the core protections of civil service law, that discipline must be remedial, not punitive, designed to "correct inadequate performance" and "[only] separating employees whose inadequate performance cannot be corrected." G.L. c. 31, § 1.

The Commission must take account of all credible evidence in the entire administrative record, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law,

including whatever would fairly detract from the weight of any particular supporting evidence. See Comm'rs of Civ. Serv. v. Municipal Ct. of Boston, 359 Mass. 211, 214 (1971), citing Selectmen of Wakefield v. Judge of First Dist. Ct., 262 Mass. 477, 482 (1928); Massachusetts Ass'n of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 264-65 (2001). It is the purview of the hearing officer to determine credibility of testimony presented to the Commission. "[T]he assessing of the credibility of witnesses is a preserve of the [commission] upon which a court conducting judicial review treads with great reluctance." Leominster v. Stratton, 58 Mass. App. Ct. at 729. See Embers of Salisbury, Inc. v. Alcoholic Beverages Control Comm'n, 401 Mass. 526, 529 (1988); Doherty v. Retirement Bd. of Medford, 425 Mass. 130, 141 (1997).

Section 43 of G.L. c. 31 also vests the Commission with the authority to affirm, vacate or modify a penalty imposed by the appointing authority. The Commission is delegated "considerable discretion" in this regard, albeit "not without bounds" so long as the Commission provides a rational explanation for how it has arrived at its decision to do so. See, e.g., Police Comm'r v. Civ. Serv. Comm'n, 39 Mass. App. Ct. 594, 600 (1996) and cases cited; Falmouth v. Civ. Serv. Comm'n, 61 Mass. App. Ct. 796, 800 (2004); Faria v. Third Bristol Div., 14 Mass. App. Ct. 985, 987 (1982) (remanded for findings to support modification). However, in the absence of "political considerations, favoritism, or bias," the same penalty is warranted "unless the commission's findings of fact differ significantly from those reported by the town or interpret the relevant law in a substantially different way." Falmouth, 447 Mass. at 824.

**ANALYSIS**

**Jurisdiction**

In several prior decisions, the Commission decided that it lacked jurisdiction to hear appeals brought to contest the just cause for the discipline of civil service employees who had retired (either

prospectively or retroactively) <u>prior</u> to the date on which the employee was discharged or the suspension ordered to be served. <u>See</u> <u>Fiore v. Massachusetts State Police</u>, 27 MCSR 136 (2014) (trooper retired on accidental disability effective October 16, trial board finding of misconduct October 18, trooper honorably discharged by reason of retirement October 22)[15]; <u>Bishop v. Department of State Police</u>, 23 MCSR 613 (2010) (retirement effective June 12, suspension ordered on June 12 to begin on June 13); <u>Gray v. Department of State Police</u>, 21 MCSR 252 (2008) (retirement effective October 31, order of suspension effective November 1); <u>Grover v. Department of State Police</u>, 21 MCSR 153 (2009) (applied for retirement October 18, retirement effective October 20, order of suspension effective October 23); <u>Ford v. Town of Brookline</u>, 20 MCSR 369 (2007) (terminated on January 5, 2005, applied for accidental disability January 20, 2005, retirement approved retroactive to March 5, 2004, the last day appellant received compensation from the town); <u>Sheehan v. Town of Hudson</u>, 19 MCSR 15 (2006) (applied for retirement in September 2002, terminated in October 2003, retirement effective retroactively to December 2002).   As the Commission stated in <u>Sheehan v. Town of Hudson</u>, *supra*:

> "[T]he retroactive effect of the Appellant's retirement eliminates any harm done to his employment status, thus the Appellant is no longer aggrieved for the purposes of pursuing an appeal before the Commission. Therefore, the Commission lacks jurisdiction to hear this appeal." *Id.*

On the other hand, the Commission has taken jurisdiction to hear just cause appeals of employees terminated <u>before</u> their retirement became effective. <u>See</u> <u>Swartz v. Bourne Fire Dep't</u>, 34 MCSR 356 (2021), *aff'd in relevant part sub nom.* <u>Town of Bourne v. Civil Service Comm'n</u>, 2022 WL 1982968 (Suffolk Sup. Ct. 2022) (disability retirement filed March 1, terminated August 22 with disability application pending, superannuation retirement approved effective August 24); <u>In re Boston Police</u>

---

[15] The <u>Fiore</u> appeal also raised issues concerning the alleged failure to reinstate the appellant after he had claimed to have recovered from his disability, claims that the Commission dismissed as untimely and a matter within the exclusive jurisdiction of the Superior Court. <u>Fiore</u>, *supra.*

