**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………….......................................................... ii

INTRODUCTION……………………………….......................................................................1

FACTUAL BACKGROUND………………………………......................................................3

LEGAL STANDARD………………………………….......................................................11

ARGUMENT………………………………….......................................................12

I.     THE CITY IS COLLATERALLY ESTOPPED FROM RE-LITIGATING
WHETHER ABASCIANO'S TWEETS WERE MISCONDUCT JUSTIFYING
HIS TERMINATION…………………………………………………….......................12

     A.     ELEMENTS OF COLLATERAL ESTOPPEL ARE CLEARLY MET...................14

II.    THE FAIRNESS FACTORS UNDER PARKLANE ANALYSIS FAVOR
APPLICATION OF COLLATERAL ESTOPPEL…………………………………….....19

III.   MASSACHUSETTS SUPREME JUDICIAL COURT AND FIRST CIRCUIT
PRECEDENTS CONFIRM PRECLUSIVE EFFECT OF ADMINISTRATIVE
DETERMINATIONS..................................................................................................28

IV.   THERE ARE NO UNRESOLVED FACTUAL DISPUTES –
ONLY DAMAGES REMAIN……………………………………………….........................31

CONCLUSION.................................................................................................................32

REQUEST FOR ORAL ARGUMENT.............................................................................33

CERTIFICATION OF SERVICE.....................................................................................33

# TABLE OF AUTHORITIES

Cases:

Aetna Casualty & Sur. Co. v. Niziolek, 395 Mass. 737, 481 N.E.2d 1356 (1985)………..………13, 14

Alba v. Raytheon Co., 441 Mass. 836 (2004)……………………….........................................passim

Baez-Cruz v. Mun. of Comerio, 140 F.3d 24 (1st Cir. 1998)....................................................13

Bellermann v. Fitchburg Gas and Electric Light Co., 470 Mass. 43 (2014)....................................passim

Curley v. City of Lynn, 408 Mass. 39 (1990)……………………….....................................14

Curran v. Cousins, 509 F.3d 36 (1st Cir. 2007)……………………….................................15

Degiacomo v. City of Quincy, 476 Mass. 38 (2016)……………………….........................................12

Diaz v. City of Somerville, 59 F.4th 24 (1st Cir. 2023)……………………….......................................passim

Evans v. Lorillard Tobacco Co., 465 Mass. 411 (2013)……………………….................................13

Falmouth v. Civ. Serv. Comm'n, 447 Mass. 814 (2006)……………………….....................................15

Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A., 395 Mass. 366 (1985)....................................12

García-García v. Costco Wholesale Corp., 878 F.3d 411 (1st Cir. 2017)..................................................12

Garcetti v. Ceballos, 547 U.S. 410 (2006)....................................................................................15

Jarosz v. Palmer, 436 Mass. 526 (2002)........................................................................................12

Kobrin v. Bd. of Registration in Med., 444 Mass. 837 (2005)……………………………………...28

Locurto v. Guiliani, 447 F.3d 159 (2d Cir. 2006)...............................................................passim

Martin v. Ring, 401 Mass. 59 (1987)...........................................................................................12

McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)……………..…………12

Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75 (1984)........................................................12

O'Connor v. Steeves, 994 F.2d 905 (1st Cir. 1993)……………………………………………...32

Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979)……….....................................................passim

Pickering v. Bd. of Educ., 391 U.S. 563 (1968)...................................................................passim

Pierce v. Morrison Mahoney LLP, 452 Mass. 718 (2008)..................................................................13

Rodriguez–Garcia v. Miranda–Marin, 610 F.3d 756 (1st Cir. 2010).........................................16

Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40 (1st Cir. 2019)....................................11

Soto v. Flores, 103 F.3d 1056 (1st Cir. 1997)……………………….........................................15

Stowe v. Bologna, 415 Mass. 20 (1993)..........................................................................................13

Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London,
637 F.3d 53 (1st Cir. 2011)……………………………….....................................................11

Univ. of Tenn. v. Elliott, 478 U.S. 788 (1986)..................................................................passim

Statutes:

42 U.S.C. § 1983..............................................................................................................passim

42 U.S.C. § 1988....................................................................................................................37

Mass. Gen. Laws ch. 31, § 43.......................................................................................passim

Mass. Gen. Laws ch. 31, § 44.......................................................................................passim

Mass. Gen. Laws ch. 30A, § 14....................................................................................passim

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| JOSEPH ABASCIANO, | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | C.A. No. 1:24-cv-12654-ADB |
| | : | MOTION FOR LEAVE TO FILE |
| | : | EXCESS PAGES (granted on May 27, 2025) |
| CITY OF BOSTON, by and Through | : | |
| Its Treasurer, Ashley Groffenberger; | : | |
| MICHELLE WU; MICHAEL A. COX; | : | |
| PHILLIP OWENS; and | : | |
| JOSEPH COPPINGER, | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY
AS TO COUNT VII OF THE AMENDED VERIFIED COMPLAINT AGAINST
DEFENDANT CITY OF BOSTON (ECF DOC. NO. 17)**

Plaintiff Joseph Abasciano, by and through his attorney, pursuant to Rule 56 of the Federal

Rules of Civil Procedure, hereby submits this memorandum of law in support of his

Motion for Partial Summary Judgment on the Issue of Liability as to Count VII of the Amended

Verified Complaint Against Defendant City of Boston (ECF Doc. No. 17), which asserts a claim for

First Amendment retaliation under 42 U.S.C. § 1983 ("Section 1983").

For the reasons stated herein, the Court should grant Abasciano's motion.

**INTRODUCTION**

On January 6, 2021, while off duty and on an approved leave, Plaintiff Joseph Abasciano

("Abasciano"), a Boston Police Officer, posted six tweets from a private, anonymous *Twitter*

account.  The tweets expressed political opinions about the 2020 Presidential election and the

Capitol protest.  No tweet mentioned his job or employer.

After receiving an anonymous complaint that Abasciano threatened the Vice President, the

Boston Police Department (the "BPD") launched two internal investigations in 2021.  Both

investigations concluded that Abasciano had not violated any departmental rule.  No discipline was recommended.  However, in December 2022 – under new leadership – the BPD opened a third investigation – solely on the existing record and with no new evidence having been uncovered – reversed its own findings, and moved to terminate Abasciano for "conduct unbecoming."

On March 13, 2023, Abasciano was terminated solely because of his tweets.  He appealed to the Massachusetts Civil Service Commission (the "Commission").  The parties fully litigated the appeal in the Commission, which consisted of the admission of eighty-six exhibits; five days of hearings; the testimony of six witnesses; and the submission of post-hearing briefs with proposed findings of fact.

On December 19, 2024, the Commission issued a forty-nine page decision vacating Abasciano's termination, ruling that his tweets were protected speech, that the City had no just cause for termination, and that no disruption to its operations occurred.  The Commission found that:

- Abasciano's tweets were anonymous and sent while off duty;
- The tweets expressed political opinions on a matter of public concern;
- The City failed to prove any operational disruption;
- The sole reason for termination was Abasciano's speech;
- The speech was constitutionally protected and not "conduct unbecoming;"
- The City lacked "just cause" to terminate Abasciano; and
- The City failed to show any other legitimate, non-retaliatory reason.

The City's defenses — including "just cause," "disruption," "lack of trust in the BPD by members of the community" and "conduct unbecoming" — were raised, litigated, argued, and rejected.  The Commission's findings conclusively resolve the elements of a Section 1983 claim in favor of Abasciano: (1) he engaged in protected speech; (2) he suffered an adverse employment action; (3) the speech was a substantial or motivating factor in the adverse action; and (4) the employer cannot prove it would have taken the same action absent the protected conduct.  The City chose not to appeal the Commission's ruling, which is now final and binding on this Court.

