# EXHIBIT B

## COMMONWEALTH OF MASSACHUSETTS

**CIVIL SERVICE COMMISSION**
100 Cambridge Street, Suite 200
Boston, MA 02114
(617) 979-1900

**JOSEPH ABASCIANO,**
        *Appellant*
  *v.*

**BOSTON POLICE DEPARTMENT**,
        *Respondent*

**Docket Number:**                     **D1-23-033**

Appearance for Appellant:         Mark P. Gagliardi, Esq.
                                Law Office of Mark P. Gagliardi
                                56 Pine Street – Suite 200
                                Providence, RI 02903

Appearance for Respondent:      Joseph A. McClellan, Esq.
                                Assistant Corporation Counsel
                                Office of the Legal Advisor
                                Boston Police Department
                                One Schroeder Plaza
                                Boston, MA 02120

Commissioners:                     Paul M. Stein

## SUMMARY OF DECISION

The substantive issue presented in this appeal is whether certain tweets sent by the Appellant on January 6, 2021, while attending the so-called "Stop the Steal" rally in Washington, D.C., constituted substantial misconduct that warranted his termination as a Police Officer in the Boston Police Department (BPD).[1] It was undisputed that, when the tweets were sent, the Appellant was off duty, they were sent from a private Twitter account and they did not identify the Appellant or his employment with the BPD. It was also undisputed that the Appellant did not participate in any way in the violent insurrection that day at the Capitol following the rally.

---

[1] After the record closed and the appeal was under advisement, the BPD filed a Motion to Dismiss the appeal for lack of jurisdiction on the grounds that an application for the Appellant's involuntary disability retirement had been filed by the BPD in June 2022 and was approved in January 2024, effective retroactive to the date of the Appellant's termination in March 2023. The BPD argued, therefore, that, as a retiree, the Appellant was no longer an aggrieved person over whom the Commission could order reinstatement or grant relief. The Appellant opposed the motion. For the reasons explained in this Decision, the Motion to Dismiss is denied.

1

The BPD conducted two thorough internal investigations – one by the Anti-Corruption Division (ACD) completed in May 2021 and another by the Internal Affairs Division (IAD) completed in November 2021. The ACD investigation confirmed that the Appellant had *not* personally participated in the violent insurrection or committed any criminal acts. As to the Appellant's tweets, the IAD investigation concluded that they were *not* intended to incite or condone violence and they did *not* impact the Appellant's ability to do his job. Overall, these investigations concluded that the Appellant had *not* engaged in any misconduct that violated the BPD's Rules and Procedures.

More than a year later, in December 2022, newly appointed BPD leadership reopened the Appellant's IAD file and, this time, reached a starkly different conclusion that charged the Appellant with "conduct unbecoming" for sending the January 6, 2021 tweets and recommended that the Appellant be terminated, which recommendation the new Police Commissioner adopted.

After a five-day de novo hearing, the Commission concluded that the two 2021 investigations were more objective, timely and thorough; were supported by a preponderance of the evidence; and deserve more weight than the less thorough December 2022 "paper review" which relied on erroneous facts and conclusions that were not substantiated by credible evidence. In short, the Commission allowed the Appellant's appeal because the preponderance of the evidence confirmed the BPD's 2021 initial findings and conclusions that the Appellant did *not* engage in misconduct on January 6, 2021, that there was *not* just cause to justify any discipline against him solely for the handful of tweets he sent from an anonymous account that day, and that the BPD had not shown, beyond speculation, that his tweets negatively impacted the BPD's operations or public mission.

This decision does not overlook the fact that most citizens, including members of this Commission, rightly reject the Appellant's misinformed opinions contained in his tweets about the 2020 election and its aftermath. The limited issues before the Commission, however, were: (1) whether the Appellant's disability retirement application filed by the BPD in June 2022 and approved retroactively to his termination date divested the Commission of jurisdiction to adjudicate the just cause for the BPD's termination decision, which the Commission decided it did not; and (2) whether, on the facts and the law, the Appellant's tweets were constitutionally protected speech, as he claimed, or whether, when made, or after they became public, the tweets rose to the level of sanctionable misconduct that justified his termination as the BPD claimed. The Commission's decision finds the Appellant's tweets to be protected speech and are not just cause for his termination. The decision is not to be construed as endorsing the substance of those misinformed opinions nor as condoning the underlying, unconscionable criminal acts committed by those who stormed the Capitol that day.

## DECISION

On March 23, 2023, the Appellant, Joseph Abasciano, appealed to the Civil Service Commission

(Commission), pursuant to G.L. c. 31, § 43, contesting his discharge as BPD Police Officer.[2] The

Commission held a remote pre-hearing on May 23, 2023 and held five days of evidentiary hearing

---

[2] The Standard Adjudicatory Rules of Practice and Procedure, 801 CMR 1.01 (formal rules), apply to adjudications before the Commission with G.L. c. 31, or any Commission rules, taking precedence.

at the Commission's Boston Offices on August 16, 2023, August 23, 2023, October 11, 2023, October 18, 2023 and December 7, 2023. The full hearings were digitally recorded and the parties received links to the recording. The recordings were transcribed into a written record which has been provided to the Commission, and the parties stipulated that the written transcripts became the official record of the hearings.[3] The parties submitted proposed decisions on April 1, 2024.

After the record closed and was under review, the Commission learned that the Appellant had been placed on injured duty leave for over two years prior to his termination and that, in June 2022, the BPD had filed an application for involuntary retirement of the Appellant, which was approved in January 2024, effective retroactively to the date of the Appellant's termination on March 13, 2023. By procedural orders, the Commission directed the parties to address whether the Appellant's retirement raised any questions about the Commission's jurisdiction over this appeal. As a result, the BPD filed a Motion to Dismiss the appeal for lack of jurisdiction, which the Appellant opposed.

For the reasons stated below, the BPD Motion to Dismiss is denied and the Appellant's appeal is allowed, as the BPD did not have just cause to discharge him for engaging in protected speech. The scope of the relief, if any, financial or otherwise, to which the Appellant may be entitled by virtue of the allowance of this appeal is a matter that must be left for agreement of the parties or adjudication in another forum with authority to interpret and enforce the applicable provisions of the relevant retirement, collective bargaining and other non-civil service laws involved.

**FINDINGS OF FACT**

The Commission received 86 exhibits into evidence (*App.Exhs.1 through 51; Resp.Exhs.1 through 35*). Based on the documents submitted and the testimony of the following witnesses:

---

[3] If there is a judicial appeal of this decision, the plaintiff in the judicial appeal would be obligated to use the official written transcripts to the extent that the plaintiff challenges the decision as unsupported by substantial evidence, arbitrary and capricious, or an abuse of discretion.

*Called by the BPD:*
- BPD Superintendent Sharon Dottin
- BPD Deputy Superintendent Philip Owens
- BPD Sergeant Detective Rafael Antunez

*Called by the Appellant:*
- Joseph Abasciano, Appellant
- BPD Deputy Superintendent Eddy Chrispin
- BPD Captain Sean Martin

and taking administrative notice of all matters filed in the case and pertinent statutes, regulations, case law and policies, and reasonable inferences therefrom, a preponderance of the evidence establishes the following findings of fact:

**Background**

1.    The Appellant, Joseph Abasciano received his bachelor's degree in 2001. After serving honorably for four years on active duty with the U.S. Marine Corps, including a deployment to Iraq, he was employed briefly as a Correction Officer with a County Sheriff's Department prior to commencing his employment as a BPD police officer in June 2007. (*App.Exh.1 & 45; Resp.Exh.30, Vol.II [Appellant];Tr.V:8-18 [Appellant]*)

2.    Throughout his career, the Appellant received approximately three dozen official commendations for his performance and had no prior discipline. (*Resp.Exhs.34 & 49; App.Exhs.1, 2 through 5 &45; Tr.V:28-39 [Appellant]*)

3.    The Appellant's first assignment was District 11, an area in Dorchester, where he worked for about five years, interrupted by a second deployment to Iraq as a reservist. During this time, then Sergeant (now Captain) Sean Martin became his supervisor and mentor. (*Resp.Exh.30,Vol.II [Appellant];Tr.V:19 [Appellant]; Tr.IV:62-63 [Martin]*)

4.    When Sgt. Martin transferred to District 2, the Appellant chose to transfer with him to serve as a member of a community policing team under Sgt. Martin's command.  District 2 covers the

4

Orchard Park/Madison Park area of Boston. District 2 was a "high call volume" district where community police teams were assigned to focus on the "hotspots" with significant levels of criminal activity. (*Resp.Exh.30,Vol.II[Appellant]; Tr.V:19-23,30 [Appellant]; Tr.IV:64-66, 69 [Martin]*)

5.   Sgt. Martin described the Appellant as a "high performer" at District 2 and District 11.  Sgt. Martin observed the Appellant deal with police colleagues and community members on a daily basis. He never knew the Appellant to treat them with disrespect. Sgt. Martin "never observed any issue of anything impacting the Appellant's ability to do the job." (*Tr.IV:67-68, 71, 81 [Martin]*)

6.   During his career, the Appellant was injured on duty on five occasions and, eventually, he transferred in or about September 2018 from District 2 to District 14, a less strenuous assignment:

- In October 2010, he suffered knee strain and minor abrasions while arresting a suspect.

- In December 2013, he suffered another knee strain while in pursuit of a suspect that led to surgery in May 2014 and rehabilitation prior to his return to work in August 2014.

- In November 2014, he tore his ACL in pursuit of a thief which required another surgery. He returned to duty in December 2016.

- In July 2018, the Appellant was subduing an armed suspect when he injured his hand, shoulder and knee. He was treated at the hospital and returned to duty.

- In July 2020, the Appellant was violently pushed by a prisoner, exacerbating prior injuries to his leg. He did not ever return to duty.[4]

(*Resp.Exh.30,Vol.II [Appellant];Tr.V:23, 26, 40-41 [Appellant]; Tr.IV:72-23 [Martin]; Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

---

[4] A request by the Appellant to return to limited duty in September 2021 was denied by the BPD because the Appellant's physical restrictions as determined by the BPD were inconsistent with his attempt to return to duty. (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

7.  After his July 2020 injury, the Appellant began using his sick leave until September 2020, when the Appellant began a prior-approved intermittent leave under the federal Family Medical Leave Act (FMLA) to care for a family member. In November, the Appellant's FMLA leave was converted to approved continuous leave for two months beginning November 15, 2020 through January 23, 2021. (*Resp.Exh.22; Tr.V:41-43 [Appellant]*)

8.  The Appellant transitioned to injured leave status pursuant to G.L. c. 41, §111F on or about January 12, 2021, due to an increase in his symptoms of pain and immobility issues that, ultimately, resulted in additional surgery in January 2022. (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

9.  The documentation that the Appellant received from the BPD approving his FMLA leave contained no guidelines or restrictions on his ability to travel for personal reasons while on FMLA leave. (*Resp.Exh.22 & 25; Tr.II:84-85 [Owens];Tr.IV:34 [Chrispin];Tr.V:43 [Appellant]*)

**BPD Rules and Procedures**

10. The BPD has promulgated a set of Rules and Procedures governing the BPD's operations and conduct of its members. Among the rules relevant to the present appeal is Rule 102 of the BPD's Rules and Procedures entitled "The Conduct and General Rights and Responsibilities of Department Personnel", which provides, in relevant part:

> **Sec.2. GENERAL CONSIDERATIONS.** Police officers are more visible to the community than most other persons in government or public service. Public scrutiny and sometimes public criticism is directed not only at police performance but also at the behavior of those who deliver police services. *The establishment of proper standards for police behavior must take into account not only the expectations of the citizen but also the importance of respecting the individual rights of police employees. The Boston Police Department recognizes that its employees have certain basic personal rights and restricts those rights only where necessary to ensure the integrity of the Department and the highest quality of police service are maintained.*
>
> . . .
>
> **Sec.3. CONDUCT.** *Employees shall conduct themselves at all times both on and off duty in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which tends to indicate that the employee is unable or unfit to*

*continue as a member of the Department, or tends to impair the operation of the Department or its employees.*

. . .

