UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:24-cv-12654-ADB

JOSEPH ABASICANO,

    Plaintiff,

v.

CITY OF BOSTON; by and through its Treasurer, Ashley Groffenberger; MICHELLE WU; MICHAEL A. COX; PHILLIP OWENS; AND JOSEPH COPPINGER,

    Defendants,

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AS TO COUNT VII OF THE AMENDED VERIFIED COMPLAINT**

    The Defendants, City of Boston, Mayor Michelle Wu, Commissioner Michael A. Cox and Officers Phillip Owens and Joseph Coppinger, request that this court deny the Plaintiff's motion pursuant to the Fed. R. Civ. P. 56. as Civil Service Commission findings of fact and rulings of law are generally not binding in a subsequent civil suit. The hearings are administrative in nature, quasi-judicial, and lack procedural safeguards. They serve the limited purpose of determining policy and rule violations and whether there exists just cause for discipline. They are not a substitute for formal court proceedings.

    Allowing the administrative proceedings to bind the parties in subsequent litigation would force the parties to litigate the claims not as they are, but as they expect them to be. Only where the specific criteria for collateral estoppel have been met can the parties be bound by Civil Service Commission findings. The elements are specific and intentionally difficult to meet as

what the Plaintiff is requesting is to remove the authority of the Federal Court to litigate Constitutional claims and place it in the hands of a local administrative body.

For the reasons stated herein, the Court should deny the Plaintiff's Motion

## INTRODUCTION

On January 5, 2021, while on leave from his duties as a Boston Police Officer under the Family Medical Leave Act (FMLA), for the purpose of caring for his wife and newborn child, the Plaintiff left the Commonwealth and drove to Maryland. **Exhibit H[1] – Plaintiff's FMLA Application; Exhibit A, pp. 6, 10**. He spent the night in a hotel and attended the now infamous January 6, 2021 "Stop the Steal" rally the following morning in Washington D.C. **Exhibit A, pp. 10-11.**

While the Plaintiff attended the January 6th rally turned riot turned insurrection, the extent of his presence and participation are known only through his testimony and that of the other officer he attended with. In the weeks, days, and months leading up to the rally, the Plaintiff regularly tweeted[2] from an account the Plaintiff claims to have been anonymous. **Exhibit A, p. 14**. However, it is clear that others knew the account belonged to him and at least one of them complained about the nature of his tweets. *See* Civil Service Commission Appeal Hearing Transcript (Day 3), pp. 107-108. Plaintiff posted approximately 2,500 known tweets from this account over a period of months, averaging 10.4 tweets per day, the majority being

---

[1] In support of their response, the Defendants refer to the Plaintiff's previously submitted exhibits (Exhibits A-G), as well as additional exhibits appended to their response hereto (Exhibits H-L), and the excerpts from the Civil Service Commission Appeal Hearing Transcripts (Days 1-4), attached to the Defendants' Response to the Plaintiff's Statement of Material Facts and Proposed Additional Material Facts.

[2] The social media platform Twitter had its name changed to X on July 23, 2023. At the time of this incident, it was still identified as Twitter and "tweet" will be used throughout this case to denote a post on the social media platform.

incendiary, showing a lack of understanding of the law, the needs of the community he served, and a loss of his grasp of reality.[3] **Exhibit I – Tweet Analytics; Exhibit J – Tweets from mailboxjoe.**

After internal investigations conducted by the Boston Police Department, the Plaintiff was terminated from his employment on March 13, 2023. **Exhibit K – Notice of Termination.** The termination was premised on a number of tweets he sent during or close in time to his participation in the "Stop the Steal" activities on January 6, 2021. *Id.*

The Plaintiff appealed his termination to the Massachusetts Civil Service Commission where over the course of five days of hearings, the Commission determined, in its words, "whether certain tweets sent by the Appellant on January 6, 2021 while attending the so-called "Stop the Steal" rally in Washington, D.C., constituted substantial misconduct that warranted his termination as a Police Officer in the Boston Police Department (BPD)." **Exhibit A, p. 1.** In conducting this review, the Commission was limited to a determination of whether the Plaintiff violated BPD Rule 103 s. 3 Conduct Unbecoming and BPD Rule 113 s. 5 Canon Eight*:* *"Employees shall conduct their private affairs so as not to reflect unfavorably on the Boston Police Department, or in such manner as to affect their ability to perform their duties honestly, fairly and without impairment."* **Exhibit A, pp. 7-8.** Neither of these rules mentions the First Amendment or how it may impact their application.