Dep't Drug Testing Appeals, 26 MCSR 73, _aff'd on other issues_, 90 Mass. App. Ct. 462 (2016), _rev. den_., 476 Mass. 1104, 1106 (2016) (disciplinary appeals by terminated police officers, including one who subsequently retired); Garvin v. Department of State Police, 21 MCSR 292 (2008) (state trooper fired on July 9, retirement effective July 10); Silva v. Department of Correction, 20 MCSR 409 (2007) (termination on March 29, retirement effective March 30). See also Coderre v. City of New Beford, 36 MCSR 401 (2023), _appeal pending_ (Commission overturned January 25, 2022 discharge of Deputy Fire Chief, who had filed a still-pending disability retirement on Dec. 1, 2021, and who was approved retroactively for superannuation retirement effective January 25, 2022, which the retirement board deemed his "last day of active service.")

The precise factual situation involved here has not been previously presented—i.e., a just cause appeal from a termination that was effective on the same day as the retroactive effective date of a previously-filed involuntary disability retirement application. For several reasons, I conclude that under the specific circumstances of this appeal, the Commission correctly took jurisdiction of the appeal at the time it was filed and duly heard the merits of the appeal. It must retain jurisdiction and issue a decision on the merits.

First, although both the termination and the retirement have the same effective date, as a technical matter, the termination is more likely construed to precede the retirement. The Appellant's March 13, 2023 termination was issued on March 13, 2023 "effective immediately" whereas the retirement was effective "as of the close of business" on March 13, 2023. Moreover, the Appellant received tax-free 111F benefits through March 13, 2023 in the final paycheck, cut prior to that date and included with his termination letter; but 111F benefits cannot be paid "for any period after such police officer or fire fighter has been retired or pensioned in accordance with law". See G.L. c. 41, §111F, ¶1.

Second, unlike other appeals in which an appellant had control over the effective date of his or her retirement, the Appellant, here, was involuntarily retired on an application filed by the BPD.

Third, this is an appropriate case in which the Commission, once vested with jurisdiction, is warranted to exercise sound discretion to retain it to redress this Appellant's bona fide claim that his termination violated core constitutional principles and basic merit principles of civil service law, especially after that claim has been fully litigated on the merits and is ripe for decision by the Commission. See Swartz v. Bourne Fire Dep't, *supra*. See also Landreth v. Zoning Board of Appeals, 88 Mass. App. Ct. 1115 (2015), *rev. den*., 473 Mass. 1109 (2016) citing O'Dea v. J.A.L., Inc, 30 Mass. App. Ct. 449, *rev. den*., 410 Mass 1102 (1991) ("A court is not ousted of jurisdiction by subsequent events—jurisdiction once attached is not impaired by what happens later.").

Fourth, pursuant to the amendments to Chapter 31 enacted by Section 137 of Chapter 238 of the Acts of 2024, the authority of the Commission to grant relief in disciplinary appeals, G.L. c. 31, §43, ¶2 now reads:

> If the commission determines, by a preponderance of the evidence, that there was just cause for an action taken against such person, it shall affirm the action of the appointing authority and deny the appeal; provided, however, that *if the commission* does not so determine, it *shall reverse the action and allow the appeal, in whole or in part, and the person concerned may be returned to their position with or without loss of compensation or other benefits and subject to such other orders as the commission may deem appropriate to restore and protect the rights provided to such person under this chapter*; provided, further, that if the preponderance of the evidence establishes that the action was based upon harmful error in the application of the appointing authority's procedure, an error of law or upon any factor or conduct on the part of the employee not reasonably related to the fitness of the employee to perform in the position, *the commission shall allow the appeal, in whole or in part, and the person concerned may be returned to their position with or without loss of compensation or other benefits.* (*Emphasis added*)

Thus, the Commission now is enabled to craft a remedy in disciplinary appeals that does not necessarily require the restoration of compensation or other rights if warranted in the specific

circumstances of a particular appeal.  This additional flexibility allows the Commission more options in an appeal such as this one, where the Appellant has subsequently retired.

In sum, the Commission must retain jurisdiction to decide this appeal on the merits. This decision turns, therefore, to why the BPD has not proved by a preponderance of evidence that there was just cause for the decision to discharge the Appellant on March 13, 2023.