Here, the doctrine of offensive collateral estoppel precludes the City from re-litigating these previously resolved issues. And because the factual and legal findings of the Commission conclusively establish the elements of a Section 1983 claim, there are no genuine disputes of material fact regarding liability under Count VII. Thus, partial summary judgment on liability in Abasciano's favor is warranted, leaving only damages to be determined at a jury trial. This approach promotes judicial economy and efficiency by preventing needless re-litigation of matters fully and fairly adjudicated in the earlier proceeding. Additionally, resolving Count VII — the central claim with the highest potential for compensatory and punitive damages — on summary judgment will substantially streamline and narrow the remaining issues for trial.

## FACTUAL BACKGROUND

### Abasciano's employment with the Boston Police Department

In June 2007, Abasciano started his employment with the City as a police officer in the Boston Police Department (the "BPD").[1] Prior to that, he served honorably for four years on active duty with the U.S. Marine Corps, including a deployment to Iraq.[2] He was also employed briefly as a Correction Officer with a County Sheriff's Department.[3] Throughout his career, Abasciano received approximately three dozen official commendations for his performance and had no prior discipline.[4] One of Abasciano's supervisors, Sean Martin ("Martin"), described him as a "high performer" in two districts in which he supervised him.[5] Martin observed Abasciano deal with police colleagues and community members on a daily basis.[6] He never knew Abasciano to treat them with disrespect.[7]

---

[1] Pl.'s Statement of Material Facts ¶1.
[2] Id.
[3] Id.
[4] Id. ¶2.
[5] Id. ¶3.
[6] Id.
[7] Id.

Martin never observed any issue or anything impacting Abasciano's ability to do the job.[8]  Abasciano maintained a social media account on *Twitter* (now known as X).[9]  He did not use his name in connection with the account, nor did he identify himself as a BPD Police Officer.[10]  He used the anonymous handle "@mailboxjoe."[11]

### Abasciano travels to Washington, D.C. to attend a Trump rally on January 6, 2021.

On January 5, 2020, Abasciano travelled to Washington, D.C. with a fellow police officer to attend the so-called "Stop The Steal" rally scheduled for the next day at which President Donald Trump was expected.[12]

### The events of January 6, 2021 in Washington, D.C.

At 5:53 a.m. on January 6, 2021, Abasciano replied to a tweet from @GabrielSterling, in which Secretary Sterling offered an explanation for his actions, writing:

**"I can't wait to see you dragged away in handcuffs."** [13]

At 6:44 a.m., Abasciano tweeted:

**"MAGA Millions Patriots here in DC. Today is a day for choosing. Today there will be only two parties in America. Traitors and Patriots! #January6, #MAGA and #MarchForTrump"**[14]

Sometime before 9:00 a.m., Abasciano and the fellow off-duty BPD officer checked out of the hotel where they stayed for the night and walked to the rally site at the Ellipse in front of the White House, passing through a metal detector to be admitted into the rally area.[15]  They wore civilian clothes and carried no BPD equipment or indicia identifying them as BPD police officers.[16]

---

[8] Id.

[9] Id. ¶4.

[10] Id.

[11] Id.

[12] Id. ¶5.

[13] Id. ¶6.

[14] Id. ¶7.

[15] Id. ¶8.

[16] Id.

At 8:14 a.m., Abasciano tweeted:

**"Hey @senmajlder look out your window. Millions of Patriots are at your doorstep and we are watching. It is time for choosing. Are you a traitor or are you a Patriot? #MarchforTrump, #StopTheSteal and #PatriotParty."**[17]

At 12:40 p.m., while still at the rally, Abasciano tweeted:

**"Everything that happens going forward @VP is now on your conscience. #1776Again, #MarchForTrump and #WeThePeople."**[18]

At 3:54 p.m., Abasciano tweeted:

**"I hope you never sleep well again @VP your Treasonous Act lead [sic] to the murder of an innocent girl and the death of America.  You are not a Godly man. I guess @LLinWood was right about you all along."**[19]

At 5:22 p.m., while on the road home, Abasciano tweeted:

**"What I saw in [sic] today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other.  Patriots and Law Enforcement trying to do their jobs in a no win [sic] position.  I fear this Treasonous election has killed the republic."**[20]

**<u>An anonymous complaint is made to the BPD about Abasciano's tweets.</u>**

During the evening of January 6, 2021 or on the following day, Abasciano was "doxed."[21] At

some point after Abasciano shut down his @mailboxjoe account, the BPD received the following

tweet:

**@bostonpolice – just a heads up.  A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress.  He and others have now removed their social media.**[22]

Attached to the tweet were screenshots of three of the January 6, 2021 tweets sent by

Abasciano.[23]

---

[17] <u>Id</u>. ¶9.
[18] <u>Id</u>. ¶10.
[19] <u>Id</u>. ¶11.
[20] <u>Id</u>. ¶12.
[21] <u>Id</u>. ¶13.
[22] <u>Id</u>. ¶14.
[23] <u>Id</u>.

**The BPD opens an investigation of Abasciano.**

On about January 16, 2021, the BPD's Anti-Corruption Division (ACD) in the Bureau of Professional Standards began an investigation into the alleged involvement of Abasciano and the fellow officer in the violence at the Capitol on January 6, 2021.[24]  The ACD's investigation focused on whether Abasciano had engaged in any criminal misconduct on January 6, 2021.[25]

On January 19, 2021, the Internal Affairs Division (IAD) of the Bureau of Professional Standards also opened an investigation into whether Abasciano's actions on January 6, 2021 had violated any BPD Rules and Procedures.[26]  The IAD rules investigation was put on hold pending completion of the ACD's investigation into Abasciano's possible violation of the criminal law.[27]  During the ACD investigation, Abasciano was interviewed on February 9, 2021 and April 21, 2021.[28]  Abasciano's fellow officer was interviewed on February 18, 2021.[29]  Ultimately, the ACD investigation concluded that Abasciano's tweets and conduct on January 6, 2021 violated no criminal law.[30]  The ACD investigation was closed on May 3, 2021 with the conclusion: "Activity was determined not to exist."[31]

**Lt. Det. Thomas Lima's Report**

On May 19, 2021, the IAD assigned Sergeant Detective Antunez ("Antunez") to investigate whether Abasciano's actions on January 6, 2021 violated any BPD Rules and Procedures[32]  Antunez prepared an investigative report which he submitted through Lieutenant Detective Thomas Lima ("Lima"), to his immediate superior, Eddy Chrispin ("Chrispin") then the Deputy Superintendent in

---

[24] Id. ¶15.
[25] Id.
[26] Id. ¶16.
[27] Id.
[28] Id. ¶17.
[29] Id.
[30] Id. ¶18.
[31] Id.
[32] Id. ¶19.

charge of the IAD.[33]  On June 29, 2021, Lima prepared a cover report which contained an abridged

summary of the facts drawn from Antunez and a conclusion that Abasciano had not violated any

BPD rules.[34]  Lima's report provided in pertinent part:

> Police Officer Joseph Abasciano posted the tweets above as a private citizen.  These
> tweets which might be categorized as political rhetoric hyperbole [and] could be
> considered offensive by some but . . . did not rise to the level of criminality nor call
> into question his ability or judgement to act as a police officer and would not be
> considered a violation of BPD rules and regulations.[35]

### The BPD determines that Abasciano violated no departmental rules and takes no disciplinary action against him.

Lima's report was forwarded and approved by Chrispin, then forwarded to BPS

Superintendent Sharon Dottin ("Dottin"), who noted and approved the report and forwarded it

along for review by the BPD Legal Advisor.[36]  On December 8, 2021, the BPD Legal Advisor

reported: "After review, I agree with the finding of NON-SUSTAINED" as to all allegations against

Abasciano.[37]  Pursuant to standard procedure, the Legal Advisor then forwarded the file to

Superintendent-in-Chief Gregory Long, the Acting Police Commissioner who then had the final

word on all IAD complaints.[38] Acting Police Commissioner Long took no action on the

recommended finding in Abasciano's IAD investigation during his tenure.[39]

### The BPD launches a third investigation of Abasciano after nine months of inactivity.

In or about September 2022, approximately a month after becoming Police Commissioner,

Michael Cox ("Commissioner Cox") elevated then-Sergeant Detective Philip Owens ("Owens") to

the (non-civil service) position of Deputy Superintendent eventually assigning him to replace

---

[33] Id. ¶20.
[34] Id. ¶21.
[35] Id. ¶22.
[36] Id. ¶23.
[37] Id. ¶24.
[38] Id.
[39] Id. ¶25.