**Sec.4 NEGLECT OF DUTY:** *This includes any conduct or omission* which is not in accordance with established and ordinary duties or procedures as to such employees or *which constitutes use of unreasonable judgment in the exercise of any discretion granted to an employee.*

. . .

**Sec.19. STATEMENT OF OPINIONS.** *Employees shall not publicly criticize or ridicule the Department, its policies, or other employees by speech, writing or expression in any other manner when such speech, writing or other expression is defamatory, unlawful, interferes with the maintenance of discipline, or is made with reckless disregard of its truth or falsity.*

. . .

**Sec.30 POLITICAL ACTIVITY.** *Employees shall be permitted to*: Register and vote in any election. *Express opinions as private individuals on political issues and candidates*, subject to the provisions of Section 19 of this Rule.  *Attend political conventions, rallies and similar political gatherings as private individuals*. Become candidates for election to an office of any town or city, other than the City of Boston, in any county other than Suffolk County, or other . . . office[s] which are not prohibited by Section 31 of the Rule. Hold membership in a political party and participate in its functions to the extent consistent with law and with these rules. Participate fully in public affairs to the extent that such endeavors do not impair the natural and efficient performance of official duties or create real or apparent conflicts of interest.

. . .

**Sec.31. EMPLOYEES NOT ON LEAVE OF ABSENCE PURSUANT TO SECTION 32 [TO BECOME A CANDIDATE FOR PUBLIC OFFICE] ARE PROHIBITED FROM:**

- Using their official capacity to interfere with or affect any election.

. . .

- Soliciting votes in support of or in opposition to any candidate in any way which would identify an employee as a member of the Boston Police Department.

. . .

- Engaging in any political activities prohibited by federal law, state statute or municipal ordinance.

. . .

[Miscellaneous prohibitions restricting the soliciting or making of political contributions or using public resources for political campaign activities are omitted here]

(*App.Exh.8*) (*emphasis added*)

11. Also relevant here is Rule 113 of the BPD's Rules and Procedures, entitled "Public Integrity Policy", which provides, in relevant part:

**Sec.1. PURPOSE**. The purpose of this policy is to set forth the standards of ethics which will guide both the Boston Police Department, as an organization, and its officers and employees in the conduct of their private and professional affairs.

. . .

**Sec.3. POLICY**. It is the policy of the Boston Police Department that every action of the Department as an organization and those of the individuals who act on its behalf, will reflect the highest standards of honesty and integrity. *In all of our dealings whether with the public, other elements of the criminal justice system, or with each other, we will act in accordance with the ethical standards that are set forth below*. Additionally, it is the responsibility of each and every member of the Boston Police Department to adhere to those standards and to

take all necessary and prudent actions to expose those who knowingly violate the public trust. It is the responsibility of the Department to prevent, Detect and correct instances of misconduct, administrative or criminal, within the organization.

. . .

**Sec.5. CANONS OF ETHICS.** General Statement – In furtherance of this policy, the following Canons of Ethics are adopted. . . *.[V]iolations of these canons severely undermine the ability of the Department to gain the confidence of both its employees and the public, and also negatively affect the ability to fulfill its essential mission. They are not meant to replace or supersede existing laws, special orders, or rules and regulations*, but to supplement them; they also serve as a reminder of the public trust that has been conferred upon the Boston Police Department by the citizens of Boston, and the need for constant vigilance to support that trust.

, , ,

**Canon Eight:** *Employees shall conduct their private affairs so as not to reflect unfavorably on the Boston Police Department, or in such manner as to affect their ability to perform their duties honestly, fairly and without impairment*.

(*App.Exh.10*) (*emphasis added*)

12. The BPD's Rules and Procedures do not include a social media policy or specific rules governing personal social media use. (*Tr.I:77 [Antunez];TrV:63-65 [Appellant]*)

**The Appellant's Trip to Washington DC on January 6, 2021**

13. The Appellant has been politically and civically active for many years. He served on the Massachusetts Republican State Committee and, more recently, on the New Hampshire Republican State Committee. (*Resp.Exh.30,Vol.II[Appellant]; Tr.V:38-39 [Appellant]; Tr.IV:54-55 [Chrispin]*)

14. The Appellant maintained a social media account on Twitter (now known as X). He did not use his name in connection with the account, nor did he identify himself as a BPD Police Officer. He used the anonymous handle "@mailboxjoe".  His user profile listed his location as "Boston" and described himself as: "A beer-drinking, Marine Vet, constitutional conservative who believes in Peace Through Strength." (*Resp.Exh.18:Resp.Exh.30,Vol.II [Appellant]; Tr.V:147 [Appellant]*)

15. In the months preceding January 6, 2021, the Appellant posted over 2500 tweets (including retweets and replies) through his "@mailboxjoe" Twitter account. The Appellant's Twitter activity throughout this time frame dealt almost entirely with politics and, specifically, with the results of the

2020 national election and its aftermath. (*Resp.Exh.29*)[5]

16. On January 5, 2020, the Appellant travelled to Washington, D.C. with a fellow officer to attend the so-called "Stop The Steal" rally scheduled for the next day at which President Donald Trump was expected. (*Resp.Exhs.18 through 21; Tr.V:43-45, 49-51 [Appellant]*)

17. At 5:27 p.m. on January 5, 2023, the Appellant sent a reply tweet to @realDonaldTrump @senatmajlder @johnCornyn @senJohn Thune, concerning the size of the rally: "Thousands? With Respect Mr. President I am here and it is going to be Millions by tomorrow." (*Resp.Exhs.12 &29*)

18. In the early morning of January 6, 2021, the Appellant received a tweet from an unknown source stating, among other things, that Gabriel Sterling, the "Georgia 'Republican' Secretary of State" had "[c]aved to Stacy Abrams and eliminated meaningful signature match" and "[t]aped and leaked a phone call with [President Trump]". The Appellant thought such reports showed that Sterling broke the law and violated his oath of office. (*Resp.Exhs.5,12&.29; Tr.V:67-68 [Appellant]*)

19. At 5:53 a.m. on January 6, 2021, the Appellant replied to a tweet from @GabrielSterling, in which Secretary Sterling offered an explanation for his actions, writing: "I can't wait to see you dragged away in handcuffs." The Appellant said this tweet used the "hyperbole of the day" to deplore Mr. Sterling's attempt to defend his actions. (*Resp.Exhs.5, 12 & 29 Tr.V:67-68 [Appellant]*)

---

[5] During the investigation which gave rise to this appeal, the BPD Regional Intelligence Center (BRIC) downloaded a large volume of data from the Appellant's archived Twitter account. These data were reported on a 24-hour clock and the parties stipulated that subtracting eight hours from the times on the document converted the time on the tweets to Eastern Standard Time (EST).

I reviewed the complete record of the retrieved Twitter data which consists primarily of retweets and replies to tweets that endorsed the idea that the 2020 presidential election was stolen through fraud by election officials and foreign interference and demanded that Donald Trump remain in office for a second term. The retrieved information is displayed in a summary, tabular form and does not identity the recipients of retweets or the content of the tweets the Appellant received to which he did not reply, nor does it show the identity of the Appellant's approximately 100 or more Twitter "followers". (*Resp.Exhs.25, 29 & 35; Tr.V:148-150[Appellant]*)

20. At 6:44 a.m., the Appellant tweeted:

MAGA Millions Patriots here in DC. Today is a day for choosing. Today there will be only two parties in America. Traitors and Patriots!" The Appellant added the hashtags #January6, #MAGA and #MarchForTrump"

The Appellant attached an image showing a crowd of people with the Washington Monument in the background. (*Resp.Exh.6, 12 & 29:Tr.V:72-73* )[6]

21. Sometime before 9:00 a.m., the Appellant and the fellow off-duty BPD officer checked out of the hotel where they stayed for the night and walked to the rally site at the Ellipse in front of the White House, passing through a metal detector to be admitted into the rally area. They wore civilian clothes and carried no BPD equipment or indicia identifying them as BPD police officers. They arrived early and got close to the stage. (*Resp.Exh.18 through 21 & 30; Tr.V:51-53 [Appellant]*)

22. At 8:14 a.m., the Appellant tweeted:

Hey @senmajlder look out your window. Millions of Patriots are at your doorstep and we are watching. It is time for choosing. Are you a traitor or are you a Patriot #MarchforTrump, #StopTheSteal and #PatriotParty.

(*Resp.Exhs.7, 12 & 29*)

23. At 9:49 a.m., the Appellant tweeted to Vice President Pence's Twitter account:

 @VP I have friends and family who do not believe you have the courage to fulfill your oath and send the illegitimate electors back to the states. Mr. VP I have faith in God you will do your duty! Stand up for America!

(*Resp.Exh.29*)

24. At 10:03 a.m., the Appellant tweeted:

"Send it back @VP".

(*Resp.Exh.29*)

---

[6] According to the Appellant, the reference to "two parties . . .traitors and patriots" was what might be called a "meme" contrived by supporters of former President Trump to glorify their self-serving position that those who wanted to keep Trump in office were "patriots" and to denigrate those who accepted Joe Biden as the legitimately elected successor as "traitors."  The language appears frequently in the thread of prior tweets about the 2020 election received by the Appellant. (*App.Exhs.13, 29 & 50; meme Tr.V:70-72 [Appellant]*)

25. At 12:40 p.m., while still at the rally, the Appellant tweeted:

> Everything that happens going forward @VP is now on your conscience" with the hashtags #1776Again, #MarchForTrump and #WeThePeople.

(*Resp.Exhs.8, 12 & 29; Tr.V:78-79 [Appellant]*)

26. The Appellant and the fellow officer stayed at the rally listening to the speeches. When President Trump finished speaking, at approximately 1:15 p.m., they left the rally and began slowly walking to the Capitol. Since they had been close to the stage, it took them over an hour to reach a grassy area near some rotaries on the <u>west</u> side of the Capitol, arriving there about 3:00 pm or 3:30 p.m. (*Resp.Exhs.18 through 21; App.Exh.51; Tr.V:78, 125 [Appellant]*)

27. By the time of their arrival, a mob had broken into the Capitol through the <u>east</u> side of the building and had made its way to the doors on the west side. The House and Senate had gone into recess and the building was in lockdown. (*Resp.Exh.17*)

28. At 3:54 p.m.[7], the Appellant tweeted:

> I hope you never sleep well again @VP your Treasonous Act lead [sic] to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @LLinWood was right about you all along.

(*Resp.Exhs.10, 12 & 29*) [8]

29. The Appellant and the fellow officer stayed at the west side of the Capitol for an hour or less, "a great distance" from the building. They crossed no barricades or lines that would have given them notice that they had gone anywhere they weren't allowed to be.  They described the crowd near them as "rowdy but controlled" with some people gathered in "prayer groups". They saw people closer to the Capitol climbing walls on the west side and others in a "tug of war" with what they assumed

---

[7] I have used the 8-hour adjusted time shown on the BRIC-retrieved Twitter data. (*Resp.Exh.29*)

[8] This tweet refers to Ashli Babitt who was shot by a Capitol Police officer shortly after 3:00 pm. The Appellant heard about the shooting through messages received on his cell phone. (*Resp.Exhs.17 & 18; Tr.V:153-154 [Appellant]*)

were law enforcement and, at one point saw a person "taking a whack" at a window, all of which "was not what we were there for" and they decided to leave. They walked back to their car (over an hour's walk) and drove home to Boston, leaving Washington ahead of a 6:00 pm curfew. (*Resp.Exhs.18 through 21; Resp.Exh.30, Vol.I [Antunez & Owens]; Tr.I:48-49 [Antunez]; Tr.V:60-62, 88, 126-132, 142-143 [Appellant]*) [9]

30. As the Appellant and the fellow officer drove back to Boston, they learned additional details about the invasion that had taken place on the east side of the Capitol and the scope of the violence that had occurred inside the building. The Appellant received a number of tweets, including some critical of the violence that had occurred, which he "liked" and retweeted them. (*Resp.Exh.29; App.Exh.15; Tr.V:87-90,138-140,150,167-172, 179-182 [Appellant]*).