In this matter, the Commission discussed the First Amendment in its analysis. However, the parties did not litigate its application, nor did they have incentive to. Over five days of hearings and six witnesses called, there were a total of ten questions asked about the First

---

[3] Analytics of the Plaintiff's Twitter account show the words and phrases most commonly used in his tweets are "election," "trump," "fraud," "president," "biden," ballots," "evidence," "coup," "breaking," "patriots," "people," "America," "votes," "ballots."

Amendment. In every instance, the witnesses, who had conducted the internal investigation and determination of rule violations, testified that they did not conduct a first amendment analysis and were not trained to do so. (Def. SUF, ¶¶ 54-63).

## ARGUMENT[4]

I. **The Specific Elements of Collateral Estoppel Are Not Met in This Case and the Defendants Cannot be Barred From Litigating the First Amendment Claim.**

In order to assert collateral estoppel, the Plaintiff must satisfy a very specific set of elements. The bar is high because, put simply, the Plaintiff is asking to remove constitutional decision-making authority from the Federal Court and place it in the hands of a local Commission. This provides limited protections for the litigants, limited discovery, varying rules around examinations, evidentiary standards, and limited power to subpoena documents or witnesses.

Issue preclusion and claim preclusion are different concepts with different elements that fall under the umbrella of res judicata. Whichever one the Plaintiff is attempting to apply, they fail for similar reasons.

Claim preclusion binds the parties by a final judgment, preventing relitigating of the matters that were or could have been adjudicated in the earlier action. See *Degiacomo v. City of Quincy,* 476 Mass. 38 (2016); *Kobrin v. Board of Registration in Med.,* 444 Mass. 837, 843 (2005). Claim preclusion requires that three elements be met – 1) the identity or privy of the parties to the present and prior actions are the same; 2*) the identity of the cause of action is the same*; 3) there was a prior final judgment on the merits. *Id (emphasis added).*

---

[4] A party opposing a properly supported motion for summary judgment must present *competent* evidence of record that shows a genuine issue for trial that is material to that party's claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52; 256 (1986).

On the other hand, issue preclusion prevents relitigating of an issue determined in an earlier action, where the same issue arises in the latter action between the same parties. *Id.* at 628. A party is precluded from relitigating an issue where 1) *there was a final judgment on the merits in the prior adjudication*, 2) the party against whom preclusion is asserted was a party (or in privity with a party), and 3) *the issue in the prior adjudication was identical to the issue in the current adjudication, was essential to the earlier judgment, and was actually litigated in the prior action. Id. (emphasis added).*

In establishing the elements of collateral estoppel, fairness to the defendant is an additional consideration. See *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331 (1979). Here, where the Plaintiff is asserting offensive collateral estoppel, the most important question is whether the Defendants "received a full and fair opportunity to litigate their claims." *Id.* at 332. In order to determine fairness, there are four main factors which the courts have considered:

1. an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding),

2. actuality of litigation (that is, that the point was actually litigated in the earlier preceding),

3. finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and

4. the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order.) See *Acevedo-Garcia v. Monroig*, 351 F. 3d 547 (1st Cir. 2003), quoting *Faigain v. Kelly,* 184 F. 3d 67, 78 (1st Cit. 1999).

**II.    The Claims and Issues Decided by the Civil Service Commission Are Not Identical to the Current Action**

The Plaintiff's Motion for Partial Summary Judgment must fail as the issues and causes of action decided by the Civil Service Commission are not identical to those in the current action. The Plaintiff is seeking summary judgment on his First Amendment retaliation claim against the City of Boston under 42 U.S.C. § 1983 (ECF Doc. No. 17). To determine whether the issues of this claim have been litigated, we must begin with a comparison of the elements of the claim and the elements which were litigated at the Civil Service Commission.

*First Amendment Claims*

Under a 42 U.S.C. §1983 claim, the challenged conduct must be attributable to a person acting under color of state law and the conduct must have worked a denial of rights secured by the Constitution or be federal law. *Soto v. Flores*, 103 F. 3d 1056, 1061 (1st Cir. 1997).