**Applicable Law Governing Private Speech by Public Employees**

BPD Rules 102, Section 30 expressly acknowledges the right of all BPD members to participate in public affairs, including, specifically to "[e]xpress opinions as private individuals on political issues" and "attend political conventions, rallies and similar political gatherings as private individuals." In addition, as a matter of law, "basic merit principles" of civil service law include a requirement to assure "fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation . . . and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens." G.L. c. 31, §1.  Thus, in almost all circumstances, political speech and conduct that is protected by the U.S. Constitution and the Massachusetts Declaration of Rights cannot be used as the basis for discipline of a tenured employee. Put another way, the BPD may not discipline a tenured police officer under any other BPD Rule for engaging in political speech or conduct to the extent that the speech or conduct falls squarely within the employee's interest in freedom of speech recognized by BPD Rule 102 Section 30, and his constitutional rights and statutory protection provided under basic merit principles of civil service law.  See, e.g., Rowe v. Civil Service Comm'n, 103 Mass. App. Ct. 1112 (2023) (Rule 23), *quoting* Rankin v. McPherson, 483 U.S. 378, 383 (1987).

However, a public employee's rights are not absolute, and they must accept certain limitations on freedom of speech.  See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  To determine where

those limitations exist, Massachusetts law generally follows the federal law in matters of protected public speech and, accordingly, employs a three-prong framework. Pereira v. Commissioner of Social Services, 432 Mass. 251, 252 n.2, 257 n.15 (2000), *citing* Pickering v. Board of Educ., 391 U.S. 463 (1968); Connick v. Myers, 461 U.S. 138 (1983); Decotiis v. Whittemore, 635 F.3d 22, 29-30 (1st Cir. 2011).

First, it must be determined whether the employee was speaking "as a citizen upon matters of public concern" when making the statements at issue. Pereira, 432 Mass. at 257 (2000), *quoting* Connick, 461 U.S. at 147 (1983). If so, the second prong, known as the *Pickering* balancing test, requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568 (1968); DeCotis, 635 F.3d at 29. In performing that balance, the question becomes "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Garcetti, 547 U.S at 418. The third prong requires the employee to provide "sufficient evidence" that the protected speech was "a substantial or motivating factor" in the adverse employment decision. Antonellis v. Department of Elder Affairs, 98 Mass. App. Ct. 251, 260 (2020), *quoting* Guilloty Perez v. Pierluisi, 339 F.3d 43, 55 (1st Cir. 2003). If the employee satisfies that initial burden, the burden of persuasion shifts to the employer to prove that "it would have taken the same action regardless of the protected speech." *Id.*

## Summary of the Analysis

The issue before the Commission on the merits of this appeal is whether tweets sent by the Appellant on January 6, 2021 are protected speech or constituted misconduct that justified his termination. The uncontroverted evidence established that the Appellant's tweets satisfy the first

and third prongs of the _Pereira_ framework, i.e.: (a) the Appellant's tweets were sent as a private citizen, while off duty on FMLA leave, using an anonymous handle from a Twitter account that did not identify the Appellant as a police officer; and (b) the BPD's decision to terminate the Appellant is grounded explicitly on the tweets he sent. Thus, the only disputed issue here arises under the second prong of the _Pickering_ balancing test, i.e., whether, on balance, the Appellant's tweets are constitutionally protected private free speech or may be restricted by the BPD as qualified speech because they have been adequately shown to adversely affect the BPD's operations or mission.

After careful consideration of the entire record, I am persuaded by the preponderance of evidence that, applying the _Pickering_ balancing test: (1) the Appellant's tweets are private political speech on matters of public concern that fit within the scope of BPD Rule 102, Section 30 and (2) the BPD has not established an adequate justification to restrict that speech in the interest of protecting the BPD's mission or operations. Therefore, the tweets cannot be sanctioned as "conduct unbecoming" under BPD Rule 102, Section 3 or as a violation of the BPD's Canon of Ethics under Rule 113, Canon 8.

 This decision should not be construed to condone or turn a blind eye to the unconscionable criminal acts committed by those who stormed the Capitol on January 6, 2021. To be sure, January 6, 2021 was a dark day in American history. Most Americans watched in disbelief as some so-called "protestors" turned violent and assaulted Capitol police officers who fought valiantly to protect the Vice President, members of Congress, their staffs and family members.  In my view, no amount of revisionism can change those facts.

Thus, I do not doubt that the BPD was understandably concerned to learn that two BPD Police Officers had attended the rally and that the Appellant had tweeted about it. The BPD's ACD

(criminal) investigation and an IAD internal affairs (rules and regulations) investigation into the Appellant's actions that day were entirely appropriate, including a forensic reconstruction of where he went and review of all 2500 tweets received by and sent from the Appellant's anonymous Twitter account. However, at the conclusion of those investigations, which spanned several months, the highest members of the BPD's management and command staff *cleared* the Appellant of any wrongdoing based on the findings of these two investigations.