Chrispin as the head of the IAD.[40]  One of the initial assignments that Owens received was to "take a look" at several IAD files pending review and needing a decision by the Police Commissioner.[41] The largest of these was Abasciano's file, which Owens knew was "a high-profile case" he had read about in the newspapers[42]

**Owens writes a non-concurrence letter opining that Abasciano violated BPD rules.**

On December 20, 2022, Owens forwarded a "Non-Concurrence" letter to Commissioner Cox disagreeing with the recommended findings of non-sustained as stated in the November 2021 IAD report.[43]  In the non-concurrence letter, Owens wrote that Abasciano "tweeted incendiary tweets that condone the violent insurrection [that] would be viewed unfavorably by the Boston Police Department and the citizens of the City of Boston."[44]

**Dottin and the BPD Legal Advisor flip-flop, reversing their prior determinations that Abasciano's conduct violated no departmental rules.**

Dottin and the Office of the Legal Advisor both reversed their prior opinions that charges against Abasciano were "Not Sustained" and approved Owens's "Non-Concurrence" letter that recommended findings of "Sustained" violations of BPD rules.[45]

**The BPD holds a "Green Folder" meeting recommending Abasciano's termination.**

A "Green Folder" meeting was held in which it was recommended that Abasciano be terminated.[46]  At the Green Folder meeting, comparator evidence was introduced of other officers who the BPD fired for social media posts.[47]  The BPD recommended terminating Police Officer MG for two comments he made on Facebook: (1) "Rats Get Bats" on the FBI's website to mock

---

[40] Id. ¶26.
[41] Id. ¶27.
[42] Id.
[43] Id. ¶28.
[44] Id. ¶29.
[45] Id. ¶30.
[46] Id. ¶31.
[47] Id. ¶32.

the request of the FBI's outreach to the public seeking to identify individuals who took part in the insurrection on January 6, 2021; and (2) "This is what happens when you hang out with drug dealers" in reference to the killing of Breonna Taylor in a botched police raid in Louisville.[48]  The BPD recommend terminating Police Officer JB after referring to a black university professor he had arrested using a repugnant racial stereotype.[49]  The case received national notoriety and led to President Obama inviting the officer and the professor to the White House for a "beer summit."[50]  Commissioner Cox approved the recommendation to proceed with Abasciano's termination.[51]

### A disciplinary hearing is held resulting in a recommendation that Abasciano's tweets violated BPD rules.

On January 30, 2023 and February 15, 2023, a hearing was convened before BPD Chief Administrative Hearings Officer Deputy Superintendent Richard Dahill ("Dahill") on three charges:

- Specification I – Misuse of FMLA in Violation of BPD Rule 103, §3, Conduct Unbecoming;
- Specification II – Posting six tweets in Violation of BPD Rule 103, §3, Conduct Unbecoming; and
- Specification III Violation of Rule 113, §5, Canon 8[52]

The BPD was represented by counsel, introduced thirty-five exhibits and called Owens and Antunez as witnesses.[53]  Abasciano was represented by counsel, introduced eighteen exhibits, testified on his own behalf, and called Dottin and Chrispin as witnesses.[54]  On March 7, 2023, Dahill issued a report finding violations of Specifications II and III.[55]

---

[48] Id. ¶33.
[49] Id. ¶34.
[50] Id.
[51] Id. ¶35.
[52] Id. ¶36.
[53] Id. ¶37.
[54] Id. ¶38.
[55] Id. ¶39.

**The BPD terminates Abasciano because of his tweets.**

On March 13, 2023, the BPD terminated Abasciano by a letter issued by Commissioner Cox.[56]  Commissioner Cox wrote:

> I find your social media posts describing individuals that stormed the Capital [sic] building as 'patriots' calls into question your ability to police members of the community in an unbiased and objective manner.  I also find that this conduct impairs the operation of the Department and its employees by damaging the Department's reputation and trust within the community. The Boston Police Department maintains a mission to foster trust and cooperation in the community and your conduct is detrimental to the mission of the Boston Polce Department.[57]

**Abasciano's appeal to the Massachusetts Civil Service Commission**

On March 23, 2023, Abasciano, appealed to the Massachusetts Civil Service Commission (the "Commission") contesting his termination pursuant to Mass. Gen. Laws c. 31, § 43.[58]  Five days of evidentiary hearings were held before the Commission on August 16, 2023, August 23, 2023, October 11, 2023, October 18, 2023, and December 7, 2023.[59]  The parties submitted eighty-six exhibits into evidence.[60]  The BPD called the following witness:  Dottin; Owens; and Antunez.[61]  Abasciano called the following witness:  Abasciano; Chrispin; and Martin.[62]  On April 4, 2024, the City submitted a post-hearing brief and proposed decision.[63]  On April 4, 2024, Abasciano submitted a post-hearing brief and proposed decision.[64]

---

[56] Id. ¶40.
[57] Id.
[58] Id. ¶41.
[59] Id. ¶42.
[60] Id. ¶43.
[61] Id. ¶44.
[62] Id. ¶45.
[63] Id. ¶46.
[64] Id. ¶47.

On December 19, 2024, the Commission issued a decision vacating Abasciano's termination.[65]  The Commission found the following:

- Abasciano's tweets were sent as a private citizen, while off duty on FMLA leave, using an anonymous handle from a Twitter account that did not identify him as a police officer.[66]
- The BPD's decision to terminate Abasciano was grounded explicitly on the tweets he sent.[67]
- Abasciano's tweets were private, political speech on matters of public concern.[68]
- The BPD did not establish an adequate justification to restrict Abasciano's speech in the interest of protecting the BPD's mission or operations[69]

The City did not appeal the Commission's decision.[70]

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See id. at 56.

A fact is material if it could influence the outcome of the lawsuit under applicable substantive law. Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017).  An issue is genuine if "the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." Id. at 23-24.  In evaluating a motion for summary judgment, the court must examine the record "in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 46 (1st Cir. 2019).

---

[65] Id. ¶48.
[66] Id. ¶49.
[67] Id. ¶50.
[68] Id. ¶51.
[69] Id. ¶52.
[70] Id. ¶53.

However, to withstand a motion for summary judgment, the nonmoving party must present sufficient competent evidence to allow a rational factfinder to resolve the issue in its favor and cannot rely merely on conclusory allegations, improbable inferences, and unsupported speculation. See García-García v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017); McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).

## ARGUMENT

I. **THE CITY IS COLLATERALLY ESTOPPED FROM RE-LITIGATING WHETHER ABASCIANO'S TWEETS WERE MISCONDUCT JUSTIFYING HIS TERMINATION.**

The judicial doctrine of collateral estoppel provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Martin v. Ring, 401 Mass. 59, 61, 514 N.E.2d 663 (1987) (quoting Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A., 395 Mass. 366, 372, 479 N.E.2d 1386 (1985)). See Jarosz v. Palmer, 436 Mass. 526, 530–531, 766 N.E.2d 482 (2002). The purpose of the doctrine is "to conserve judicial resources, to prevent the unnecessary costs associated with multiple litigation, and to ensure the finality of judgments." Martin, 401 Mass. 59 at 61.