31. At 5:22 p.m., while on the road home, the Appellant tweeted:

> What I saw in [sic] today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots and Law Enforcement trying to do their jobs in a no win [sic] position. I fear this Treasonous election has killed the republic.

(*Resp.Exh.9, 12 & 29:Tr.V:62, 87 [Appellant]*)

32. During the evening of January 6, 2021 or on the following day, the Appellant was "doxxed" (identified as a BPD police officer using the @mailboxjoe Twitter account) by another BPD police officer (whom the Appellant said was a "high ranking" police union official who was not on good terms with the Appellant), using a (now defunct) fictitious Twitter handle. (*Resp.Exhs.1 & 2,18 through 21 & 29; Resp.Exh.30,Vol.II [Appellant]; Tr.V:97-98, 111-117, 174-178 [Appellant]*)

---

[9] At the Commission hearing, the Appellant had some doubt about what he saw personally and what he assumed he saw but later learned from news coverage and social media. I do not find that the Appellant's accounts of his actions on January 6, 2021 have changed much, but, to the extent there are discrepancies, which I attribute mainly to fading memory, my findings give greater weight to the more contemporaneous recollections provided during the 2021 BPD investigatory interviews. [*Resp.Exhs.18 through 21*]. (*Tr.V:64, 122-131 [Appellant];Tr.I:120-122 [Dottin]*)

33. The suspected officer was one of maybe two BPD officers whom the Appellant believed knew about the Appellant's nickname "Mailbox Joe" that had been given to him by his neighbors. The Appellant was not initially "one hundred percent" certain and declined to name the officer during the BPD investigation, when he had union representation. By the time of the Commission hearing, the Appellant testified that this BPD officer had admitted to the Appellant to being the person who identified the Appellant as the owner of the Twitter account with the handle @mailboxjoe. (*Resp.Exhs.18 through 21, Resp.Exh.30,Vol.II [Appellant]; Tr.V:111-114, 145-148 [Appellant]*)

34. After learning that he had been identified as the owner of his anonymous Twitter account, the Appellant closed down the account. (*Resp.Exhs.1 & 2,18 through 21 & 29; Resp.Exh.30,Vol.II [Appellant]; Tr.V:97-98, 111-117, 174-178 [Appellant]*)

35. The Appellant had been targeted with harassment and vandalism at his home in the past, due to his support of President Trump during the 2020 election. For that reason, he had previously shut down his Facebook account which identified him personally.  He kept his Twitter account because he believed, until his exposure January 6, 2021, that his tweets about political matters were anonymous and would not be traced back to him or his family. (*Resp.Exhs.18 through 21.Resp.Exh.30,Vol.II [Appellant]; Tr.V:98 [Appellant]*)

**The BPD's Bureau of Professional Standards First Investigation**

36. At some point after the Appellant shut down his @mailboxjoe account, the BPD received ag tweet from the police officer later confirmed to be the BPD officer described above:

> @bostonpolice – just a heads up. A couple of your off duty officers were at the Capitol taking pics and here's Abasciano threatening VP and members of Congress. He and others have now removed their social media.

Attached to the tweet were screenshots of three of the January 6, 2021 tweets sent by the Appellant described above in Finding Nos. 20, 22 and 28. (*Resp.Exhs.1 & 4*)

13

37. On January 14, 2021, the Boston Globe reported, in part:

> The Boston Police Department said it is investigating whether one of its officers took part last week in a rally and ensuing siege on the US Capitol, and the agency is examining social media posts in which the alleged officer threatened Vice President Mike Pence. . . . Boston police and the Globe know the suspected identity of the officer, but the Globe is not naming him because it cannot confirm the authenticity of the posts. . . . Another Twitter user had taken screenshots of @mailboxjoe's post, then shared them with the Boston Police Department's social medical account and identified @mailboxjoe as a veteran officer. It does not appear that the department acted on that message prior to Globe inquiries.

At least one television station also broadcast a similar report. *Resp.Exhs.4, 13 & 14;Resp.Exh.30, Vol.I [Antunez & Owens]*)

38. On about January 16, 2021, the BPD's Anti-Corruption Division (ACD) in the Bureau of Professional Standards began an investigation into the alleged involvement of the Appellant and the fellow officer in the violence at the Capitol on January 6, 2021. The ACD's investigation focused on whether the Appellant had engaged in any criminal misconduct on January 6, 2021. (*Resp.Exhs.23 &24; Resp.Exh.30, Vol.I [Antunez]; Tr.I:40-42 [Antunez];Tr.II:22-23 [Owens]*)

39. On January 19, 2021, the Internal Affairs Division (IAD) of the Bureau of Professional Standards also opened an investigation into whether the Appellant's actions on January 6, 2021 had violated any BPD Rules and Procedures.  The IAD rules investigation was put on hold pending completion of the ACD's investigation into the Appellant's possible violation of the criminal law. (*App.Exh.46; Resp.Exh.30, Vol,I[Antunez];Tr.I:41-42,70[Antunez];Tr.IV:7 [Chrispin]*)

40. During the ACD investigation, the Appellant was interviewed on February 9, 2021 and April 21, 2021. The Appellant's fellow officer was interviewed on February 18, 2021.  At his first interview, the Appellant confirmed that the Twitter handle @mailboxjoe was his. He acknowledged that he had closed the account after being "doxxed", i.e. identified as the owner of the Twitter account @mailboxjoe.  He had a strong suspicion about who had publicly identified him but declined to name him because the Appellant was not absolutely certain. (*Resp.Exhs.18 through 20*)

14

41. Both the @mailboxjoe account and the other officer's Twitter account had been deactivated by the time of the ACD investigation. But for the Appellant's confirmation, the BPD would not have been able to connect him with the Twitter handle @mailboxjoe. It could not determine the identity of the person who had tied the Appellant to his Twitter account. (*Resp.Exhs.2 & 3;Tr.I:94-95 [Antunez] Tr.I:180-182 [Dottin]; Tr.II:1313-134 [Owens]*)

42. In addition to the interviews, the ACD reviewed the tweets that allegedly involved threats to the Vice President and others along with the data from the Appellant's account retrieved by the Boston Regional Intelligence Center (BRIC), as well as face recognition data and cell phone data obtained through the FBI, which confirmed that, as the Appellant asserted, neither the Appellant nor the fellow officer had been part of the mob that had stormed the Capitol. (*Resp.Exhs.23 & 24*)

43. Ultimately, the ACD investigation concluded that the Appellant's tweets and conduct on January 6, 2021 violated no criminal law. The ACD investigation was closed on May 3, 2021 with the conclusion: "Activity was determined not to exist." (*Resp.Exhs.23 & 24; Tr.I:43-44 [Antunez]; Tr.II:27 [Owens];Tr.IV:89-91 [Martin]*)

44. On May 19, 2021, the IAD revived its investigation. IAD Sergeant Detective Antunez was assigned to investigate whether the Appellant's actions on January 6, 2021 violated any BPD Rules and Procedures, with the focus on Rule 102, Section 4, Neglect of Duty/Unreasonable Judgement. (*App.Exh.46*; *Resp.Exhs.22 & 25; Resp.Exh.30,Vol.I [Antunez];Tr.I:45,50-53 65-67, 73 [Antunez]; Tr.II;26-28 [Owens];Tr.IV:9-12 [Chrispin]*)[10]

---

[10] Deputy Superintendent Eddy Chrispin served as the commander in charge of the IAD from January 21, 2021 until October 2022. As the head of the IAD, Superintendent Chrispin would be responsible to review the allegations of a complaint against a BPD officer and identify at least one rule violation for purposes of "recording it and tracking it" on the BPD's software program (IAPro). Investigators were expected to "take into account all of the Boston Police Department Rules and Regulations" that would come into play as the facts of the investigation were developed. (*Tr.IV:4-5: 9-14 [Chrispin]*)

45. Sergeant Detective Antunez received the complete ACD file.  He listened to audio recordings of all of the ACD interviews of the Appellant and his fellow officer. He reviewed the tweets made by the Appellant as well as the history of his Twitter account obtained by the BIRC that had been obtained during the ACD investigation. He conducted his own audio/video interview of the Appellant on May 25, 2021 in which he covers the issues involving the Appellant's alleged misuse of FMLA leave as well as his behavior on January 6, 2020.  He reviewed the Appellant's time and attendance records for January 5, 2021 and January 6, 2021. He confirmed the Appellant's description of the prior vandalism of his home by obtaining copies of the BPD incident reports for three days in August and September 2020. He prepared a 42-page investigative report which he submitted through Lieutenant Detective Thomas Lima, to his immediate superior, Eddy Chrispin, then the Deputy Superintendent in charge of the IAD. (*App.Exh.46; Resp.Exhs.25 & 35: Tr.I:46-51 [Appellant]*)

46. On June 29, 2021, Lieutenant Detective Lima prepared a cover report which contained an abridged summary of the facts drawn from Sergeant Detective Antunez and a conclusion that the Appellant had not violated any BPD rules. Pursuant to standard procedure, Lieutenant Detective Lima's report was forwarded and approved by Deputy Superintendent Chrispin, then forwarded to BPS Superintendent Sharon Dottin, who noted and approved the report and forwarded it along for review by the BPD Legal Advisor. (*Resp.Exhs.35&.46  Tr.I:51-52[Antunez];Tr.I:100-127[Dottin];Tr.IV;16-32 [Chrispin]*)

47. The BPD Office of the Legal Advisor "tasked back" the investigation to IAD and, after further review, eventually approved it. On or about November 16, 2021, the final report was approved by IAD Deputy Superintendent Chrispin and the Bureau of Professional Standards Superintendent Sharon Dottin.  (*App.Exhs.26, 35 & 46;Tr.I:125-127 [Dottin]*)

48. The IAD November 16, 2021 investigation report made the following Findings/Recommendations concerning the Appellant:

Relative to Police Officer Joseph Abasciano being present at the President's speech and the march to the Capital [sic] building, Officer Abasciano stated that he was in the vicinity of the Capitol Grounds for 25 to 40 minutes. . . .Officer Abasciano stated that when he saw a window being broken to the Capital [sic] building, he decided that it was time to leave the area and return to his rental vehicle. *There was no evidence that either of the officers had been on the Capitol grounds during the violence or had participated in any violent acts or any threatening disorderly behavior.*

Relative to the tweets and social media posts, Police Officer Joseph Abasciano had written many tweets that might be considered to be rhetorical hyperbole. *The Internal Affairs Division investigation revealed no evidence that PO Abasciano posted inappropriate comments that were threatening on his Twitter account* . . . . The Boston Police Department has no social media policy.

Relative to the FMLA requirements, there are no distinctive FMLA guidelines or restrictions at the Federal and State levels of government that dictate what a person on paternity leave can and cannot do. . . .

Boston Police Department Rule 102, Section 4, states the following: Sec 4: NEGLECT OF DUTY: This includes any conduct or omission which is not in accordance with established and ordinary duties or procedures as to such employees or which constitutes use of unreasonable judgment in the exercising of any discretion granted to an employee.