Here, the Defendant is alleging that his First Amendment rights were violated. (ECF Doc. No. 17). The speech of public employees is subject to additional scrutiny as "it is well settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out.'" Decotiis v. Whittemore, 635 F. 3d 22, 29 (1st Cir. 2011). In the public employment context, however, this right is not unlimited as explained by the Supreme Court in Garcetti v. Ceballos, 54 U.S. 410, 418 (2006), "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." This is because:

> [g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

*Garcetti*, 547 U.S. at 418-19.

Consequently, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Davignon v. Hodgson*, 524 F. 3d. 91, 100 (1st Cir. 2008) (*quoting City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).

In <u>Garcetti</u>, the Supreme Court articulated a two-pronged approach to interpret those constitutional protections that are accorded to public employee speech:

> "The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. <u>The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment.</u> A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."
>
> *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), (citations omitted)(emphasis added).

Under the *Garcetti* test, significant weight is given to the public employer's "reasonable predictions of disruption, even when the speech involved is on a matter of public concern'". *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951 (2006).

The First Circuit has crafted its own similar three-part inquiry necessary to determine whether an adverse employment action against a public employee violates First Amendment free speech rights:

> First, a court must determine "whether the employee spoke as a citizen on a matter of public concern. <u>Second, the court must 'balance…the interests</u>

>of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employer. Third, the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision. If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show it would that it would have reached the same decision even absent the protected conduct.

>*Decotiis v. Whittemore*, 635 F.3d 22, 29-30 (2011).

Police departments have a significant interest in ensuring a workplace based on respectful relationships with the population they serve and a respect for human differences. There is a strong interest in preventing employee speech that reflects intolerance of groups of people in the community served by the department. See *Bonnell v. Lorenzo*, 241 F.3d 800, 824 (6th Cir. 2001) (In reference to teacher language, the district has "strong interest in preventing employee speech that reflects intolerance of groups of people represented in its student body or staff." "…learning institution has strong interest in preventing" speech "that rises to a level of harassment – whether based on sex, race, ethnicity, or other invidious premise – and which creates a hostile learning environment").

In order to adjudicate these elements, a defendant may call members of the community, members of the department, public officials, and experts, to discuss how the Plaintiff's speech may cause distrust a disruption to his work in the community. None of the witnesses called at the Civil Service Commission hearing were non-law enforcement members of the community nor were any of the witnesses questioned at any length about community impacts of the Plaintiff's speech.

*Civil Service Commission Claims*

While the first and third elements laid out in *Whittemore* are clear, the second element, *"balance[ing]… the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employer,"* was not a part of the evidence at the Commission. *Id; see also* excerpts from Civil Service Commission Transcripts Day 1-5, attached hereto. The Civil Service Commission focused on the law as it applies to the Boston Police Department Rules and Procedure. See Exhibit A. There was virtually no testimony regarding the public's view of the tweets, internal views of the tweets, how the Plaintiff's misconstruing of the Constitutional and enforcement mechanisms of the law may impact his ability to enforce the Constitution in the community, or a whole host of other relevant areas of inquiry.

While this court will weigh the constitutional requirements of the First Amendment, the Civil Service Commission was substantially more limited in its inquiry. The Commission opens its inquiry by defining the scope of the decision:

> "The substantive issue presented in this appeal is whether certain tweets sent by the Appellant on January 6, 2021 while attending the so-called "Stop the Steal" rally in Washington, D.C., constituted substantial misconduct that warranted his termination as a Police Officer in the Boston Police Department (BPD)."

**Exhibit A, p. 1.**

The purpose of the hearings was not to conduct a First Amendment analysis, but to compare conduct to a very specific set of rules under BPD's Rules and Procedures, specifically addressing the following rules:

*Rule 102* The Conduct and General Rights and Responsibilities of Department Personnel. . .