Specifically, the BPD's initial ACD and IAD investigations credibly concluded: (1) the Appellant did not personally participate or condone the insurrection that took place that day; in fact, he left the scene at the Capitol immediately after he saw that others were beginning engage in what he considered inappropriate behavior; (2) his tweets did not threaten, advocate or condone violence; and (3) the tweets did not, and would not be likely to impair his ability to perform his job as a BPD police officer or otherwise impair the efficiency of the public service performed by the BPD.

More than a year later, the Appellant was terminated based on a "new" December 2022 paper review that reached *starkly different* findings. The December 2022 review is far less thorough, more subjective, exudes a tinge of being result-driven and fails to sufficiently explain how the two starkly different conclusions can be reconciled; moreover, it is not supported by the preponderance of the credible evidence introduced at the Commission hearing, as were the conclusions of the initial two 2021 investigations.

For example, the December 2022 report starts with the unsupported conclusion that it was "inaccurate" that the Appellant attended the protest as a private citizen, erroneously implying that, somehow, he was acting in his capacity as a BPD Police Officer.  This is simply not supported by the record.  Rather, as noted in the initial 2021 ACD and IAD reports, the Appellant never held

36

himself out as a police officer that day, he never referenced his job as a BPD Police Officer, and his Twitter handle did not reference his name, employer or occupation.

Accordingly, I give greater weight to the 2021 findings and testimony of Deputy Superintendent Chrispin than I do the 2022 findings and testimony of Deputy Superintendent Owens. I do not credit the distinction that Superintendent Dottin purported to make between the earlier two investigations and the "new" one, as the reason she changed her opinion from "Not Sustained" to "Sustained". I do credit the testimony of both Deputy Superintendent Chrispin and Capt. Martin that there is no significant difference in what facts constitute on-duty "neglect of duty/unreasonable judgment" proscribed by Section 2 of Rule 102 and "conduct unbecoming" proscribed by Section 3 of Rule 102.

In sum, the decision in this appeal comes down to choosing between conflicting reports, with starkly different conclusions, completed by the *same* Department at *different* times. Ultimately, the BPD's 2021 ACD and IAD reports were more thorough, more objective and more reflective of the *actual* facts associated with the Appellant's actions on January 6, 2021 as established by the five day de novo Commission hearing held before me. In short, the preponderance of the evidence presented at the Commission hearing supports the BPD's 2021 ACD and IAD findings and conclusions, in which the BPD concluded that the Appellant did *not* engage in misconduct on January 6, 2021 and that there was *not* just cause to justify any discipline against him. Applying the *Pickering* balancing test and other applicable law outlined above to these findings and conclusions, the Commission must act to overturn the Appellant's termination.

## The Preponderance of the Evidence Favors the Appellant Under the *Pickering* Balancing Test

First, to put the issue in perspective, it must be remembered that, as the BPD's initial two investigations concluded, the preponderance of the evidence showed that none of the

Appellant's tweets were intended to, and did not expressly, endorse or condone the violent insurrection that occurred at the Capitol on January 6, 2021. The Appellant never participated in that insurrection. In fact, the preponderance of the evidence established that the Appellant condemned, or at least disapproved of, the violence. When he saw that the rally had begun to turn violent, he left the Capitol grounds and went home.

Second, the Appellant's tweets are clearly matters of public concern facially protected by the First Amendment. I find credible the conclusions of the BPD's initial investigators who found that none of the tweets that the Appellant sent prior to, during or after attending the January 6, 2021 rally went so far as to "condone the violent insurrection" or "threaten" anyone. Even speech that is offensive and suggestive of hostile or aggressive behavior but does not rise to the level of a "true threat", does not lose its First Amendment protections. See In re Kendall, 712 F.3d 814, 825 n.8 (3d Cir. 2013) (describing narrow categories outside of which various forms of violent speech are protected: "true threats," incitement to "imminent[ ] lawless action," and "fighting words"); Bauer v. Sampson, 261 F.3d 775, 783–84 (9th Cir. 2001) ("Although [plaintiff's] writings have some violent content, they are hyperbole of the sort found in non-mainstream political invective and in context . . . are patently *not* true threats." (*emphasis* in original) (internal quotations omitted)); Fenico v. City of Philadelphia, 70 F.4th 151, 165 (2023) ("[E]ven the most deeply troubling speech may be of concern to the public and warrant First Amendment protection— depending on the facts of the case. While it carries the potential to be inflammatory, [even] speech touching on race relations is "inherently of public concern." citing *Connick*); Munroe v. Central Bucks Sch. Dist., 805 F.3d 454, 470 (3d Cir. 2015), *as amended* (Oct. 25, 2019)https://www.westlaw.com/Link/Document/FullText?findType=Y&serNum=2037077980&pubNum=0000506&originatingDoc=I7bdba9c0063911eea0fbd6e62288d3fa&refType=RP&fi=co_pp