Federal courts apply the preclusion law of the state that rendered the prior judgment. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). Under Massachusetts law, a previously litigated issue is precluded if the following elements are met:

(1) there was a final judgment on the merits in the prior adjudication;
(2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication;
(3) the issue in the prior adjudication was identical to the issue in the current adjudication; the issue was essential to the earlier judgment; and
(4) the issue was actually litigated in the prior action.

Degiacomo v. City of Quincy, 476 Mass. 38, 41, 63 N.E.3d 365 (2016).

The doctrine may be applied with respect to administrative agency determinations so long as the tribunal rendering judgment has the legal authority to adjudicate the dispute. Alba v. Raytheon Co., 441 Mass. 836, 841, 809 N.E.2d 516 (2004). Furthermore, "[W]hen a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' . . . federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tenn. v. Elliott, 478 U.S. 788, 799 (1986) (quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966)); see Baez-Cruz v. Mun. of Comerio, 140 F.3d 24, 28 (1st Cir. 1998)). Thus, if the conditions establishing collateral estoppel are satisfied, "[a] final order of an administrative agency in an adjudicatory proceeding, not appealed from and as to which the appeal period has expired, precludes re-litigation of the same issues between the same parties, just as would a final judgment of a court of competent jurisdiction." Stowe v. Bologna, 415 Mass. 20, 22, 610 N.E.2d 961 (1993); see Alba v. Raytheon Co., 441 Mass. 836, 841, 809 N.E.2d 516 (2004) (holding that issue preclusion estopped plaintiff from relitigating issues in chapter 151B claim that were previously determined in un-appealed administrative proceeding).

Here, Abasciano seeks to invoke the doctrine of offensive collateral estoppel. "The offensive use of collateral estoppel 'occurs when a plaintiff seeks to prevent a defendant from litigating issues which the defendant has previously litigated unsuccessfully in an action against another party.'" Evans v. Lorillard Tobacco Co., 465 Mass. 411, 466, 990 N.E.2d 997 (quoting Matter of Cohen, 435 Mass. 7, 15, 753 N.E.2d 799 (2001)). Offensive issue preclusion "does not require mutuality of parties, so long as there is an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction." Pierce v. Morrison Mahoney LLP, 452 Mass. 718, 730, 897 N.E.2d 562 (2008) (quoting Miles v. Aetna Cas. & Sur. Co., 412 Mass. 424, 427, 589 N.E.2d 314 (1992)). Additionally, "the

determination of the issues for which preclusion is sought must have been essential to the underlying judgment." <u>Matter of Brauer</u>, 452 Mass. 56, 67, 890 N.E.2d 847 (2008).  When determining whether the offensive use of collateral estoppel has afforded a defendant due process, "[f]airness is the decisive consideration." <u>Aetna Casualty & Sur. Co. v. Niziolek</u>, 395 Mass. 737, 745, 481 N.E.2d 1356 (1985); <u>See</u> <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 331 (1979) (except where its use would be unfair to a defendant, Federal courts may apply collateral estoppel offensively). Finally, a judge has wide discretion in deciding whether the doctrine should apply in a particular case. <u>Matter of Brauer</u>, 452 Mass. at 67.

### A.      THE ELEMENTS OF A COLLATERAL ESTOPPEL CLAIM ARE CLEARLY MET.

#### 1.   <u>Final Judgment</u>

The Commission conducted five days of evidentiary hearings which included six witnesses and the admission of eighty-six exhibits into evidence.  On December 19, 2024, the Commission issued a decision which became final when the City of Boston declined to appeal it.[71] <u>See</u> <u>Curley v. City of Lynn</u>, 408 Mass. 39, 556 N.E.2d 96 (1990) (holding that an appeal of a civil service Commission decision filed more than thirty days thereafter is untimely); <u>see</u> <u>also</u> Mass. Gen. Laws ch. 31, § 44.

#### 2.   <u>Identity of Parties</u>

The City was the Respondent in the Commission proceedings.  As discussed in more detail below, it had a full and fair opportunity to litigate the matter.

---

[71] Am. Ver. Compl. ¶359 (ECF Doc. No. 17) ("The BPD never appealed the CSC Decision to the Massachusetts Superior Court and, therefore, the CSC Decision and order are final."); Ans. ¶359 (ECF Doc. No. 20) ("The Defendants admit the allegations contained in this paragraph.").

### 3. Identity and Essential Issues

#### a. Were the tweets constitutionally protected speech or misconduct justifying termination?

In the Commission proceedings, the City had the burden to demonstrate by a preponderance of the evidence that it possessed "just cause" to terminate Abasciano. See Mass. Gen. Laws ch. 31, § 43; Falmouth v. Civ. Serv. Comm'n, 447 Mass. 814, 823, 857 N.E.2d 1052 (2006). Since the termination was based specifically on the six tweets that Abasciano posted on January 6, 2021, the City was required to establish that these tweets amounted to misconduct under BPD rules. However, given that Abasciano was a public employee tweeting as a private citizen during his personal time on a matter of public interest – the 2020 Presidential election – his tweets implicated protections under the First Amendment. Consequently, the core issue addressed by the Commission was whether these tweets were protected speech under the Constitution or, as argued by the City, whether they constituted misconduct warranting termination.

In the present litigation, Abasciano alleges a violation of his rights under 42 U.S.C. § 1983 (Count VII), which holds liable any individual who, acting under color of state law, deprives another of rights secured by the Constitution or federal laws. See 42 U.S.C. § 1983. To succeed on a Section 1983 claim, a plaintiff must establish that the challenged action was attributable to a person acting under color of state law and resulted in a deprivation of constitutional or federal statutory rights. Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). In evaluating whether an adverse employment action violates a public employee's First Amendment free speech rights, the First Circuit employs a three-step analysis derived from Pickering v. Bd. of Educ., 391 U.S. 563 (1968). First, a court must determine "'whether the employee spoke as a citizen on a matter of public concern.'" Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). Second, the court must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees." Id. at 44 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)) (omission in original).  Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." Id. at 45.  If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that "it would have reached the same decision even absent the protected conduct." Rodriguez–Garcia v. Miranda–Marin, 610 F.3d 756, 765–66 (1st Cir. 2010) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

Accordingly, establishing a violation of Count VII in this litigation requires resolving the identical issue considered by the Commission:  Whether Abasciano's tweets constituted constitutionally protected speech or whether, applying the Pickering standard, the City possessed sufficient justification to terminate him for misconduct.

### b.  Issue Essentiality

The Commission's decision vacating Abasciano's termination was based solely on addressing the question of whether Abasciano's tweets were constitutionally protected speech or whether they amounted to misconduct in violation of BPD.  The Commission wrote in the summary of its decision:

> The issue before the Commission on the merits of this appeal is whether tweets sent by the Appellant on January 6, 2021 are protected speech or constituted misconduct that justified his termination. The uncontroverted evidence established that the Appellant's tweets satisfy the first and third prongs of the *Pereira* framework, i.e.: (a) the Appellant's tweets were sent as a private citizen, while off duty on FMLA leave, using an anonymous handle from a Twitter account that did not identify the Appellant as a police officer; and (b) the BPD's decision to terminate the Appellant is grounded explicitly on the tweets he sent. Thus, the only disputed issue here arises under the second prong of the *Pickering* balancing test, i.e., whether, on balance, the Appellant's tweets are constitutionally protected private free speech or may be restricted by the BPD as qualified speech because they have been adequately shown to adversely affect the BPD's operations or mission. After careful consideration of the entire record, I am persuaded by the preponderance of evidence that, applying the *Pickering* balancing test: (1) the Appellant's tweets are private political speech on matters of public concern that fit within the scope of BPD Rule 102, Section 30 and (2) the BPD has not established an adequate justification to restrict that speech in the interest of protecting

the BPD's mission or operations. Therefore, the tweets cannot be sanctioned as "conduct unbecoming" under BPD Rule 102, Section 3 or as a violation of the BPD's Canon of Ethics under Rule 113, Canon 8. (Ex. A at 34-35).