The following are the quotes . . . as they may relate to threats against the Vice President of the United States and, as a Boston Police Officer, unreasonable judgment as an employee of the Boston Police Department.

[Quoting the tweets on 1/5/21 @ 5:27 am; 1/6/21 @ 5:53 am, @6:44 am, @8:14 am, 12:40 pm, @3:54 pm and @5:22 am]

[T]he Constitution of the United States the First Amendment . . . protects citizens against government limits on their freedom of expression, but it does not prevent a private employer from setting its own rules. . . . The Supreme Court has recognized . . . the 'Brandeburg Test' which requires that in order to punish the speaker, the speech is 1–directed to inciting or producing imminent lawless action, and 2–likely to incite or produce such action. . . . [The BPD] does not have a social media policy for employees, on-duty or off-duty, and as such these tweets did not violate any social media policy."

. . .

*Police Officer Joseph Abasciano posted the tweets above as a private citizen. These tweets which might be categorized as political rhetoric hyperbole [and] could be considered offensive by some but . . . did not rise to the level of criminality nor call into question his ability or judgement to act as a police officer and would not be considered a violation of BPD rules and regulations.*

After careful review and due consideration of all the facts and evidence, I am unable to prove or disprove that the violation of BPD Rule 102 – Section 4 - Neglect of Duty/Unreasonable Judgment occurred. While out on . . . leave as an employee of the Boston Police Department, Officer Abasciano, within an approximately 24-hur period, drove down to Washington, D.C., participated in a rally for the President, marched to the perimeter of the Capital [sic] and drove back to Massachusetts. His tweets, prior to the events of the day, were not deemed inappropriate. *I [Detective Lieutenant Lima] after a thorough review of the evidence relative to Officer Abasciano's Twitter account and his personal tweets, did not find any evidence in which Officer Abasciano was in violation of any BPD rules*. Therefore, I respectfully recommend that this allegation be classified as Not Sustained."

(*Resp.Exhs.26 & 35*) (*Emphasis added*)

49. On December 8, 2021, the BPD Legal Advisor reported: "After review, I agree with the finding of NON-SUSTAINED" as to all allegations against the Appellant. Pursuant to standard procedure, the Legal Advisor then forwarded the file to Superintendent-in-Chief Gregory Long, the Acting Police Commissioner who then had the final word on all IAD complaints. (*Tr.I:114-115 [Dottin];Tr.II;40-41 [Owens]; Tr.IV:24-26 [Chrispin]*)

50. Acting Commissioner Long was appointed Acting Police Commissioner on February 3, 2021 by former Mayor Michael Walsh and served until Michael Cox, the current Police Commissioner, was sworn in by his successor, Mayor Michelle Wu, on August 22, 2022. Acting Police Commissioner Long took no action on the recommended finding in the Appellant's IAD investigation during his tenure. (*Resp.Exh.46;Tr.II:40-41,130 [Owens];Tr.IV:26-27 [Chrispin]; Administrative Notice [police.boston.gov]*) [11]

**The Involuntary Retirement Application**

48. The BPD raised the idea of a disability retirement with the Appellant as early as 2014, based on

---

[11] Police Commissioner William Gross retired unexpectedly in late January 2021. His replacement, Dennis White, was placed on administrative leave after three days in office (and ultimately terminated in June 2021). Michelle Wu became Mayor of Boston on November 16, 2021 replacing Kim Janey, the Acting Mayor when Mayor Walsh resigned after he was nominated as the Biden Administration's Secretary of Labor. (*Administrative Notice [BPD History; Michell Wu Wikipedia]*)

the opinions of the BPD's medical professionals, but the Appellant preferred to pursue a course of treatment recommended by his own doctors. (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

51. In January 2022, the Appellant underwent another hip surgery, with little improvement. The doctors suspected increased loading on the right knee due to the hip surgery. MRIs performed in May and June 2022 confirmed that the Appellant had suffered a "partial tear of the anterior fibers in the ACL" and "1) acquired musculoskeletal deformity, 2) chondromalacia of right patella, and 3) sprain on anterior cruciate ligament of knee". (*Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

52. On June 30, 2022, Acting Commissioner Long signed an Involuntary Retirement Application in which he stated that the Appellant "has not been able to do the full and essential duties of a police officer since 01/11/2021. It appears he will not be able to perform these duties in the near future." (*Exhibit B, Appellant's Supplemental Post-Hearing Memorandum; Appendix A to BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum*)

**The BPD's 2022 Investigation Review**

53. In or about September 2022, approximately a month after becoming Police Commissioner, Michael Cox elevated then Sergeant Detective Philip Owens to the (non-civil service) position of Deputy Superintendent, transferred him from District A7 (East Boston) to work in the Commissioner's office for about a month, and then assigned him to replace Deputy Superintendent Chrispin as the head of the IAD. (*Tr.II:10-11[Owens], Tr.III:55-56 [Owens]*)[12]

---

[12] Commissioner Cox (then Deputy Superintendent Cox) had supervised Sergeant Detective Owens when they both worked in the IAD. (*Tr.II:11[Owens]*)

54. One of the initial assignments that Deputy Superintendent Owens received was to "take a look" at several IAD files pending review and needing a decision by the Police Commissioner. The largest of these was the Appellant's file, which Deputy Superintendent Owens knew was "a high-profile case" he had read about in the newspapers. (*Tr.II:42-45,68-69,72[Owens];Tr.III;65[Owens]*)

55. The Appellant's IAD file was the last file that Deputy Superintendent Owens reviewed.  His review consisted mainly of reading the ACD and IAD investigative files that had been completed in May 2021 and November 2021 with a recommendation that no misconduct had occurred to warrant discipline of the Appellant. (*App.Exhs.12, 24 & 47; Tr.II:46-71, 70 [Owens]; Tr.III:82-84,139,147 [Owens]; Tr.V:97 [Appellant]*)

56. Ater attending a training session regarding the FMLA and conducting his own research, Deputy Superintendent Owens reached out to several sources for information specifically about the Appellant's FMLA. He recalled having no substantive follow-up communications with the Appellant or with either Lieutenant Detective Lima or Sergeant Detective Antunez. He did speak with Superintendent Dottin and Deputy Superintendent Chrispin, but only about the FMLA issue. (*App.Exhs.12,24& 47;Tr.II:46-71,70[Owens];Tr.III:82-84,139, 147 [Owens]; Tr.V:97 [Appellant]*)

57. On December 20, 2022, Deputy Superintendent Owens forwarded an IAD Recommendation to Police Commissioner Cox, accompanied by a "Non-Concurrence" letter that he had prepared, in which he explained why he was "inclined to disagree" with the recommended findings of non-sustained as stated in the November 2021 IAD report. Specifically, he found, instead, that:

- The Appellant had "purposefully misused his granted FMLA outside of its intended scope" by attending a rally on January 6, 2021 that "turned into a violent insurrection";

-  "[T]he argument that that Officer Abasciano partook of the events of January 6, 2016 as a private citizen [and not as a BPD officer] was "inaccurate";

- The Appellant made "incendiary tweets that condone violent insurrection"; and

- The Appellant showed "consciousness of guilt" by shutting down his Twitter account after he was outed as a BPD police officer because he "understood that being identified as a Boston Police Officer . . . present at the January 6th 2021 violent insurrection, who also tweeted incendiary tweets that condone the violent insurrection[,] would be viewed unfavorably by the Boston Police Department and the citizens of the City of Boston."

(*Resp.Exhs.28 & 35*)

58. Deputy Superintendent Owens recommended that Appellant's misuse of FMLA leave and "inflammatory tweets", as he described them, were enough to prove by a preponderance of evidence that charges be "Sustained" against the Appellant for violation of BPD Rule 102, Section 3 (Conduct Unbecoming of a Police Officer) and BPD Rule 113, Section 5, Canon Eight (Public Integrity Policy).(*Resp.Exhs.28,35&46;Tr.II;77-89.100-111[Owens];Tr.III;149-150,162, 175-178 [Owens]*)

59. Superintendent Dottin and the Office of the Legal Advisor both reversed their prior opinions that charges against the Appellant were "Not Sustained" and approved Deputy Superintendent Owens's "Non-Concurrence" letter that recommended findings of "Sustained" violations of Rules 102 and 113. (*Resp.Exh.46;Tr.I:115-117,142-143[Dottin];Tr.II:113-114[Owens]*)

60. At the Commission hearing, Superintendent Dottin offers several reasons to distinguish her approval to sustain the charges recommended by Deputy Superintendent Owens in his December 2022 non-concurrence letter from her August 2021 concurrence with Detective Lieutenant Lima's recommendation that the charges against the Appellant were "not sustained". She asserted that the 2021 charges and the 2022 charges cited different BPD rules – the original IAD report had focused on violation of the rule prohibiting "neglect of duty" and "unreasonable judgment" versus "conduct unbecoming" and violation of the Canons of Ethics cited in the 2022 report (which could apply to

21

both on-duty and off-duty behavior). She agreed that the "tweets" alone were a "grey area" and could be considered protected political speech but, taking the "totality of the day" into account, she said she agreed with Deputy Superintendent's Owens's conclusion that the Appellant's attendance at the January 6, 2021 rally went "beyond the intended scope" of his approved FMLA leave and that he had sent "incendiary tweets condoning the violent insurrection." She said that "[o]nce Deputy Owens had put it all together, it just kind of came together, and it kind of clicked for me" that the Appellant's trustworthiness as a BPD police officer (both within the BPD and with the public) had been compromised by the "totality" of his actions which amounted to conduct unbecoming in violation of Rule 102, Section 3 and a breach of the public trust that reflect unfavorable on the BPD in violation of the Public Integrity Policy. (*Tr.I:142-161 [Dottin]*)

61.  After the charges against the Appellant were approved, the Bureau of Professional Standards audit review unit researched the records and prepared a comparator memo containing a synopsis of what purported to be comparable examples of "Discipline Administered in Similar Cases"; here, two prior cases involving violations of Rule 102 - Conduct Unbecoming and Canon 8 of Rule 113 - Public Integrity Policy. (*Resp.Exhs.34 & 46; Tr.I:167-170 [Dottin];Tr.II:115-116 [Owens]*)

62. In the Appellant's case, the comparator memo used to measure the level of discipline to be imposed on the Appellant included two examples of allegedly similar misconduct in which termination was imposed or pending Police Commissioner approval:

- BPD Police Officer MG – termination recommendation pending for posting the comment "Rats Get Bats" on the FBI's website to mock the request of the FBI's outreach to the public seeking to identify individuals who took part in the insurrection on January 6, 2021. This was not the officer's only comment that suggested he condoned violence. After the killing of Breonna Taylor in a botched police raid in Louisville, the officer purportedly

downplayed the shooting by posting something to the effect: "This is what happens when you hang out with drug dealers." (*Resp.Exh.34;Tr.III:157[Owens];Tr.II;120[Owens]; Tr.IV:57-59, 110,134-135 [Chrispin]*)[13]

- BPD Police Officer JB – Officer terminated after referring to a black university professor he had arrested using a repugnant racial stereotype.  The case received national notoriety and led to President Obama inviting the officer and the professor to the White House for a "beer summit." (*Resp.Exh.34;Tr.III:157-159[Owens];Tr.IV:110-118 [Chrispin]*)

63. Superintendent Dottin, Deputy Superintendent Owens and a representative of the Office of Legal Advisor reviewed the comparator memo, together with the Appellant's prior disciplinary record (none) and the severity of the offense, at a "Green Folder" meeting at which they determined that termination from employment was the appropriate discipline. Their recommendation was then communicated to Police Commissioner Cox, who approved the recommendation to proceed with the Appellant's termination. (*Resp.Exh.46; Tr.I:167 [Dottin]; Tr.II:115-119,121-123 [Owens]*)