*Sec.3. CONDUCT. Employees shall conduct themselves at all times both on and off duty in such a manner as to reflect most favorably on the Department. Conduct unbecoming an*

*employee shall include that which tends to indicate that the employee is unable or unfit to continue as a member of the Department, or tends to impair the operation of the Department or its employees.*

Rule 113 Public Integrity Policy

*Canon Eight: Employees shall conduct their private affairs so as not to reflect unfavorably on the Boston Police Department, or in such manner as to affect their ability to perform their duties honestly, fairly and without impairment.*
*(App.Exh.10) (emphasis added)*

**Exhibit A, pp. 6-7**

The Commission did not conduct an independent inquiry of First Amendment law, but applied the law to the BPD Rules, noting that "BPD may not discipline a tenured police officer under any BPD Rule for engaging in political speech or conduct to the extent that the speech or conduct falls squarely within the employee's interest in freedom of speech *recognized by BPD Rule 102 Section 30*, and his constitutional rights and statutory protection provided under basic merit principles of civil service law." **Exhibit A, p. 33.**

**III.     The Claim Was Not Actually Litigated at the Civil Service Commission**

The Plaintiff's argument must fail as the elements of a claim for First Amendment retaliation were not litigated at the Civil Service Commission. While the Commission attempted to integrate First Amendment analysis into its decision, the reality is that the Defendants did not have the opportunity to fully litigate the issue.

The Plaintiff's Complaint accentuates this point by making allegations in his Second Amendment Complaint that were not decided by the Commission. "Because there were no complaints by any police officer, City of Boston employees or members of the public about the January 6, 2021 tweets in which Abasciano commented upon matters of public concern, the efficiency of the public services of the City of Boston performs through the BPD – preventing crime, protecting and serving the community, and upholding the laws of the city, state, and

10

country – was not disrupted in any way. (ECF Doc. No. 17, para 445).

There was virtually no testimony or analysis on the efficiency of public services, impacts on his ability to prevent crime and protect the community, impacts on the Plaintiff's ability to service the community, and his ability to uphold the laws based on the inflammatory nature of his tweets. Each of the tweets raises issues that would require witness testimony from leaders in the community and BPD personnel to better understand their impact. The Plaintiff's tweets bring into stark question his understanding of the laws and the Constitution and at times his grasp of reality.

At 5:53 a.m. on January 6, 2021, Abasciano replied to a tweet from @GabrielSterling, in which Secretary Sterling offered an explanation for his actions, writing:

"I can't wait to see you dragged away in handcuffs."[5]

As a police officer, the Plaintiff should understand probable cause, due process, and use of force, yet he calls for public officials to be dragged away in handcuffs – not for breaking the law, but for disagreeing with his politics. One could question under what circumstances, absent probable cause, he believes it is appropriate to drag members of the community he polices away using his handcuffs.

At 6:44 a.m., Abasciano tweeted:

"MAGA Millions Patriots here in DC. Today is a day for choosing. Today there will be only two parties in America. Traitors and Patriots! #January6, #MAGA and #MarchForTrump"

At 6:44 a.m., before many people have arrived for the event, the Plaintiff tweeted about the number of participants in support of his view that people side with the opinions he is espousing. As a part of his job as a police officer, he is tasked with controlling crowds,

---

[5] The cited Plaintiff's tweets can be found in **Exhibit A, pp. 7-9** and **Exhibit K** and the rest of the tweets from his account "mailboxjoe" can be found in **Exhibit J**.

understanding security needs based on size and type of event. He is trained in crowd control and working large scale events, and yet his ability to estimate the number of people is terribly concerning. Official estimates put the entire crowd size at approximately 53,000.[6] The number of law enforcement and the security requirements of handling an event with 53,000 people is substantially different than an event with millions of people (i.e. the difference between a Red Sox Game and the Boston Marathon), and yet the Plaintiff doesn't seem to be able to differentiate.

In a stunning misuse of the word "traitor", the Plaintiff went on state that those who did not support the attempts to overthrow the democratic process were traitors. While the Capitol Police risked their lives to protect democracy, the Plaintiff's tweet would define them as traitors. Legal definition aside, in this one tweet, the Plaintiff branded most of the residents of the City that he was sworn to protect as traitors, a crime punishable by death.

While the Plaintiff can argue political hyperbole, the question for the purposes of this motion and his First Amendment claim is how these tweets impacted BPD operations, their mission, and the efficiency of the public service it performs. None of these issues were sufficiently litigated at the Civil Service Commission.