_sp_506_470&originationContext=document&vr=3.0&rs=cblt1.0&transitionType=DocumentItem
&contextData=(sc.Search) ("humor, satire, and even 'personal invective' could be used in order to
make or embellish a point about a matter of political, social or other concern to the community");
Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (finding that accusing the County Sheriff he
worked for of cronyism was political speech but not his statement that the Sheriff should be
assassinated in a "Hitler-style" coup); Locurto v. Giuliani, 447 F.3d 159, 183 (2006) ("Whatever
our own views of the quality and prudence of the plaintiffs' chosen means of expression,
commentary on race is, beyond peradventure, within the core protections of the First Amendment.");
Guilloty Perez, 339 F.3d at 55 ("the mere fact that the statements [made by the plaintiff] were
erroneous does not remove them from the Constitution's protection; erroneous remarks are an
inevitable by-product of unrestrained public debate . . . . Unless [the plaintiff] 'knowingly or
recklessly made false statements' the subsequent determination that his allegations were untrue will
not deprive them of their constitutional protection." [Citations omitted])

Third, having concluded that the Appellant's tweets constitute speech on a matter of public
concern (i.e., the 2020 election and its aftermath), the question remains: may these tweets,
although constituting intrinsically protected speech, be the subject of discipline because the value of
the Appellant's speech on the matters of public concern contained in the tweets is outweighed by
evidence of the harm that his tweets have done, or may do, to the mission or operations of the BPD?

In assessing whether any of these tweets crossed the line into misconduct that warrant
discipline of the Appellant, the *Pickering* balancing test calls for a "sliding scale" approach. As
stated in Fenico, *supra*:

> The inquiry into the protected status of speech is a question of law, not fact. [Citation]
> However, it is a question of law that nonetheless requires a robust factual basis, given that
> *Pickering* sets forth a uniquely "particularized" balancing test, not a simple burden-shifting
> threshold. [quoting Connick]. . . .[T]he more substantially an employee's speech involves

matters of public concern, the higher the state's burden will then be to justify taking action, and vice versa . . ." As this Court has recognized, the public concern inquiry "involves a sliding scale in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public [quoting Monroe]."

*Id*., 70 F.4th at 162.

Thus, as one part of the *Pickering* balancing test, the intensity of inflammatory and insulting speech can be factored into account in considering the weight to be given to the Appellant's interest to speak freely. In Hussey v. City of Cambridge, 720 F.Supp.3d 41 (D.Mass.), appeal pending (1st Cir. 2024), the Court upheld a four-day suspension of police officer, giving diminished weight to the "insensitive, disparaging or dehumanizing" comments that protested the naming of police reform legislation for George Floyd. The Court's analysis bears noting:

> *Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance.*" [citations omitted] . . .The post [by Hussey] called George Floyd "a career criminal, a thief and druggie." . . . . Even if the term [druggie] itself is not inherently derogatory, here it was used in a derogatory fashion. . . .
>
> *However, the value of Hussey's post is not as diminished as it would have been had Hussey used lewd, vulgar, or obscene terms. [citation omitted] . . .The term "druggie" may be a pejorative and offensive term, but it is neither profane nor obscene*. Notably, both Commissioner Bard and Elow agreed that the term does not have any racial connotation. [citation to Record]. *The other words used by Hussey are commonplace terms*.

*Id*, 720 F.Supp.3d at 55. See also Hernandez v. City of Phoenix, 43 F.4th 966, 979 (9th Cir. 2022) (police officer's social media posts that insulted racial and religious minorities occupied "a much lower rung on the First Amendment hierarchy" and "touched on matters of public concern in only the most limited sense"); Bennett v. Metropolitan Gov't of Nashville, 977 F.3d 530, 538-39 (6th Cir. 2020), *cert. den.,* 141 S.Ct. 2795 (2021) (use of n-word in social media post did not receive "highest rung" of protection and consequently required a lower showing of disruption to justify employer's adverse action).

The other factor in the *Pickering* balancing test is whether the offensive speech bears a nexus, based on evidence, to some negative effect on the operations of the BPD. While evaluating the

government's interest, the law considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388, citing Pickering, 391 U.S. at 570-573.