### 4. **Actually Litigated**

The parties fully-litigated the free speech issue before the Commission. The City presented

Owens as its star witness. Owens testified that he believed Abasciano's tweets undermined the

public's trust in the BPD:

> Q.    . . . . What is the mission of the Boston Police Department?
> **A.    The mission of the Boston Police Department is community policing, and community policing involves the public and public trust.**
>
> Q.    And what is it about Officer Abasciano's conduct that you felt violated that and violated and called into question the public's trust or diminished the public's trust in the Boston Police Department based on what specific conduct of Officer Abasciano?
> **A.    His inflammatory tweets made it appear that he supported the actions that was going on during the riot at the Capital.**

(Day 2 Hrg. Tr. at 79:24-80:8).

However, the City never offered a logical explanation of how Abasciano's tweets diminished

the public's trust in the BPD beyond mere speculation. Owens testified:

> Q.    What is the problem of a Boston Police officer saying after today there's only going to be two parties, traitors and patriots?
> **A.    To me, that goes back to the rule. It questions his judgment. Can we trust that he's going to be fairly in policing and doing his job? He says there's only two parties, patriots and traitors.**
>
> Q.    And does that affect the public trust as well?
> **A.    Absolutely does.**

(Day 2 Hrg. Tr. at 97:1-12).

> Q.    Superintendent Owens, I don't want to belabor this, but I just want to make sure I understand this concern about Officer Abasciano dividing people into patriots and traitors. Is it your concern that the public doesn't trust him because he divides people patriots and traitors?
> **A.    That would be a concern, yes.**
>
> Q.    And then how does that manifest itself to – what is your concern, what is the -- what flows from that?
> **A.    So the public -- it's going to impede our operation to the public.**

Q.      Your concern that people are walking around going, you know what, there's a Boston Police officer who divides people into patriots and traitors and I don't think he should -- I'm afraid he's going to arrest me one day?

**A.      I don't know the exact -- how they exactly feel, but there -- I would be concerned that they would fear that he wouldn't treat them fairly, yes, absolutely.**

Q.      And then what services would the Boston Police Department not be able to provide because Joe Abasciano divides people into patriots and traitors?

**A.      Total operational plans. It's comm -- not community service, but part of community policing, but our service to the public. We're public driven. Everything we do is for public service.**

(Day 3 Hrg. Tr. at 125:1-126:6).

Furthermore, the City offered no evidence of actual disruption that was caused by

Abasciano's tweets.  Crispin testified:

Q.      . . . [T]o your knowledge, were there any Boston police officers who complained to the department about the tweets that Joe Abasciano sent out on January 6th?

**A.      Not that I am aware of.**

Q.      To your knowledge, were there any Boston police officers who reported to the department that they refused to work with Joe Abasciano?

**A.      Not that I am aware of.**

Q.      What about any City of Boston employees, to the best of your knowledge, did any City of Boston employees contact the department and said -- to complain about Joe Abasciano's tweets on January 6th?

**A.      Not that I am aware of.**

Q.      What about, were there any protests that you were aware of, of members of the public protesting in front of the police department or police station, because of the tweets Joe Abasciano sent on January 6th?

**A.      Not that I am aware of.**

(Day 4 Hrg. Tr. 102:22-104:5).

Furthermore, the City and Abasciano submitted comprehensive post-hearing briefs explicitly

addressing whether Abasciano's speech was protected under the First Amendment, while invoking

the Pickering analysis.  In its post hearing brief, the City wrote:

The Appellant's conduct plainly interfered with and impaired the Department's operations and working relationships. Officer Abasciano's statement condoning the Capitol rioters while labeling individuals who held that view the election was legitimate as "traitors" frustrated the Department's public safety mission and threatened "community trust" in the Department, which is "vitally important" to its

function. Acting in a biased manner or creating a perception thereof undermines public trust. <u>Locurto v. Guiliani</u>, 447 F.3d 159, 182 (2d Cir. 2006).

(<u>Ex</u>. D at 34).

        Given all this, there is simply no basis for concluding that the Department's interest in providing efficient and effective public safety services was outweighed by the Appellant's free speech interest, given the gravity of the situation and determinately impacted on the work of the Department.

(<u>Id</u>. at 36).

In his post hearing brief, Abasciano wrote:

        Here, it is indisputable that Abasciano was acting as a private citizen at the time he sent the tweets and that the tweets involved a matter of public concern – the 2020 Presidential election.  It is also indisputable that Abasciano's tweets were a substantial or motivating factor for his termination.  Thus, the only question left to decide is whether the BPD had an adequate justification, based on the impact to its own operations, for the action it took against Abasciano.

(<u>Ex</u>. E at 36-37).

        Here, there were no complaints by any of Abasciano's fellow police officers or any City of Boston employees.  There was also no public outcry or protests by members of the public.

(<u>Id</u>. at 37).

        Some of Abasciano's tweets were published in news articles, yet there was still no public outcry.  The BPD only received two contacts about Abasciano and one was the B. Rosa complaint filed by his political rival.  Thus, there was no evidence that the public had lost any trust in the BPD and any such prediction was purely speculative.  Furthermore, any alleged bias by Abasciano that would cause members of the public to lose trust in the BPD cannot reasonably be connected to his tweets.

(<u>Id</u>. at 38).

After a thorough review of the record including the above arguments set forth in the parties' post hearing briefs, the Commission agreed with Abasciano's arguments on this issue and found in his favor.

## II.    THE FAIRNESS FACTORS UNDER THE <u>PARKLANE</u> ANALYSIS FAVOR APPLICATION OF COLLATERAL ESTOPPEL.

Having established that the collateral estoppel elements are satisfied, the Court must next consider whether applying estoppel here would be fair to the City.  To determine the fairness of particular applications of offensive collateral estoppel, courts generally ask whether: (1) the party in

whose favor the estoppel would operate could have joined the original action; (2) the party against whom it would operate had an adequate incentive to defend the original action vigorously; (3) "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," and (4) "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-31 (1979).  "The party facing preclusion bears the burden of proof on the question of fairness." Bellerman v. Fitchburg Gas and Elec. Light Co., 470 Mass. 43, 62, 18 N.E.3d 1050 (2014).

Here, when applying the above factors, it is clear that an application of offensive collateral estoppel would not be unfair to Defendant City of Boston.

## 1. __Abasciano's inability to join earlier action__

While Parklane cautions against granting estoppel to plaintiffs who "could have joined the earlier action," that concern is inapplicable here.  The prior action was an administrative disciplinary appeal before the Commission under Mass. Gen. Laws ch. 31, § 43, brought by Abasciano himself in a purely individual employment capacity to challenge his discharge.  That proceeding did not, and could not, adjudicate Section 1983 First Amendment retaliation claims, nor could it provide for damages or injunctive relief available in this Court.  Thus, Plaintiff did not have an opportunity to litigate the Section 1983 claim there, and the procedural posture avoids the "wait-and-see" problem identified in Parklane. Parklane Hosiery Co., 439 U.S. at 330.