64. On January 30, 2023 and February 15, 2023, a hearing was convened before BPD Chief Administrative Hearings Officer Deputy Superintendent Richard Dahill on three alleged charges:

- **Misuse of FMLA leave** instead of taking "another type of day off" to attend the January 6, 2021 rally. **Specification I - Violation of BPD Rule 103, §3, Conduct Unbecoming.**

- **Posting six named tweets** on January 6, 2021 that were visible to the public and "support the capital [sic] riots and insurrection of the United States", "support the arrest of elected officials" and "divides individuals into 'traitors' and 'patriots' ", reflect unfavorably on the BPD and call into question the Appellant's fitness to serve as a BPD police officer and the Appellant's ability to perform his duties fairly, and without bias. **Specification II - Violation of BPD Rule 103, §3, Conduct Unbecoming; Specification III - Violation of BPD Rule 113, §5, Canon 8**

The BPD was represented by counsel, introduced 35 exhibits and called Deputy Superintendent Owens and Sergeant Detective Antunez.  The Appellant was represented by counsel, introduced 18

---

[13] The evidence did not disclose whether Officer MG's post disclosed his affiliation with the BPD or whether he was identified as such by the BPD through other means.

exhibits, called Superintendent Dottin, Deputy Superintendent Chrispin and testified on his own behalf. (*Resp.Exhs.30, 32, 33 & 46*)

65. On March 7, 2023, Deputy Superintendent Dahill issued his report. He rejected the BPD's argument that the Appellant misused his FMLA leave and concluded that Specification I was NOT SUSTAINED.  He did find that the Appellant's twitter posts "indicate that the Appellant is unable to impartially and without bias perform his duties" as a sworn BPD police officer, "indicates a rigid viewpoint that does not recognize the duty to protect the rights of all individuals", showed "lack of a commitment to preserving life and property", "impaired the working relationships among members of the Department, damaged the Department's reputation, interfered with the Department operations as evidenced by the numerous media reports concerning Officer Abasciano's conduct", and "negatively impacted the Department's relationship with the community and damaged the Department's reputation."  Deputy Superintendent Dahill considered, but rejected, the Appellant's arguments that his tweets were expressing his First Amendment rights as a private citizen and that he was being singled out and treated more harshly than other officers because his opinions were unpopular within the BPD.  Deputy Superintendent Dahill concluded that the BPD had proved the charge of violation of Rule 102, §3 and Rule 113, §5, Canon 8. (*Resp.Exh.32*)

66. By letter dated March 13, 2023, Police Commissioner Cox, without further inquiry of the Appellant or any other BPD member, found that "your social media posts describing individuals that stormed the Capital [sic] building as 'patriots' calls into question your ability to police members of the community in an unbiased and objective manner.  I also find that this conduct impairs the operation of the Department and its employees by damaging the Department's reputation and trust within the community . . . and your conduct is detrimental to the mission of the Boston Polce Department."  Police Commissioner Cox concluded that the evidence at the hearing before Deputy

Superintendent Dahill established just cause to sustain Specifications II (Conduct Unbecoming) and Specification III (Canon of Ethics, Canon Eight) and informed the Appellant that his employment with the BPD was terminated "effective immediately." (*Resp.Exhs.33 & 46*)

67. The BPD hand-delivered a copy of the termination notice to the Appellant at his residence in New Hampshire, which is approximately a two-hour drive from the BPD headquarters, sometime in the late afternoon of March 13, 2024. (*Appellant's Opposition to BPD's Motion to Dismiss; E-mail from BPD counsel to Commission dated 10/16/2024*)

68. Upon receipt of notice of termination, the Appellant initiated steps to "buy back" his military service to give him 20 years of service, enough to file for a superannuation retirement. After doing so, he began to receive superannuation retirement benefits in or about May or June 2024, retroactive to March 13, 2023. (*Exhibit A & C, Appellant's Supplemental Post-Hearing Memorandum*)

69. By letter dated January 26, 2024, the Boston Retirement System informed the Appellant:

> This is to notify you that the Boston Retirement Board in conjunction with the Public Employee Retirement Administration Commission has approved your application for an <u>Accidental Disability Retirement</u> to take effect as of the close of business on <u>03/13/2023,</u> in accordance with Massachusetts General Laws, C[hapter] 32, §7.

(*Resp.Exh.22; Resp.Exh.30,Vol.II [Appellant]; Email from Appellant's Counsel 5/28/24; Exhibit C, Appellant's Opposition to BPD's Motion to Dismiss*)

## **Evidence at Commission Hearing of BPD's Disparate Treatment of Protected Speech**

70. The Appellant called two witnesses with direct personal knowledge of the Appellant's work ethic and on-the-job performance: (a) Capt. Martin supervised the Appellant's work at District 2 and District 11 for about five years, as described earlier; (b) Deputy Superintendent Chrispin was a Board Member and past President of the Massachusetts Association of Minority Law Enforcement Officers (MAMLEO) and knew the Appellant from his participation at a number of MAMLEO board meetings. (*Tr.IV:54 [Chrispin]; Tr.IV:62-64 [Martin]*)

71. Capt. Martin knew the Appellant's political views were "very conservative", but he never observed the Appellant expressing them to members of the public in his capacity as a police officer. He never knew the Appellant to treat any members of the public in an unfair or disrespectful manner or treat any police officer or member of the community in a biased way. He did not ever observe the Appellant treat anyone differently or disrespectfully or unfairly because they had different political views. As his supervisor, he never saw that the Appellant's political views prevented him from performing any of his duties as a BPD police officer. (*Tr.IV:65-70 [Martin]*)

72. During the Commission hearing, I asked Capt. Martin to review the Appellant's tweets sent on January 6, 2021 and asked whether they impacted his opinion about the Appellant's ability to perform his job as a police officer. Capt. Martin responded:

> "Basically, these tweets . . . are extremely, extremely passionate about politics. He is very emotional, but looking at these, I don't see how, given my history, my experience, and the time I supervised and worked with Joe, I don't see how this – I have never seen this impact his ability to do his job or how he treated anybody."

(*Tr.IV:85-86 [Martin]*)

73. Deputy Superintendent Chrispin did not see the Appellant's tweets calling people patriots and traitors as a work-related problem, because "I don't think that necessarily speaks to his ability to do his job. I think a lot of these things are based on opinion, and they are somewhat subjective . . . because obviously Deputy Superintendent Owens disagrees with me. . . . I just didn't think it rose to that level." He agreed that it was a "tough case" but "we have to strike a balance in terms of what amounts to a threat, what amounts to conduct unbecoming, and what are First Amendment rights" to express thoughts or ideas. He did not read the Appellant to be "encouraging inducing violence, encouraging violence or condoning violence", which he believed was the threshold that needed to be crossed in order to rise to the level of a violation of BPD rules. (*Tr.IV:50-56, 101-102 [Chrispin]*)

74. Save for the anonymous message from the person whom the Appellant identified as harboring personal animus against him, no BPD police officers or City of Boston employee complained about the Appellant's tweets or refused to work with him. The BPD received no confirmed complaints or protests about the Appellant from members of the public, even after media reports had disclosed his identity. (*Tr.IV:102-104 [Chrispin]; Tr.V:111-114, 145-148 [Appellant]*)

75. Deputy Superintendent Chrispin considered the rules governing "conduct unbecoming" and "unreasonable judgement" to encompass a broad array of comparable conduct and a violation of either of those rules was not necessarily reason for termination. (*Tr. IV:100-101, 141-142 [Chrispin]*)

76. The Appellant introduced several examples of other alleged conduct unbecoming by BPD officers that resulted in lesser discipline or no discipline, including:

- A BPD officer who received a three-day suspension for leaking sensitive information about a homicide investigation; and

- A BPD officer who received a 60-day or 90-day suspension after being caught stealing.

When asked about the latter discipline, Superintendent Dottin agreed that it was "fair" to say that, at the BPD, "committing a crime of stealing on camera . . . gets you a brief suspension, but speech that you categorize as political gets you terminated." (*Tr.I:163-165 [Dottin]*)[14]

77. BPD officers receive training on the freedom of speech provided to citizens under the First Amendment to the U.S. Constitution and the Massachusetts Declaration of Rights, but that training does not encompass standards governing protected speech by BPD officers speaking as private citizens on matters of public concern, and BPD officers do not appear familiar with those specific standards. (*Tr.I:150-157[Dottin]; Tr.II:126 [Owens]*)

---

[14] The Appellant also introduced summaries of incidents involving alleged serious misconduct by BPD officers, some of which received public attention, including some that were the subject of a public protest, but which did not always result in termination. Given the limited details provided about these other examples, I do not give them much weight. (*See Appellant's Exhs.30-44 & 49*)

## APPLICABLE CIVIL SERVICE LAW

A tenured civil service employee may be disciplined for "just cause" after due notice and hearing upon written decision "which shall state fully and specifically the reasons therefore." G.L. c. 31, § 41. An employee aggrieved by the decision may appeal to the Commission. G.L. c. 31, § 43. Under section 43, the appointing authority carries the burden to prove "just cause" for the action taken by a "preponderance of the evidence." Id. See, e.g., Falmouth v. Civ. Serv. Comm'n, 447 Mass. 814, 823 (2006); Police Dep't of Boston v. Collins, 48 Mass. App. Ct. 411, *rev. den*., 726 N.E.2d 417 (2000).

In performing its review, the Commission hears evidence and finds facts anew. Examining an earlier but substantially similar version of the same statute, the Appeals Court wrote: " 'We interpret this as providing for a hearing de novo upon all material evidence and a decision by the commission upon that evidence and not merely for a review of the previous hearing held before the appointing officer. There is no limitation of the evidence to that which was before the appointing officer.' " Leominster v. Stratton, 58 Mass. App. Ct. 726, 727-28 (2003).

The Commission determines just cause for discipline by inquiring "whether the employee has been guilty of substantial misconduct which adversely affects the public interest by impairing the efficiency of public service." School Comm. v. Civ. Serv. Comm'n, 43 Mass. App. Ct. 486, 488, *rev. den*., 426 Mass. 1104 (1997). See also Doherty v. Civil Serv. Comm'n, 486 Mass. 487, 493 (2020). It is also a basic tenet of merit principles, which are the core protections of civil service law, that discipline must be remedial, not punitive, designed to "correct inadequate performance" and "[only] separating employees whose inadequate performance cannot be corrected." G.L. c. 31, § 1.

The Commission must take account of all credible evidence in the entire administrative record, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law,

including whatever would fairly detract from the weight of any particular supporting evidence. See Comm'rs of Civ. Serv. v. Municipal Ct. of Boston, 359 Mass. 211, 214 (1971), citing Selectmen of Wakefield v. Judge of First Dist. Ct., 262 Mass. 477, 482 (1928); Massachusetts Ass'n of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 264-65 (2001). It is the purview of the hearing officer to determine credibility of testimony presented to the Commission. "[T]he assessing of the credibility of witnesses is a preserve of the [commission] upon which a court conducting judicial review treads with great reluctance." Leominster v. Stratton, 58 Mass. App. Ct. at 729. See Embers of Salisbury, Inc. v. Alcoholic Beverages Control Comm'n, 401 Mass. 526, 529 (1988); Doherty v. Retirement Bd. of Medford, 425 Mass. 130, 141 (1997).