*At 8:14 a.m., Abasciano tweeted:*

*"Hey @senmajlder look out your window. Millions of Patriots are at your doorstep and we are watching. It is time for choosing. Are you a traitor or are you a Patriot? #MarchforTrump, #StopTheSteal and #PatriotParty."*

*At 12:40 p.m., while still at the rally, Abasciano tweeted:*

*"Everything that happens going forward @VP is now on your conscience. #1776Again, #MarchForTrump and #WeThePeople."*

---

[6] https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT-2-7.pdf#page=10

12

This tweet was sent before President Trump concluded his remarks at 1:10 p.m. Shortly thereafter, the Capitol riots occurred. "What happens going forward" is predictive of the coming riot. Whether he participated in the acts is irrelevant. The fact that he condoned what was happening raises questions about his ability to participate in the Boston Police mission to serve and protect the public.

At 3:54 p.m., Abasciano tweeted:

"I hope you never sleep well again @VP your Treasonous Act lead [sic] to the murder of an innocent girl and the death of America. You are not a Godly man. I guess @LLinWood was right about you all along."

At 5:22 p.m., while on the road home, Abasciano tweeted:

"What I saw in [sic] today frankly made me weep for our once great nation. The Political Elitist Class has successfully turned Americans against each other. Patriots and Law Enforcement trying to do their jobs in a no win [sic] position. I fear this Treasonous election has killed the republic."

This tweet is important in a couple of ways. First, the Plaintiff is discussing his views on law enforcement action on January 6th. Second, he is noting what he believes to be a potential end to the democratic republic of the United States. Once again, this public expression of his views could impact his ability to act as a police officer. If he believes the country is ceasing to exist, to what entity is he sworn to uphold the laws? These are serious questions that were not addressed during the Commission hearings.

Any impact on the efficiency of public services, a critical element in deciding a First Amendment claim, was not fully addressed by the Commission. See *Pickering v. Board of Educ.*, 391 U.S. 463 (1968) ("a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.") The Commission credits that the initial BPD ACD and IAD investigation concluded that the

Plaintiff's tweets would not "otherwise impair the efficiency of public services," however, there was no additional analysis, testimony, or impetus for the Defendants to further expand upon this claim as it was not critical to determination a violation of the BPD rules that were before the Commission for consideration.

While the Commission notes that "no credible evidence was presented to establish that the Appellant's tweets caused any internal disruption to the BPD's operations," the Defendants had no reason to present such testimony. **Exhibit A, p. 41.** The rules at issue do not define internal disruption as an element of a violation of the rules. **Exhibit A, pp. 6-7.** In fact, there was no testimony, questions to witnesses, or eliciting of information regarding internal disruptions at all, because the Defendants did not have a reason to do so.

    **A.**    **The Plaintiff's Threat of Lawsuit and First Amendment Retaliation Claims and Public Attention Does Create an Incentive to Litigate Issues Not Before the Civil Service Commission**

The Plaintiff's assertion that simply by sending an email raising a claim or media attention suggesting a claim, the Defendants are now incentivized to defend the position is preposterous. One could imagine a pandora's box that would open if the Plaintiff's counsel can simply raise a number of claims via email, phone call, or in the media and then suggest that this now requires the defendants to defend the claims at an administrative hearing with different elements or face estoppel down the road. Collateral estoppel operates in both directions, and one could imagine both sides attempting to create res judicata situations through informal communications only to have the courts review and interpret email and oral communication in later proceedings. The fact that the Plaintiff has raised a single email as evidence of the Defendants' incentive to litigate the claim only further shows the weakness of his position.

**B.     The Defendants' Limited Questioning About Public Trust Does Not Demonstrate an Attempt to Litigate a First Amendment Retaliation Claim.**

Over five days of hearings, the Plaintiff can only cite two pages, a total of three questions, in the transcripts to support his proposition that the Plaintiff's violation of public trust was litigated. (ECF Doc. No. 33, pp. 18-19). First, public trust is only one aspect of how the Plaintiff's speech can impact the entities operations. See *Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Decotiis v. Whittemore,* 635 F.3d 22, 29-30 (2011). Second, the Plaintiff cites to language in a specific Second Circuit decision, "loss of public trust," similar to the language in the three questions asked by the Defendant's counsel to suggest the Defendant had some grand plan to litigate the claims. See *Locurto v. Guiliani,* 447 F.3d 159 (2d Cir. 2006). This requires a stretch of the imagination. Had the Defendants been litigating this claim, the testimony would have been significant and the Defendants would have called officers on the street, uninvolved in the investigation, to testify to the public's perceptions and public leaders.