Here, no credible evidence was presented to establish that the Appellant's tweets caused any internal disruption in the BPD's operations. Thus, this case lacks any similarity to other cases that have come before the Commission in which the problematic speech makes unambiguously false, racist, scurrilous, or otherwise reprehensible claims against the public employer or its employees. See, e.g., Rowe v. Civil Service Comm'n, 103 Mass. App. Ct. 1112 (2023) (Rule 23); Roca v. City of Holyoke, 36 MCSR 172 (2023), aff'd, 2024 WL 4475681 (MA Super. Ct. Sept. 11, 2024). See also, Guilloty Perez, 339 F.3d at 53-54 (noting the importance of "discipline, maintenance of harmony among coworkers and close personal relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency" and "courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests" but "[t]here is no evidence in the record that fellow agents had lost faith in [the plaintiff] or were unwilling to work with him because he had lodged complaints about improprieties in the department").

Rather, the BPD argues that the Appellant's tweets threatened the BPD's functions because his (misinformed) political view that the 2020 election was stolen could have jeopardized public trust in the Department by the great majority of Bostonians who disagreed with that allegation. Government employers, especially public safety employers, must have "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First

Amendment." <u>Connick</u>, 461 U.S. at 146. The Court must give "substantial weight to government employers' reasonable predictions of disruption" and gives "greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." <u>Waters v. Churchill,</u> 511 U.S. 661, 673 (1994). <u>See also Locurto</u>, 447 F.3d at 178 (2d Cir. 2006) ("[I]n considering how to respond to the plaintiffs' actions, Giuliani, Safir, and Von Essen were driven largely by concerns over the public perception of the NYPD and FDNY").

Still, the BPD's judgment must be based on some <u>evidence</u> and cannot rely on speculation alone to justify its actions. <u>Moser v. Las Vegas Metro. Police Dep't,</u> 984 F.3d 900, 909 (9th Cir.) ("[A]n employer must provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable"); <u>Fenico</u>, *supra,* 70 F.4th at 166 ("[A]n employer must still establish likely disruption through record support, and courts have long required more than 'unadorned speculation as to the impact of speech.' ") *quoting* <u>Hall v. Ford</u>, 856 F.2d 255, 261 (D.C. Cir. 1988)).

In <u>Flanagan v. Munger</u>, 890 F.2d 1557 (10th Cir. 1989), the Court held that a police chief violated police officers' First Amendment rights by prohibiting the officers from owning a video store which rented out adult films. In overturning the district court's decision that the officers had failed to show that their First Amendment rights outweighed the department's concern that "reaction by offended members of the public would adversely impact its external relations and operations", the Court stated:

> The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason *may not* cooperate with law enforcement officers in the future. . . . *[A]pprehension of disturbance is not enough to overcome the right to freedom of expression." [Citations].*

<u>Id</u>., at 1566-67 (*emphasis added*).

Here, most of the Appellant's tweets about the January 6, 2021 rally (see Finding nos. 17, 19,

20, 22, 23, 24 & 25) were sent before he left the rally to walk to the Capitol grounds, and before he had any notice whatsoever that the rally had turned violent. These tweets focused <u>entirely</u> on the Appellant's <u>political</u> objective of promoting the <u>rally</u> and exhorting <u>elected</u> <u>officials</u> (the Congress and the Vice President) to honor there oath of office and "choose" what the Appellant was calling the patriotic path – sending disputed electoral votes back to the states. These particular tweets (albeit controversial, and, in the view of many, patently wrongheaded) are not directed at the BPD or its employees and do not involve any racial or otherwise vulgar, profane or obscene subject matter. They are classic examples of protected political speech.

One of these tweets (Finding Nos. 19) and two others sent by the Appellant after arriving at the Capitol (Findings 28 & 30) are closer calls and could be construed to deserve heightened scrutiny under the *Pickering* balancing test. To be sure, some of the language in these tweets is particularly harsh – i.e., accusing Vice President Pence of and the "Political Elitest Class" of treason that led to the "murder of an innocent girl" and has "killed the republic". However, these tweets also expressed a theme similar to his earlier tweets:  what the Appellant considered betrayal by elected officials whom the Appellant (erroneously) was misled into believing had violated their oaths of office. They do not express animosity toward any members of the BPD or any individual, group or class of Boston citizens or officials.

- <u>Finding No. 19</u> –The 5:53 a.m. tweet on January 6, 2021 responding to the Georgia Secretary of State: "I can't wait to see you dragged away in handcuffs."

- <u>Finding No</u>. 28 - The 3:54 p.m. tweet to Vice President Pence:  "I hope you never sleep well again @VP your Treasonous Act lead [sic] to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @LLinWood was right about you all along"

- <u>Finding No. 31</u> – The 5:22 p.m. tweet, while on the road home: "What I saw in [sic] today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots and Law Enforcement trying to do their jobs in a no win [sic] position. I fear this Treasonous election has killed the republic.