## 2. __The City's incentive to litigate vigorously__

### a. __Abasciano threatened to sue the City for Section 1983 First Amendment retaliation three months prior to the first evidentiary before the Commission.__

The record overwhelmingly demonstrates that the City had every incentive to vigorously defend the termination decision.  Importantly, the City knew that Abasciano had a Section 1983

claim already teed up against it three months before the City presented its case before the

Commission on August 16, 2023.  Indeed, on May 23, 2023, Abasciano's counsel contacted the

City's counsel by email in an early attempt to resolve the dispute without resorting to full-blown

evidentiary proceedings before the Commission.  In that email, Abasciano's counsel specifically

referenced a potential Section 1983 claim.  Abasciano's counsel wrote:

> Dear Joe:
>
> As I indicated during today's hearing, Officer Abasciano intends to set forth a global
> demand to the City of Boston in an effort to resolve all of his pending and potential
> legal claims (the appeal pending before the Civil Service Board; the MCAD
> complaint; and a potential federal court lawsuit for First Amendment retaliation for
> violation of 42 USC sec. 1983 and defamation). In exchange for a release of all
> claims, my client would receive a monetary settlement and the City would agree to
> rescind his termination. I expect to get this out within the next two weeks. To whom
> should I send the demand?

(Ex. F) (emphasis added).

### b.   The City's line of questioning about public trust demonstrates that it anticipated a First Amendment Claim.

One of the central considerations under the Pickering balancing test is whether the

employee's speech "impairs discipline by superiors or harmony among coworkers, has a detrimental

impact on close working relationships . . . or impedes the performance of the speaker's duties or

interferes with the regular operation of the enterprise." Pickering v. Bd. of Educ., 391 U.S. 563, 570–

73 (1968).  In its post-hearing brief, the City cited to Locurto v. Guiliani, 447 F.3d 159 (2d Cir.

2006), a Second Circuit decision explicitly addressing the concept of loss of public trust as a

significant government interest in police discipline cases involving First Amendment claims. (Ex. D

at 34) ("Officer Abasciano's statement condoning the Capitol rioters while labeling individuals who

held that view the election was legitimate as "traitors" frustrated the Department's public safety

mission and threatened "community trust" in the Department, which is "vitally important" to its

function. Acting in a biased manner or creating a perception thereof undermines public trust.

Locurto, 447 F.3d at 182.

Significantly, during a hearing before the Commission, the City's counsel explicitly elicited testimony from Owens concerning a purported loss of public trust in the BPD resulting from Abasciano's tweets (Day 2 Hrg. Tr. at 79:24-80:8; 97:1-12). This strategic questioning did not emerge spontaneously – it deliberately mirrored language from Locurto, laying a clear roadmap to defeat a potential Section 1983 First Amendment retaliation claim. By adopting this specific language of "loss of public trust," the City unmistakably demonstrated its awareness and anticipation of First Amendment litigation. Moreover, this aligns with undisputed evidence that months prior to the hearing, Abasciano's counsel explicitly notified the City in writing of his intent to assert a federal claim under Section 1983. Thus, when the City litigated whether Abasciano's tweets impaired public trust and departmental operations, it did so fully aware these issues would form the core of an anticipated constitutional claim. This deliberate strategy provides exactly the type of clear record supporting the application of offensive collateral estoppel. The City had a full and fair opportunity to litigate. Having intentionally framed its defense using Pickering principles — and having lost on those terms before the Commission — it cannot now seek to relitigate those same issues before this Court.

      c.    **The City knew that Abasciano's termination had been picked up by the local news stations, and it knew he was planning to sue for a violation of his First Amendment rights.**

The City had a clear and substantial interest in defending the termination of a police officer following public political speech, especially where that speech had garnered press and community attention. In fact, Owens testified that it was "a high-profile case" he had read about in the newspapers. (Day 2 Hrg. Tr. at 66:17-67:9).

      d.    **The City knew it had no formal social media policy in place governing off-duty expression.**

During the evidentiary hearings before the Commission, the undisputed evidence showed that neither the City, nor the BPD had in place any formal social media policy at the time of

Abasciano's tweets on January 6, 2021.[72]  The City's witnesses did not identify any written policy that prohibited officers from anonymously posting political opinions on public matters while off duty, nor was there any rule prohibiting attendance at a political rally during approved FMLA leave.  The City's own proposed decision does not cite to a social media policy.  Instead, it relies on generalized rules such as "conduct unbecoming" and vague notions of damage to public trust.  The absence of a policy was not due to oversight – it was well known to the BPD.  In fact, the BPD re-visited the Internal Affairs investigation more than a year after it initially concluded no discipline was warranted, and in the process, acknowledged that it was evaluating the case under shifting public standards and internal expectations, not codified departmental rules.

### e.    The City knew that more social media-related cases were inevitable.

The year 2021 and the period following January 6 saw an explosion in off-duty social media activity by law enforcement officers across the country, prompting national debate over the limits of public employee speech.  The City was undoubtedly aware of this growing trend.  In the BPD itself, the issue of officers' use of *Twitter* and other platforms for political commentary had begun to surface, and the BPD was on notice that future First Amendment disputes involving officer conduct on social media were foreseeable.

The City also knew that the Abasciano case would serve as a high-profile benchmark for how it and other departments could discipline officers for speech made while off duty on private platforms, particularly in the absence of explicit policies.  If it succeeded in affirming the termination despite the lack of a social media policy, the BPD would have had greater discretion in future

---

[72] Am. Ver. Compl. ¶351 (ECF Doc. No. 17) ("As of August 16, 2023, the BPD still did not have a social media policy in place. The Defendants admit the allegations contained in this paragraph."); Ans. ¶351 (ECF Doc. No. 20) ("The Defendants admit the allegations contained in this paragraph.").

terminations.  A loss, on the other hand, would expose its policy vacuum and constrain future disciplinary action.

f.    **The City treated Abasciano's appeal as a test case.**

The City's decision to conduct a third investigation after Abasciano's case lay dormant for nine months and reverse its own 2021 internal findings – despite two prior investigations concluding no misconduct occurred – demonstrates that it viewed the Abasciano case not as routine, but as an opportunity to take a new and more aggressive disciplinary position.  The BPD leadership under Commissioner Cox treated the matter as a precedent-setting action and sought termination on the basis of "conduct unbecoming," without first implementing any new guidance or regulation.

The City's conduct – investigating, reversing itself, and fully litigating the termination in a five-day de novo hearing – confirms that it understood the significance of the case for shaping its future handling of politically sensitive speech by officers.

g.    **The City pulled out all of the stops in a vigorous defense of Abasciano's appeal.**

The City had a clear and compelling institutional incentive to defend the civil service appeal brought by Abasciano.  The City presented multiple witnesses, introduced thirty-five exhibits, and participated in five days of evidentiary hearings before the Commission.  The City asserted that Abasciano's conduct violated internal rules, impaired the BPD's public mission, and undermined public trust — all of which, if accepted, would have validated the termination under state law and saved the City from reinstatement obligations.  However, the City did not stop there.  It also pursued additional legal tactics to avoid an adverse ruling after the close of evidence, demonstrating the intensity of its effort to uphold the termination.  For example, after the evidentiary record closed, and while the case was under advisement, the City filed a Motion to Dismiss for Lack of Jurisdiction, arguing that the Commission lacked authority to grant relief because the City had filed an involuntary disability retirement application on Abasciano's behalf retroactive to his termination.

This procedural maneuver attempted to cut off the Commission's jurisdiction and prevent it from issuing a ruling on the merits of Abasciano's termination.  This motion was not a perfunctory filing. But rather, it was a post-hearing litigation strategy advanced after full briefing and evidentiary development, designed to avoid a potentially unfavorable ruling after it was obvious that a victory for Abasciano was forthcoming.  Its timing underscores the City's awareness of the high stakes involved in the Commission's resolution of the just cause issue and its desire to insulate itself from the collateral consequences of a loss.