Section 43 of G.L. c. 31 also vests the Commission with the authority to affirm, vacate or modify a penalty imposed by the appointing authority. The Commission is delegated "considerable discretion" in this regard, albeit "not without bounds" so long as the Commission provides a rational explanation for how it has arrived at its decision to do so. See, e.g., Police Comm'r v. Civ. Serv. Comm'n, 39 Mass. App. Ct. 594, 600 (1996) and cases cited; Falmouth v. Civ. Serv. Comm'n, 61 Mass. App. Ct. 796, 800 (2004); Faria v. Third Bristol Div., 14 Mass. App. Ct. 985, 987 (1982) (remanded for findings to support modification). However, in the absence of "political considerations, favoritism, or bias," the same penalty is warranted "unless the commission's findings of fact differ significantly from those reported by the town or interpret the relevant law in a substantially different way." Falmouth, 447 Mass. at 824.

**ANALYSIS**

**Jurisdiction**

In several prior decisions, the Commission decided that it lacked jurisdiction to hear appeals brought to contest the just cause for the discipline of civil service employees who had retired (either

prospectively or retroactively) <u>prior</u> to the date on which the employee was discharged or the suspension ordered to be served. <u>See</u> <u>Fiore v. Massachusetts State Police</u>, 27 MCSR 136 (2014) (trooper retired on accidental disability effective October 16, trial board finding of misconduct October 18, trooper honorably discharged by reason of retirement October 22)[15]; <u>Bishop v. Department of State Police</u>, 23 MCSR 613 (2010) (retirement effective June 12, suspension ordered on June 12 to begin on June 13); <u>Gray v. Department of State Police</u>, 21 MCSR 252 (2008) (retirement effective October 31, order of suspension effective November 1); <u>Grover v. Department of State Police</u>, 21 MCSR 153 (2009) (applied for retirement October 18, retirement effective October 20, order of suspension effective October 23); <u>Ford v. Town of Brookline</u>, 20 MCSR 369 (2007) (terminated on January 5, 2005, applied for accidental disability January 20, 2005, retirement approved retroactive to March 5, 2004, the last day appellant received compensation from the town); <u>Sheehan v. Town of Hudson</u>, 19 MCSR 15 (2006) (applied for retirement in September 2002, terminated in October 2003, retirement effective retroactively to December 2002).   As the Commission stated in <u>Sheehan v. Town of Hudson</u>, *supra*:

> "[T]he retroactive effect of the Appellant's retirement eliminates any harm done to his employment status, thus the Appellant is no longer aggrieved for the purposes of pursuing an appeal before the Commission. Therefore, the Commission lacks jurisdiction to hear this appeal." *Id.*

On the other hand, the Commission has taken jurisdiction to hear just cause appeals of employees terminated <u>before</u> their retirement became effective. <u>See</u> <u>Swartz v. Bourne Fire Dep't</u>, 34 MCSR 356 (2021), *aff'd in relevant part sub nom.* <u>Town of Bourne v. Civil Service Comm'n</u>, 2022 WL 1982968 (Suffolk Sup. Ct. 2022) (disability retirement filed March 1, terminated August 22 with disability application pending, superannuation retirement approved effective August 24); <u>In re Boston Police</u>

---

[15] The <u>Fiore</u> appeal also raised issues concerning the alleged failure to reinstate the appellant after he had claimed to have recovered from his disability, claims that the Commission dismissed as untimely and a matter within the exclusive jurisdiction of the Superior Court. <u>Fiore</u>, *supra.*

Dep't Drug Testing Appeals, 26 MCSR 73, _aff'd on other issues_, 90 Mass. App. Ct. 462 (2016), _rev. den._, 476 Mass. 1104, 1106 (2016) (disciplinary appeals by terminated police officers, including one who subsequently retired); Garvin v. Department of State Police, 21 MCSR 292 (2008) (state trooper fired on July 9, retirement effective July 10); Silva v. Department of Correction, 20 MCSR 409 (2007) (termination on March 29, retirement effective March 30). See also Coderre v. City of New Beford, 36 MCSR 401 (2023), _appeal pending_ (Commission overturned January 25, 2022 discharge of Deputy Fire Chief, who had filed a still-pending disability retirement on Dec. 1, 2021, and who was approved retroactively for superannuation retirement effective January 25, 2022, which the retirement board deemed his "last day of active service.")

The precise factual situation involved here has not been previously presented—i.e., a just cause appeal from a termination that was effective on the same day as the retroactive effective date of a previously-filed involuntary disability retirement application. For several reasons, I conclude that under the specific circumstances of this appeal, the Commission correctly took jurisdiction of the appeal at the time it was filed and duly heard the merits of the appeal. It must retain jurisdiction and issue a decision on the merits.

First, although both the termination and the retirement have the same effective date, as a technical matter, the termination is more likely construed to precede the retirement. The Appellant's March 13, 2023 termination was issued on March 13, 2023 "effective immediately" whereas the retirement was effective "as of the close of business" on March 13, 2023. Moreover, the Appellant received tax-free 111F benefits through March 13, 2023 in the final paycheck, cut prior to that date and included with his termination letter; but 111F benefits cannot be paid "for any period after such police officer or fire fighter has been retired or pensioned in accordance with law". See G.L. c. 41, §111F, ¶1.

Second, unlike other appeals in which an appellant had control over the effective date of his or her retirement, the Appellant, here, was involuntarily retired on an application filed by the BPD.

Third, this is an appropriate case in which the Commission, once vested with jurisdiction, is warranted to exercise sound discretion to retain it to redress this Appellant's bona fide claim that his termination violated core constitutional principles and basic merit principles of civil service law, especially after that claim has been fully litigated on the merits and is ripe for decision by the Commission. See Swartz v. Bourne Fire Dep't, *supra*. See also Landreth v. Zoning Board of Appeals, 88 Mass. App. Ct. 1115 (2015), *rev. den*., 473 Mass. 1109 (2016) citing O'Dea v. J.A.L., Inc, 30 Mass. App. Ct. 449, *rev. den*., 410 Mass 1102 (1991) ("A court is not ousted of jurisdiction by subsequent events—jurisdiction once attached is not impaired by what happens later.").

Fourth, pursuant to the amendments to Chapter 31 enacted by Section 137 of Chapter 238 of the Acts of 2024, the authority of the Commission to grant relief in disciplinary appeals, G.L. c. 31, §43, ¶2 now reads:

> If the commission determines, by a preponderance of the evidence, that there was just cause for an action taken against such person, it shall affirm the action of the appointing authority and deny the appeal; provided, however, that *if the commission* does not so determine, it *shall reverse the action and allow the appeal, in whole or in part, and the person concerned may be returned to their position with or without loss of compensation or other benefits and subject to such other orders as the commission may deem appropriate to restore and protect the rights provided to such person under this chapter*; provided, further, that if the preponderance of the evidence establishes that the action was based upon harmful error in the application of the appointing authority's procedure, an error of law or upon any factor or conduct on the part of the employee not reasonably related to the fitness of the employee to perform in the position, *the commission shall allow the appeal, in whole or in part, and the person concerned may be returned to their position with or without loss of compensation or other benefits.* (*Emphasis added*)

Thus, the Commission now is enabled to craft a remedy in disciplinary appeals that does not necessarily require the restoration of compensation or other rights if warranted in the specific

circumstances of a particular appeal.  This additional flexibility allows the Commission more options

in an appeal such as this one, where the Appellant has subsequently retired.

In sum, the Commission must retain jurisdiction to decide this appeal on the merits. This decision

turns, therefore, to why the BPD has not proved by a preponderance of evidence that there was just

cause for the decision to discharge the Appellant on March 13, 2023.

**Applicable Law Governing Private Speech by Public Employees**

BPD Rules 102, Section 30 expressly acknowledges the right of all BPD members to participate

in public affairs, including, specifically to "[e]xpress opinions as private individuals on political

issues" and "attend political conventions, rallies and similar political gatherings as private

individuals." In addition, as a matter of law, "basic merit principles" of civil service law include a

requirement to assure "fair treatment of all applicants and employees in all aspects of personnel

administration without regard to political affiliation . . . and with proper regard for privacy, basic

rights outlined in this chapter and constitutional rights as citizens." G.L. c. 31, §1.  Thus, in almost

all circumstances, political speech and conduct that is protected by the U.S. Constitution and the

Massachusetts Declaration of Rights cannot be used as the basis for discipline of a tenured

employee. Put another way, the BPD may not discipline a tenured police officer under any other

BPD Rule for engaging in political speech or conduct to the extent that the speech or conduct falls

squarely within the employee's interest in freedom of speech recognized by BPD Rule 102 Section

30, and his constitutional rights and statutory protection provided under basic merit principles of

civil service law.  See, e.g., Rowe v. Civil Service Comm'n, 103 Mass. App. Ct. 1112 (2023) (Rule

23), *quoting* Rankin v. McPherson, 483 U.S. 378, 383 (1987).

However, a public employee's rights are not absolute, and they must accept certain limitations

on freedom of speech.  See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  To determine where

those limitations exist, Massachusetts law generally follows the federal law in matters of protected public speech and, accordingly, employs a three-prong framework. Pereira v. Commissioner of Social Services, 432 Mass. 251, 252 n.2, 257 n.15 (2000), *citing* Pickering v. Board of Educ., 391 U.S. 463 (1968); Connick v. Myers, 461 U.S. 138 (1983); Decotiis v. Whittemore, 635 F.3d 22, 29-30 (1st Cir. 2011).

First, it must be determined whether the employee was speaking "as a citizen upon matters of public concern" when making the statements at issue. Pereira, 432 Mass. at 257 (2000), *quoting* Connick, 461 U.S. at 147 (1983). If so, the second prong, known as the *Pickering* balancing test, requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568 (1968); DeCotis, 635 F.3d at 29. In performing that balance, the question becomes "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Garcetti, 547 U.S at 418. The third prong requires the employee to provide "sufficient evidence" that the protected speech was "a substantial or motivating factor" in the adverse employment decision. Antonellis v. Department of Elder Affairs, 98 Mass. App. Ct. 251, 260 (2020), *quoting* Guilloty Perez v. Pierluisi, 339 F.3d 43, 55 (1st Cir. 2003). If the employee satisfies that initial burden, the burden of persuasion shifts to the employer to prove that "it would have taken the same action regardless of the protected speech." *Id.*

## Summary of the Analysis

The issue before the Commission on the merits of this appeal is whether tweets sent by the Appellant on January 6, 2021 are protected speech or constituted misconduct that justified his termination. The uncontroverted evidence established that the Appellant's tweets satisfy the first

and third prongs of the *Pereira* framework, i.e.: (a) the Appellant's tweets were sent as a private citizen, while off duty on FMLA leave, using an anonymous handle from a Twitter account that did not identify the Appellant as a police officer; and (b) the BPD's decision to terminate the Appellant is grounded explicitly on the tweets he sent. Thus, the only disputed issue here arises under the second prong of the *Pickering* balancing test, i.e., whether, on balance, the Appellant's tweets are constitutionally protected private free speech or may be restricted by the BPD as qualified speech because they have been adequately shown to adversely affect the BPD's operations or mission.

After careful consideration of the entire record, I am persuaded by the preponderance of evidence that, applying the *Pickering* balancing test: (1) the Appellant's tweets are private political speech on matters of public concern that fit within the scope of BPD Rule 102, Section 30 and (2) the BPD has not established an adequate justification to restrict that speech in the interest of protecting the BPD's mission or operations. Therefore, the tweets cannot be sanctioned as "conduct unbecoming" under BPD Rule 102, Section 3 or as a violation of the BPD's Canon of Ethics under Rule 113, Canon 8.

This decision should not be construed to condone or turn a blind eye to the unconscionable criminal acts committed by those who stormed the Capitol on January 6, 2021. To be sure, January 6, 2021 was a dark day in American history. Most Americans watched in disbelief as some so-called "protestors" turned violent and assaulted Capitol police officers who fought valiantly to protect the Vice President, members of Congress, their staffs and family members. In my view, no amount of revisionism can change those facts.