**C.     There Are Two Prior Administrative Hearings with Different Results**

Oddly, in his brief the Plaintiff suggests there are no prior adjudications determining the legitimacy of his termination. (ECF Doc. No. 33, p. 25). This is wrong. An administrative hearing was held by the Boston Police Department, taking place on January 30 and February 15, 2023, to determine whether the Plaintiff violated the same rules adjudicated in the Civil Service Hearing – R. 102 §3 and R. 113 §5. **Exhibit L – Report from Deputy Superintendent Richard Dahill**. The administrative hearing officer received 35 exhibits from the Defendant and 18 exhibits from the Plaintiff and heard from the same five witnesses as the Civil Service Commission. **Exhibit L, pp. 3-4.** The testimony and exhibits were almost identical to what was presented at the Civil Service Commission. See **Exhibits A and L.** The hearing officer sustained two violations of the Boston Police Rules and Regulations and found that the Plaintiff's conduct

"negatively impacted the Department's relationship with the community and damages the Department's reputation" noting that his social media posts may be construed by the public as "indicative that the certain employees of the Department fail to exercise their duties impartially or without bias." **Exhibit L, pp. 13-14.**

### IV. <u>Procedural Fairness Weighs in Favor of the Defendants and Dictates That the First Amendment Claim be Litigated in a Court Of Law</u>

The Plaintiff's motion must fail because under the *Parklane* fairness test, the issues cited for collateral estoppel were not *actually* litigated in the prior proceeding, nor were they essential to the final judgment. See *Parklane*, 439 U.S. at 331; *Acevedo-Garcia v. Monroig*, 351 at 575.

The Plaintiff makes repeated assertions that the Defendants were on notice of First Amendment claims through an email he sent them and media coverage and while the Defendants contest vetting these claims prior to the present proceeding, it's irrelevant, because the standard for fairness is whether the claims were *actually* litigated and they were not. *Id.* None of the witnesses who testified at Civil Service had the expertise, knowledge, or background to assess or testify to the First Amendment claims. Every one of them was asked a question about whether they did First Amendment analysis when they were conducting their internal investigations of the Plaintiff and their answers were a resounding no. *See* Defendants' Additional Statement of Material Facts, ¶¶ 54-63.

The internal investigation did not investigate First Amendment retaliation claims, the witnesses did not offer testimony about the elements of such claims, and they were never litigated, so the Plaintiff's argument must fail.

### CONCLUSION

The Plaintiff's attempt at offensive Collateral Estoppel should be denied as the issues, claims, and their elements surrounding the Plaintiff's First Amendment claims for retaliation

were not litigated in the Civil Service Commission, they were not central to the Commission's determination, and the Defendants have not had an opportunity to actually litigate them. The law and fundamental fairness dictate that the Defendants be allowed to actually litigate and defend the claims contained in Count VII of the Plaintiff's Complaint. Therefore, the Defendants respectfully request that this Court deny the Plaintiff's Motion for Partial Summary Judgment.

        Respectfully submitted,
        The Defendants,
        City of Boston, by and through its Treasurer, Ashley Groffenberger, Michelle Wu, Michael A. Cox, Phillip Owens, and Joseph Coppinger,
        By their attorneys,

        *Michael V. Glennon*
        Leonard H. Kesten, BBO# 542042
        Michael V. Glennon, BBO# 678977
        BRODY, HARDOON, PERKINS & KESTEN, LLP
        265 Franklin Street, 12th Floor
        Boston, MA 02110
        (617) 880-7100
        lkesten@bhpklaw.com
        mglennon@bhpklaw.com

DATED: July 1, 2025

## CERTIFICATE OF SERVICE

    I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing(NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

        */s/ Michael V. Glennon*
        Michael V. Glennon, BBO# 678977

DATED: July 1, 2025