43

This scenario is inapposite to those cases in which a public employer established the requisite actual or reasonable expectation of a loss of the public trust required to override an employee's right freedom of expression. Those cases of "external" disruption that have met the *Pickering* balancing test have involved government employees who publicly express racist bias or sexually deviant behavior, not pure political speech. See, e.g., Locurto, 447 F.3d 159 (2d Cir. 2006) (public demonstration led by Al Sharpton against police officers who operated a parade float mocking Blacks); Melzer v. Board of Education, 336 F.3d 185 (2003) (parental furor over employment of a self-described pedophilic public high school teacher); Hussey v. City of Cambridge, 720 F.Supp.3d 41 (D.Mass.), appeal pending (1st Cir. 2024) (protest by local NAACP to police officer's disparagement of George Floyd).  Despite extensive research, I found no comparable example in which just cause was found to discipline a police officer or other public employee for expressing unpopular political opinions of the kind or tone involved here.

In sum, the BPD failed to meet their burden of producing evidence to prove that any BPD personnel, Boston employees, or members of the public (save for the Appellant's one nemesis) protested any of the Appellant's tweets, including the three more severely critical ones singled out above, or voiced any complaints about him. The BPD's own command staff took different views about the risk of disruption that these tweets had on the BPD's ability to fulfil its public mission.[16]  Those who knew the Appellant professionally provided credible evidence of his ability to keep his politics from having any influence on his ability and duty to do his job as a BPD police officer. Neither Deputy Superintendent Crispin nor Captain Martin saw the

---

[16] Deputy Chief Owens was reluctant to tie any single tweet to a violation of BPD rules. When specifically asked about the tweet expressing the Appellant's hope that Gabriel Stealing would be "dragged away in handcuffs", even Deputy Chief Owens unequivocally agreed *that* particular tweet was, in fact, protected by Section 30 of Rule 102 (*See Tr.III:92-97*).

Appellant's tweets as conduct unbecoming. Hearty disagreement by those in positions of authority can generally form no basis for employment discipline. <u>See</u>, <u>e.g.,</u> <u>Hayes v. Massachusetts. Bay Transp. Auth.</u>, 498 F. Supp. 3d 224, 234 (D. Mass. 2020) ("[V]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.") (quoting <u>Rankin</u>, 483 U.S. at 384). It becomes a slippery slope when personal political differences, consciously or unconsciously, begin to influence decisions about employees' professional careers and capabilities in the workplace.

**<u>Other Factors</u>**

I briefly address two remaining issues raised by the parties.

First, I find that the two comparators used by the BPD to justify the Appellant's termination are inapposite. BG's comments mocked the FBI's interest in identifying people who participated in the insurrection on January 6, 2021, and belittled the murder of an innocent victim of a botched police raid.  JB's misconduct involved unambiguously racist remarks about a Black man whom he arrested. I find more significant the examples raised by the Appellant involving officers who engaged in serious on-duty misconduct (compromising an investigation; stealing) and received only suspensions.

Second, I have considered the fact that the BPD's Rules and Procedures did not, and apparently still do not, include a specific social media policy. This fact, however, does not change the analysis. It would behoove the BPD, however, to review its policies and determine whether promulgation of a social media policy would serve the interests and the mission of the BPD in the future.

**<u>The Appellant's Alleged Procedural Violations</u>**

In addition to the substantive protected speech issue on the merits, the Appellant also asserted a number of procedural issues, including: (1) the resolution of the Appellant's discipline was unreasonably delayed and time-barred as a matter of law, in violation of G.L. c. 6E, §10(h), added as part of the law creating the Police Officer Standards and Training Commission (POST), which now requires that a police department complete its internal affairs investigation within one year; (2) the investigation and the discipline imposed was tainted by politically-motivated pre-disposition and conscious bias; and (3) the investigation was not thorough and enabled an anonymous complainant with an axe to grind against the Appellant to expose him and subject him to an investigation that would otherwise never have happened. As I have determined that the Commission must allow this appeal on the merits, the Commission need not decide these disputed procedural claims, as a resolution of these issues is not necessary to and would not change this Decision.

**<u>Modification of the Discipline</u>**

Finally, having found that the BPD did not have just cause to terminate the Appellant, I consider whether the Commission should exercise its discretion to modify the discipline. Basic merit principles require that discipline be consistently imposed, both within and across appointing authorities. See, e.g., Bliss v. Town of Wareham, 24 MCSR 246 (2011), *citing* Town of Falmouth v. Civil Service Comm'n, 447 Mass, 814, 823 (2006). Accordingly, under other circumstances, a modified discipline along the lines of the four-day suspension imposed in *Hussey* would be worthy of consideration for the reasons set forth in that case. Here, however, the BPD's initial investigation concluded that no discipline was warranted and, therefore, I conclude that allowing the appeal is the more appropriate result rather than a modification.