The Commission denied the motion and ultimately ruled against the City on the merits, finding that the termination violated Abasciano's constitutional rights and that no just cause existed. The City's effort to avoid that ruling further confirms that it fully understood the significance of the legal and policy issues at stake and vigorously litigated the matter in every available forum.

### 3.  Absence of inconsistent prior judgments

Here, there are no inconsistent prior rulings.  The Commission is the only body to adjudicate the legitimacy of Abasciano's termination, and it ruled unequivocally that:

- Abasciano's tweets were constitutionally protected speech;
- The BPD's 2022 paper review was flawed and not credible;
- There was no disruption to the BPD's operations or public trust; and
- The BPD lacked just cause to discharge Abasciano

The absence of any prior conflicting judgment strongly supports the application of estoppel.

### 4.  Procedural fairness and opportunity before the Commission

The final Parklane factor concerns whether the defendant (here, the City of Boston) would be unfairly prejudiced by the application of offensive collateral estoppel because it lacked procedural opportunities in the prior proceeding that it now possesses.  This factor weighs heavily in favor of applying estoppel here, because the City had robust procedural rights in the Commission proceedings — including discovery, subpoena power, evidentiary hearings, cross-examination, and

the ability to submit post-hearing legal briefs — that match or exceed what is available under the Federal Rules of Civil Procedure.

### a.    Discovery under the Civil Service Commission's procedural rules

The Commission is governed by the Standard Adjudicatory Rules of Practice and Procedure, 801 CMR 1.01, which apply to all formal adjudications under Massachusetts administrative law unless superseded by specific Commission rules.  Under 801 CMR 1.01(8):

- Discovery is available and includes the ability to request documents, submit interrogatories, and depose witnesses with Commission approval;
- The parties may engage in informal discovery or request that the Commission order formal discovery mechanisms; and
- The Commission may issue subpoenas to compel production of documents and testimony (Mass. Gen. Laws ch. 31, § 2(b)).

In this case, the City:

- Subpoenaed Abasciano's Twitter account dating back to November 4, 2020 in an effort to find other allegedly inflammatory tweets and in response, it received 2514 tweets, retweets, and replies (Ex. G);
- Filed a motion to quash a subpoena issued by Abasciano to Commissioner Cox to testify at a hearing as an adverse witness for him;
- Had access to internal reports, BPD emails, and Abasciano's cell phone data from a BPD issued phone;
- Entered more than thirty-five exhibits into evidence, including Abasciano's Twitter history, Twitter screenshots, FMLA records, and internal investigative files;
- Had full access to conduct internal interviews with officers who were required to cooperate;
- Had the opportunity to submit rebuttal evidence and challenge Abasciano's credibility; and
- Filed a Motion to Dismiss for Lack of Jurisdiction

This level of discovery is at least functionally equivalent to that under Rules 26 and 37 of the Federal Rules of Civil Procedure and exceeds it in some ways due to the employer's ability to compel cooperation from its own employees under departmental rules.

Here, the City subpoenaed Abasciano's Twitter account, receiving 2,514 tweets, retweets, and replies in response (Ex. G).  Undoubtedly, the City scrutinized each tweet in meticulous detail,

combing through the material in search of any potential "smoking gun" to justify Abasciano's

termination. Despite this exhaustive examination, the City found nothing — no misconduct, no

inappropriate behavior, and certainly no evidence of "conduct unbecoming." Given this exhaustive

but fruitless investigation, allowing the City to recycle the same evidence in subsequent litigation

would be futile, inefficient, and would yield no meaningful or new evidence relevant to this Court's

determination.

> **b.    <u>Evidentiary hearings were formal, adversarial, and comprehensive</u>.**

Under 801 CMR 1.01(10)-(11) and Mass. Gen. Laws ch. 31, § 43, Commission hearings:

- Are formal adversarial hearings conducted by Commissioners;
- Include the right to present live testimony, cross-examine witnesses, and introduce documentary evidence;
- Require the Commission to base its decision on the preponderance of the evidence standard; and
- Are digitally recorded, and transcripts become the official record (as they did here).

In this case:

- The City participated in five full days of hearing;
- It was represented by counsel and examined six witnesses (three of its own, three called by Abasciano);
- It submitted a post-hearing proposed decision and brief (akin to proposed findings and conclusions of law); and
- The Commission rendered a written decision analyzing the facts and applying constitutional standards, including the <u>Pickering</u> balancing test.

In addition, the record on which Abasciano relies was not developed for the first time before

the Commission. Prior to the Commission appeal, the BPD had already conducted a disciplinary

process that included two hearings where multiple witnesses testified and numerous exhibits were

presented. These proceedings formed the factual foundation for the termination and were

incorporated into the Commission's record. As such, the evidence underlying the Commission's

findings was the result of layered factual development across multiple stages — including internal

investigation, disciplinary hearing, and full evidentiary hearing — further supporting the application

of collateral estoppel.  The City had ample notice, incentive, and opportunity to present and

preserve its case at each stage of the process.

There is no additional procedural advantage to the City in federal court.  If anything, the

Commission's familiarity with public employment law and its ability to consider internal department

practices in context gave the City a procedural and substantive forum uniquely suited to its defense.

### c.  Judicial review of the Commission's decision was available but not pursued.

The City had the right to seek judicial review of the Commission's decision under Mass.

Gen. Laws ch. 31, § 44 and ch. 30A, § 14, which would have allowed it to challenge the findings in

state superior court.  However, the City never appealed the Commission's decision.[73]

## III.  THE MASSACHUSETTS SUPREME JUDICIAL COURT AND FIRST CIRCUIT PRECEDENTS CONFIRM PRECLUSIVE EFFECT OF ADMINISTRATIVE DETERMINATIONS.

The Commission's findings concluded that:

- Abasciano's tweets on January 6, 2021, were sent on his own time, from a private, anonymous Twitter account.
- The tweets were on a matter of public concern, namely political and electoral issues.
- The City presented no credible evidence that the tweets disrupted the operation of the Department or undermined its public mission.
- The sole basis for Abasciano's termination was his speech, and there was no just cause to terminate him.
- His speech was constitutionally protected, and the termination was unlawful.

Under settled law, including University of Tennessee v. Elliott, 478 U.S. 788 (1986), and

Kobrin v. Bd. of Registration in Med., 444 Mass. 837 (2005), these factual and legal determinations

by a state administrative body are entitled to preclusive effect in federal court, provided the party

against whom estoppel is asserted had a full and fair opportunity to litigate — which the City did.

Likewise, the First Circuit gives preclusive effect to un-appealed final agency determinations that

comport with due process.  Both the Massachusetts Supreme Judicial Court and the First Circuit

---

[73] FN 71, supra.

Court of Appeals have ruled that a party is collaterally estopped from re-litigating factual and legal findings established by an administrative agency.

**Diaz v. City of Somerville, 59 F.4th 24 (1st Cir. 2023)**

In Diaz, Henry Diaz, a black and Hispanic police officer with the City of Somerville, was discharged after an off-duty incident involving Diaz physically assaulting a pedestrian and subsequently lying about the incident during an internal investigation.  Following termination by the City, Diaz appealed his dismissal to the Commission.  After conducting evidentiary hearings, the Commission upheld Diaz's termination, concluding he had committed serious misconduct (assaulting a civilian without justification) and lied during the internal investigation.  It also specifically found that Diaz had not been treated disparately based on his race as compared to similarly-situated officers.  After the Commission's decision, Diaz filed suit in Massachusetts state court, alleging racial discrimination under Title VII and Mass. Gen. Laws ch. 151B ("Chapter 151B"), which defendant removed to the United States District Court for the District of Massachusetts.