Thus, I do not doubt that the BPD was understandably concerned to learn that two BPD Police Officers had attended the rally and that the Appellant had tweeted about it. The BPD's ACD

(criminal) investigation and an IAD internal affairs (rules and regulations) investigation into the Appellant's actions that day were entirely appropriate, including a forensic reconstruction of where he went and review of all 2500 tweets received by and sent from the Appellant's anonymous Twitter account. However, at the conclusion of those investigations, which spanned several months, the highest members of the BPD's management and command staff *cleared* the Appellant of any wrongdoing based on the findings of these two investigations.

Specifically, the BPD's initial ACD and IAD investigations credibly concluded: (1) the Appellant did not personally participate or condone the insurrection that took place that day; in fact, he left the scene at the Capitol immediately after he saw that others were beginning engage in what he considered inappropriate behavior; (2) his tweets did not threaten, advocate or condone violence; and (3) the tweets did not, and would not be likely to impair his ability to perform his job as a BPD police officer or otherwise impair the efficiency of the public service performed by the BPD.

More than a year later, the Appellant was terminated based on a "new" December 2022 paper review that reached *starkly different* findings. The December 2022 review is far less thorough, more subjective, exudes a tinge of being result-driven and fails to sufficiently explain how the two starkly different conclusions can be reconciled; moreover, it is not supported by the preponderance of the credible evidence introduced at the Commission hearing, as were the conclusions of the initial two 2021 investigations.

For example, the December 2022 report starts with the unsupported conclusion that it was "inaccurate" that the Appellant attended the protest as a private citizen, erroneously implying that, somehow, he was acting in his capacity as a BPD Police Officer.  This is simply not supported by the record.  Rather, as noted in the initial 2021 ACD and IAD reports, the Appellant never held

himself out as a police officer that day, he never referenced his job as a BPD Police Officer, and his Twitter handle did not reference his name, employer or occupation.

Accordingly, I give greater weight to the 2021 findings and testimony of Deputy Superintendent Chrispin than I do the 2022 findings and testimony of Deputy Superintendent Owens. I do not credit the distinction that Superintendent Dottin purported to make between the earlier two investigations and the "new" one, as the reason she changed her opinion from "Not Sustained" to "Sustained". I do credit the testimony of both Deputy Superintendent Chrispin and Capt. Martin that there is no significant difference in what facts constitute on-duty "neglect of duty/unreasonable judgment" proscribed by Section 2 of Rule 102 and "conduct unbecoming" proscribed by Section 3 of Rule 102.

In sum, the decision in this appeal comes down to choosing between conflicting reports, with starkly different conclusions, completed by the *same* Department at *different* times. Ultimately, the BPD's  2021 ACD and IAD reports were more thorough, more objective and more reflective of the *actual* facts associated with the Appellant's actions on January 6, 2021 as established by the five day de novo Commission hearing held before me. In short, the preponderance of the evidence presented at the Commission hearing supports the BPD's 2021 ACD and IAD findings and conclusions, in which the BPD concluded that the Appellant did *not* engage in misconduct on January 6, 2021 and that there was *not* just cause to justify any discipline against him.  Applying the *Pickering* balancing test and other applicable law outlined above to these findings and conclusions, the Commission must act to overturn the Appellant's termination.

**The Preponderance of the Evidence Favors the Appellant Under the *Pickering* Balancing Test**

First, to put the issue in perspective, it must be remembered that, as the BPD's initial two investigations concluded, the preponderance of the evidence showed that none of the

Appellant's tweets were intended to, and did not expressly, endorse or condone the violent insurrection that occurred at the Capitol on January 6, 2021. The Appellant never participated in that insurrection. In fact, the preponderance of the evidence established that the Appellant condemned, or at least disapproved of, the violence. When he saw that the rally had begun to turn violent, he left the Capitol grounds and went home.

Second, the Appellant's tweets are clearly matters of public concern facially protected by the First Amendment. I find credible the conclusions of the BPD's initial investigators who found that none of the tweets that the Appellant sent prior to, during or after attending the January 6, 2021 rally went so far as to "condone the violent insurrection" or "threaten" anyone. Even speech that is offensive and suggestive of hostile or aggressive behavior but does not rise to the level of a "true threat", does not lose its First Amendment protections. See In re Kendall, 712 F.3d 814, 825 n.8 (3d Cir. 2013) (describing narrow categories outside of which various forms of violent speech are protected: "true threats," incitement to "imminent[ ] lawless action," and "fighting words"); Bauer v. Sampson, 261 F.3d 775, 783–84 (9th Cir. 2001) ("Although [plaintiff's] writings have some violent content, they are hyperbole of the sort found in non-mainstream political invective and in context . . . are patently *not* true threats." (*emphasis* in original) (internal quotations omitted)); Fenico v. City of Philadelphia, 70 F.4th 151, 165 (2023) ("[E]ven the most deeply troubling speech may be of concern to the public and warrant First Amendment protection—depending on the facts of the case. While it carries the potential to be inflammatory, [even] speech touching on race relations is "inherently of public concern." citing *Connick*); Munroe v. Central Bucks Sch. Dist., 805 F.3d 454, 470 (3d Cir. 2015), *as amended* (Oct. 25, 2019)https://www.westlaw.com/Link/Document/FullText?findType=Y&serNum=2037077980&pubNum=0000506&originatingDoc=I7bdba9c0063911eea0fbd6e62288d3fa&refType=RP&fi=co_pp

_sp_506_470&originationContext=document&vr=3.0&rs=cblt1.0&transitionType=DocumentItem

&contextData=(sc.Search) ("humor, satire, and even 'personal invective' could be used in order to

make or embellish a point about a matter of political, social or other concern to the community");

Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (finding that accusing the County Sheriff he

worked for of cronyism was political speech but not his statement that the Sheriff should be

assassinated in a "Hitler-style" coup); Locurto v. Giuliani, 447 F.3d  159, 183 (2006) ("Whatever

our own views of the quality and prudence of the plaintiffs' chosen means of expression,

commentary on race is, beyond peradventure, within the core protections of the First Amendment.");

Guilloty Perez, 339 F.3d at 55 ("the mere fact that the statements [made by the plaintiff] were

erroneous does not remove them from the Constitution's protection; erroneous remarks are an

inevitable by-product of unrestrained public debate . . . . Unless [the plaintiff] 'knowingly or

recklessly made false statements' the subsequent determination that his allegations were untrue will

not deprive them of their constitutional protection." [Citations omitted])

   Third, having concluded that the Appellant's tweets constitute speech on a matter of public

concern (i.e., the 2020 election and its aftermath), the question remains: may these tweets,

although constituting intrinsically protected speech, be the subject of discipline because the value of

the Appellant's speech on the matters of public concern contained in the tweets is outweighed by

evidence of the harm that his tweets have done, or may do, to the mission or operations of the BPD?

   In assessing whether any of these tweets crossed the line into misconduct that warrant

discipline of the Appellant, the *Pickering* balancing test calls for a "sliding scale" approach. As

stated in Fenico, *supra*:

> The inquiry into the protected status of speech is a question of law, not fact. [Citation]
> However, it is a question of law that nonetheless requires a robust factual basis, given that
> *Pickering* sets forth a uniquely "particularized" balancing test, not a simple burden-shifting
> threshold.  [quoting Connick]. . . .[T]he more substantially an employee's speech involves

matters of public concern, the higher the state's burden will then be to justify taking action, and vice versa    . . ." As this Court has recognized, the public concern inquiry "involves a sliding scale in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public [quoting <u>Monroe</u>]."

*Id*., 70 F.4th at 162.

Thus, as one part of the *Pickering* balancing test, the intensity of inflammatory and insulting speech can be factored into account in considering the weight to be given to the Appellant's interest to speak freely. In <u>Hussey v. City of Cambridge</u>, 720 F.Supp.3d 41 (D.Mass.), <u>appeal pending</u> (1st Cir. 2024), the Court upheld a four-day suspension of police officer, giving diminished weight to the "insensitive, disparaging or dehumanizing" comments that protested the naming of police reform legislation for George Floyd. The Court's analysis bears noting:

> <u>*Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance.*</u>" [citations omitted] . . .The post [by Hussey] called George Floyd "a career criminal, a thief and druggie." . . . . Even if the term [druggie] itself is not inherently derogatory, here it was used in a derogatory fashion. . . .

> <u>*However, the value of Hussey's post is not as diminished as it would have been had Hussey used lewd, vulgar, or obscene terms. [citation omitted] . . .The term "druggie" may be a pejorative and offensive term, but it is neither profane nor obscene*</u>. Notably, both Commissioner Bard and Elow agreed that the term does not have any racial connotation. [citation to Record]. <u>*The other words used by Hussey are commonplace terms*</u>.

*Id*, 720 F.Supp.3d at 55. <u>See also</u> <u>Hernandez v. City of Phoenix</u>, 43 F.4th 966, 979 (9th Cir. 2022) (police officer's social media posts that insulted racial and religious minorities occupied "a much lower rung on the First Amendment hierarchy" and "touched on matters of public concern in only the most limited sense"); <u>Bennett v. Metropolitan Gov't of Nashville,</u> 977 F.3d 530, 538-39 (6th Cir. 2020), <u>*cert. den.,*</u> 141 S.Ct. 2795 (2021) (use of n-word in social media post did not receive "highest rung" of protection and consequently required a lower showing of disruption to justify employer's adverse action).

The other factor in the <u>*Pickering*</u> balancing test is whether the offensive speech bears a nexus, based on evidence, to some negative effect on the operations of the BPD. While evaluating the

government's interest, the law considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388, citing Pickering, 391 U.S. at 570-573.

Here, no credible evidence was presented to establish that the Appellant's tweets caused any internal disruption in the BPD's operations. Thus, this case lacks any similarity to other cases that have come before the Commission in which the problematic speech makes unambiguously false, racist, scurrilous, or otherwise reprehensible claims against the public employer or its employees. See, e.g., Rowe v. Civil Service Comm'n, 103 Mass. App. Ct. 1112 (2023) (Rule 23); Roca v. City of Holyoke, 36 MCSR 172 (2023), aff'd, 2024 WL 4475681 (MA Super. Ct. Sept. 11, 2024). See also, Guilloty Perez, 339 F.3d at 53-54 (noting the importance of "discipline, maintenance of harmony among coworkers and close personal relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency" and "courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests" but "[t]here is no evidence in the record that fellow agents had lost faith in [the plaintiff] or were unwilling to work with him because he had lodged complaints about improprieties in the department").

Rather, the BPD argues that the Appellant's tweets threatened the BPD's functions because his (misinformed) political view that the 2020 election was stolen could have jeopardized public trust in the Department by the great majority of Bostonians who disagreed with that allegation. Government employers, especially public safety employers, must have "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First

Amendment." <u>Connick</u>, 461 U.S. at 146. The Court must give "substantial weight to government employers' reasonable predictions of disruption" and gives "greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." <u>Waters v. Churchill,</u> 511 U.S. 661, 673 (1994). <u>See also Locurto</u>, 447 F.3d at 178 (2d Cir. 2006) ("[I]n considering how to respond to the plaintiffs' actions, Giuliani, Safir, and Von Essen were driven largely by concerns over the public perception of the NYPD and FDNY").

Still, the BPD's judgment must be based on some <u>evidence</u> and cannot rely on speculation alone to justify its actions. <u>Moser v. Las Vegas Metro. Police Dep't,</u> 984 F.3d 900, 909 (9th Cir.) ("[A]n employer must provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable"); <u>Fenico</u>, *supra,* 70 F.4th at 166 ("[A]n employer must still establish likely disruption through record support, and courts have long required more than 'unadorned speculation as to the impact of speech.' ") *quoting* <u>Hall v. Ford</u>, 856 F.2d 255, 261 (D.C. Cir. 1988)).