Moreover, as the Appellant is now retired, reducing the termination to a suspension of any length presently would appear meaningless and have no remedial effect.

**The Appropriate Remedy**

The remedy in this appeal must be designed to reflect the unique circumstances involved. In particular, the Appellant has not performed the duties of a police officer since July 2020. He is currently totally disabled from performing those duties. Prior to March 13, 2023, he had been on injured leave and receiving 111F benefits, which equal payment of base salary substantially tax-free, and, as he is now retired, he would not be eligible to receive such benefits after March 13, 2023. See G.L. c. 41, §111F, ¶1.[17]

Moreover, the Appellant has been receiving accidental disability retirement benefits pursuant to G.L. c. 32, §7, effective March 13, 2024, which are 72% of his base salary, also substantially tax free, and are at least equivalent to or better than the base salary he would earn as a full-duty BPD police officer. (See *BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum, pp. 3-5*)

Under these circumstances, the Commission is warranted in allowing his appeal without compensation or benefits for the period after March 13, 2023, pursuant to G.L. c. 31, § 43, ¶ 2 (as amended effective November 20, 2024).

The Appellant has also asserted a claim for reimbursement of his attorneys' fees. The Appellant is entitled to seek reimbursement from the BPD for the statutory fees set forth in G.L.

---

[17]Should the Appellant have any basis to believe otherwise, his remedy to seek continuation of such 111F benefits would lie in another forum. See  Boutin v. City of Westfield, Docket No. 2079CV0114 (Hampden Sup. Ct. 2020) (granting preliminary injunction to restore 111F benefits). See generally Jordan v. City of Lynn, 25 MCSR 100 (2012) (addressing distinction between civil service reinstatement rights of recovered disability retiree and reinstatement rights under retirement law over which Commission does not have jurisdiction).

c. 31, § 45 (as amended effective November 20, 2024). Under the amendment to Section 2(e) of Chapter 31, enacted in Section 112 of St. 2024, Ch. 238, the Commission is authorized to award additional attorneys' fees in certain cases in which the Commission makes a finding that the appointing authority acted in bad faith, but I find no basis to make such a finding here.

## **<u>CONCLUSION</u>**

For all of the above reasons, the BPD's Motion to Dismiss is ***<u>denied</u>***. The appeal of Joseph Abasciano, Docket No. D1-23-033, is hereby ***<u>allowed</u>***. The Appellant's termination is vacated. For the reasons of the Appellant's disability status and involuntary disability retirement described above, the Commission determines that the appeal is allowed without requiring reinstatement at this time or allowing the Appellant compensation or benefits to which he might be entitled pursuant to Chapter 31 for the period after March 13, 2023. Nothing in this decision is meant to permit or preclude the Appellant from pursuing compensation or benefits to which he may now, or at some future time, claim to be entitled in another forum under the requirements of laws other than Chapter 31 (including, without limitation, Massachusetts retirement laws).

Civil Service Commission

*/s/ Paul M. Stein*
Paul M. Stein, Commissioner

By 4-0 vote of the Civil Service Commission (Bowman, Chair; Markey, McConney and Stein, Commissioners) [Dooley, Commissioner not-participating] on December 19, 2024.

Either party may file a motion for reconsideration within ten days of the receipt of this Commission order or decision. Under the pertinent provisions of the Code of Mass. Regulations, 801 CMR 1.01(7)(l), the motion must identify a clerical or mechanical error in the decision or a significant factor the Agency or the Presiding Officer may have overlooked in deciding the case. A motion for reconsideration <u>does not</u> toll the statutorily prescribed thirty-day time limit for seeking judicial review of this commission order or decision.

Under the provisions of G.L. c. 31, § 44, any party aggrieved by this Commission order or decision may initiate proceedings for judicial review under G.L. c. 30A, § 14 in the superior court within thirty (30) days after receipt of this order or decision. Commencement of such proceeding shall not, unless specifically ordered by the court, operate as a stay of this Commission order or decision. After initiating proceedings for judicial review in Superior Court, the plaintiff, or his/her attorney, is required to serve a copy of the summons and complaint upon the Boston office of the Attorney General of the Commonwealth, with a copy to the Civil Service Commission, in the time and in the manner prescribed by Mass. R. Civ. P. 4(d).

Notice to:
Mark P. Gagliardi, Esq. (for Appellant)
Joseph A. McClellan, Esq. (for Respondent)