In the district court, the City moved for summary judgment, arguing that Diaz was collaterally estopped from relitigating two key issues already determined by the Commission: (1) Whether the City had a legitimate, nondiscriminatory reason for terminating Diaz; and (2) whether Diaz had been subjected to disparate treatment compared to similarly situated officers.  The district court accepted the City's collateral estoppel argument on the Chapter 151B claim, holding that: (1) Diaz was precluded from relitigating these issues because the Commission, acting in a judicial capacity, had already provided a final judgment on the merits regarding these identical issues; and (2) Diaz had a full and fair opportunity to litigate these questions before the Commission.  Because Diaz's only means of establishing pretext under Massachusetts law was to show disparate treatment through comparators — an issue the Commission had already conclusively rejected — the district

court granted summary judgment to the City on Diaz's Chapter 151B claim. Diaz appealed the district court's ruling to the First Circuit Court of Appeals.

On appeal, Diaz argued the district court erred on the collateral estoppel ruling because the Commission had considered only whether there was "just cause" for termination, not whether there was discrimination. He also presented additional comparators not used before the Commission. The First Circuit affirmed the district court's dismissal of Diaz's Chapter 151B claim on collateral estoppel grounds for the following reasons:

1. <u>Identity and Essential Nature of Issues</u>:
   - The First Circuit found the issue addressed by the Commission — whether Diaz was treated differently than similarly-situated officers — was exactly the same issue presented in Diaz's Chapter 151B claim. <u>Id</u>. at 30.
   - It emphasized that the Commission had squarely determined Diaz's comparators were not sufficiently similar to show disparate treatment, a finding central to both the Commission determination and Diaz's discrimination claim under Chapter 151B. <u>Id</u>. at 32-33.
2. <u>Full and Fair Opportunity to Litigate</u>:
   - The Court of Appeals held that Diaz had a full and fair opportunity to litigate the comparator issue at the Commission level. <u>Id</u>. at 31.
   - The fact that Diaz later identified additional comparators not presented to the Commission was irrelevant because issue preclusion turns on the opportunity to litigate, not on how effectively that opportunity was used. <u>Id</u>.

**<u>Bellermann v. Fitchburg Gas and Electric Light Co.</u>,**
**470 Mass. 43, 18 N.E.3d 1050 (2014)**

The <u>Bellerman</u> case is illustrative of how Massachusetts courts apply the use of offensive collateral estoppel to matters previously adjudicated in an administrative agency. In <u>Bellerman</u>, residential and business customers of Fitchburg Gas and Electric (FG&E) brought claims against the company following significant power outages during a winter storm in December 2008. They alleged gross negligence and violations of the Massachusetts Consumer Protection Act (Chapter 93A), asserting FG&E inadequately prepared for the storm, failed to restore power timely, and provided misleading and inadequate information to customers regarding restoration timelines.

The Massachusetts Department of Public Utilities (DPU) conducted extensive hearings and found FG&E had numerous deficiencies, including inadequate emergency planning, insufficient vegetation management, poor communication, and inadequate restoration efforts.  FG&E did not appeal these findings.  When the customers subsequently filed suit in Massachusetts Superior Court, they sought to use offensive collateral estoppel to prevent FG&E from relitigating these factual findings.

Importantly, the Superior Court ruled that factual findings made by DPU in a prior administrative proceeding could be given preclusive effect under the doctrine of offensive collateral estoppel.  Specifically, the court found the DPU's detailed findings regarding FG&E's deficiencies in planning, communication, and storm response were binding and could not be re-litigated by FG&E in the judicial proceeding.  The Massachusetts Supreme Judicial Court affirmed the lower court's ruling holding the court properly applied offensive collateral estoppel.

## IV.    THERE ARE NO UNRESOLVED FACTUAL DISPUTES – ONLY DAMAGES REMAIN

### A.    COLLATERAL ESTOPPEL APPLIES — THE CITY HAD A FULL AND FAIR OPPORTUNITY TO LITIGATE

Because the City is collaterally estopped from relitigating the issues of protected speech and lack of just cause, it cannot offer any admissible evidence in this Court to contest the essential elements of Plaintiff's Section 1983 claim.  The Commission already determined there was:

- No breach of Departmental rules;
- No operational disruption; and
- No basis for termination aside from protected speech.

### B.    THE COMMISSION APPLIED THE SAME LEGAL STANDARD UNDER SECTION 1983 AS THIS COURT MUST.

To establish liability under Count VII, Abasciano must show:

1. He engaged in protected speech;
2. He suffered an adverse employment action;
3. The speech was a substantial or motivating factor in the adverse action; and

4. The employer cannot prove it would have taken the same action absent the protected conduct.

The Commission explicitly applied the <u>Pickering</u> balancing test, as required by First Circuit precedent in <u>O'Connor v. Steeves</u>, 994 F.2d 905 (1st Cir. 1993) and conclusively resolve each of these elements.

1. The speech was protected under the First Amendment;
2. Abasciano was terminated;
3. The Commission found that his speech was the sole reason for the termination; and
4. The City failed to show any other legitimate, non-retaliatory reason

The City's defenses — including "just cause," "disruption," "lack of trust in the BPD by members of the community" or "conduct unbecoming" — were raised, litigated, argued, and rejected. The City chose not to appeal the Commission's ruling. Accordingly, there is no material fact in dispute as to liability. Thus, there are no triable issues of fact on liability, and summary judgment under Rule 56 must enter in Plaintiff's favor on Count VII. And because liability is established as a matter of law, the only issue left for trial is the scope and measure of damages, including:

- Back pay and benefits (if warranted);
- Emotional distress;
- Punitive damages (if warranted); and
- Attorneys' fees and costs under 42 U.S.C. § 1988.

This result aligns with the goals of judicial economy and efficiency, avoiding unnecessary re-litigation of matters already decided after a full and fair hearing.

## CONCLUSION

The City of Boston had every opportunity to defend its decision to terminate Abasciano and lost on the merits. Under the doctrine of offensive collateral estoppel, it does not get a "re-do" on those same facts in federal court. Furthermore, because the factual and legal findings of the Commission conclusively establish the elements of a Section 1983 claim, there are no genuine disputes of material fact regarding liability under Count VII. Thus, partial summary judgment on

liability in Abasciano's favor is warranted, leaving only damages to be determined at a jury trial. As such, Plaintiff respectfully requests that this Court grant partial summary judgment on liability in his favor and set the matter for a jury trial on damages.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 7.1 of the Local Rules for the U.S. District Court for Massachusetts, Abasciano respectfully requests that the Court hear oral argument on this matter. Abasciano believes that oral argument will assist the Court in deciding this motion, which involves complicated legal issues, that are well-suited to direct argument beyond that contained within the parties' respective written submissions and that will clarify or expound upon the arguments set forth in the parties' briefs. Plaintiff Joseph Abasciano hereby requests 30 minutes for oral argument.

Respectfully submitted by:

Plaintiff
JOSEPH ABASCIANO

By His Attorney,

/s/Mark P. Gagliardi
Mark P. Gagliardi (MA BBO #657622)
mark@markgagliardilaw.net

LAW OFFICE OF MARK P. GAGLIARDI
56 Pine Street, Suite 200
Providence, RI 02903
(401) 277-2030 (office)
(401) 274-2780 (fax)
(401) 487-6666 (mobile)

Dated: May 27, 2025

## CERTIFICATION OF SERVICE

I hereby certify that on this **27**th day of May 20**25**, I filed electronically this document with the ECF system of the United States District Court for the District of Massachusetts and, therefore, all counsel of record has received notice electronically.

/s/Mark P. Gagliardi
Mark P. Gagliardi