In <u>Flanagan v. Munger</u>, 890 F.2d 1557 (10th Cir. 1989), the Court held that a police chief violated police officers' First Amendment rights by prohibiting the officers from owning a video store which rented out adult films. In overturning the district court's decision that the officers had failed to show that their First Amendment rights outweighed the department's concern that "reaction by offended members of the public would adversely impact its external relations and operations", the Court stated:

> The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason *may not* cooperate with law enforcement officers in the future. . . . *[A]pprehension of disturbance is not enough to overcome the right to freedom of expression." [Citations].*

<u>Id</u>., at 1566-67 (*emphasis added*).

Here, most of the Appellant's tweets about the January 6, 2021 rally (see Finding nos. 17, 19,

42

20, 22, 23, 24 & 25) were sent before he left the rally to walk to the Capitol grounds, and before he had any notice whatsoever that the rally had turned violent. These tweets focused <u>entirely</u> on the Appellant's <u>political</u> objective of promoting the <u>rally</u> and exhorting <u>elected</u> <u>officials</u> (the Congress and the Vice President) to honor there oath of office and "choose" what the Appellant was calling the patriotic path – sending disputed electoral votes back to the states. These particular tweets (albeit controversial, and, in the view of many, patently wrongheaded) are not directed at the BPD or its employees and do not involve any racial or otherwise vulgar, profane or obscene subject matter. They are classic examples of protected political speech.

One of these tweets (Finding Nos. 19) and two others sent by the Appellant after arriving at the Capitol (Findings 28 & 30) are closer calls and could be construed to deserve heightened scrutiny under the _Pickering_ balancing test. To be sure, some of the language in these tweets is particularly harsh – i.e., accusing Vice President Pence of and the "Political Elitest Class" of treason that led to the "murder of an innocent girl" and has "killed the republic". However, these tweets also expressed a theme similar to his earlier tweets:  what the Appellant considered betrayal by elected officials whom the Appellant (erroneously) was misled into believing had violated their oaths of office. They do not express animosity toward any members of the BPD or any individual, group or class of Boston citizens or officials.

- <u>Finding No. 19</u> –The 5:53 a.m. tweet on January 6, 2021 responding to the Georgia Secretary of State: "I can't wait to see you dragged away in handcuffs."

- <u>Finding No</u>. 28 - The 3:54 p.m. tweet to Vice President Pence:  "I hope you never sleep well again @VP your Treasonous Act lead [sic] to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @LLinWood was right about you all along"

- <u>Finding No. 31</u> – The 5:22 p.m. tweet, while on the road home: "What I saw in [sic] today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots and Law Enforcement trying to do their jobs in a no win [sic] position. I fear this Treasonous election has killed the republic.

This scenario is inapposite to those cases in which a public employer established the requisite actual or reasonable expectation of a loss of the public trust required to override an employee's right freedom of expression. Those cases of "external" disruption that have met the *Pickering* balancing test have involved government employees who publicly express racist bias or sexually deviant behavior, not pure political speech. See, e.g., Locurto, 447 F.3d 159 (2d Cir. 2006) (public demonstration led by Al Sharpton against police officers who operated a parade float mocking Blacks); Melzer v. Board of Education, 336 F.3d 185 (2003) (parental furor over employment of a self-described pedophilic public high school teacher); Hussey v. City of Cambridge, 720 F.Supp.3d 41 (D.Mass.), appeal pending (1st Cir. 2024) (protest by local NAACP to police officer's disparagement of George Floyd). Despite extensive research, I found no comparable example in which just cause was found to discipline a police officer or other public employee for expressing unpopular political opinions of the kind or tone involved here.

In sum, the BPD failed to meet their burden of producing evidence to prove that any BPD personnel, Boston employees, or members of the public (save for the Appellant's one nemesis) protested any of the Appellant's tweets, including the three more severely critical ones singled out above, or voiced any complaints about him. The BPD's own command staff took different views about the risk of disruption that these tweets had on the BPD's ability to fulfil its public mission.[16] Those who knew the Appellant professionally provided credible evidence of his ability to keep his politics from having any influence on his ability and duty to do his job as a BPD police officer. Neither Deputy Superintendent Crispin nor Captain Martin saw the

---

[16] Deputy Chief Owens was reluctant to tie any single tweet to a violation of BPD rules. When specifically asked about the tweet expressing the Appellant's hope that Gabriel Stealing would be "dragged away in handcuffs", even Deputy Chief Owens unequivocally agreed *that* particular tweet was, in fact, protected by Section 30 of Rule 102 (*See Tr.III:92-97*).

Appellant's tweets as conduct unbecoming. Hearty disagreement by those in positions of authority can generally form no basis for employment discipline. <u>See</u>, <u>e.g.,</u> <u>Hayes v. Massachusetts. Bay Transp. Auth.</u>, 498 F. Supp. 3d 224, 234 (D. Mass. 2020) ("[V]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.") (quoting <u>Rankin</u>, 483 U.S. at 384). It becomes a slippery slope when personal political differences, consciously or unconsciously, begin to influence decisions about employees' professional careers and capabilities in the workplace.

**<u>Other Factors</u>**

I briefly address two remaining issues raised by the parties.

First, I find that the two comparators used by the BPD to justify the Appellant's termination are inapposite. BG's comments mocked the FBI's interest in identifying people who participated in the insurrection on January 6, 2021, and belittled the murder of an innocent victim of a botched police raid.  JB's misconduct involved unambiguously racist remarks about a Black man whom he arrested. I find more significant the examples raised by the Appellant involving officers who engaged in serious on-duty misconduct (compromising an investigation; stealing) and received only suspensions.

Second, I have considered the fact that the BPD's Rules and Procedures did not, and apparently still do not, include a specific social media policy. This fact, however, does not change the analysis. It would behoove the BPD, however, to review its policies and determine whether promulgation of a social media policy would serve the interests and the mission of the BPD in the future.

**<u>The Appellant's Alleged Procedural Violations</u>**

In addition to the substantive protected speech issue on the merits, the Appellant also asserted a number of procedural issues, including: (1) the resolution of the Appellant's discipline was unreasonably delayed and time-barred as a matter of law, in violation of G.L. c. 6E, §10(h), added as part of the law creating the Police Officer Standards and Training Commission (POST), which now requires that a police department complete its internal affairs investigation within one year; (2) the investigation and the discipline imposed was tainted by politically-motivated pre-disposition and conscious bias; and (3) the investigation was not thorough and enabled an anonymous complainant with an axe to grind against the Appellant to expose him and subject him to an investigation that would otherwise never have happened. As I have determined that the Commission must allow this appeal on the merits, the Commission need not decide these disputed procedural claims, as a resolution of these issues is not necessary to and would not change this Decision.

**Modification of the Discipline**

Finally, having found that the BPD did not have just cause to terminate the Appellant, I consider whether the Commission should exercise its discretion to modify the discipline. Basic merit principles require that discipline be consistently imposed, both within and across appointing authorities. See, e.g., Bliss v. Town of Wareham, 24 MCSR 246 (2011), *citing* Town of Falmouth v. Civil Service Comm'n, 447 Mass, 814, 823 (2006). Accordingly, under other circumstances, a modified discipline along the lines of the four-day suspension imposed in *Hussey* would be worthy of consideration for the reasons set forth in that case. Here, however, the BPD's initial investigation concluded that no discipline was warranted and, therefore, I conclude that allowing the appeal is the more appropriate result rather than a modification.

Moreover, as the Appellant is now retired, reducing the termination to a suspension of any length presently would appear meaningless and have no remedial effect.

**The Appropriate Remedy**

The remedy in this appeal must be designed to reflect the unique circumstances involved. In particular, the Appellant has not performed the duties of a police officer since July 2020.  He is currently totally disabled from performing those duties.  Prior to March 13, 2023, he had been on injured leave and receiving 111F benefits, which equal payment of base salary substantially tax-free, and, as he is now retired, he would not be eligible to receive such benefits after March 13, 2023. See G.L. c. 41, §111F, ¶1.[17]

Moreover, the Appellant has been receiving accidental disability retirement benefits pursuant to G.L. c. 32, §7, effective March 13, 2024, which are 72% of his base salary, also substantially tax free, and are at least equivalent to or better than the base salary he would earn as a full-duty BPD police officer. (See *BPD's Reply Memorandum to Appellant's Supplemental Post-Hearing Memorandum, pp. 3-5*)

Under these circumstances, the Commission is warranted in allowing his appeal without compensation or benefits for the period after March 13, 2023, pursuant to G.L. c. 31, § 43, ¶ 2 (as amended effective November 20, 2024).

The Appellant has also asserted a claim for reimbursement of his attorneys' fees. The Appellant is entitled to seek reimbursement from the BPD for the statutory fees set forth in G.L.

---

[17]Should the Appellant have any basis to believe otherwise, his remedy to seek continuation of such 111F benefits would lie in another forum. See  Boutin v. City of Westfield, Docket No. 2079CV0114 (Hampden Sup. Ct. 2020) (granting preliminary injunction to restore 111F benefits). See generally Jordan v. City of Lynn, 25 MCSR 100 (2012) (addressing distinction between civil service reinstatement rights of recovered disability retiree and reinstatement rights under retirement law over which Commission does not have jurisdiction).

c. 31, § 45 (as amended effective November 20, 2024). Under the amendment to Section 2(e) of Chapter 31, enacted in Section 112 of St. 2024, Ch. 238, the Commission is authorized to award additional attorneys' fees in certain cases in which the Commission makes a finding that the appointing authority acted in bad faith, but I find no basis to make such a finding here.

## **<u>CONCLUSION</u>**

For all of the above reasons, the BPD's Motion to Dismiss is ***<u>denied</u>***. The appeal of Joseph Abasciano, Docket No. D1-23-033, is hereby ***<u>allowed</u>***. The Appellant's termination is vacated. For the reasons of the Appellant's disability status and involuntary disability retirement described above, the Commission determines that the appeal is allowed without requiring reinstatement at this time or allowing the Appellant compensation or benefits to which he might be entitled pursuant to Chapter 31 for the period after March 13, 2023. Nothing in this decision is meant to permit or preclude the Appellant from pursuing compensation or benefits to which he may now, or at some future time, claim to be entitled in another forum under the requirements of laws other than Chapter 31 (including, without limitation, Massachusetts retirement laws).

Civil Service Commission

*/s/ Paul M. Stein*
Paul M. Stein, Commissioner

By 4-0 vote of the Civil Service Commission (Bowman, Chair; Markey, McConney and Stein, Commissioners) [Dooley, Commissioner not-participating] on December 19, 2024.

Either party may file a motion for reconsideration within ten days of the receipt of this Commission order or decision. Under the pertinent provisions of the Code of Mass. Regulations, 801 CMR 1.01(7)(l), the motion must identify a clerical or mechanical error in the decision or a significant factor the Agency or the Presiding Officer may have overlooked in deciding the case. A motion for reconsideration <u>does not</u> toll the statutorily prescribed thirty-day time limit for seeking judicial review of this commission order or decision.

Under the provisions of G.L. c. 31, § 44, any party aggrieved by this Commission order or decision may initiate proceedings for judicial review under G.L. c. 30A, § 14 in the superior court within thirty (30) days after receipt of this order or decision. Commencement of such proceeding shall not, unless specifically ordered by the court, operate as a stay of this Commission order or decision. After initiating proceedings for judicial review in Superior Court, the plaintiff, or his/her attorney, is required to serve a copy of the summons and complaint upon the Boston office of the Attorney General of the Commonwealth, with a copy to the Civil Service Commission, in the time and in the manner prescribed by Mass. R. Civ. P. 4(d).

Notice to:
Mark P. Gagliardi, Esq. (for Appellant)
Joseph A. McClellan, Esq. (for Respondent)